UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :          **INDICTMENT**

     -v-                               :          S2 10 Cr. 228 (LTS)

DANIEL BONVENTRE,                     :
ANNETTE BONGIORNO,
JOANN CRUPI,                          :
     a/k/a "Jodi,"
JEROME O'HARA, and                    :
GEORGE PEREZ,
                                       :

            Defendants.           :

                                       :

- - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11 5 10

## COUNT ONE

**(Conspiracy to Commit Securities Fraud, to Falsify Records of a
Broker-Dealer, to Falsify Records of an Investment Adviser
and to Make False Filings With the SEC)**

     The Grand Jury charges:

### Relevant Persons and Entities

     1.   At all times relevant to this Indictment, Bernard

L. Madoff Investment Securities LLC, and its predecessor, Bernard

L. Madoff Investment Securities (collectively and separately,

"BLMIS"), had its principal place of business in New York, New

York.  BLMIS was a broker-dealer that engaged in three principal

types of business operations: "Market Making"; "Proprietary

Trading"; and Investment Advisory ("IA") services.  BLMIS was

registered with the United States Securities and Exchange

Commission ("SEC") as a broker-dealer and, as of on or about

August 25, 2006, as an investment adviser.  BLMIS operated on a fiscal year ending October 31.

2.   As a registered broker-dealer and as an investment adviser, BLMIS was required to make and keep certain books and records in its ordinary course of business.  Among other things, those books and records included the following:

a.   Blotters (or other records of original entry) containing an itemized daily record of all purchases and sales of securities and all receipts and deliveries of securities (including certificate numbers), showing the account for which each such transaction was effected, the name and amount of securities, the unit and aggregate purchase or sale price (if any), the trade date, and the name or other designation of the person from whom the securities were purchased or received or to whom the securities were sold or delivered (the "contra party");

b.   Documents reflecting each brokerage order, and any other instruction, given or received for the purchase or sale of securities, whether executed or unexecuted, including the account for which the order or other instruction was entered, the time the order was received, the time at which the order was entered, the price at which the order was executed and, to the extent feasible, the time of execution or cancellation;

c.    Records identifying the name and address of the beneficial owner of each cash and margin account held at the broker-dealer and/or investment adviser;

d.    Ledgers (or other records) reflecting all assets and liabilities, income and expense and capital accounts;

e.    Ledgers reflecting moneys borrowed and moneys loaned (together with a record of the collateral therefor and any substitutions in such collateral);

f.    A journal or journals, including cash receipts and disbursements, records, and other records of original entry forming the basis of entries in any ledger;

g.    General and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts; and

h.    All check books, bank statements, cancelled checks and cash reconciliations of the investment adviser.

3.    At all times relevant to this Indictment, Madoff Securities International Ltd. ("MSIL") was a corporation incorporated in the United Kingdom.  MSIL was an affiliate of BLMIS that engaged principally in proprietary trading.

4.    Bernard L. Madoff ("Madoff") was the founder of BLMIS and served as its sole member and principal.  In that capacity, Madoff controlled the business activities of BLMIS.

3

Madoff owned the majority of the voting shares of MSIL and served as the Chairman of MSIL's Board of Directors.

5.    Frank DiPascali, Jr. ("DiPascali") was employed at BLMIS between on or about September 11, 1975, and on or about December 11, 2008.  During his employment at BLMIS, DiPascali had a variety of duties and responsibilities.  By the early 1990s, DiPascali was one of the BLMIS employees responsible for managing the majority of BLMIS's IA accounts into which thousands of BLMIS clients invested, and eventually lost, billions of dollars. Specifically, DiPascali managed the IA accounts that were invested in the "split strike conversion" strategy, as described in Section B below.

6.    DANIEL BONVENTRE, the defendant, was employed by BLMIS from in or about August 1968, through at least on or about December 11, 2008.  BONVENTRE began working at BLMIS as an auditor, and subsequently was given increasing responsibility for supervising the back office operations of BLMIS.  BONVENTRE eventually assumed the position of "Director of Operations" for BLMIS beginning at least as early as in or about 1978.  In his capacity as Director of Operations, BONVENTRE was responsible for, among other things: (a) maintaining and supervising the production of the principal internal accounting documents for BLMIS, including the General Ledger ("G/L"); (b) maintaining the stock record for BLMIS and resolving any discrepancies between

internal and external records; (c) supervising the use and reconciliation of BLMIS bank accounts through which the Market Making, Proprietary Trading, and IA business operations were funded; (d) supervising BLMIS employees who worked in the accounting department and the "cage";[1] and (e) supervising JEROME O'HARA and GEORGE PEREZ, the defendants, insofar as their work related to the production of the G/L and other BLMIS accounting records.

7.   ANNETTE BONGIORNO, the defendant, was employed at BLMIS from on or about July 1, 1968, through at least on or about December 11, 2008.  During her employment, BONGIORNO had a variety of duties and responsibilities, including managing hundreds of IA accounts purportedly having a cumulative balance of approximately $8.5 billion dollars as of November 30, 2008. BONGIORNO also supervised employees who worked for the IA business.

8.   JOANN CRUPI, a/k/a "Jodi," the defendant, was employed at BLMIS from on or about July 5, 1983, through at least on or about December 11, 2008.  During her employment at BLMIS, CRUPI had a variety of duties and responsibilities, including tracking the daily activity of the bank account into which billions of dollars of IA clients' money for investment was

---

[1]    The "cage" was the area of BLMIS's office in which settlement and clearing functions occurred, and in which checks and wire transfers were sent and/or received.

deposited, and from which IA client redemptions were paid (the "IA Bank Account"), and directing wire transfers into and out of the IA Bank Account.  In addition, CRUPI managed several BLMIS IA accounts purportedly having a cumulative balance of approximately $900 million as of November 30, 2008.  CRUPI also assisted DiPascali in managing the Split Strike accounts.

9.    At all times relevant to this Indictment, JEROME O'HARA and GEORGE PEREZ, the defendants, were employed by BLMIS starting in or about 1990 and 1991, respectively.  O'HARA and PEREZ were each responsible for, among other things, developing and maintaining computer programs for computers that supported the operations of BLMIS, including its Market Making, Proprietary Trading, and IA operations.

**Background**

A.    **The Ponzi Scheme**

10.    From at least as early as the 1980s through on or about December 11, 2008, Madoff, DiPascali, and other co-conspirators perpetrated a scheme to defraud the clients of the BLMIS IA business ("IA Clients") by accepting billions of dollars of IA Clients' funds under false pretenses, failing to invest the IA Clients' funds as promised, creating and disseminating false and fraudulent documents to IA Clients purporting to show that their funds had been invested, creating false books and records

of BLMIS, and lying to the SEC and an accounting firm to conceal the fraudulent scheme.

11.   To execute the scheme, Madoff solicited, and caused others to solicit, prospective clients to open trading accounts with BLMIS, based upon, among other things, a promise to use investor funds to purchase shares of common stock, options, other securities, and financial instruments, and representations that he would achieve high rates of return for clients with limited risk.  These representations were false.  Contrary to representations made on account statements and other documents sent to IA Clients, Madoff, DiPascali, and other co-conspirators knew that the IA Clients' funds were not being invested in securities as promised.  Moreover, Madoff, DiPascali, and other co-conspirators misappropriated IA Clients' funds and converted those funds to their own use and the use of others.

