Specifically, two wire transfers (approximately nearly $110 million and approximately $151.8 million, respectively) totaling approximately $261.8 million were executed from the IA Bank Account to the BLMIS Operating Account, thereby repaying the BLMIS Operating Account for substantially all of the funds that had been used to keep the Ponzi scheme going through the Four Wire Transfers.  As BONVENTRE well knew, entries on the G/L, and its supporting books and records, failed accurately to reflect the purpose of these two wire transfers.

   c.   **BLMIS Incurs Hundreds of Millions of Dollars of Debt to Meet the Liquidity Crisis**

113. On or about March 31, 2006, BLMIS drew down approximately $110 million on the Bank No. 2 LOC.  On or about April 12, 2006, another approximately $160 million was drawn on the Bank No. 2 LOC.  The balance owed on the Bank No. 2 LOC reached a peak of approximately $342 million on or about May 25, 2006.

114. On or about June 1, 2006, the Client Collateralized Loans balance of approximately $145 million was fully repaid using funds from the IA Bank Account.

115. On or about June 1, 2006, the principal balance of the Bank No. 2 LOC was reduced by approximately $103 million.  On or about June 6, 2006, the principal balance of the Bank No. 2 LOC was reduced by an additional approximately $167 million.

116. Following the resolution of the 2005-06 liquidity crisis, in or about June 2006, substantially all of the funds that were deposited in the IA Bank Account were investor funds, or funds from the MSIL Account (that itself had been funded by monies received from the IA Bank Account), and IA Clients' requests for withdrawals were satisfied by the new investor funds in the IA Bank Account.

2.   **Filing a False and Misleading FOCUS Report With the SEC**

117. As an SEC-registered broker-dealer, BLMIS was required to file FOCUS Reports on a monthly, quarterly, and annual basis.  The FOCUS Reports required BLMIS to file with the SEC accurate balance sheet information, including a summary of the firm's assets and liabilities.

118. In his role as BLMIS's Director of Operations, DANIEL BONVENTRE, the defendant, provided information concerning BLMIS expenses that was used in preparation of the FOCUS Reports filed by BLMIS, and supervised others who were involved in the process of preparing those filings.  As BONVENTRE well knew, the information contained in the BLMIS FOCUS Reports concerning BLMIS's assets, liabilities, revenues, and expenses, was derived from information recorded in the G/L.

119. Contrary to GAAP, and rules and regulations promulgated by the SEC, the G/L, and its supporting books and records, as well as the FOCUS Reports filed by BLMIS with the

51

SEC, failed accurately to reflect the assets contained in the IA
Bank Account, the BLMIS Brokerage Accounts, and the other BLMIS
IA Accounts, and likewise did not reflect the liability of BLMIS
to its IA Clients that arose from the custody of IA Client funds
in those accounts.  The omitted assets and associated liabilities
of BLMIS's IA operations were material.

121. As DANIEL BONVENTRE, the defendant, well knew, the
FOCUS Reports filed by BLMIS with the SEC failed accurately to
reflect the assets contained in the IA Bank Account, the BLMIS
Brokerage Accounts and the other BLMIS IA Accounts, and likewise
did not reflect the liability of BLMIS to its IA Clients that
arose from the custody of IA Client funds in those accounts.  At
various points in time, the assets and associated liabilities of
BLMIS's IA operations, which were omitted from the FOCUS Reports
filed by BLMIS with the SEC, ranged from millions to billions of
dollars.

121. For example, as DANIEL BONVENTRE, the defendant,
well knew, BLMIS's liabilities were understated by at least
approximately $299 million in a FOCUS Report filed by BLMIS with
the SEC on or about May 22, 2006.

**DANIEL BONVENTRE Received Proceeds From False and Fraudulent
Profitable "Trades" Executed In His IA Account**

122. DANIEL BONVENTRE, the defendant, maintained at
BLMIS an IA account (the "Bonventre IA Account") from at least as
early as 1983 through December 2008.  At BONVENTRE's request,

ANNETTE BONGIORNO, the defendant, created a number of backdated, fictitious trades to create false gains in his account.  One series of trades in a particular stock was backdated by approximately twelve years, and produced a purported gain of over $999,000.  Two more series of backdated trades were created in 2004 and 2006 for illicit "profits" of over $977,000.  As described below, between approximately 2002 and 2006, BONVENTRE received the benefit of more than approximately $1.8 million in three separate backdated securities transactions in the BONVENTRE IA Account that, in fact, were not actually executed.

A.    **The November 2002 Fictitious Big Lots "Trade"**

123. On or about November 12, 2002, Madoff signed a check drawn on the IA Bank Account made out to DANIEL BONVENTRE, the defendant, and his wife in the amount of approximately $999,375 ("Check No. 2").  That check was thereafter deposited in a joint bank account held by BONVENTRE and his wife (the "Bonventre Bank Account").

124. On or about November 22, 2002, ANNETTE BONGIORNO, the defendant, directed a backdated trade to be entered in the records of the Bonventre IA Account maintained on House 17 that purportedly had taken place in 1990, approximately twelve years earlier.  The false trade created by BONGIORNO had the effect of showing, on paper, purchases of 40,000 shares of common stock of Consolidated Stores on January 31, 1990, for approximately

$90,000, and sales of approximately 62,500 shares of common stock of Big Lots Inc. (adjusted for a stock split and the change of Consolidated Stores' corporate name to Big Lots Inc.) on September 26, 2002, for approximately $1,089,375. These purported purchases and sales of Big Lots Inc. common stock resulted in purported long-term gains of approximately $999,375.

125. The backdated trades in Big Lots were created in order to disguise payments made by BLMIS to DANIEL BONVENTRE, the defendant, as a stock transaction in order for BONVENTRE to take advantage of the lower tax rate for long-term capital gains (as opposed to the higher tax rate for ordinary income).

126. Following the backdated Big Lots "trade," and the withdrawal effected through Check No. 2, the Bonventre IA Account reflected a balance of approximately $182,000.

**B.   The July 2004 Fictitious Lucent "Trade"**

127. The Bonventre IA Account statements for the period March 2003 through March 2004 reflected no securities positions, and a constant cash balance of approximately $182,000. In or about April 2004, DANIEL BONVENTRE, the defendant, and his wife received from BLMIS a check drawn on the IA Account in the amount of approximately $200,000, and the balance in the Bonventre IA Account was reduced by the same amount, leaving a balance, as of on or about April 30, 2004, of approximately -$18,000.

128. On or about July 12, 2004, at the direction of ANNETTE BONGIORNO, the defendant, a series of false, backdated trades were entered in the records of the Bonventre IA Account maintained on House 17.  Those false trades had the effect of showing, on paper: (a) the purchase of approximately 90,000 shares of common stock of Lucent Technologies Inc. ("Lucent") on March 11, 2003, for a total price of approximately $144,000; (b) the purchase of approximately 67,000 shares of Lucent on March 12, 2003, for a total price of approximately $102,510; (c) the sale of approximately 67,000 shares of Lucent on April 19, 2004, for a total price of approximately $285,420; and (d) the sale of approximately 90,000 shares of Lucent on April 20, 2004, for a total price of approximately $360,900.

