UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA          :

     -v-                          :    S10 10 cr. 228 (S-2) (LTS)

DANIEL BONVENTRE, et al.          :

                              :
            Defendants.
------------------------------------------------------X

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTIONS IN LIMINE

Sercarz & Riopelle, LLP
810 Seventh Avenue, Suite 620
New York, New York 10019
(212) 586-4900
Fax: (212) 586-1234

*Attorneys for Defendant Annette Bongiorno*

I. **THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING EVIDENCE OF THE DEFENDANT'S EXPENDITURES AND USE OF THE PROCEEDS OF THE ALLEGED FRAUD**

Ms. Bongiorno moves in limine to preclude the government from introducing evidence of the defendant's lifestyle and the manner in which she and her husband spent the funds they received from BLMIS. The defense respectfully submits that any such evidence is (a) not relevant to the offenses charged against Ms. Bongiorno, and (b) is prejudicial in ways that substantially outweigh its probative value.

The government's exhibit list includes documentary exhibits that relate to Mr. and Ms. Bongiorno's use of funds that were paid to them by BLMIS either in the form of Ms. Bongiorno's salary, or in the form of withdrawals from investment accounts owned by them at BLMIS. For example, GX 105-B485 to GX 105-B490 consist of documents relating to Mr. and Mrs. Bongiorno's purchase of a Bentley automobile, a Mercedes Benz automobile, a condominium in Florida, and two bank accounts into which Ms. Bongiorno deposited funds she received from BLMIS. GX 208-83 through GX 208-94 relate to Ms. Bongiorno's use of her personal credit card, and her payments on that card. And GX 200-59 through GX 200-70 consist of documents concerning various securities accounts at Citibank and Smith Barney and a safe deposit box owned by Mr. and Mrs. Bongiorno.

As the Court knows, the indictment charges Ms. Bongiorno with knowing participation in Mr. Madoff's Ponzi scheme and related crimes such as the preparation of false account statements and trade confirmations. The indictment also charges Ms. Bongiorno with tax evasion in connection with certain withdrawals of funds she received from BLMIS and did not declare as income, and with obstructing and impeding the due administration of the Internal Revenue Laws by such conduct. Every charge against Ms. Bongiorno either relates to her

conduct during her day to day employment at BLMIS, or to a limited number of payments she received from BLMIS, payments which were made from accounts known as the "Special 1" or "Special 2" accounts. S10 10 Cr. 228 (LTS), at ¶ 39. *None* of the charges in the indictment alleges any impropriety in the way in which Ms. Bongiorno spent her salary or trading profits, apart from her failure to declare a very limited number of payments as income on her tax returns. Thus, what Ms. Bongiorno and her husband did with the money they withdrew from BLMIS is irrelevant to the charges in the indictment, and evidence relating to Mr. and Ms. Bongiorno's expenditures should be precluded.

Evidence that Ms. Bongiorno bought a Mercedes Benz car or an expensive condominium, or used her credit card to shop at Nordstrom's, or that her husband bought a Bentley or owned a securities brokerage account, does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The facts that are of consequence to this case are what Ms. Bongiorno did on the job, what she said about that and to whom, what she was told about her job and by whom, and what she understood about the nature of her actions. Whether she bought a Mercedes or a Toyota or a used Volkswagen is of no moment to deciding Ms. Bongiorno's guilt or innocence in this case.

In addition, proof that Ms. Bongiorno decided to buy nice things does not prove that she had any particular motive to commit the crimes charged against her. All her expenditures prove is that she could afford to buy high quality goods and chose to do so. See United States v. Ewing, 936 F.2d 903, 906 (7th Cir. 1991); United States v. Hatfield, 685 F. Supp.2d 320, 326 (E.D.N.Y. 2010) ("it is irrelevant if Mr. Brooks spent his fortune on lavish parties, instead of donating it to starving Malawian orphans"). Ms. Bongiorno could have spent her money as she

2

did whether or not it was legitimately earned. Therefore, the manner in which Ms. Bongiorno spent her money is no proof whatever of criminal motive in this case.