B.   **The "Split Strike" Strategy**

12.   Under the direction of Madoff, DiPascali helped to develop the purported "split strike conversion" ("Split Strike") investment strategy that Madoff used to market the IA business to IA Clients and prospective IA Clients beginning in or about the early 1990s.  Current and prospective IA Clients who were invested in the Split Strike strategy were promised that: (i) their funds would be invested in a basket of approximately 35-50 common stocks within the Standard & Poor's 100 Index (the "S&P

100"), a collection of the 100 largest publicly traded companies in terms of their market capitalization; (ii) the basket of stocks would closely mimic the price movements of the S&P 100; (iii) the investments would be hedged by using IA Clients' funds to buy and sell option contracts related to those stocks, thereby limiting potential losses caused by unpredictable changes in stock prices; (iv) Madoff opportunistically would time the entry and exit from the strategy; and (v) when the IA Clients' funds were not invested in the basket of stocks and options described above, those funds would be invested in money market funds and United States Government-issued securities such as United States Treasury bills.

13.   In total, thousands of IA Clients, including individual investors, charitable organizations, trusts, pension funds, and hedge funds, among others, with billions of dollars of cumulative investments, were told by Madoff, DiPascali and other co-conspirators that their funds were invested with BLMIS using the Split Strike strategy.  (These clients are herein referred to, collectively, as the "Split Strike Clients".)

14.   Madoff, DiPascali, and other co-conspirators knew that the Split Strike strategy was a fiction in that the Split Strike Clients' funds were not invested in the securities recorded on those clients' account statements.  The reported performance of the Split Strike strategy was fabricated by

Madoff, DiPascali, and other co-conspirators through a process in which transactions were "executed" only on paper, based on historically reported prices of securities, for the purpose of producing and sending documents to Split Strike Clients that falsely made it appear that BLMIS had achieved the promised "returns" of approximately 10 to 17 percent per year.

15.   On a regular basis, Madoff provided guidance to DiPascali and, through DiPascali, to other co-conspirators, about the gains or losses that Madoff wanted to be reflected in the account statements of the Split Strike Clients.   Based on that guidance, DiPascali and other co-conspirators prepared model baskets of S&P 100 stocks based on historical market prices and tracked how those hypothetical baskets would have performed in the actual marketplace to determine whether and when to "enter the market."   Whenever Madoff informed DiPascali that he had decided to "enter the market," DiPascali and other co-conspirators caused data related to the chosen basket of securities to be entered into a computer dedicated to the IA business, which was housed principally on the seventeenth floor of BLMIS's offices.   That computer was referred to by certain BLMIS employees as "House 17."   Madoff, DiPascali, and other co-conspirators used computer programs developed by JEROME O'HARA and GEORGE PEREZ, the defendants, to, among other things, allocate multiples of the chosen basket to Split Strike Clients

on a pro rata basis based on each such client's purported account
balance.  When Madoff made a final decision purportedly to "enter
the market," DiPascali and other co-conspirators would cause tens
of thousands of false documents to be produced from data stored
on House 17 that purported to confirm the purchases of securities
that, in fact, had not been purchased.

16.  The purported trades by which BLMIS supposedly
"entered the market" were priced using data from market activity
that already occurred - sometimes one or more days prior to the
date on which the decision to "enter the market" was finalized.
Because none of the "trades" actually occurred, Madoff,
DiPascali, and other co-conspirators relied on historical price
and trading volume data obtained from published sources of market
information.  With the benefit of hindsight, Madoff and DiPascali
chose the prices at which securities purportedly were purchased
in light of Madoff's objectives.  In doing so, Madoff, DiPascali,
and other co-conspirators attempted to ensure that the trade
confirmation slips sent to Split Strike Clients reflected prices
that fell within the range of prices at which each such security
in fact had traded on the pertinent day.

17.  A similar process to that described in paragraphs
15 and 16 above was used in "exiting the market" by "selling out"
of the purported stock and option positions and "buying" United
States Treasury bills and shares in a money market fund with the

10

"proceeds" of those purported sales.  With the benefit of hindsight, Madoff and DiPascali evaluated whether and when to appear to "sell out" of the securities positions that previously had been reported to Split Strike Clients.  Thereafter, DiPascali and other co-conspirators caused BLMIS computer operators to input fake data that generated tens of thousands of false confirmations of the purported transactions, which were subsequently printed and sent to Split Strike Clients through the United States mails.

18.  On a monthly basis, Madoff, DiPascali and other co-conspirators oversaw the production and mailing of thousands of pages of account statements to Split Strike Clients.  Those documents falsely reflected securities transactions that had not been executed and securities positions that, in fact, did not exist.

19.  In practice, the growth in account values reported on the Split Strike Clients' account statements approximated the annualized rates of return that had been targeted by Madoff.  As directed by Madoff, DiPascali and other co-conspirators routinely added additional fictitious options "trades" to the books and records maintained on House 17 for certain Split Strike Client accounts for the purpose of making it appear that those accounts had achieved their respective targeted annual rates of return.

C.   **The Non-Split Strike Client Accounts**

20.  BLMIS had many IA Clients other than Split Strike Clients (the "Non-Split Strike Clients").  As described more fully below, the Non-Split Strike Clients were promised that their investment funds would be used to buy and sell securities in strategies that would realize annual returns in varying amounts up to at least approximately 45 percent per year. Madoff, DiPascali, ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the defendants, and others, took steps to make it appear that funds from the Non-Split Strike Clients had been invested and generated the returns they had been promised by Madoff when, in fact, they had not.

D.   **BLMIS Operations and Computer Systems**

21.  BLMIS made use of numerous information technology systems in support of its Market Making, Proprietary Trading and IA businesses.  Madoff, DiPascali, DANIEL BONVENTRE, ANNETTE BONGIORNO, and JOANN CRUPI, a/k/a "Jodi," the defendants, and their co-conspirators relied upon BLMIS computers operated by BLMIS employees, and computer programs developed and maintained by JEROME O'HARA and GEORGE PEREZ, the defendants, among others, to carry out and conceal the fraudulent scheme.

1.   **House 05: Market Making and Proprietary Trading**

22.  The operations of the Market Making and Proprietary Trading businesses were supported principally by two

12

computer systems, among others: (1) a STRATUS trading platform; and (2) an IBM AS/400 server known internally at BLMIS (and referred to herein) as "House 05."[2]

a.    The STRATUS system was responsible for, among other things, effectuating the trading activities of BLMIS and, to that end, communicated with third parties, including trading contra parties.  The data generated through the STRATUS system about BLMIS trades (including, for example, dates, times, number of shares, and stock symbols) were regularly transferred to House 05.

b.    JEROME O'HARA and GEORGE PEREZ, the defendants, were familiar with the "back-end" processing on House 05 of the trades executed on behalf of the Market Making and Proprietary Trading businesses.  Among other things, these "back-end" programs processed data captured during the order entry and execution process by the STRATUS system to create various BLMIS books and records including, but not limited to, trading blotters and stock ledgers.  House 05 also had software that enabled communication with third parties including, but not limited to, the Depository Trust Company ("DTC"),[3] and obtained data from

---

[2]    On or about April 30, 1993, BLMIS began using two IBM AS/400 servers (including House 05) at its offices at 885 Third Avenue, New York, New York, in connection with its Market Making, Proprietary Trading and IA businesses.