129. The purported purchases and sales of Lucent stock described above, resulted in purported net profits of approximately $399,810.  ANNETTE BONGIORNO, the defendant, documented this transaction on an account statement belonging to DANIEL BONVENTRE, the defendant, on which she wrote: "Dan had me put thru a profit trade for 399,810.00 then add that figure to cap additions."  Immediately following the Lucent "transaction," the Bonventre IA Account reflected a balance of approximately $381,000.

130. The backdated trades in Lucent were created in order to disguise payments made by BLMIS to DANIEL BONVENTRE, the

defendant, as a stock transaction in order for BONVENTRE to take advantage of the lower tax rate for long-term capital gains (as opposed to the higher tax rate for ordinary income).

131. On or about May 25, 2005, a check drawn on the IA Bank Account in the amount of approximately $400,000 ("Check No. 3") was made out to DANIEL BONVENTRE, the defendant, and his wife.  Immediately following the withdrawal effected by Check No. 3, the Bonventre IA Account reflected a cash balance of approximately -$18,190.

## C.   The March 2006 Fictitious Apple "Trade"

132. During the period between in or about January 2005 through in or about February 2006, the Bonventre IA Account statements reflected no securities positions, and a constant cash balance of approximately -$18,190.00.

133. In or about March 2006, DANIEL BONVENTRE, the defendant, provided the following handwritten instructions to ANNETTE BONGIORNO, the defendant:

> Hi Annette
>
> As per our phone conversation, I need a long term capital gain of $449000.- on an investment of $129000.- for a sale proceed of $578000.--
>
> I'll be back in NY on March 30th but if you need to speak to me before then, call me on []
>
> Thanks
> Dan

56

134. On or about March 31, 2006, ANNETTE BONGIORNO, the defendant, entered a series of purported trades in the records of the Bonventre IA Account.  Those false trades had the effect of showing: (a) the purchase of approximately 8,000 shares of common stock of Apple Computer Inc. ("Apple") on January 25, 2005, for a total price of approximately $577,760; and (b) the sale of approximately 16,000 shares of Apple on March 9, 2006, for total proceeds of approximately $1,056,960.[5]

135. The backdated trades in Apple were created in order to disguise payments made by BLMIS to DANIEL BONVENTRE, the defendant, as a stock transaction in order for BONVENTRE to take advantage of the lower tax rate for long-term capital gains (as opposed to a higher tax rate for ordinary income).

136. The purported purchases and sales of Apple, described above, resulted in purported net long term gains of approximately $479,200, and immediately following the Apple "transaction," the Bonventre IA Account reflected a balance of approximately $461,010.  On or about April 6, 2006, BONVENTRE received a check drawn on the IA Bank Account in the amount of approximately $577,954.81.  A balance of -116,944.81 resulted and, as described in paragraph 77 above, BONVENTRE's IA Account balance was brought to $0.

---

[5]    The additional 8,000 shares were credited to the Bonventre IA Account as a consequence of a two-for-one Apple stock split on March 2, 2005.

## ANNETTE BONGIORNO Received Proceeds from False and Fraudulent Profitable "Trades" Executed in Her IA Accounts

137. ANNETTE BONGIORNO, the defendant, and her husband, "Rudy," maintained a BLMIS account called the RuAnn Family Plan account, named after Rudy and ANNETTE BONGIORNO (the "RuAnn Account") at least as early as the 1980's, and recruited many individuals to invest in it. BONGIORNO created and sent handwritten statements that purportedly showed each RuAnn Account investor's interest in the consolidated RuAnn Account.

138. ANNETTE BONGIORNO, the defendant, opened a bank account in the name of the RuAnn Family Plan at another financial institution. This bank account was used to channel funds between RuAnn Account investors and the IA Bank Account. In or about 1993, most or all of the RuAnn Account investors' investments in the RuAnn Account were transferred to individual Split Strike IA accounts managed by DiPascali. BONGIORNO did not close the RuAnn Account at BLMIS after 1993, but instead, as discussed below, used it as one of her own accounts to create profitable "trades" for her personal benefit over the following 15 years.

139. ANNETTE BONGIORNO, the defendant, managed several BLMIS IA accounts held in her name, her husband's name, and/or jointly with her husband. Just as she did in the accounts of other IA Clients, BONGIORNO created "trades" in her own BLMIS accounts to reflect extraordinary gains. BONGIORNO first invested in a BLMIS account in or about 1975. Although BONGIORNO

deposited only approximately $920,000 into her own accounts since
in or about 1975, she withdrew approximately $14.5 million during
the same period. The cumulative value of BONGIORNO's IA
accounts, on or about November 30, 2008, was approximately $53
million. These high balances and BONGIORNO's withdrawals were
made possible only through backdated, highly profitable trades
created in her accounts.

140. ANNETTE BONGIORNO, the defendant, maintained
several BLMIS accounts in her name, and regularly managed the
activity in three of these accounts. BONGIORNO followed the same
basic steps to create gains in these accounts as she did to
create gains in investor accounts generally. Most of the trades
in her accounts were backdated to create extraordinary gains or
to avoid losses.

141. For example, in or about 2002, ANNETTE BONGIORNO,
the defendant, created gains in one of her IA accounts by
shorting WorldCom stock as the company's financial performance,
credit ratings and share price rapidly declined. Throughout
2002, none of BONGIORNO's accounts reflected a position or
activity in WorldCom. BONGIORNO obtained a Bloomberg report,
printed on June 3, 2002, with WorldCom daily stock prices from
December 24, 2001, through June 3, 2002. On or about June 3,
2002, BONGIORNO caused short trades to be reflected in her
account to create a gain of approximately $1.039 million by

59

taking advantage of a more than 87 percent drop in share price between on or about January 11, 2002, and on or about May 31, 2002.

142. On or about June 27, 2002, the same day the SEC filed civil charges accusing WorldCom of financial accounting fraud, ANNETTE BONGIORNO, the defendant, locked in approximately $653,000 of these gains.  BONGIORNO did so by creating backdated cover positions to secure the more than 55 percent drop in share price between on or about January 11, 2002, and on or about March 26, 2002.

143. ANNETTE BONGIORNO, the defendant, also created profits to eliminate a deficit in one of her IA accounts by backdating trades in 2006 to take advantage of a rise in Apple's stock price.  At the end of June 2006, one of BONGIORNO's IA accounts had a reported net account balance of negative $2.2 million.  On or about August 1, 2006, BONGIORNO purported to purchase Apple stock on or about July 13, 2006.  As BONGIORNO well knew when she created the trades, Apple's share price had increased by over 31 percent between on or about July 13 and on or about July 31, 2006, and the backdated "purchase" yielded $2.85 million in gains and a positive balance of approximately $136,000 in her account.