In Ewing, the Fifth Circuit observed: "[t]hat the defendant went to Las Vegas, or bought a new car tells us nothing about why he defrauded the insurance companies. Ewing might have spent the money the same way had the policies been legitimate...." Id. The Ewing Court also recognized that a desire for money is virtually universal. See id. ("The government maintains that the evidence [purchases of cars, a boat and jewelry] established the defendant's motive because it showed that [the defendant] had an 'appetite' for money. But who doesn't?"). Thus, proof that Mr. and Ms. Bongiorno bought a Bentley or a condominium establishes only that Ms. Bongiorno and her husband liked nice things and had the capacity at one point to pay for them. These facts tell us nothing about Ms. Bongiorno's motive to commit any crime.

We further submit that even if there is any probative value in determining what Ms. Bongiorno and her husband spent their money on in past times (and we submit there is none), such probative value is substantially outweighed by the danger of unfair prejudice, and must also be excluded under Fed. R. Evid. 403 for that reason. Given the lack of any connection between the defendant's income and lifestyle, on the one hand, and the alleged fraud, on the other, references to the defendant's expenditures will improperly invite the jury to equate affluence with greed and corruption, and unfairly prejudice the defendant. See United States v. Stahl, 616 F.2d 30, 32 (2d Cir. 1980). In fact, proof of Ms. Bongiorno's lifestyle may well make one or more jurors jealous of her, and invite them to convict her for that reason rather than for any reason associated with her conduct. The danger of unfair prejudice to Ms. Bongiorno is particularly acute in the current climate. Greed and misbehavior on Wall Street is a constant topic in today's media, and proof of Ms. Bongiorno's expenditures on luxury items will only

3

inflame the jury and prejudice Ms. Bongiorno in the jury's eyes. Fed. R. 403 requires that this evidence be excluded, because it will only distract and confuse the jury, and prejudice Ms. Bongiorno.

## II. THE GOVERNMENT SHOULD BE PRECLUDED FROM OFFERING PROOF CONCERNING MS. BONGIORNO'S USE OF THE BLMIS CREDIT CARD AND THE USE BY OTHERS OF THE BLMIS CREDIT CARD, UNLESS SUCH USAGE IS PROPER IMPEACHMENT, OR IS SOMEHOW RELEVANT TO THE CHARGES IN THE INDICTMENT

Government Exhibits 208-1 through GX 208-260 consist of records relating to the usage by a small army of BLMIS employees of American Express cards paid for by BLMIS, and payments made on the BLMIS American Express cards. While a few of these statements relate to a BLMIS American Express card that was used by Ms. Bongiorno (GX208-106 through GX 208-109), there is no allegation in the indictment that Ms. Bongiorno used this card improperly, and there has been no disclosure under Federal Rule of Evidence 404(b) to suggest that Ms. Bongiorno's use of a BLMIS credit card is somehow evidence that sheds light on the charges in the indictment. Thus, Ms. Bongiorno's modest and entirely lawful use of her BLMIS credit card is not relevant to the issue of her guilt or innocence and should be precluded. References to her should be redacted from the government's exhibits relating to the use of the BLMIS credit card account.

If references to Ms. Bongiorno are not redacted from the records relating to the BLMIS American Express account, there is a significant possibility she will be prejudiced. These records indicate that the BLMIS American Express Account was used by many government witnesses, as well as individuals who have pleaded guilty to wrongdoing at BLMIS. One of Ms. Bongiorno's co-defendants is accused of charging a significant amount of personal expenses to the BLMIS credit card, and virtually every member of Bernard Madoff's family appears, from a

cursory review of the relevant statements, to have lived the high life on the BLMIS American Express account. Certain government witnesses, such as David Kugel, for example, also appear to have charged significant personal expenses to the BLMIS American Express Account.