[3]    Among other things, DTC creates efficiencies in the clearing and settlement of securities transactions by retaining

those third parties for use in creating BLMIS books and records. BLMIS employees regularly used the programs on House 05 to compare trading data received from the STRATUS system with information obtained from DTC and generated "break sheets" showing any discrepancies between BLMIS's information and DTC's data.

c.    Both O'HARA and PEREZ were responsible for developing programs for, and maintaining, House 05.  O'HARA and PEREZ had direct knowledge of House 05, the BLMIS books and records created by House 05, the sources of data that House 05 incorporated into BLMIS's books and records, and the manner in which House 05 received information from third parties, including DTC.

2.    **House 17:  The IA Business**

23.    The operations of the IA business were supported by House 17, which was a separate IBM AS/400 server.  As JEROME O'HARA and GEORGE PEREZ, the defendants, well knew, unlike House 05, House 17 did not receive trading data related to the IA business electronically from any computer that communicated with third parties, including trading contra parties.  Rather, Madoff,

---

custody of securities on behalf of financial institutions and recording on its books and records changes in the ownership of those securities.  BLMIS had an account at DTC in which the securities of the Market Making and Proprietary Trading operations were custodied, as well as a few equity securities held on behalf of certain IA Clients.

DiPascali, ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the
defendants, and others involved in the IA business, created
trading data related to the purported activities of the IA
business and caused that data to be entered into the House 17
server.

24.   JEROME O'HARA and GEORGE PEREZ, the defendants,
developed and maintained computer programs on House 17 (the
"House 17 Programs") that were used to enter fake IA business
trade data.   The House 17 Programs were used to generate, among
other things, account statements, trade confirmations, trading
blotters, and other books and records related to BLMIS's
purported IA business.   As O'HARA and PEREZ well knew, House 17,
unlike House 05, did not obtain data concerning the purported
trades related to the IA business from DTC, although it could
have been programmed to do so.   As O'HARA and PEREZ further knew,
House 17, unlike House 05, did not reconcile the purported trade
data generated by BLMIS employees against any outside source.

25.   The House 17 Programs produced fake IA business
books and records as follows:

a.   For Split Strike Clients: (i) information
about a basket of purported trades (purchases when entering the
market, and sales when exiting the market) was entered into House
17 and was used to generate data reflecting purported trades;
(ii) the data describing the purported trades was stored in

several files, including the Settled Trades File; (iii) trade data and other information stored on House 17 was merged with information contained in a file titled "A.NAME" (the "A.NAME File"), which contained certain information about all the IA Clients, including, but not limited to, unique BLMIS account numbers, the names of account holders, and the mailing addresses to which statements and other documents were to be sent; (iv) the merged information was formatted for presentation on BLMIS account statements and confirmation slips; and (v) account statements and confirmation slips were printed and distributed to IA Clients, primarily through the U.S. mails.

b.    For IA Clients who were not Split Strike Clients, the process was similar; however, because their "trades" generally did not include purported "basket trades," those trades were entered individually into House 17 based on instructions provided by BLMIS employees on an account-by-account basis.

26.   The books and records generated by the House 17 Programs for BLMIS's IA business were entirely false and fraudulent because, among other things, they purported to reflect securities transactions that, in fact, had never been executed.

E.    **Avellino & Bienes and the Liquidity Crisis of 1992**

27.   In or about 1992, the SEC brought charges against Avellino & Bienes ("A&B"), an investment fund that was invested primarily in BLMIS, for offering securities in unregistered

transactions to investors in violation of the law.  Consequently,
a receiver was appointed by the court in the SEC's enforcement
action (the "Receiver").  Since A&B's funds were at BLMIS, the
Receiver required that BLMIS liquidate the A&B accounts and
provide account records substantiating the values and trading in
those accounts.

  28.  Madoff well knew that A&B falsely had represented
to its clients that BLMIS was engaged in bona fide convertible
arbitrage, a market neutral investment strategy involving the
simultaneous purchase of convertible securities and the short
sale of the same issuer's common stock.  In fact, the purported
trades in the numerous A&B accounts, which for years had been
created by ANNETTE BONGIORNO, the defendant, did not follow a
consistent, organized, or diversified investment strategy that
mitigated risk.  In order to generate for the Receiver and the
SEC the historical records that purported to substantiate
profitable trades in the A&B accounts, Madoff enlisted the help
of DiPascali, BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the
defendants, and others in developing a strategy whereby the A&B
statements would be recreated to reflect what A&B had represented
to its clients.

  29.  Over several months, ANNETTE BONGIORNO, the
defendant, and others, created historical records and account
statements that purported to reflect profitable trading in the

17

A&B accounts.  BONGIORNO made revisions to the account statements to hide from the Receiver and the SEC the existence of, and transactions in, certain IA accounts.  For example, an IA account held in the name of Avellino & Alpern ("A&A") periodically had transferred funds to and from an A&B account.  An account statement issued to A&B in 1989 showed a transfer of funds that A&B had received from A&A.  In order to hide from the Receiver the existence of the A&A account and the 1989 transfer, BONGIORNO created revised A&B account statements to reflect this inflow of funds as a purported dividend from General Motors, instead of as a transfer from A&A.  None of these revisions would have been necessary if the trades and positions reflected on the account statements had been real in the first place.  Further, as BONGIORNO well knew, the resulting, fabricated account statements were provided to the Receiver.

          30.  Because the positions A&B held at BLMIS did not exist, they could not be liquidated to redeem A&B's investments upon the dissolution of A&B.  Moreover, in or about the Fall of 1992, the IA Bank Account did not have enough funds to pay the hundreds of millions of dollars due the Receiver and, ultimately, the A&B customers.  In order to provide funds for this purpose, in or about November 1992, Madoff obtained securities from at least two IA clients and used those securities as collateral for loans.  Some of the loan proceeds were transferred to BLMIS bank

accounts and were used to pay off a portion of the balance due the Receiver and, ultimately, A&B customers.

31.   DANIEL BONVENTRE, the defendant, was aware of the deposit of securities from the two IA clients, and that the securities belonged to the IA clients, not BLMIS.   In fact, the securities were credited to the IA clients' respective IA accounts and were reflected on the IA clients' respective account statements as of November 30, 1992.   BONVENTRE also was aware of the balance in the IA Bank Account and reviewed and initialed documents reflecting the balance in the IA Bank Account in or about October and November 1992.

32.   DANIEL BONVENTRE, the defendant, well knew that loan proceeds were used to pay off a portion of the balance due the Receiver and, ultimately, A&B customers.   However, BONVENTRE caused the inclusion of entries into the G/L, and/or its supporting books and records, that falsely created the appearance that the loan proceeds that had been used to pay A&B, and/or its customers, had been used to purchase assets for BLMIS.

33.   The Receiver, upon receipt of the liquidated funds and in reliance on the false account statements altered by Madoff, DiPascali, ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the defendants, and others, reimbursed the thousands of A&B investors for the full amount of the purported investments, in excess of $300 million.

**The Management of the Non-Split Strike Client IA Accounts**

34.   From at least as early as the 1990s, through in
or about December 2008, ANNETTE BONGIORNO, the defendant, managed
hundreds of Non-Split Strike IA Clients' accounts for which BLMIS
purportedly used an investment strategy using long and short
equities.  The accounts managed by BONGIORNO purportedly had a
cumulative balance of approximately $8.5 billion as of November
30, 2008.  From at least as early as the 2000s, through in or
about December 2008, JOANN CRUPI, a/k/a "Jodi," also managed
several Non-Split Strike IA accounts purportedly invested in
equities and options, and those accounts had a cumulative balance
of approximately $900 million as of November 30, 2008.