144. ANNETTE BONGIORNO, the defendant, backdated a short trade to avoid losses she otherwise would have incurred due

60

to a drop in Apple's stock price in or around September 2008.  On
or about October 1, 2008, BONGIORNO entered a purported trade
that was backdated to on or about September 3, 2008, in which she
shorted 175,000 shares of Apple.  As BONGIORNO well knew when she
created this trade, Apple's stock had fallen by over 32 percent
between on or about September 3 and on or about September 30,
2008, and the short "trade" allowed her to avoid a loss of
approximately $9.5 million.

145.  ANNETTE BONGIORNO, the defendant, created trades
to avoid losses she would have incurred due to a Summer 2008
price drop in the Fannie Mae stock she purported to hold in two
of her accounts.  BONGIORNO purported to buy Fannie Mae stock on
or about October 31, 2007, and to have held it through the Summer
of 2008.  On or about August 1, 2008, BONGIORNO backdated a sale
of Fannie Mae shares to on or about April 29, 2008, thereby
avoiding losses of approximately $2.3 million that would have
resulted from the more than 61 percent decrease in stock price
between those two dates.  BONGIORNO did not seek to avoid the
entire stock drop, and realized a $3.5 million loss from the
diminution in share price before BONGIORNO's purported April 29,
2008 sale date.  BONGIORNO directed that STMTPRO statements be
created on or about August 28, 2008, for May, June, and July 2008
to reflect these trades and adjusted beginning balances, ending
balances, and stock positions in the corresponding months.

146. ANNETTE BONGIORNO, the defendant, created gains in her accounts in or around the Fall of 2008 by backdating shorts on SPDRs (securities designed to track the performance of the S&P 500 index), which were declining with the overall market at that time.  BONGIORNO obtained a Bloomberg report, printed on or about October 29, 2008, showing SPDR prices from in or about late September 2008 through on or about October 29, 2008.  On or about November 3, 2008, BONGIORNO caused her accounts to reflect short positions in SPDRs on or about September 26 and 30, 2008, at slightly different prices.  Due to the more than 17 percent drop in share price, BONGIORNO enjoyed a gain as of on or about October 31, 2008 of approximately $11.1 million.

147. ANNETTE BONGIORNO, the defendant, avoided losses in one of her accounts in or around the Fall 2008 by backdating the sale of Aetna stock she purportedly held in one of her accounts.  On or about October 1, 2008, BONGIORNO caused purported sales of 228,000 shares of Aetna stock to be reflected in her account as of on or about August 29 and September 2, 2008. These backdated sales allowed her to avoid an 18 percent share price drop and related loss of approximately $1.8 million. BONGIORNO created additional trades to avoid losses in her account on or about October 1, 2008, by reflecting short positions on another 400,000 Aetna shares in her account as of on or about September 18 and 19, 2008.  This allowed her to avoid a

loss of approximately $1.9 million related to the more than 5 percent drop in share price between on or about September 18 and September 30, 2008.

148. At or around the end of October 2008, ANNETTE BONGIORNO, the defendant, cancelled the backdated shorts and replaced them with backdated sales of the same Aetna shares, on the same days, at the same prices.  BONGIORNO did this in response to an SEC restriction on naked shorting in various stocks.[6]

### Between 2003 and 2007, DANIEL BONVENTRE Received From BLMIS More Than Approximately $270,000 in "Off-the-Books" Income

149. Between on or about February 10, 2003, and on or about October 29, 2007, DANIEL BONVENTRE, the defendant, received and deposited into one or more bank accounts in which he had an interest, approximately six checks, drawn on a BLMIS bank account, as shown below (the "Bonventre Checks"):

| Date | Amount |
|------|--------|
| February 10, 2003 | $33,300.00 |
| November 12, 2003 | $65,000.00 |
| December 21, 2004 | $18,420.24 |
| January 13, 2006 | $61,900.00 |
| January 17, 2007 | $35,000.00 |
| October 29, 2007 | $60,000.00 |

---

[6]    Naked short selling, or naked shorting, is the practice of short-selling a financial instrument without first borrowing the security or ensuring that the security can be borrowed, as is conventionally done in a short sale.

150. None of the approximately $273,620.24 received by DANIEL BONVENTRE, the defendant, through the Bonventre Checks, was reported by BLMIS or BONVENTRE to the United States Internal Revenue Service as salary, bonus or any other form of income.

**Between 2004 and 2008, ANNETTE BONGIORNO Received From BLMIS More Than Approximately $325,000 in "Off-the-Books" Income**

151. In addition to the withdrawals ANNETTE BONGIORNO, the defendant, made from trading accounts under her management, BONGIORNO also maintained two additional accounts in which she did not create fake trades, but from which she withdrew approximately $883,000 since in or about January 1990. These two accounts – "BLM Special 1" and "BLM Special 2" – belonged to both BONGIORNO and her husband. Although no trading in either of these accounts was reflected since at least as early as in or about 1992, BONGIORNO routinely made withdrawals from these accounts until BLMIS collapsed in December 2008. Monthly account statements reflected these withdrawals and an increasing debit (i.e., negative) balance over time.

152. Between in or about 2004 and in or about 2008, ANNETTE BONGIORNO, the defendant, received approximately $325,000 in cash, withdrawn from these two BLMIS accounts owned by BONGIORNO and her husband, as shown below:

| Year | BLM Special 1 | BLM Special 2 | Total Checks | Total Amount |
|------|---------------|---------------|--------------|--------------|
| 2004 | $40,500 | $45,000 | 38 | $85,500 |
| 2005 | $28,000 | $33,100 | 31 | $61,100 |
| 2006 | $34,000 | $32,000 | 30 | $66,000 |
| 2007 | $24,000 | $37,500 | 27 | $61,500 |
| 2008 | $23,500 | $27,500 | 23 | $51,000 |
| Total | $150,000 | $175,100 | 149 | $325,100 |

153. None of the approximately $325,100 received by ANNETTE BONGIORNO, the defendant, through the "BLM Special 1" and "BLM Special 2" accounts was reflected in the records of BLMIS, or reported by BLMIS or BONGIORNO to the United States Internal Revenue Service, as salary, bonus or any other form of compensation.

## Between 2004 and 2008, JOANN CRUPI Received From BLMIS More Than Approximately $270,000 in "Off-the-Books" Income

154. Between in or about 2004, and in or about 2008, JOANN CRUPI, a/k/a "Jodi," the defendant, charged more than approximately $270,000 in personal charges to a BLMIS American Express account, in the approximate amounts detailed below:

| Year | Approximate Amount of Personal Charges |
|------|----------------------------------------|
| 2004 | $40,757 |
| 2005 | $56,238 |
| 2006 | $52,042 |
| 2007 | $63,120 |
| 2008 | $55,069 |

155. None of the more than approximately $270,000 in benefits received by JOANN CRUPI, a/k/a "Jodi," the defendant, was reflected in the records of BLMIS, or reported by BLMIS or

CRUPI to the United States Internal Revenue Service, as salary or any other form of compensation.

### The 2008 Liquidity Crisis and the Collapse of BLMIS

156. From at least in or about the Fall of 2008, requests for redemptions made by BLMIS IA Clients began to increase at a rate greater than investments made by new or existing clients. By in or about mid-November 2008, as this liquidity crisis deepened, Madoff, DiPascali, JOANN CRUPI, a/k/a "Jodi," the defendant, and others were concerned that BLMIS would not be able to fulfill the requests for redemptions, which were outpacing deposits at an increasing rate.