While the Madoff family's extravagant charges to the BLMIS American Express account may be an appropriate item of proof for the government, and a government witness's improper charges to the BLMIS American Express account may be an appropriate topic of cross examination, Ms. Bongiorno's entirely appropriate charges – which no one contends were improper -- are not a proper area of inquiry for anyone, and the references to Ms. Bongiorno on account statements that are replete with improper and eye-popping expenditures by others can only prejudice her and confuse the jury. Therefore, we respectfully request that the Court direct the government to redact all references to Ms. Bongiorno from the records relating to the BLMIS American Express account as irrelevant and prejudicial. Fed. R. Evid. 401, 403.[1]

### III. THE WORD "FABRICATED" SHOULD BE STRICKEN FROM GOVERNMENT'S EXHIBITS 2000-1 THROUGH 2000-5

Government's Exhibits 2000-1 through 2000-5 appear to summarize certain trading activity that Ms. Bongiorno caused to be recorded in various account statements during the course of her employment at BLMIS. Each of the government's charts includes the word "Fabricated" in its title. That word is a loaded one, which carries with it the whiff of illegality. Clearly, the government hopes to communicate that Ms. Bongiorno's mere involvement in entering these trades into the accounts of certain BLMIS clients is illegitimate because the trades were "fabricated." Far less prejudicial characterizations of the activity that these charts describe

---

[1] We ask the Court to consider ordering the government to pare down its proof to what is necessary and not extravagant. For example, we doubt that Shana Madoff will be called to testify. If she is not, do we really need to sit through whatever testimony there might be about her use of various credit cards? (See GX 208-168 through GX 208-175, for example). We respectfully submit that all good things must come to an end, and proof like this is properly excluded from the jury's consideration as an unnecessary "waste of time" and "cumulative." Fed. R. Evid. 403.

are available to the government, and we respectfully submit that the government should be required to use a more neutral word than "fabricated" in these charts. Examples of less loaded words that would describe the activity illustrated in the charts include "recorded" or "entered," and we respectfully request that the Court direct to the government to use one of these words, or some other word or description that is less fraught with criminality in connection with Government's Exhibits 2000-1 through 2000-5.

## IV. THE GOVERNMENT SHOULD NOT BE PERMITTED TO USE GX 1000-34 IN CONNECTION WITH ANY CHART IT MAY PREPARE TO ILLUSTRATE OR DIAGRAM THE ALLEGED CONSPIRACY

The government has marked Ms. Bongiorno's "mug shot" as Government's Exhibit 1000-34. For the following reasons, we respectfully submit that this photograph should not be used for any purpose during the trial.

We anticipate that the government will likely prepare an exhibit that purports to diagram the conspiracy, by placing pictures of the defendants and their alleged co-conspirators on a large board. In this case, there is no need for the government to use Ms. Bongiorno's mug shot – which is never anyone's best photograph – for this purpose. The government has several other photographs of Ms. Bongiorno which it can use in any chart it might wish to use to illustrate the alleged conspiracy. See, e.g., GX 1000-3, 1000-7 and 1000-8. It should be directed to use one of those photographs rather than Ms. Bongiorno's "mug shot" for the following reasons.

The government's purpose in marking Ms. Bongiorno's "mug shot" as an exhibit is obvious. In this day and age, every juror knows what a "mug shot" looks like, and showing the jurors a "mug shot" reminds them of the defendant's arrest, and prejudices the defendant in the jury's eyes by giving the jury a palpable and constant reminder of the defendant's arrest. Showing the defendant's "mug shot" to the jury in open court has the further effect of

humiliating the defendant by reminding him or her of the arrest, a bit of prejudice and humiliation that will only be exacerbated if the defense requests that the Court remind the jury that it should draw no negative inference from the government's use of the defendant's "mug shot" in its charts.

In the present case, there is no need for the government to use Ms. Bongiorno's mug shot in any way. It has other, more neutral pictures of Ms. Bongiorno which it can use in any diagram or chart it wishes to make to illustrate the alleged conspiracy. Given the availability of less prejudicial evidence, we respectfully request that the government be directed to use a picture other than Ms. Bongiorno's "mug shot" in any illustrative chart or diagram it prepares.

## V. THE GOVERNMENT'S WITNESSES SHOULD NOT BE PERMITTED TO EXPRESS INAPPROPRIATE LAY OPNIONS

Many of the official reports turned over by the government to the defense pursuant to 18 U.S.C. § 3500 indicate that government witnesses have expressed their opinion as to what the defendants knew about Mr. Madoff's Ponzi scheme, even though none of the defendants ever made an admission that they knew that BLMIS operated as a Ponzi scheme or fraud. The expression of such an opinion from the witness stand would be highly improper, and we respectfully request that the Court direct the government to instruct its witnesses not to express such opinions if they are called to testify.