35.  ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi,"
the defendants, managed these Non-Split Strike IA accounts by
identifying which trades to include on IA Clients' account
statements using historical price information reported in the
Wall Street Journal and Bloomberg.  BONGIORNO and CRUPI created
trades with the goal of arriving at a specific annual rate of
return, called a "benchmark" rate of return, that was pre-
determined by Madoff.  Benchmark returns ranged from
approximately 11 percent to up to at least approximately 45
percent per year and varied depending on the IA Client.  Madoff
communicated the benchmark returns for each account or group of

accounts to BONGIORNO and CRUPI, who in turn caused the benchmark returns to be entered into House 17.

36.   At the end of each month, quarter or year, ANNETTE BONGIORNO and JOANN CRUPI, a/k/a "Jodi," the defendants, and others, reviewed BLMIS reports comparing the benchmark return for each account with the purported year-to-date "returns" earned by Non-Split Strike Client accounts they managed.  When there were differences between the benchmark returns and the returns that purportedly had been earned by the time the reports were run, BONGIORNO, CRUPI, and others, created trades and adjustments in certain IA Clients' accounts to ensure that the annual returns reported to the Non-Split Strike Clients appeared to meet or exceed their expected returns.

A.   **ANNETTE BONGIORNO's Management of Hundreds of Non-Split Strike IA Accounts**

37.   From at least as early as the early 1990s, through in or about December 2008, ANNETTE BONGIORNO, the defendant, managed hundreds of Non-Split Strike IA accounts (the "Bongiorno High Net Worth Clients").  During the course of managing these IA accounts which contained billions of dollars, BONGIORNO, among other things, (a) "executed" trades in the accounts of the Bongiorno High Net Worth Clients only on paper, based on historically reported prices of securities that she researched, and that achieved annual rates of return that had been pre-determined by Madoff; (b) processed exceptional gains in the IA

accounts of the Bongiorno High Net Worth Clients that purportedly
occurred months before the IA accounts had been established; (c)
asked Bongiorno High Net Worth Clients to return previously-
issued BLMIS account statements so that she could alter them, and
often include additional backdated trades; (d) received specific
instructions from the Bongiorno High Net Worth Clients about the
amount of appreciations and gains they wanted to be reflected in
their IA accounts; and (e) used the STMTPRO program, described in
paragraph 40 below, to create dozens of IA account statements for
the Bongiorno High Net Worth Clients that contained tens of
millions of dollars worth of gains from trades created by
BONGIORNO months before the Bongiorno High Net Worth Clients'
accounts even had been opened at BLMIS.

    38.  As part of the process of creating trades to be
reflected in the Bongiorno High Net Worth Clients' accounts,
BONGIORNO either referred to an internal report, titled "Jodi
Stocks," which was based on data from Bloomberg and showed price
changes for many of the stocks in the S&P 500 during the previous
month, quarter, and year, or she directed others to print reports
directly from Bloomberg that reflected similar information.
Using the historical price information, BONGIORNO and others
wrote up trade tickets setting forth the details of particular
trades to be reflected on individual BLMIS account statements.
Specifically, BONGIORNO and others filled in trade tickets with

stock symbols, trade dates, settlement dates, the nature of the transaction (e.g., a buy, sell, short, or cover), the price of the security, the number of shares, and sometimes the expected gain or loss associated with the transaction.

39.   Generally, all trade tickets were completed and entered into House 17 at the end of the month, or the beginning of the following month, prior to the account statements being issued, and the trades were reflected on the month-end statements that were sent to IA Clients.

40.   At times, ANNETTE BONGIORNO, the defendant, and others, backdated trades so that they appeared to have occurred months earlier on IA Clients' account statements.  To do so, BONGIORNO and others created an account statement using a House 17 computer program called "STMTPRO."[1]  The STMTPRO program was created at least as early as 1993, and was maintained by JEROME O'HARA and GEORGE PEREZ, the defendants, since at least that time.  STMTPRO allowed the user to either create an account statement with a largely blank account statement, or revise an existing account statement.  BONGIORNO often used STMTPRO to make account statements from a previous month in order to incorporate backdated trades.

_____

[1] This program went through several modifications since its inception and, as a result, was saved as several different versions on House 17.

41. ANNETTE BONGIORNO, the defendant, asked certain IA Clients to return account statements they previously had received from BLMIS. BONGIORNO, at times, crossed the statements out and wrote new transactions and balances, and other changes, on these statements that were to be included on revised statements. BONGIORNO then caused the changes to be entered on House 17, and used STMTPRO to create manipulated statements reflecting the newly "revised" transactions and balances. These revised statements were then distributed to certain IA Clients.

42. In or about the early 1990s, when some House 17 programs were modified to track investor trades, ANNETTE BONGIORNO, the defendant, requested the ability to backdate trades and manipulate the appearance of IA account statements. BONGIORNO worked closely with DANIEL BONVENTRE, the defendant, to develop the programs that could produce the manipulated account statements, transactions, and balances; and, on occasion, BONGIORNO described in written detail to BONVENTRE how she wanted these programs to work. For example, in or about the early 1990s, BONGIORNO wrote to BONVENTRE, stating:

> "Dan . . . Here are some of the problems with the new programs that I saw right away. . . I need the ability to give any settlement date I want[.] Trades can be punched any time on any day and as long as the settlement date is after the previous month end these trades have to hit the ledgers & statement in the correct settlement date order. If settlement date is before previous month end then they should be listed on current month end statements and ledgers first. No trades should show as 'as ofs' unless I

24

want them to.  No comps should have entry dates on
them just trade and settlement."

**B.    JOANN CRUPI's Management of IA Clients' Accounts**

43.  From approximately the early 2000s, through in or
about December 2008, JOANN CRUPI, a/k/a "Jodi," the defendant,
managed several IA accounts affiliated with an IA Client (the
"Crupi High Net Worth Client").  During the course of managing
these IA accounts, which purportedly contained approximately $900
million as of November 30, 2008, CRUPI created account
statements, trade confirmations, and other documents that
reflected securities transactions that had not been executed and
securities positions that did not exist.  In addition, CRUPI,
among other things, (a) "executed" trades in the accounts of the
Crupi High Net Worth Client only on paper, based on historically
reported prices of securities that she researched, and that
achieved annual rates of return that had been pre-determined by
Madoff; (b) backdated the purchase dates of purported trades so
that she could control the amount of gains reflected in the Crupi
High Net Worth Client accounts; (c) "executed" the purchase and
sale of particular securities on the same date; (d) caused
dividends to be credited to the Crupi High Net Worth Client
account statements before the dividends had been paid by the
issuing company; (e) caused wire transfers to be sent to the
Crupi High Net Worth Client before any securities were sold in
the accounts and, days later, backdated purported sales of

securities or U.S. Treasury bills to match the date of the wire
transfers, making it appear that the sales occurred on the same
day as the wire transfers.