157. On or about November 3, 2008, the balance of the IA Bank Account reflected on the Daily Report, which was prepared or maintained by JOANN CRUPI, a/k/a "Jodi," the defendant, showed a balance of approximately $487 million, and unfulfilled requests for redemptions totaling approximately $1.447 billion.

158. On or about November 17, 2008, DANIEL BONVENTRE, the defendant, called Bank No. 1 and inquired about a loan of approximately $200 million on behalf of BLMIS using Federal bonds as collateral.

159. On or about November 20, 2008, IA Client A sent approximately $181 million of Federal Home Loan Bank ("FHLB") bonds to BLMIS to be credited to accounts affiliated with IA Client A. DANIEL BONVENTRE, the defendant, was well aware of the

deposit of the FHLB bonds and the fact that they belonged to an IA Client, not BLMIS.  In fact, the $181 million of FHLB bonds were credited to IA Client A's accounts on or about November 20, 2008, and were reflected on IA Client A's account statements as of November 30, 2008.  (On or about December 1, 2008, the issuer called back $46 million of the FHLB bonds.)

160. On or about November 25, 2008, the balance of the IA Bank Account reflected on the Daily Report, which was prepared or maintained by JOANN CRUPI, a/k/a "Jodi," the defendant, showed a balance of approximately $266 million, and unfulfilled requests for redemptions totaling approximately $759 million.

161. On or about December 1 and December 2, 2008, approximately $181 million was transferred from the BLMIS Operating Account directly to the IA Bank Account.

162. Because the $181 million in wire transfers came out of the BLMIS Operating Account (which, unlike the IA Bank Account, was reflected on the G/L) those transactions had to be accounted for on the G/L.

163. On or about December 2, 2008, DANIEL BONVENTRE, the defendant, directed the inclusion of entries in the G/L, and its supporting books and records, that falsely created the appearance that $135 million (of the $181 million) in wire transfers had been used to purchase assets for BLMIS (including

Client A's bonds) when, in fact, they had not been used for that purpose.

164. In fact, DANIEL BONVENTRE, the defendant, directed the inclusion in the G/L, and its supporting books and records, of IA Client A's bonds, identified with the same CUSIP number, creating the appearance that BLMIS had purchased the $135 million in FHLB bonds.

165. On or about December 3, 2008, JOANN CRUPI, a/k/a "Jodi," the defendant, and DiPascali met on a street corner near BLMIS. DiPascali told CRUPI that Madoff had just told him that BLMIS was out of money and that there were no assets standing behind the BLMIS obligations reflected in the IA Clients' account statements.

166. By on or about December 4, 2008, the balance of the IA Bank Account as reflected on the Daily Report, which was prepared and maintained by JOANN CRUPI, a/k/a "Jodi," the defendant, showed a balance of only approximately $295 million, and unfulfilled requests for redemptions totaling approximately $1.455 billion — nearly twice the amount reflected on the November 25, 2008, Daily Report.

167. In the days following the December 3 meeting, JOANN CRUPI, a/k/a "Jodi," the defendant, and DiPascali discussed what they would say to law enforcement authorities once BLMIS eventually collapsed. DiPascali told CRUPI that he did not know

what he would say.  CRUPI told DiPascali that she was going to

say that she thought that the trades executed on behalf of the IA

Clients were being done overseas.

168. On or about Sunday, December 7, 2008, JOANN CRUPI,

a/k/a "Jodi," the defendant, and DiPascali met again in a

restaurant in New Jersey and further discussed the liquidity

crisis at BLMIS.  CRUPI asked DiPascali what he was going to tell

law enforcement authorities.  CRUPI told DiPascali that she was

"sticking to my story," and would tell law enforcement

authorities that she thought that the trades executed on behalf

of the IA Clients were being done overseas.  CRUPI and DiPascali

further discussed sending the remaining BLMIS funds to certain IA

Clients and employees.

169. From approximately on or about December 3, 2008,

through approximately on or about December 10, 2008, Madoff,

DiPascali, JOANN CRUPI, a/k/a "Jodi," the defendant, and others,

continued to take in more than approximately $48 million of new

deposits from investors.

170.  During this time period, DiPascali, JOANN CRUPI,

a/k/a "Jodi," the defendant, and others, prepared lists

reflecting preferred employees, employee family members, and

certain other IA Clients, and the balances in their respective IA

accounts.  DiPascali, CRUPI and others, also prepared checks, or

caused checks to be prepared, for these preferred IA Clients so

that the remaining BLMIS funds would be sent to them, thereby putting the interests of the select few IA Clients ahead of all of the other IA Clients.  More than approximately $300 million in checks were prepared to be sent out to these preferred IA clients.

171.  At the time BLMIS collapsed, JOANN CRUPI, a/k/a "Jodi," the defendant, had in her desk two Daily Journal Reports for December 11, 2008, listing the preferred IA Clients and the balances in their IA accounts, and reflecting CRUPI's handwritten calculations.  CRUPI's desk also contained: a batch of checks made out to some of the preferred IA Clients in the amount of approximately $176 million; a Daily Journal Report for December 10, 2008, reflecting the amount of new deposits by IA Clients on that date; and several ripped up duplicate checks.

## STATUTORY ALLEGATIONS

### The Conspiracy

172.  From at least in or about 1992, up to and including on or about December 11, 2008, in the Southern District of New York and elsewhere, DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, Bernard L. Madoff, Frank DiPascali, Jr., and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, (a)

70

securities fraud, in violation of Title 15, United States Code,

Sections 78j(b) and 78ff; and Title 17, Code of Federal

Regulations, Section 240.10b-5; (b) falsifying the records of a

broker-dealer, in violation of Title 15, United States Code,

Sections 78q(a) and 78ff; and Title 17, Code of Federal

Regulations, Section 240.17a-3; (c) falsifying the records of an

investment adviser, in violation of Title 15, United States Code,

Sections 80b-4 and 80b-17, and Title 17, Code of Federal

Regulations, Section 275.204-2; and (d) causing the filing of

false documents with the SEC, in violation of Title 15, United

States Code, Sections 78q(a) and 78ff, and Title 17, Code of

Federal Regulations, Section 240.17a-5.

## Objects of the Conspiracy

### Securities Fraud

173. It was a part and an object of the conspiracy that

DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi,"

JEROME O'HARA and GEORGE PEREZ, the defendants, Madoff,

DiPascali, and others known and unknown, unlawfully, willfully,

and knowingly, directly and indirectly, by use of the means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, would and did use

and employ manipulative and deceptive devices and contrivances in

connection with the purchase and sale of securities, in

contravention of Title 17, Code of Federal Regulations, Section

71

240.10b-5, by:    (a) employing devices, schemes, and artifices to defraud; (b) making and causing BLMIS to make untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons who invested in and through BLMIS, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Falsifying Records of a Broker-Dealer

174. It was a further part and an object of the conspiracy that DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, Madoff, DiPascali, and others known and unknown, unlawfully, willfully, and knowingly, did cause BLMIS, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, in violation of Title 15, United States Code, Sections 78q(a) and 78ff; and Title 17, Code of Federal Regulations, Section 240.17a-3.