It is well established that the expression of an opinion by a government witness as to the defendant's knowledge of a fraud is improper lay opinion. See United States v. Kaplan, 490 F.3d 110, 119 (2d Cir. 2006) (District Court erred when it permitted prosecution witness to testify to his opinion concerning defendant's knowledge of fraud). The prejudice of such testimony is obvious, and unless the witness in question is a mind reader, the witness would be incompetent to give such testimony.

We are sure the government understands the appropriate limits of its witnesses' testimony, but given the great number of inadmissible lay opinions expressed in the materials the defendants have reviewed, we respectfully request that the Court issue a ruling, prior to trial, finding that the government's witnesses may not express an opinion as to the defendants' knowledge of the fraud at BLMIS, and directing the government to advise its witnesses of this ruling.

### VI. MS. BONGIORNO'S STATEMENT TO GOVERNMENT WITNESS DIPASCALI, "DO YOU REALIZE HOW MUCH UNREALIZED GAINS I HAVE IN MY PORTFOLIO?" IS NOT HEARSAY, AND IS ADMISSIBLE AS AN EXCITED UTTERANCE/STATEMENT OF MS. BONGIORNO'S STATE OF MIND

The government has disclosed to Ms. Bongiorno certain material it believes to be exculpatory. One item of that exculpatory material is a description of Ms. Bongiorno's question to Mr. DiPascali on December 10, 2008, "Do you realize how much unrealized gains I have in my portfolio?" The government's disclosure of this material is attached to this memorandum of law as Exhibit A. For the following reasons, Ms. Bongiorno contends that this statement is admissible in evidence, and she seeks a pre-trial ruling on this point so that she can use this statement in her opening statement to the jury.

As is indicated by Exhibit A, Ms. Bongiorno made the statement "Do you realize how much unrealized gains I have in my portfolio?" in response to a December 10, 2008 directive by Mr. DiPascali that would require her "to cash out all employee accounts ... including her own." According to Mr. DiPascali, Ms. Bongiorno "balked" and responded to his directive with the question quoted above, and described in Exhibit A.

Questions are verbal acts, not statements of fact offered for the truth of the matter asserted in them. Therefore, Ms. Bongiorno's question to Mr. DiPascali is not hearsay and should be admitted if Mr. DiPascali testifies. See Fed. R. Evid. 801.

Moreover, Ms. Bongiorno's question is clearly an excited utterance, blurted out in response to Mr. DiPascali's directive. Thus, to the extent there is any hearsay assertion contained in Ms. Bongiorno's question to Mr. DiPascali (and we contend there is none), Ms. Bongiorno's statement is admissible as an excited utterance, pursuant to Fed. R. Evid. 803(2).

Finally, Ms. Bongiorno's question to Mr. DiPascali conveys her shock, concern and dismay at the idea that she must liquidate her portfolio immediately. As such, Ms. Bongiorno's question is a statement of her contemporaneous state of mind and emotion, which are relevant to disprove that she was a knowing participant in the Madoff Ponzi scheme fraud. If she were a knowing participant in the scheme, Ms. Bongiorno would have known for some time that "the jig was up" -- as Mr. DiPascali certainly did – and a "cover up" in the form of account liquidation would have come as no surprise to her. The fact that Ms. Bongiorno had no such knowledge is vividly conveyed by her shocked and dismayed question to Mr. DiPascali. Therefore, even if there is some hearsay aspect of Ms. Bongiorno's question (and again, we submit there is none), her question is admissible as a statement of her "then existing mental [and] emotional ... condition" pursuant to Fed. R. Evid. 803(3).

### VII. THE GOVERNMENT SHOULD BE COMPELLED TO PRODUCE THE PROFFER AGREEMENTS OFFERED TO ITS WITNESSES, AND ANY NOTES OF "ATTORNEY PROFFERS" MADE ON BEHALF OF ITS WITNESSES.