### Reviews of BLMIS Between 2003 and 2008

44.   BLMIS was subjected to at least five separate
reviews by the SEC and a European accounting firm (the "European
Accounting Firm") between 2003 and 2008 (collectively, the
"Reviews").[2]

45.   Beginning at least as early as in or about
December 2003, in connection with the Reviews, Madoff and/or
DiPascali caused DANIEL BONVENTRE, JOANN CRUPI, a/k/a "Jodi,"
JEROME O'HARA and GEORGE PEREZ, the defendants, to create
additional false and fraudulent BLMIS's books and records.
Madoff's goals in directing the creation of additional false and
fraudulent books and records included, among other things:
(a) revealing information about as few of BLMIS's IA Clients as
possible, thereby concealing the scale of the business;
(b) presenting explanations of BLMIS's operations that would make
it more difficult for the SEC and/or the European Accounting Firm
to attempt to verify with third parties the information provided
by BLMIS; and (c) falsifying information to ensure that the

---

[2]   The European Accounting Firm's client was a European
financial institution that served as custodian for the assets of
an IA client (the "European IA Client") and that had a sub-
custodian agreement with BLMIS.

documents produced looked authentic and did not contain
suspicious patterns that might alert the SEC and/or the European
Accounting Firm to the fraud.

46.   In an effort to achieve these goals, Madoff
caused: (a) DiPascali, DANIEL BONVENTRE, JOANN CRUPI, a/k/a
"Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, and
others, to create fake "special" versions of historical BLMIS
books and records to show to the SEC and the European Accounting
Firm; and (b) DiPascali, BONVENTRE, O'HARA and PEREZ, and others,
to create false documents purportedly obtained from third parties
in the ordinary course of BLMIS's business.

47.   The "special" versions of historical BLMIS
documents were prepared only for a small subset of the BLMIS IA
Clients (the "Special Clients") so that Madoff could conceal the
scale of his purported IA business.  DiPascali and JOANN CRUPI,
a/k/a "Jodi," the defendant, assisted in selecting the "Special
Clients" accounts that would be shown to the SEC and the European
Accounting Firm, knowing that the few Special Clients ultimately
selected represented only a small fraction of the thousands of IA
Clients at BLMIS.  In her desk, CRUPI maintained a list of
Special Clients.

### The False "Special" Trade Blotters

48.   JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and
GEORGE PEREZ, the defendants, created false retrospective daily

trade blotters ("the Special Blotters") that purported to identify, on a trade-by-trade basis, information such as the client for whom the trade was conducted, the contra party to the trade, the number of shares traded, and the price at which the trade was executed.  The Special Blotters reported information that was materially inconsistent with information contained in the BLMIS Settled Trades File.  As described in further detail below, O'HARA and PEREZ developed and maintained special House 17 Programs (the "Special House 17 Programs") and files, many of which were used in conjunction with one another, to create the Special Blotters.

**A.    O'HARA and PEREZ Changed the Identities of Certain IA Clients on the Special Blotters**

        49.   In connection with the SEC's 2004 Review, Madoff attempted to make it appear that BLMIS did not have custody of its IA Clients' assets because he knew that, were the SEC to check with DTC, it would learn that DTC was not holding the securities listed on the IA Clients' account statements in a segregated account for BLMIS.  To explain why DTC would not hold these securities, Madoff directed the preparation of documents in a "receive-versus-payment"/"delivery-versus-payment" ("RVP/DVP") format that showed no securities or cash balances in the accounts of IA Clients.[3]  To be consistent with an RVP/DVP scenario, the

_____

        [3]    In a RVP/DVP arrangement, payment for securities purchased is made to the selling customer's agent and/or delivery

names of the Special Clients were changed to financial

institutions holding assets for the benefit of the Special

Clients because RVP/DVP accounts require the involvement of such

a custodian.

50.   In creating the Special Blotters to prepare for

the SEC's 2004 Review, JEROME O'HARA and GEORGE PEREZ, the

defendants, used a file titled "S.NAME6" that contained

information different from that contained in the A.NAME File,

described in paragraph 25(a) above, to produce account

statements, blotters and other books and records with misleading

and inaccurate information about the identities of BLMIS clients.

Not only did the S.NAME6 File contain information about a small

fraction (approximately 20) of the thousands of IA Clients whose

information was contained in the A.NAME File, but the information

about the Special Clients was changed to make it falsely appear

that the IA account holders were financial institutions that held

custody of the IA Clients' assets for the benefit of those

clients.   For example, an account held in the name of "ABC Fund"

---

of securities sold is made to the buying customer's agent in
exchange for payment at time of settlement, usually in the form
of cash.   Because transactions in RVP/DVP accounts are settled
directly with the agent on a transaction-by-transaction basis,
account statements sent by a broker-dealer like BLMIS to
customers with RVP/DVP accounts generally do not reflect any cash
balance or security position with the broker-dealer at the end of
a period.   Thus, an RVP/DVP account is inconsistent with an
account as to which the broker-dealer holds securities on behalf
of a client at DTC in a segregated position.

in the A.NAME File was changed to "XYZ Financial Institution f/b/o ABC Fund" in the S.NAME6 File.[4]  Other special programs developed and maintained by O'HARA and PEREZ for the purpose of producing documents for the SEC in 2004 drew client information from the S.NAME6 File rather than the A.NAME File.  As a consequence, those Special House 17 Programs produced blotters, account statements, and other books and records with misleading and inaccurate information about the identities of BLMIS clients.

51.  For subsequent Reviews by the SEC and the European Accounting Firm in 2005 and 2006, JEROME O'HARA and GEORGE PEREZ, the defendants, created other versions of the S.NAME File (e.g., S.NAME7, S.NAME7B, and S.NAME8) that were used in connection with creating Special Blotters and other false and fraudulent documents, including false account statements.

**B.   BONVENTRE, CRUPI, O'HARA and PEREZ Changed Details About the Number of Shares, Execution Times, Contra Parties, and Transaction Numbers for Trades Reported on the Special Blotters**

52.  JEROME O'HARA and GEORGE PEREZ, the defendants, also developed and maintained Special House 17 Programs that, in connection with the 2004, 2005 and 2006 SEC Reviews, enabled Madoff and DiPascali to change information about trades that purportedly already had occurred.  For example, O'HARA and PEREZ developed and maintained Special House 17 Programs to:   (a)

---

[4]     "F/b/o" is a term that means "for the benefit of."

randomly divide each equity trade contained in the Settled Trades
File associated with the Special Clients into up to 15 separate
"slices"; (b) randomly assign to each subdivided equity trade a
false execution time so as to ensure, among other things, that
the assigned trade times for equities occurred during trading
hours in London, before the U.S. equities markets had opened; and
(c) randomly assign a new fake transaction number to each
subdivided equity trade in the Special Blotter for the SEC's
Review.

  53. Although the Settled Trades File identified the
contra party for each purported trade as "CLEARING BANK," at the
direction of Madoff and DiPascali, DANIEL BONVENTRE, JOANN CRUPI,
a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants,
changed or participated in changing the contra parties on the
Special Blotters.

  54. JEROME O'HARA and GEORGE PEREZ, the defendants,
also created a series of modifications to the S.NAME files and
other House 17 Programs that allowed BLMIS to present different
scenarios to the SEC and the European Accounting Firm about the
purported contra parties to BLMIS "trades."