## Falsifying Records of an Investment Adviser

175. It was a further part and an object of the conspiracy that DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, Madoff, DiPascali, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, in connection with BLMIS's business as an investment adviser, did cause BLMIS to fail to make and keep for prescribed periods such records, furnish such copies thereof and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, in violation of Title 15, United States Code, Sections 80b-4 and 80b-17; and Title 17, Code of Federal Regulations, Section 275.204-2.

## False Filings With the SEC

176. It was a further part and an object of the conspiracy that DANIEL BONVENTRE, JEROME O'HARA and GEORGE PEREZ, the defendants, Madoff and others known and unknown, unlawfully, willfully, and knowingly, in applications, reports, and documents required to be filed with the SEC under the Securities Exchange Act of 1934, and the rules and regulations thereunder, did make and cause to be made statements that were false and misleading with respect to material facts, in violation of Title 15, United

73

States Code, Sections 78q(a) and 78ff; and Title 17, Code of
Federal Regulations, Section 240.17a-5.

### Means and Methods of the Conspiracy

177. Among the means and methods by which DANIEL
BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME
O'HARA and GEORGE PEREZ, the defendants, Madoff, DiPascali, and
others, known and unknown, would and did carry out the conspiracy
were the following:

a. BONGIORNO handled the receipt of funds sent
to BLMIS by the IA Clients for investment; transferred IA
Clients' funds between and among various BLMIS accounts; handled
requests for redemptions sent to BLMIS by IA Clients;
communicated with the IA Clients and answered their questions
about their purported investments; and oversaw the creation and
mailing to IA Clients of thousands of pages of accounts
statements, trade confirmations, and other documents that
contained backdated trades based on historical stock prices.

b. CRUPI created account statements and trade
confirmations, and other documents, that reflected purported
securities transactions that she calculated on the basis of
historical stock prices.

c. At the direction of Madoff, DiPascali, and
others, O'HARA and PEREZ developed and maintained computer
programs that were used to generate false and fraudulent books

and records related to the operation of the IA business for the purpose of misleading the SEC about the nature, scale, and activities of BLMIS's IA business.

        d.   At the direction of Madoff, DiPascali, and others, O'HARA and PEREZ developed and maintained computer programs that were used to generate false and fraudulent books and records related to the operation of BLMIS's IA business for the purpose of misleading the European Accounting Firm about BLMIS's operations, including where the assets of the European Accounting Firm's client were being held.

        e.   CRUPI assisted in the creation of false and fraudulent books and records related to the operation of the IA business for the purpose of misleading the SEC and the European Accounting Firm.

        f.   BONVENTRE supervised the "back office" operations of BLMIS (i.e., the post-market processing, including the confirmation, payment, settling and accounting of transactions), prepared, and supervised the preparation and maintenance of, the G/L, and reconciled BLMIS bank accounts, including accounts associated with BLMIS's IA, Market Making and Proprietary Trading operations;

        g.   BONVENTRE prepared information to be included in FOCUS Reports made and kept by BLMIS, and filed by BLMIS with the SEC;

       h.    BONVENTRE acted as an authorized signatory for BLMIS in its business relationships with certain banks and DTC;

       i.    At BONVENTRE's request, BONGIORNO created a number of backdated trades to create gains in BONVENTRE's account.

       j.    BLMIS filed false and misleading documents with the SEC that omitted material information about its financial condition.

       k.    CRUPI kept track of the funds transferred into and out of the IA Bank Account and prepared a Daily Report regarding the IA Bank Account for Madoff and others.

       l.    Hundreds of millions of dollars of IA investor funds were used to support BLMIS's Market Making and Proprietary Trading operations, but were accounted for on BLMIS's books and records, including the G/L, so as to conceal the true source of the funds.

## Overt Acts

178. In furtherance of the conspiracy and to effect the illegal objects thereof, DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

       a.   In or about 1992, in New York, New York,
BONGIORNO fabricated A&B account statements to reflect the inflow
of funds into the account as a dividend from General Motors,
instead of a transfer of funds from another IA account.

       b.   In or about November 1992, in New York, New
York, BONVENTRE caused false and fraudulent BLMIS books and
records to be created.

       c.   On or about November 8, 2000, BONGIORNO
caused approximately $1,025,000 to be wire transferred from the
IA Bank Account to a personal account held by BONGIORNO at
another financial institution.

       d.   On or about November 22, 2002, in New York,
New York, BONGIORNO created a backdated trade to be entered in
the records of the BONVENTRE IA Account maintained on House 17
that purportedly had taken place approximately twelve years
earlier.

       e.   On or about February 10, 2003, in New York,
New York, BONVENTRE received a check in the amount of
approximately $33,300 from a BLMIS bank account.

       f.   On or about November 12, 2003, in New York,
New York, BONVENTRE received a check in the amount of
approximately $65,000 from a BLMIS bank account.

       g.   On or about December 19, 2003, in New York,
New York, O'HARA created a computer program that was used to

produce false and fraudulent BLMIS books and records for the IA business.

  h. In or about January 2004, in New York, New York, PEREZ modified a computer program which was used to produce false and fraudulent BLMIS books and records for the IA business.

  i. On or about January 7, 2004, in New York, New York, O'HARA created a computer program that was used to produce false and fraudulent BLMIS books and records for the IA business in connection with a review of BLMIS by the SEC.

  j. In or about February 2004, in New York, New York, PEREZ modified a computer program used to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

  k. On or about February 19, 2004, in New York, New York, O'HARA created a computer program that was used to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

  l. On or about December 21, 2004, in New York, New York, BONVENTRE received a check in the amount of approximately $18,420.24 from a BLMIS bank account.

  m. In or about April 2005, in New York, New York, PEREZ modified a computer program that was used to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

n.   On or about April 14, 2005, in New York, New York, PEREZ created a computer file that was used in conjunction with other computer files and computer programs to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

o.   In or about October 2005, in New York, New York, PEREZ created a computer program that was used to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the European Accounting Firm.

p.   On or about October 21, 2005, in New York, New York, PEREZ created a computer file that was used in conjunction with other computer files and computer programs to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the European Accounting Firm.

q.   In or about the months preceding November 2005, in New York, New York, BONVENTRE prepared DiPascali to play the role of BLMIS's Director of Operations during a visit to the BLMIS offices by representatives of the European Accounting Firm.

r.   On or about November 14, 2005, in New York, New York, BONVENTRE directed that a letter be written to a bank in which he requested a $95 million loan on behalf of BLMIS.

s.   In or about December 2005, in New York, New York, O'HARA modified a computer program that was used to produce

79

false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

t.   In or about December 2005, in New York, New York, PEREZ created a computer program that was used to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

u.   In or about December 2005, in New York, New York, O'HARA modified a computer program that was used to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the SEC.