A review of the 3500/Giglio material produced by the government indicates that the government interviewed many of its witnesses pursuant to a "queen for a day" or "proffer agreement," which provided the witnesses with a limited form of use immunity in connection with the statements made during the interview. The grant of immunity – even if in a limited form – is classic Giglio material, and should be produced. The government has not produced the "proffer agreements" in connection with at least some of its witnesses. For example, no such

9

agreement has been produced for Mr. Freiling, nor has one been produced for Mr. DiPascali, even though the official reports of their interviews indicate that they were given "proffer agreements" in connection with many of their interviews. See, e.g., GX 3404-4; GX 3501-4. Therefore, we respectfully request that the Court direct the government to produce these immunity agreements for all of its witnesses who received them.

Similarly, we respectfully request that the Court require the government to produce any notes or official reports of "attorney proffers" made by the attorneys for the government's witnesses when those attorneys were speaking to the government. It is common in large scale investigations of this type for the attorneys for potential witnesses to present to the government the facts as known to them based on their discussions with their clients. Recently, it has been the Southern District's practice to record these "attorney proffers" in official reports, and to require a law enforcement agent be present to make notes of any statements made by attorneys on behalf of their clients.

The statements made by an attorney during an attorney proffer are statements of an agent made in the course of his agency on behalf of his principal. The whole point of making such statements is to give the government a sense of what the client will say when interviewed, and therefore, "attorney proffers" are statements of the witnesses. These statements should be produced as Jencks Act material. We respectfully request that the Court direct the government to produce its reports and/or notes of any "attorney proffers" made to it by the attorneys for its witnesses.

10

## VIII. AT TRIAL, ALL DEFENDANTS SHOULD BE PRESUMED TO JOIN IN ALL OBJECTIONS MADE BY THEIR CO-DEFENDANTS' COUNSEL, AND SHOULD NOT BE REQUIRED TO REITERATE THEIR IN LIMINE OBJECTIONS WITHOUT MAKING THEM ON THE RECORD AGAIN

When the Court rules on Ms. Bongiorno's limine motions, we respectfully request that the Court include in its order a standing order that all defense counsel will be presumed to join in any objection by a co-defendant's counsel. Such an order will relieve counsel – and the Court – of the burden of having all counsel state that they join in each objection made by a colleague. In what promises to be a lengthy trial, this procedure will help a little to make the proceedings more streamlined.

Similarly, if the Court denies any of the defendant's motions in limine, we respectfully request that the Court include in its order that the defendant need not restate her objection on the record at the time the evidence in question is admitted, in order to preserve her objection for appeal. This, too, will streamline the proceedings somewhat.

Finally, to the extent Ms. Bongiorno's co-defendants make motions in limine, Ms. Bongiorno joins in those motions to the extent they are applicable to her.

## **CONCLUSION**

For all the reasons set forth herein we respectfully request that each of Ms. Bongiorno's motions in limine be granted.

Dated: New York, New York
       August 30, 2013

                         Respectfully submitted,

                         SERCARZ AND RIOPELLE, LLP

                         By:_____/S/_____
                                Roland G. Riopelle, Esq. (RR-2950)
                                Maurice H. Sercarz, Esq. (MS-7040)
                                810 Seventh Avenue, Suite 620
                                New York, New York 10019
                                Telephone: (212) 586-4900
                                Email: rriopelle@sercarzandriopelle.com
                                *Attorneys for the Defendant*

# EXHIBIT A

On Wednesday, December 10, 2008, DIPASCALI began making out checks, dated for the following day, for the group of employees he had earmarked to pay. CRUPI had gotten together the names from BONGIORNO that he needed, but DIPASCALI needed to fabricate a story to convince BONGIORNO to cash out these accounts completely so he could pay them, too. DIPASCALI did not know how BONGIORNO would handle the truth, and he did not want to get into all of it with her. DIPASCALI concocted a story that there was an upcoming investor advisory audit and they would be asking MADOFF if he was an investment advisor for employees. If MADOFF had to say yes, the audit would last for two weeks. If he could say no, it would cut the audit to two days. DIPASCALI explained that BONGIORNO needed to temporarily cash out all the employee accounts she had, including her own, so this audit would go away quicker. BONGIORNO balked, telling DIPASCALI: "Do you realize how much unrealized gains I have in my portfolio?"

H