  55. Specifically, when the SEC was performing a
review, Madoff and DiPascali, with the assistance of DANIEL
BONVENTRE, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE
PEREZ, the defendants, and other co-conspirators, for the purpose

of producing documents to the SEC that would conceal the true operations of BLMIS, caused Special Blotters to be created that falsely showed that BLMIS had executed trades on behalf of the Special Clients with European contra parties about which it would be more difficult for the SEC to obtain information as part of its review.

56.   Conversely, when the European Accounting Firm was performing a review, BLMIS took the opposite approach by making it appear as though trades occurred with contra parties in the United States.  Madoff and DiPascali, with the assistance of DANIEL BONVENTRE, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, and other co-conspirators, caused Special Blotters to be created that falsely showed that BLMIS had executed trades on behalf of Special Clients with United States-based contra parties about which it would be less likely for the European Accounting Firm to obtain information as part of its review.

57.   For his part, DANIEL BONVENTRE, the defendant, reviewed a list of European financial institutions to be used as contra parties.

58.   In addition to changing the contra parties, JOANN CRUPI, a/k/a "Jodi," the defendant, ensured that the fake Special Blotters looked authentic.  For example, CRUPI checked whether the financial institutions used as purported contra parties

appeared in a random fashion on the Special Blotters. When CRUPI found that a financial institution was used too frequently in the Special Blotters, and therefore the Blotters did not look authentic, she brought it to the attention of DiPascali. CRUPI and DiPascali then discussed methods of solving the problem with GEORGE PEREZ and/or JEROME O'HARA, the defendants. In CRUPI's desk, she maintained a list of European financial institutions to be used as contra parties on the fake Special Blotters.

59. JOANN CRUPI, a/k/a "Jodi," the defendant, also checked the fake Special Blotters to ensure that they looked authentic by reviewing whether the purported execution times of the trades looked "random" enough. CRUPI ensured that the Special Blotters did not reflect too many trades occurring at the same times, or other peculiarities that would alert the SEC or the European Accounting Firm that the Special Blotters were fake. When CRUPI found that a Special Blotter showed too many trades that purportedly occurred at a particular time, she brought it to the attention of DiPascali. DiPascali and CRUPI then discussed the problem, and methods of solving it, with GEORGE PEREZ and/or JEROME O'HARA, the defendants.

### JEROME O'HARA and GEORGE PEREZ Created False and Fraudulent Order Entry And Execution Reports

60. In connection with the Reviews, JEROME O'HARA and GEORGE PEREZ, the defendants, also developed and maintained House 17 Programs that retrospectively created false and fraudulent

order entry and execution reports (the "Special OERs"), based in part on the output from the Special Blotter programs described above.  The Special OERs included information about when orders for equity securities had been executed (as found in the Special Blotters), in addition to the times at which the order underlying each executed equity trade purportedly had been placed.

61.  JEROME O'HARA and GEORGE PEREZ, the defendants, developed and maintained Special House 17 Programs that added false order information to the fictitious trade execution information contained in the Special Blotters.  The programs they developed employed a series of mathematical formulas to generate, at random, the time that any given purported order for the purchase or sale of an equity was placed.

## JEROME O'HARA Created False and Fraudulent Records About BLMIS Commissions

62.  On or about January 6, 2004, the SEC requested certain information and documents from BLMIS including, but not limited to, information about commissions, broken out by customer and by security, received by BLMIS in connection with its work on behalf of certain IA Clients.

63.  Among the first Special House 17 Programs developed and maintained by JEROME O'HARA, the defendant, in connection with the SEC's 2004 review of BLMIS, were a series of computer programs (the "2004 Special Commission Programs") that were created within a few days after BLMIS received the SEC's

January 6, 2004 document request.  Because BLMIS did not actually earn any commissions on its "trades," the 2004 Special Commission Programs generated fake retrospective reports for the period under review that falsely purported to show commissions received by BLMIS broken out by account and by security by multiplying the shares traded for those clients by $0.04 per share.  In fact, no such trades ever had occurred, and therefore no such calculation of the commissions owed to BLMIS in connection with the IA business previously had been made.

### JOANN CRUPI, JEROME O'HARA and GEORGE PEREZ Created False and Fraudulent IA Client Account Statements

64.  To meet the goals set forth in paragraph 45 above, at certain times, including during certain SEC Reviews, Madoff wanted to produce documents concerning certain IA Clients in an RVP/DVP format.

65.  DiPascali, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, created false IA account statements in a completely different format from the IA account statements that regularly had been sent to all IA Clients, including the 2004 Special Clients, for years.  The RVP/DVP statements created by DiPascali, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, at the direction of Madoff, showed additional fake transactions that had not been reported to the 2004 Special Clients and which zeroed out any securities balances (the "Special RVP/DVP Statements").  Whereas

the non-RVP/DVP statements showed long positions and/or cash balances in the clients' accounts, the Special RVP/DVP Statements provided to the SEC did not show any long or short positions being held by BLMIS on behalf of the account holders.

66.   Further, so that BLMIS would not have to verify that it was holding IA Clients assets, the account titles were changed on some of the Special RVP/DVP Statements.   Specifically, the names of account holders were changed to financial institutions holding accounts for the benefit of the Special Clients.

67.   In creating the Special RVP/DVP Statements, JOANN CRUPI, a/k/a "Jodi," the defendant, researched financial institutions to be used in the altered account titles and caused the account titles to be changed.   For example, an account held in the name of "ABC Fund" was changed to "XYZ Financial Institution f/b/o ABC Fund."   Once the account titles were changed on the Special RVP/DVP Statements, the altered account titles also were reflected on the Special Trade Blotters, and related documents, as described in Paragraphs 49-50 above.

68.   JEROME O'HARA and GEORGE PEREZ, the defendants, wrote, modified and/or maintained House 17 Programs that created Special RVP/DVP Statements.

69. The Special RVP/DVP Statements were created in connection with the SEC Reviews in 2004, 2005 and 2006, and were kept at BLMIS as part of its books and records.

### DANIEL BONVENTRE, JEROME O'HARA AND GEORGE PEREZ
### Created False and Fraudulent DTC Reports

70. DANIEL BONVENTRE, JEROME O'HARA and GEORGE PEREZ, the defendants, were familiar with the process by which House 05 obtained information from DTC about the securities held at DTC on behalf of BLMIS's Market Making and Proprietary Trading businesses. BONVENTRE, O'HARA and PEREZ knew that: (a) House 05 communicated directly with computers at DTC and received data from DTC in several files, including an "APIBAL" file, after providing BLMIS's DTC account number and password; and (b) programs on House 05 enabled users to compare the information obtained from DTC with that produced by the STRATUS system.

71. On or about January 31, 2004, JEROME O'HARA, the defendant, created a House 17 Program ("DTC17EOM") designed to generate a monthly report that looked like the reports previously produced by DTC for House 05, but which added the purported holdings of the IA Special Clients to the BLMIS holdings for its Proprietary Trading and Market Making operations. DTC17EOM permitted an operator to pull the DTC APIBAL file for a given month using the House 05 backup tape for that month and to add the Special Clients' purported stock records obtained from the House 17 Stock Record File to that file. DTC17EOM enabled a

BLMIS computer operator to print fraudulent DTC reports that reflected the combined data.

72.  As DANIEL BONVENTRE, JEROME O'HARA and GEORGE PEREZ, the defendants, well knew, false and fraudulent DTC reports derived from DTC17EOM and other programs developed and maintained by O'HARA and PEREZ, and which were reviewed by BONVENTRE, were intended to be shown to representatives of the European Accounting Firm who visited BLMIS during the 2005 Review.