v.   In or about January 2006, in New York, New York, BONVENTRE contacted a bank to secure a $50 million loan on behalf of BLMIS.

w.   On or about January 11, 2006, in New York, New York, O'HARA created a computer disk that contained files including false and fraudulent BLMIS books and records, and which was produced to the SEC in connection with its review of BLMIS.

x.   On or about January 13, 2006, in New York, New York, BONVENTRE received a check in the amount of approximately $61,900 from a BLMIS bank account.

y.   On or about January 30, 2006, in New York, New York, BONVENTRE created false and fraudulent BLMIS books and records.

z.   On or about February 1, 2006, in New York, New York, BONVENTRE created false and fraudulent BLMIS books and records.

aa.   On or about March 29, 2006, in New York, New York, CRUPI researched historical stock prices and created backdated trades in the account of an IA Client.

bb.   On or about April 4, 2006, in New York, New York, BONVENTRE created false and fraudulent BLMIS books and records.

cc.   On or about April 6, 2006, in New York, New York, O'HARA closed BLMIS IA Accounts in which he had an interest and received more than $976,000 by checks.

dd.   On or about April 6, 2006, in New York, New York, PEREZ closed a BLMIS IA Account in which he had an interest and received approximately $289,000 by check.

ee.   On or about April 17, 2006, in New York, New York, BONVENTRE created false and fraudulent BLMIS books and records.

ff.   On or about June 1, 2006, in New York, New York, BONVENTRE created false and fraudulent BLMIS books and records.

gg.   In or about June 2006, in New York, New York, a debt owed by BONVENTRE to BLMIS in the amount of approximately $116,944.81 was canceled.

hh.   In or about September 2006, in New York, New York, O'HARA and PEREZ met with Madoff and DiPascali and stated that they would no longer create computer programs used to produce false and fraudulent BLMIS books and records.

ii.   In or about September 2006, in New York, New York, DiPascali told O'HARA and PEREZ that Madoff had authorized DiPascali to meet any salary demands made by O'HARA and PEREZ.

jj.   In or about the Fall of 2006, in New York, New York, O'HARA and PEREZ demanded pay increases of approximately 20 percent.

kk.   In or about November 2006, in New York, New York, O'HARA received a pay increase of approximately 20 percent.

ll.   In or about November 2006, in New York, New York, O'HARA received a net bonus of approximately $64,812.

nn.   In or about November 2006, in New York, New York, PEREZ received a pay increase of approximately 20 percent.

oo.   In or about November 2006, in New York, New York, PEREZ received a net bonus of approximately $60,165.

pp.   On or about January 17, 2007, in New York, New York, BONVENTRE received a check in the amount of approximately $35,000 from a BLMIS bank account.

qq.   On or about February 23, 2007, BONGIORNO caused approximately $60,000 to be wire transferred from the IA

Bank Account to a personal account held by BONGIORNO at another financial institution.

rr.  On or about October 29, 2007, BONVENTRE, in New York, New York, received a check in the amount of approximately $60,000 from a BLMIS bank account.

ss.  In or about February 2008, in New York, New York, O'HARA and PEREZ created computer programs that allowed DiPascali and others to produce false and fraudulent BLMIS books and records in connection with a review of BLMIS by the European Accounting Firm.

tt.  On or about April 9, 2008, BONGIORNO caused approximately $650,000 to be wire transferred from the IA Bank Account to a bank account held by BONGIORNO at another financial institution.

uu.  In or about 2008, in New York, New York, CRUPI received a pay increase of approximately 20 percent.

vv.  On or about June 25, 2008, in New York, New York, CRUPI caused approximately $475,000 to be wire transferred from a BLMIS bank account to a trust account held at a law firm representing her in connection with a real estate purchase.

ww.  On or about June 30, 2008, in New York, New York, CRUPI caused dividend income that was not paid until July 2008 to be reflected on an IA Client's June 30, 2008, account statement.

83

xx.  On or about July 16, 2008, in New York, New York, CRUPI received a fax containing a list of financial institutions to be used as contra parties in false and fraudulent BLMIS books and records.

yy.  On or about October 1, 2008, in New York, New York, BONGIORNO created false and fraudulent BLMIS books and records.

zz.  On or about October 16, 2008, in New York, New York, CRUPI caused approximately $2,225,000 to be wire transferred from a BLMIS bank account to a trust account held at a law firm representing her in connection with a real estate purchase.

aaa. On or about November 3, 2008, in New York, New York, BONGIORNO created false and fraudulent BLMIS books and records.

bbb. On or about November 17, 2008, BONVENTRE made a telephone call in which he requested a loan on behalf of BLMIS.

ccc.  On or about December 1, 2008, in New York, New York, CRUPI created backdated trades in an IA Client's account that reflected sales of Treasury bills on November 17, 2008 in the amount of approximately $5 million.

ddd. On or about December 2, 2008, in New York, New York, BONVENTRE created false and fraudulent BLMIS books and records.

84

eee. On or about December 3, 2008, CRUPI and DiPascali had a meeting in New York, New York.

fff. From on or about December 3, 2008, to on or about December 10, 2008, in New York, New York, CRUPI recorded the receipt of more than approximately $48 million in investor deposits into the IA Bank Account.

ggg. In or about December 2008, in New York, New York, CRUPI prepared checks to preferred IA Clients.

(Title 18, United States Code, Section 371.

## COUNT TWO
### (Securities Fraud)

179. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein, as setting forth a scheme to defraud.

180. From at least in or about 1992, through on or about December 11, 2008, in the Southern District of New York and elsewhere, DANIEL BONVENTRE, ANNETTE BONGIORNO, and JOANN CRUPI, a/k/a "Jodi," the defendants, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

85

(a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in transactions, acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons.

> (Title 15, United States Code, Sections 78j(b) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.10b-5;
> Title 18, United States Code, Section 2.)

## COUNT THREE
### (Falsifying Records of a Broker-Dealer)

181. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

182. Between in or about 1992, and on or about December 11, 2008, DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, unlawfully, willfully, and knowingly, did cause BLMIS, a registered broker-dealer, to fail to make and keep such records as the SEC, by rule, prescribed as necessary and appropriate in the public interest, for the protection of investors, and otherwise in furtherance of the purposes of the Securities Exchange Act of 1934, to wit, BONVENTRE, BONGIORNO, CRUPI, O'HARA

and PEREZ caused false and fraudulent books and records, including, among other things, client account statements, trade confirmations, trade blotters, order entry and execution reports, commission reports and/or DTC reports, to be made and kept by BLMIS, a broker-dealer.

> (Title 15, United States Code, Sections 78q(a) and 78ff;
> Title 17, Code of Federal Regulations, Section 240.17a-3;
> Title 18, United States Code, Section 2.)