### BLMIS Payments to JEROME O'HARA and GEORGE PEREZ After the SEC's 2004 Review of BLMIS

73.  After the SEC's 2004 review of BLMIS, in or about October 2004, JEROME O'HARA, the defendant, received a payment from BLMIS totaling approximately $116,950.  The payment was disguised as a transfer from an IA Account to another IA Account held in the names of O'HARA and his wife.  The payment to O'HARA was not indicated in the records of BLMIS as salary, bonus or other type of compensation.  The $116,950 in funds were "invested" at BLMIS and purportedly earned approximately $33,500 in gains until O'HARA withdrew the funds in or about 2006, as described below.

74.  Similarly, in or about October 2004, GEORGE PEREZ, the defendant, received a payment from BLMIS totaling approximately $108,530.  The payment was disguised as a transfer from an IA Account to another IA Account held in the name of

PEREZ and his wife.  The payment to PEREZ was not indicated in the records of BLMIS as salary, bonus or other type of compensation.  The funds were "invested" at BLMIS and purportedly earned approximately $53,800 in gains until PEREZ withdrew the funds in or about 2006, as described below.

### BONVENTRE, O'HARA and PEREZ Empty Their IA Accounts

75.  During the SEC's review of BLMIS in 2006, DANIEL BONVENTRE, JEROME O'HARA and GEORGE PEREZ, the defendants, each emptied their IA Accounts on or about the same date – April 6, 2006.

76.  On or about April 6, 2006, DANIEL BONVENTRE, the defendant, during the course of the 2006 SEC Review, received a check drawn on the IA Bank Account in the amount of approximately $577,954.81 ("Check No. 1").  On or about April 7, 2006, Check No. 1 was deposited in a bank account held by BONVENTRE and his wife.

77.  Following the deposit of Check No. 1, Bonventre's IA account reflected a balance of approximately -$116,944.81. Bonventre's IA account statement reflecting activity through June 30, 2006 shows a journal entry in the amount of approximately $116,944.81, which then brought the balance in the account to $0.

78.  On or about April 6, 2006, JEROME O'HARA, the defendant, during the course of the 2006 SEC Review, closed BLMIS

IA Accounts in which he had an interest and received more than $976,000 by checks.

79. On or about April 6, 2006, GEORGE PEREZ, the defendant, during the course of the 2006 SEC Review, closed a BLMIS IA Account in which he had an interest and received approximately $289,000 by check.

### The Conduct of The Defendants
### After the 2006 SEC Review of BLMIS

80. In or about September 2006, JEROME O'HARA and GEORGE PEREZ, the defendants, met with Madoff and DiPascali and stated that they would no longer create computer programs used to produce false and fraudulent BLMIS books and records.

81. In or about September 2006, in an effort to keep JEROME O'HARA and GEORGE PEREZ, the defendants, working at BLMIS, Madoff authorized DiPascali to meet any salary demands made by O'HARA and PEREZ. DiPascali transmitted Madoff's offer to both O'HARA and PEREZ.

82. In or about the Fall of 2006, JEROME O'HARA and GEORGE PEREZ, the defendants, demanded salary increases of approximately 20 percent. In or about November 2006, O'HARA and PEREZ each received a salary increase of approximately 20 percent and also received net bonuses of approximately $64,812, and $60,165, respectively.

83.   In or about the Fall of 2006, JOANN CRUPI, a/k/a
Jodi," the defendant, also received a salary increase of
approximately 20 percent.

84.   When JOANN CRUPI, a/k/a Jodi," the defendant,
learned that JEROME O'HARA and GEORGE PEREZ, the defendants,
refused to create computer programs used to produce false and
fraudulent BLMIS books and records, CRUPI offered to provide
additional assistance with the "special" work.

85.   In or about February 2008, the European Accounting
Firm conducted another review of BLMIS.  Even though they
previously had refused to create programs to produce more fake
books and records, JEROME O'HARA and GEORGE PEREZ, the
defendants, agreed to create computer programs that allowed
DiPascali, JOANN CRUPI, a/k/a "Jodi," the defendant, and others,
to use House 17 to alter data about IA Clients and to produce
false and fraudulent BLMIS books and records in connection with
that review.

86.   In or about 2008, JOANN CRUPI, a/k/a "Jodi," the
defendant, received another salary increase of approximately 20
percent.

87.   In addition, in or about 2008, JOANN CRUPI, a/k/a
"Jodi," the defendant, received payments from Madoff totaling
more than $2,700,000, which she used in part to purchase a beach
house in Mantoloking, New Jersey, for approximately $2,225,000.

41

Specifically, on or about June 25, 2008, Madoff made a payment of $475,000 to CRUPI. These funds were transferred directly out of the IA Bank Account, the account into which IA Clients' money was deposited. On or about October 16, 2008, Madoff made another payment to CRUPI in the amount of $2,225,000. These funds also were transferred directly out of the IA Bank Account.

88. The payments to JOANN CRUPI, a/k/a "Jodi," the defendant, were not indicated in the records of BLMIS as salary, bonus or other type of compensation to CRUPI.

### BLMIS's Finances

**A.   The Principal Bank and Brokerage Accounts of BLMIS and MSIL**

89. Billions of dollars of funds received from IA Clients for investment were deposited principally into the IA Bank Account. The funds used to fulfill requests from IA Clients for withdrawals from their BLMIS accounts were obtained principally from the IA Bank Account. The IA Bank Account was maintained most recently at a bank in New York, New York ("Bank No. 1"), along with a checking account maintained at Bank No. 1 that was affiliated with the IA Bank Account (the "IA Checking Account").

90. The end-of-day balances in the IA Bank Account – balances which generally were in the range of hundreds of millions of dollars during the 2001-2008 period – were swept into a variety of overnight deposit accounts (the "IA Sweep

42

Accounts"). In addition, beginning in or about 2007, in excess of approximately $1 billion was invested in U.S. Treasury bills and other similar investments and was custodied in a separate account held by BLMIS at Bank No. 1. (The above-described BLMIS accounts held at Bank No. 1 collectively are referred to herein as the "IA Bank Account"). Interest earned on those investments generally was transferred to the IA Bank Account on a regular basis.

91. BLMIS maintained a separate bank account that was principally used to fund, directly and indirectly, the operations of BLMIS (the "BLMIS Operating Account"). The BLMIS Operating Account was custodied most recently at a bank in New York, New York ("Bank No. 2"). BLMIS opened one or more lines of credit at Bank No. 2 (collectively the "Bank No. 2 LOC").

92. At all times relevant to this Indictment, BLMIS also maintained brokerage accounts at a variety of financial institutions (the "IA Brokerage Accounts"). Funds in the IA Brokerage Accounts generally were invested in U.S. Government-issued securities such as U.S. Treasury bills.

93. At all times relevant to this Indictment, MSIL maintained a bank account in the United Kingdom (the "MSIL Bank Account").

B.    **Maintaining The IA Bank Account**

94.   Before approximately the mid-1990s, ANNETTE
BONGIORNO, the defendant, kept track of the daily balance and the
funds transferred into and out of the IA Bank Account.  In or
about the mid-1990s, this responsibility was transferred from
BONGIORNO to JOANN CRUPI, a/k/a "Jodi," the defendant.