## COUNT FOUR
### (Falsifying Records of an Investment Adviser)

183. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

184. Between in or about 1992, and on or about December 11, 2008, in the Southern District of New York and elsewhere, DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a "Jodi," JEROME O'HARA and GEORGE PEREZ, the defendants, unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, in connection with BLMIS's business as an investment adviser, did cause BLMIS to fail to make and keep for prescribed periods such records, furnish such copies thereof, and make and disseminate such reports as the SEC, by rule, prescribed as necessary and appropriate in the public interest and for the protection of investors, to wit, BONVENTRE, BONGIORNO, CRUPI, O'HARA and PEREZ caused false and fraudulent books and records,

87

including, among other things, client account statements, trade

confirmations, trade blotters, order entry and execution reports,

commission reports and/or DTC reports, to be made and kept by

BLMIS, an investment adviser.

(Title 15, United States Code, Sections 80b-4 and 80b-17;
Title 17, Code of Federal Regulations, Section 275.204-2;
Title 18, United States Code, Section 2.)

## COUNT FIVE
### (False Filing With the SEC)

185. The allegations contained in paragraphs 1 through

171 and 177 through 178 above are hereby repeated, realleged and

incorporated by reference as if fully set forth herein.

186. In or about May 2006, in the Southern District of

New York and elsewhere, DANIEL BONVENTRE, the defendant,

unlawfully, willfully, and knowingly, in applications, reports,

and documents required to be filed with the SEC under the

Securities Exchange Act of 1934, and the rules and regulations

thereunder, did make and cause to be made statements that were

false and misleading with respect to material facts, to wit,

BONVENTRE aided and abetted the filing with the SEC of a false

and misleading BLMIS FOCUS Report.

(Title 15, United States Code, Sections 78q(a) and 78ff;
Title 17, Code of Federal Regulations, Section 240.17a-5;
Title 18, United States Code, Section 2.)

88

**COUNT SIX**
**(Subscribing to a False U.S. Individual**
**Income Tax Return for Tax Year 2003)**

187. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

188. On or about April 13, 2004, in the Southern District of New York and elsewhere, DANIEL BONVENTRE, the defendant, unlawfully, willfully and knowingly did make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the tax year 2003, which return contained and was verified by the written declaration of DANIEL BONVENTRE that it was made under penalties of perjury, and which return DANIEL BONVENTRE did not believe to be true and correct as to every material matter, in that DANIEL BONVENTRE falsely omitted wage and other income of approximately $98,300, whereas, as DANIEL BONVENTRE then and there well knew and believed, he was not entitled to omit that income from his 2003 return.

(Title 26, United States Code, Section 7206(1).)

**COUNT SEVEN**
**(Subscribing to a False U.S. Individual**
**Income Tax Return for Tax Year 2004)**

189. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

89

190. On or about April 15, 2005, in the Southern District of New York and elsewhere, DANIEL BONVENTRE, the defendant, unlawfully, willfully and knowingly did make and subscribe a U.S. Individual Income Tax Return, Form 1040, for the tax year 2004, which return contained and was verified by the written declaration of DANIEL BONVENTRE that it was made under penalties of perjury, and which return DANIEL BONVENTRE did not believe to be true and correct as to every material matter, in that DANIEL BONVENTRE: (a) falsely omitted wage and other income of approximately $18,420; and (b) falsely characterized hundreds of thousands of dollars of ordinary income as a long-term capital gain, whereas, as DANIEL BONVENTRE then and there well knew and believed, he was not entitled to omit the $18,420 in income from his 2004 return, and that he was not entitled on that return to characterize the ordinary income he received as a long-term capital gain.

(Title 26, United States Code, Section 7206(1).)

## COUNT EIGHT
### (Subscribing to a False U.S. Individual Income Tax Return for Tax Year 2006)

191. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

192. On or about April 12, 2007, in the Southern District of New York and elsewhere, DANIEL BONVENTRE, the

90

defendant, unlawfully, willfully and knowingly did make and
subscribe a U.S. Individual Income Tax Return, Form 1040, for the
tax year 2006, which return contained and was verified by the
written declaration of DANIEL BONVENTRE that it was made under
penalties of perjury, and which return DANIEL BONVENTRE did not
believe to be true and correct as to every material matter, in
that DANIEL BONVENTRE, the defendant: (a) falsely omitted
approximately $61,900 of wage and other income; (b) falsely
omitted approximately $166,944 of cancellation-of-indebtedness
income; and (c) falsely characterized hundreds of thousands of
dollars of ordinary income as a long-term capital gain, whereas,
as DANIEL BONVENTRE then and there well knew and believed, he was
not entitled to omit the wage and other income, and cancellation-
of-debt income, from his 2006 return, and that he was not
entitled on that return to characterize the ordinary income he
received as a long-term capital gain.

(Title 26, United States Code, Section 7206(1).)

### COUNT NINE
**(Subscribing to a False U.S. Individual
Income Tax Return for Tax Year 2007)**

193. The allegations contained in paragraphs 1 through
171 and 177 through 178 above are hereby repeated, realleged and
incorporated by reference as if fully set forth herein.

194. On or about April 11, 2008, in the Southern
District of New York and elsewhere, DANIEL BONVENTRE, the

91

defendant, unlawfully, willfully and knowingly did make and

subscribe a U.S. Individual Income Tax Return, Form 1040, for the

tax year 2007, which return contained and was verified by the

written declaration of DANIEL BONVENTRE that it was made under

penalties of perjury, and which return DANIEL BONVENTRE did not

believe to be true and correct as to every material matter, in

that DANIEL BONVENTRE, the defendant, falsely omitted wage and

other income of approximately $95,000, whereas, as DANIEL

BONVENTRE then and there well knew and believed, he was not

entitled to omit that income from his 2007 return.

(Title 26, United States Code, Section 7206(1).)

**COUNTS TEN THROUGH FOURTEEN**
**(Tax Evasion - ANNETTE BONGIORNO)**

195. The allegations contained in paragraphs 1 through

171 and 177 through 178 above are hereby repeated, realleged and

incorporated by reference as if fully set forth herein.

196. From on or about January 1 of each of the calendar

years set forth below, through on or about the tax return filing

dates set forth below for each calendar year, in the Southern

District of New York and elsewhere, ANNETTE BONGIORNO, the

defendant, unlawfully, wilfully, and knowingly, did attempt to

evade and defeat a substantial part of the income tax due and

owing by her to the United States of America for the calendar

years 2004 through 2008 by various means, including, among other

things, by (a) arranging to get paid a portion of her income

92

through monthly checks that ANNETTE BONGIORNO caused to be cashed in New York, New York, thereby causing Bernard L. Madoff Investment Securities to issue ANNETTE BONGIORNO tax reporting documents that falsely under-reported BONGIORNO's income, and (b) by preparing and causing to be prepared, by signing and causing to be signed, and by filing and causing to be filed with the Internal Revenue Service, a false and fraudulent United States Individual Income Tax Return, Form 1040, for the calendar years 2004 through 2008, wherein ANNETTE BONGIORNO failed to report certain income she received from Bernard L. Madoff Investment Securities, and thus falsely stated that her taxable income was in the amount set forth below, and that the amount of tax due and owing thereon was in the amount set forth below, whereas, as ANNETTE BONGIORNO, the defendant, then and there well knew and believed, the correct taxable income and correct tax due and owing for the calendar years 2004 through 2008 was substantially in excess of the amounts reported, as set forth below:

| COUNT | TAX YEAR | APPROXIMATE FILING DATE OF RETURN | REPORTED TAXABLE INCOME | TAX PAID | CORRECTED TAXABLE INCOME | ADDITIONAL TAX DUE AND OWING |
|---|---|---|---|---|---|---|
| 10 | 2004 | 4/15/2005 | $ 96,943 | $ 21,492 | $185,008 | $27,425 |
| 11 | 2005 | 4/15/2006 | $ 59,470 | $ 18,924 | $122,403 | $18,616 |
| 12 | 2006 | 4/15/2007 | $ 54,792 | $ 17,675 | $122,112 | $20,201 |
| 13 | 2007 | 4/15/2008 | $579,085 | $174,766 | $640,606 | $17,220 |
| 14 | 2008 | 10/15/2009 | $ 65,467 | $ 63,701 | $116,977 | $17,850 |

(Title 26, United States Code, Section 7201.)