95.   From approximately the mid-1990s, through in or
about December 2008, JOANN CRUPI, a/k/a "Jodi," the defendant,
prepared handwritten note cards reflecting the daily balance, as
well as the funds transferred into and out of the IA Bank Account
(the "Note Cards").  On a daily basis, CRUPI also prepared a
report regarding the IA Bank Account for Madoff and others (the
"Daily Report").  The Daily Report, which was handwritten, set
forth on a single page the day's opening balance, the end-of-day
balance, the funds transferred to BLMIS by check or wire by IA
Clients that were deposited into the IA Bank Account, and funds
transferred out of the IA Bank Account, including all redemptions
sent to IA Clients.  The Daily Report also listed redemptions
that IA Clients had requested but that had not yet been
fulfilled.

96.   By tracking, on a daily basis, the cash flowing
into and out of the IA Bank Account and listing the redemptions
that had been requested, but not yet fulfilled, the Daily Report
enabled Madoff, DiPascali, JOANN CRUPI, a/k/a "Jodi," the

44

defendant, and others to determine whether there were sufficient funds available to cover requested redemptions.

97.  When the balance on the Daily Report appeared too low to cover the expected redemptions, JOANN CRUPI, a/k/a "Jodi," the defendant, often brought this to the attention of DiPascali or Madoff and asked them whether additional client funds would be coming in to BLMIS to cover the expected redemptions.

98.  From at least in or about the 1990s through in or about 2008, DANIEL BONVENTRE, the defendant, reconciled or supervised the reconciliation of the IA Bank Account on a monthly basis.  Further, BONVENTRE often reviewed and initialed the Note Cards maintained by JOANN CRUPI, a/k/a "Jodi," the defendant, that kept track of the daily balance and the funds transferred into and out of the IA Bank Account.

C.  **The Use of IA Funds to Support BLMIS's Market Making and Proprietary Trading Operations**

99.  As DANIEL BONVENTRE, the defendant, and others, well knew, between in or about 1998 and in or about December 2008, hundreds of millions of dollars were transferred from the IA Bank Account to the BLMIS Operating Account, either directly or through other accounts including the IA Brokerage Accounts and the MSIL Bank Account.  These transfers were accounted for improperly: (a) in the G/L in the asset account titled "Trading"; and/or (b) in the G/L as revenue in the form of "Commissions Revenue;" and/or (c) on BLMIS Financial and Operational Combined

45

Uniform Single Reports ("FOCUS Reports") filed with the SEC as BLMIS revenue in the form of "Gains or losses on firm securities trading accounts from all other trading;" and/or (d) on BLMIS FOCUS reports as "Commissions on transactions in listed equity securities executed on an exchange."  In truth and in fact, however, and as BONVENTRE well knew, contrary to the entries in the G/L, substantially all of these transfers originated with the IA Bank Account and not from any trading activities of BLMIS, or from any commissions earned by BLMIS.

**D.    The Financial Condition of BLMIS**

100. Beginning at least as early as in or about 2002, as DANIEL BONVENTRE, the defendant, well knew, BLMIS's Market Making and Proprietary Trading operations did not generate sufficient revenue to meet BLMIS's expenses.

101. Moreover, as DANIEL BONVENTRE, the defendant, well knew, BLMIS suffered a liquidity crisis between in or about November 2005 and June 2006 caused by demands for withdrawals by IA Clients that exceeded the firm's available funds.

**1.    The Liquidity Crisis: November 2005-June 2006**

102. On or about November 2, 2005, BLMIS's Daily Report for the IA Bank Account showed an end-of-day balance of approximately $13 million - a sum that was insufficient to cover the approximately $105 million in payments by BLMIS scheduled to be made to IA Clients for the following three business days.

46

Therefore, funds were transferred from the BLMIS Brokerage Accounts to meet the cash needs of the IA operations on or about November 3, 2005.

### a.   **The Client A Bonds**

103. On or about November 4, 2005, an IA client ("IA Client A") sent approximately $100 million of Federal Home Loan Bank ("FHLB") bonds to BLMIS to be credited to accounts affiliated with IA Client A.  DANIEL BONVENTRE, the defendant, was well aware of the deposit of the FHLB bonds and the fact that they were to be credited to accounts affiliated with IA Client A.

104. On or about November 14, 2005, DANIEL BONVENTRE, the defendant, directed that a letter be written to Bank No. 1 in which he requested a $95 million loan on behalf of BLMIS using Client A's FHLB bonds as collateral.

105. On or about January 18, 2006, IA Client A sent another approximately $54 million of FHLB bonds to BLMIS to be credited to accounts affiliated with IA Client A.  (The $154 million in FHLB bonds described in this paragraph and paragraph 103, above, are referred to herein collectively as the "Client A Bonds.")  DANIEL BONVENTRE, the defendant, was aware of the deposit of the Client A Bonds and the fact that they belonged to Client A, not BLMIS.

106. On or about January 23, 2006, DANIEL BONVENTRE, the defendant, caused BLMIS to borrow another approximately $50

million using the Client A Bonds as collateral.  (The
approximately $145 million in debt incurred by BLMIS using the
Client A Bonds as collateral is referred to herein collectively
as the "Client Collateralized Loans.")  The proceeds of the
Client Collateralized Loans were deposited in the IA Bank Account
and were used to satisfy requests for withdrawals from IA
Clients.

          **b.**    **The "Four Wire Transfers"**

        107. Between in or about January 2006 and in or about
April 2006, deposits by IA Clients into the IA Bank Account
failed to keep pace with requests for withdrawals by IA Clients.

        108. Between in or about January 2006 and in or about
April 2006, approximately four wire transfers totaling
approximately $262 million were made from the BLMIS Operating
Account directly to four separate IA Clients to satisfy their
requests for withdrawals from their respective IA accounts (the
"Four Wire Transfers").  Those transfers occurred on January 30,
2006 (approximately $28 million), February 1, 2006 (approximately
$38 million), April 4, 2006 (approximately $76 million), and
April 13, 2006 (approximately $120 million).

        109. Because the Four Wire Transfers came out of the
BLMIS Operating Account (which, unlike the IA Bank Account, was
reflected on the G/L) those transactions had to be accounted for
on the G/L.  According to Generally Accepted Accounting

Principles ("GAAP"), and SEC rules and regulations, the G/L, and/or its supporting books and records, were required to reflect accurately BLMIS's use of, and/or the recipients of, the Four Wire Transfers.

110. DANIEL BONVENTRE, the defendant, directed the inclusion of entries in the G/L and its supporting books and records that concealed the fact that the Four Wire Transfers related to IA business operations (including withdrawals by IA Clients). The G/L entries and other books and records that BONVENTRE caused to be made falsely created the appearance that the Four Wire Transfers had been used to purchase assets for BLMIS (including the Client A Bonds), when, in fact, they had not been used for that purpose.

111. Likewise, in or about June 2006, DANIEL BONVENTRE, the defendant, made entries on the G/L related to transactions that transferred approximately $261.8 million from the IA Bank Account to the BLMIS Operating Account in a way that further concealed the purpose of the Four Wire Transfers and the relationship between the BLMIS Operating Account and the IA business operations.

112. On or about June 1, 2006, and June 6, 2006, DANIEL BONVENTRE, the defendant, caused entries to be made in the G/L that, in substance, reversed the entries that had concealed the true purpose of the Four Wire Transfers in the first instance.