## COUNTS FIFTEEN THROUGH SEVENTEEN
### (Tax Evasion - JOANN CRUPI)

197. The allegations contained in paragraphs 1 through 171 and 177 through 178 above are hereby repeated, realleged and incorporated by reference as if fully set forth herein.

198. From on or about January 1 of each of the calendar years set forth below, through on or about the tax return filing dates set forth below for each calendar year, in the Southern District of New York and elsewhere, JOANN CRUPI, a/k/a "Jodi," the defendant, unlawfully, wilfully, and knowingly, did attempt to evade and defeat a substantial part of the income tax due and owing by her to the United States of America for the calendar years 2004, 2007, and 2008 by various means, including, among other things, by (a) using a corporate credit card to pay annually for tens of thousands of dollars of personal expenses and thereby causing Bernard L. Madoff Investment Securities to falsely and fraudulently characterize those expenses as business rather than payroll or wage expenses; (b) causing Bernard L. Madoff Investment Securities to issue JOANN CRUPI, a/k/a "Jodi," tax reporting documents that falsely under-reported CRUPI's income in the form of personal credit card payments; and (c) by preparing and causing to be prepared, by signing and causing to be signed, and by filing and causing to be filed with the Internal Revenue Service, false and fraudulent United States

94

Individual Income Tax Return, Form 1040, for the calendar years 2004, 2007, and 2008 wherein JOANN CRUPI, a/k/a "Jodi," failed to report certain income she received from Bernard L. Madoff Investment Securities, and thus falsely stated that her taxable income was in the amount set forth below, and that the amount of tax due and owing thereon was in the amount set forth below, whereas, as JOANN CRUPI, a/k/a "Jodi," the defendant, then and there well knew and believed, the correct taxable income and correct tax due and owing for the calendar years 2004, 2007, and 2008 was substantially in excess of the amounts reported, as set forth below:

| COUNT | TAX YEAR | APPROXIMATE FILING DATE OF RETURN | REPORTED TAXABLE INCOME | TAX PAID | CORRECTED TAXABLE INCOME | ADDITIONAL TAX DUE AND OWING |
|-------|----------|-----------------------------------|-------------------------|----------|--------------------------|------------------------------|
| 15 | 2004 | 4/15/2005 | $ 104,418 | $ 26,422 | $170,290 | $13,341 |
| 16 | 2007 | 4/15/2006 | $ 0 | $ 0 | $34,700 | $7,955 |
| 17 | 2008 | 10/19/2009 | $2,534,045 | $938,230 | $2,589,665 | $19,467 |

(Title 26, United States Code, Section 7201.)

### FORFEITURE ALLEGATION

199. As the result of committing one or both of the conspiracy and securities fraud offenses alleged in Counts One and Two of this Indictment, DANIEL BONVENTRE, ANNETTE BONGIORNO, JOANN CRUPI, a/k/a Jodi," JEROME O'HARA, and GEORGE PEREZ, the defendants, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds

traceable to the commission of the said offenses, including, but not limited to, a sum of money equal to at least $154.5 billion, in that such sum in aggregate represents the amount of proceeds obtained as a result of the said offenses or is traceable to such property, and all right, title and interest of the defendants in any and all specific property that constitutes or is derived from proceeds traceable to the commission of the said offenses, including, but not limited to, the following:

a.   All right, title and interest of JEROME O'HARA, the defendant, in the real property and appurtenances located at 167 Legion Place, Malverne, New York, Known and designated on the Nassau County Tax Map as Section 35, Block 220, Lot: 27 to 30;

b.   All right, title and interest of DANIEL BONVENTRE, the defendant, in the real property and appurtenances commonly known as, and having a Post Office address of, 16 Edgewater Terrace, Mantoloking, New Jersey, 08738, located in the Township of Brick, Ocean County, New Jersey, and designated on the Township of Brick Tax Map as Block No. 42.02, Lot No. 16;

c.   All right, title and interest of DANIEL BONVENTRE, the defendant, in and to any and all shares of capital stock of 79th Street East Owners Inc. held in the names of Daniel R. Bonventre and Barbara G. Bonventre and in the proprietary lease between Daniel R. Bonventre and Barbara G. Bonventre and 79th Street East Owners Inc. for Apartment 17G in the building known as 505 East 79th Street, New York, New York, 10021, together with all contract rights, fixtures and appurtenances attached to, placed upon or used in any way in connection with such property; and

d.   All right, title and interest of DANIEL BONVENTRE, the defendant, in one 2008 BMW 335i Convertible, VIN WBAWL73538PX57654, bearing New York License

Plate CTC5585 and registered to Daniel R.
Bonventre.

<u>Substitute Asset Provision</u>

200. If any of the above-described forfeitable

property, as a result of any act or omission of the defendants:

a.   cannot be located upon the exercise of due
     diligence;

b.   has been transferred or sold to, or deposited
     with, a third person;

c.   has been placed beyond the jurisdiction of
     the Court;

d.   has been substantially diminished in value;
     or

e.   has been commingled with other property which
     cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of the defendants up to the value of the

forfeitable property described above.

(Title 18, United States Code, Section 981(a)(1)(C),
and Title 28, United States Code, Section 2461.)


_____                _____
FOREPERSON                             PREET BHARARA
                                       United States Attorney


97

Form No. USA-33s-274 (Ed. 9-25-58)

---

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

## UNITED STATES OF AMERICA

### - v -

## DANIEL BONVENTRE,
## ANNETTE BONGIORNO,
## JOANN CRUPI,
## a/k/a "Jodi,"
## JEROME O'HARA, and
## GEORGE PEREZ,

**Defendants.**

---

## INDICTMENT

S2 10 Cr. 228 (LTS)

15 U.S.C. §§ 78j(b), 78q(a), 78ff, 80b-4, 80b-17;
Title 17, Code of Federal Regulations,
Sections 240.10b-5, 240.17a-3, 240.17a-5, 275.204-2; 26
U.S.C., §§ 7201,7206(l); 18 U.S.C. §§ 371 and 2.

---

PREET BHARARA
United States Attorney.

_____
Foreperson

Indictment filed, arrest warrants issued.
F. Maas, USMJ