UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————

UNITED STATES OF AMERICA

       - against -                           10 CR 228 (LTS)

DANIEL BONVENTRE et al.,

              Defendants.

———————————————————

MEMORANDUM OF LAW IN SUPPORT OF MOTIONS FOR *IN LIMINE* RELIEF,
SEVERANCE AND CERTAIN DISCLOSURES

Introduction

        On behalf of all defendants, to the extent applicable to each of them, this Memorandum of Law seeks three categories of relief.

        First, based on the government's recent disclosures of exhibits, experts and 3500 material, the defense seeks preclusion of (1) testimony of experts noticed by the government for whom the government has failed to provide the witnesses' opinions and bases therefor as required by Rule 16(a)(1)(G) of the Federal Rules of Evidence; and (2) certain unduly prejudicial, inflammatory and/or irrelevant material.

        Second, based on the government's recent disclosures, the defense has asked the government for certain exhibits identified on the government's exhibit list and 3500 disclosures but not produced, and for certain specificity in extraordinarily voluminous exhibits.  While we expect the government will comply with these requests, in an abundance of caution we seek preclusion of these specific exhibits should the government not respond meaningfully within the next few business days.

1

Third, based on the government's recent superseding indictment, the defendants renew their motions for severance and certain particularization.  In effect, the defendants seek to renew their pretrial motions submitted on two prior occasions concerning earlier iterations of the indictment, for the reasons set forth in our prior motion papers.  As to particularization, the government's exhibits and 3500 material may create a smaller haystack than the government's earlier discovery, but it remains a haystack.  It is not clear which needles are the bases for certain charges nor where exactly they are.

Counsels' review of the government's recent disclosures is far from complete.  Of the government's trial exhibits, those which counsel believe are relevant to each defendant amount to as much as 750,000 pages.  The government's 3500 material, disclosed within the past week, comprises over 12,000 pages of interview reports and related documents.  The defense may need to raise other issues with the Court as counsels' review of these disclosures continues.  Meanwhile, all defendants join in the strands of this motion (1) directed at the government's experts; and (2) seeking a bill of particulars, for the reasons set forth in their individual and joint prior motion papers.

A.    Because of the Government's Violation of Rule 16(a)(1)(G), Government
      Experts Schneider, Dabney, Diedrich, Brady and Auerbach Should be Precluded

The government has identified as among its experts the following:  Dara Schneider (auditing and accounting of broker-dealers and investment advisers), Margo Dabney (tax harm), Rich Diedrich (computer programs, procedures and files), Nancy Brady (IT trading infrastructure) and Michael Auerbach (ERISA and its record-keeping requirements).[1]  For each

---

[1]  The government has requested that the letter in which these disclosures were made be treated as confidential.  Without agreeing or disagreeing with that request, we will not file the letter

of these experts, the government has provided only a description of the expert's qualifications and subject matter of his or her testimony. As for Ms. Schneider, the identified subject matter of her testimony includes accounting principles, other matters of general application, and "certain instances in which Madoff Securities' books and records diverged from GAAP [Generally Accepted Accounting Principles]," but no identification of any specific such instance is provided. For Mr. Diedrich, there is almost nothing in the government's disclosure to provide guidance on whether his testimony will touch on indisputable computer programming tasks or whether instead, his testimony will be of the disputed sort that will require a rebuttal witness and corresponding rebuttal report.

Federal Rule of Criminal Procedure 16(a)(1)(G) provides that "[t]he government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial ... The summary provided under this subparagraph *must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.*" (emphasis added). "Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions. *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics."); *see also United States v. Mahaffy*, 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (same); *United States v. Valle*, 2013 U.S. Dist. LEXIS 14864, at *14 (S.D.N.Y. Feb. 2, 2013) ("general description of possible bases [for expert's opinion] does not meet the requirements").

---

electronically with this memorandum, but will provide the letter to the Court by hand-delivery or facsimile.

The reason why defendants are entitled to advance disclosure of the opinions of expert witnesses and the bases therefor is precisely to avoid the type of situation in which the defendants now find themselves:  scouring through a mountain of material that provides no basis whatsoever for determining the specific opinions as to which these experts will testify, let alone the bases therefor.  Charging a defendant with certain crimes, but leaving him to guess as to the specifics of proposed experts' opinions does not allow a defendant and his experts to prepare adequately to address the expert's testimony and prepare for cross-examination.  *See United States v. Cruz*, 363 F.3d 187, 196 n.2 (2d Cir. 2004) (district court erred in admitting expert testimony after government did not give adequate notice, but instead "blindsided defense counsel with this testimony and undermined the goals of the very disclosure requirement which the government had assured defense counsel it would comply with").

In *United States v. White*, 492 F.3d 380, 399 (6th Cir. 2007), a Medicare fraud case, the government as part of its Rule 16 disclosure, much like the government here, "offered only generalized information about the nature of the expected testimony, along with the witnesses' contact information and one sentence detailing their qualifications."  In particular, that disclosure stated:

> They are familiar with Medicare rules, regulations, and procedures with respect to cost reporting and costs allowable as reimbursement to providers of medical services to Medicare patients. Costs reimbursed under the Medicare program include the reasonable costs actually incurred but excludes any costs unnecessary to the efficient delivery of needed health services. "Related Party" costs are only allowed for the actual cost to the party related to the provider if otherwise reasonable and necessary. A related party may include a person or entity which has significant influence over the provider. Medicare is keenly interested in knowing whether there were any costs attributable to a "related party" in order to determine what costs would be properly allowed to the provider.

*Id.* at 405-06. The court found such bare-bones, generic disclosure lacking, citing the Advisory Committee's desire to "minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." *Id.* It left the defendant no better prepared to challenge the experts at trial because it "did not identify what opinion the expert would offer on those subjects." *Id.* at 407 (quoting *Duvall*, 272 F.3d at 828); *see also United States v. Pirro*, 76 F. Supp. 2d 478, 488 (S.D.N.Y. 1999) (requiring timely government disclosure of formal summary of tax expert witness in tax fraud trial).

The government's Rule 16 expert disclosure is at least as problematic as in *White*, if not more so, as it offers only generic descriptions or "vague avowals" of the subject matters or categories that the proposed experts' testimony would cover. For example, while the government identifies the general areas of Dara Schneider's testimony and "certain instances" in which she found Mr. Madoff's records to "diverge[]" from applicable accounting principles, it fails to identify the specific instances about which she will testify or her opinions. The dilemma is compounded by the volume of possibly relevant documents. For example, Mr. Bonventre has identified 750,000 pages of documents just relevant to him, of which at least a third is relevant to his experts from the financial industry. The defendants know from the indictment what the case against them is about, but do not know at this late date what "certain instances" of accounting irregularity Ms. Schneider will address or precisely what her opinions might be.

The same holds for Mr. Auerbach, the proposed ERISA expert: we can infer from the indictment that Mr. Auerbach's testimony relates to counts related to a form submitted to the Department of Labor about Mr. Bonventre's son's employment at Mr. Madoff's firm, but the

5

lack of any disclosure of Mr. Auerbach's opinion or the bases therefor disables any expert in assessing that opinion and preparing to meet it.

The government's disclosure for expert witness Rich Diedrich fares no better under Rule 16.  In its August 23, 2013 disclosure – with respect to Mr. Diedrich specifically, whose testimony appears to be most pertinent to defendants Perez and O'Hara – the government merely provided  a "list of programs, procedures, and other data files in the Madoff securities system" to which Mr. Diedrich is prepared to testify, along with various files setting forth the programs as to which he will testify that there is some unspecified "relationship."  *See* Gov't Letter at 5.  The government glaringly did *not* provide a description of *any of* Mr. Diedrich's opinions, or the bases and reasons for his opinions, which is clearly mandated under Rule 16. Indeed, based on the information provided, the defense has no idea what Mr. Diedrich's opinions are on *any* of the subject areas identified by the government.  This is plainly improper and puts the defense in an untenable position in preparing for cross-examination, *and in determining if any rebuttal experts are needed.*

The same failing is true for the disclosure as to expert Nancy Brady.  Once again, broad subject areas are described (in 3 sentences), but no *specific opinions,* let alone the bases for those opinions, are set forth.  Thus, yet, again, the government plainly has dropped the ball on its expert disclosure obligations, and has failed to comply with Rule 16.

The proposed testimony of Margo Dabney is especially problematic.  Ms. Dabney is the government's proposed tax expert who is to testify "generally about the tax harm caused by the various tax frauds allegedly committed by the defendants," but that lone sentence about her testimony does not disclose her opinions or bases therefor.  Nor does it enlighten the defense as

to how such testimony would even be admissible, a challenge that may well need to be made once the substance of her testimony comes into clearer focus.

Ms. Dabney has presumably prepared an analysis of taxes for some or all of the approximately eighteen-year period during which the government alleges that one or more of the defendants failed to declare various income. The time for defense tax experts to prepare a response to Ms. Dabney is now, not scrambling midway through trial during Ms. Dabney's testimony when any opportunity for meaningful cross-examination is lost.

Further, the relevance of the "tax harm" to which the government says Ms. Dabney will testify is unclear. Tax harm is not an element of the false tax filing counts with which several defendants are charged – or of any other charged offense. The alleged falsity of tax filings does not turn on whether the shortcoming is $1, $100, or $1,000. To the extent the government needs to prove the falsity of the submitted returns, it need not prove anything related to "tax harm." It may become a consideration at sentencing, akin to proving the amount of fraud loss under U.S.S.G. §2B1.1, but only if a defendant were to be convicted. As long as he or she is presumed innocent, a government expert on tax harm has no place at his trial.

Moreover, given the inadequacies in the government's disclosures, the court is unable to exercise its gatekeeping function under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 679 (1993) in deciding whether or not to admit expert testimony under Rule 702, because it does not know what the proffered expert testimony *is*, much less whether it is relevant and has a sufficiently reliable foundation. *See Cruz*, 363 F.3d at 192. Thus, even a *Daubert* hearing would be largely futile.

7

For these reasons, the proposed testimony of Ms. Dabney, Mr. Diedrich, Ms. Brady and Mr. Auerbach should be precluded, as should the testimony of Ms. Schneider's opinions as to "certain instances" of accounting irregularities about which the government has not provided proper expert notice.

B.      The Court Should Preclude Evidence of How Mr. Bonventre Used Certain Funds

Mr. Bonventre moves *in limine* to preclude the government from introducing evidence pertaining to his personal finances, expenditures and the manner in which he spent funds earned or received from BLMIS.  Such evidence is not relevant to the charges against him, and its prejudicial impact would substantially outweigh any negligible and slight probative value under Federal Rule of Evidence 403.

In its production of exhibits, the government included multiple faxes, emails, account statements or other documents that relate to the purchase or existence of luxury goods or services that are irrelevant in order to prove Mr. Bonventre's guilt at trial.  Those exhibits include but are not limited to the following:

•       GX 105-a223 ("Personal Stmt of Financial Condition")

•       GX105-a236 ("Fax with St. Barths Hotel Deposit")

•       GX 105-a237 ("Cigar Sale receipt")

•       GX 105-a238 ("Fax re Shipment of Cigars")

•       GX 208-55-60 (Platinum AMEX credit card statements)

•       GX 900-41 ("Statement of Net Worth")

•       GX 900-58 ("Richmond County Country Club 1992-1999 STMTS")

8

- GX 106-7 (E-mail re: dinner at Le Cirque)

- GX 106-8 (Email re: acquisition of Cohiba cigars)

- GX 106-17-20 (Emails re: purchase of Chateau Boswell wines)

- GX 106-23 (Emails re: travel to Southampton).

Mr. Bonventre's tastes in cigars, wines, restaurants and vacation spots are not at issue and are not a legitimate part of this trial. The jury should not be presented with whether he preferred St. Barth's over St. Louis, the Richmond County Country Club over Prospect Park, or Le Cirque over the Olive Garden. These scintillating tidbits are not relevant and not admissible for a legitimate purpose. Mr. Bonventre is charged with knowingly participating in Mr. Madoff's Ponzi scheme, enabling and concealing it through various subsidiary violations, and filing false tax returns. His guilt or innocence turns on what he knew, his state of mind, and what he did at BLMIS. The government can make its points without unduly inflaming the jury by showing precisely how Mr. Bonventre spent his income, whether or not it was reported.

For the same reasons as argued in the respective submissions of Ms. Bongiorno and Ms. Crupi, which Mr. Bonventre joins in full and incorporates by reference herein, the Court should preclude evidence of Mr. Bonventre's non-BLMIS expenditures. As Ms. Crupi argues, "[t]his evidence serves one purpose alone – to inflame the jury and invite them to see [Mr. Bonventre] as living "the high life" on the backs of Madoff's victims. Such evidence only invites the jury to draw impermissible inferences as to [Mr. Bonventre's] character." *Crupi Motions In Limine*, at 4 (Document No. 407).

9

The Seventh Circuit has cautioned that expenditure evidence, particularly if offered to prove motive or intent and not solely the fact of enrichment itself, should not become "a vehicle by which the government can indiscriminately introduce highly prejudicial evidence of extrinsic acts [giving rise] to inferences about the defendant's character." *United States v. Ewings*, 936 F.2d 903, 907 (7th Cir. 1991) (court was "reluctant to subscribe to the government's theory that criminal intent may be inferred from the items on his shopping list"). Expenditure evidence that does "not help to establish the proposition that the defendant committed the offense," is not relevant and therefore not admissible. *Id.* at 905. Any probative value in such expenditures is substantially outweighed by the prejudice Mr. Bonventre would suffer under Rule 403, and the Court should therefore preclude it.

C.    The Court Should Preclude Exhibits Neither Produced Nor
       Tailored to the Allegations of Mr. Bonventre's Role or Function

Government Exhibit 206-7 comprises all bank statements and checks related to a Chase Bank account for the years 2001 through 2008 used by Mr. Madoff in his investment advisory business. The exhibit comprises almost 500,000 pages. Mr. Bonventre recognizes that the exhibit may be relevant to support the government's general allegations about the Ponzi scheme, as well as allegations that Mr. Bonventre may have signed some checks as a signatory on the account, reconciled the account at various times, and provided documents relevant to the account to investigators after Mr. Madoff's arrest. Because of the size of the exhibit, we have asked the government for information about the exhibit and clarify that request here. If there is any other purpose in admitting such a large document against Mr. Bonventre, or if there are specific checks or statements which the government believes are admissible against Mr.

10

Bonventre for any reason other than those stated above, we request that the government say so or face preclusion. The document is far too large for Mr. Bonventre to be expected to hunt through 500,000 pages to try and infer any component document's relevance so that he can prepare his defense.

In addition, multiple exhibits designated by the government on its exhibit list or identified as 3500 material do not appear to have been produced. For example, Mr. Bonventre, through counsel, has asked the government to produce GX 4000-e66, which is listed in the government's exhibit list as "ECP's notes re: BLMIS total trading accts," GX 105-a396 ("DTC Stock Record Breaksheet"), GX 105-b434 ("Annette's A&B: 1989-1990"), GX 600-3 ("SEC BLMIS Document Request List"), and certain 3500 material.

Mr. Bonventre understands that a few exhibits may have inadvertently slipped through the cracks. Unless the government produces these exhibits within the next few business days and narrows the field for GX 206-7 to allow for meaningful review, the Could should preclude them.

D.     The Court Should Preclude Mr. Bonventre's 2003 Tax Filings and BLMIS Income

The indictment alleges at Paragraph 46 that Mr. Bonventre failed to accurately report off-the books income from 1992 through 2008. Insofar as it alleges off-the-books income beginning at least in 1992 and a corresponding failure to list it on his tax returns, these allegations constitute prior bad acts. Mr. Bonventre is charged with omitting wage and other income on his tax returns beginning with the 2003 return (Count Twenty) filed in early 2004, but the six-year limitations period for false tax filings precludes substantive charges relating to any

tax return prior to 2003.  Thus, the indictment alleges uncharged conduct relating to the pre-2003 tax returns.

Federal Rule of Evidence 404(b) excludes as proof of character, evidence of a person's crime, wrong, or other act offered "in order to show action in conformity therewith." Thus, the government cannot use a defendant's prior (or subsequent) bad acts to prove his propensity to commit the crime charged or a certain category of offense.  At the same time, Rule 404(b) provides that a defendant's "prior bad acts" may become admissible for an alternative purpose, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident."  Even so, courts may not presume that such evidence is either relevant or admissible.  *See United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).

However, Rule 404(b) may not be used to admit evidence of uncharged criminal conduct that does *not* relate to a *prior* bad act.  Such evidence, intrinsic to crime or crimes charged, is instead direct proof of the offenses for which the defendant is on trial and is not "other act" evidence.  *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012).  Nevertheless, the government does not have *carte blanche* to determine what other acts constitute direct evidence of the charged crimes.  Rather, uncharged conduct is only admissible as direct evidence if it "arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial."  *Id.* (citing *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)); *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2008) (uncharged crimes treated as part of the very act charged or proof of that act).

In *Curley*, in which the defendant was convicted of stalking and harassing his ex-wife, evidence of the defendant's physical abuse of his wife during the period in question was "part of or inextricably intertwined with the charged conduct" and therefore admissible as direct proof of his intent and her fear. 639 F.3d at 58-59. Evidence as to his *prior* abuse was admissible under Rule 404(b) in order to show intent to harass and intimidate his partner, and to prove a pattern of activity probative of his intent and her reasonable fear. *Id.* at 59; *see also Carboni*, 204 F.3d at 44 (uncharged conduct, businessman's inclusion of fictional inventory in addition to perpetual inventory, admissible independently of Rule 404(b) because "inextricably intertwined with the charged conduct" of making false statements in loan applications).

In *Quinones*, 511 F.3d at 308, the defendants' purchases of cocaine, challenged on propensity grounds, "were clearly part of a crime charged in the indictment, specifically, the narcotics conspiracy charged in Count Five, a stated objective of which was defendants' distribution and possession with intent to distribute of five or more kilograms of cocaine. [Those] purchases, as acts in furtherance of the charged conspiracy, were obviously relevant to proof of the existence of that conspiracy." Likewise, evidence of the defendant's threats to execute informants "constituted important proof of the crimes charged [including the murder of another government informant] [and were] inextricably linked with the evidence offered to prove the charged offense" and were therefore admissible without reference to Rule 404(b). *Id.*

Here, to the extent Mr. Bonventre's past or uncharged (and allegedly false) tax filings are relevant and admissible, they would come in for some proper Rule 404(b) purpose, such as proof of intent, knowledge, state of mind, plan or pattern or the absence of mistake. *See United States v. Daraio*, 445 F.3d 253 (3d Cir. 2006); *United States v. Middleton*, 246 F.3d 825

13

(6th Cir. 2001). But whatever the merit of a hypothetical Rule 404(b) argument as to the time-barred tax counts, it is just that: hypothetical, because the government has *not* sought to justify its admission by resort to 404(b). It has not included the uncharged tax counts in its 404(b) disclosure or accompanying memorandum. Instead, it appears to take the position that they constitute direct evidence of the charged crimes, either the conspiracies (any of them), the securities fraud counts, the false filing/record-keeping offenses or the tax crimes.

As direct evidence either of Mr. Bonventre's knowing participation in the charged conspiracies, securities fraud, or false filing/record-keeping counts, it is extremely weak sauce, for the same reasons Messrs. O'Hara and Perez identified in their memorandum opposing admission of their own uncharged tax offenses. Omitting alleged income on his individual tax return was not done in furtherance of any charged conspiracy. *See Quinones*, 511 F.3d at 308 (acts in furtherance of the conspiracy are not "other act evidence under Rule 404(b)) (citing *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992)). Nor can it be used to provide general "background" or "context" to the conspiracy, some of the most overused and misused terms in the prosecutor's lexicon.

The indictment alleges the Count One umbrella conspiracy as one to defraud Madoff Securities Investment Advisory Clients. It lists four separate objects: the commission of securities fraud, falsification of the records of a broker-dealer and investment adviser and mail fraud. Indictment at ¶¶ 56-59. The "means and methods" do not mention any individual tax returns or tax consequences of the defendants' purported enrichment. Indictment at ¶ 60a-I.

Likewise, the alleged overt acts omit any reference to the defendants' individual tax returns.[2] Indictment at ¶ 61a-g.

As Messrs. O'Hara and Perez argue, the conspiracies and non-inchoate crimes (not including Counts 20-23, the false tax filings for 2003-2007 discussed *infra*) involves conduct and evidence that is wholly separate from Mr. Bonventre's alleged omission of income on his pre-2003 tax returns and the evidence necessary to prove that uncharged allegation. They are not part of the "same transactions" or "series of transactions" as those underpinning the charged offenses. *See Robinson*, 702 F.3d at 37. Nor is the pre-2003 tax evidence remotely necessary to "complete the story of the crimes on trial." *See Carboni*, 204 F.3d at 44. Such evidence would not help the jury understand the charged crimes and make findings of fact, but would be more likely to cause confusion and a waste of time. It is quite easy to extricate evidence relating to tax returns prior to 2002 from evidence of the charged crimes, because one has nothing to do with the other – they are not linked in the first place (except as a result of the government's decision to allege Mr. Bonventre's prior tax acts under the banner of its Count One conspiracy). Precluding the pre-2003 tax returns would in no way hamstring the government in proving the charged crimes.

Nor, because it is outside the limitations period, is it relevant to the jury's assessment of Mr. Bonventre's alleged commission of the charged tax crimes in Counts 20-23. In *United States v. Young*, for example, the court found that pre-statute of limitations evidence of

---

[2] The same is true for the four other conspiracy counts in which Mr. Bonventre is named, Two through Five, as well as the substantive counts (6-15, 18-19, 24). Counts Four and Twenty-four, which charge respectively conspiracy to commit tax fraud and Obstructing/Impeding the Administration of Internal Revenue Laws, allege activity with respect to Madoff's or BLMIS' taxes, not Mr. Bonventre's individual returns.

the defendant's bad acts was not intrinsic to the elements of the crimes charged, and therefore

inadmissible outside of the Rule 404(b) context. *See* 702 F. Supp. 2d 11, 13-14 (D. Me. 2010)

(citing *United States v. Anzalone*, 783 F.2d 10, 11 (1st Cir. 1986)). *Anzalone* rejected the

government's argument that a "continuing fraudulent scheme" could be proven by bad acts that

pre-date the limitations period, independent of Rule 404(b). 783 F.2d at 11. The court in *Young*

agreed, but unfortunately for the defendant, the time-barred allegations were nevertheless

admissible under the government's Rule 404(b) theory of prior bad acts, an argument the

government apparently does not press here. *See id.*; *United States v. Richardson*, 532 F.3d 1279,

1289 (11th Cir. 2008) (Trager, J., sitting by designation) (suggesting that admission of time-

barred prior bad acts proper under Rule 404(b), not as direct evidence of charged offense);

*United States v. Primrose*, 718 F.2d 1484, 1492 (10th Cir. 1983) (same). It is difficult to see how

the pre-2003 tax returns would be intrinsic to the crimes in Counts 20-23, which by their very

nature are limited to conduct and income earned in one year (or 16 months, counting the filing

period until April of the following year).

       It would only be relevant for an improper purpose, i.e. to prove his propensity

to commit the charged tax crimes. In other words, Mr. Bonventre is more likely to have filed

false tax returns in the charged years because he previously filed false returns for the uncharged

years. Whatever the surface appeal of that argument, it is categorically foreclosed by Rule

404(b)'s proscription on propensity evidence. The government is thus unable unable to justify

the admission of evidence of Bonventre's pre-2003 tax filings without some 404(b) purpose,

permissible (but not argued) or impermissible (propensity). Accordingly, the court should

preclude evidence of the government's allegations that Mr. Bonventre falsely omitted income from BLMIS on his individual tax returns prior to 2003.

E.      The Court Should Preclude Evidence of Mr. Bonventre's "Mug Shot"

Even though the government's disclosed exhibits include at least one other clear photograph of Mr. Bonventre's face, it has marked Mr. Bonventre's arrest photo or "mug shot" as Government's Exhibit 1000-16 in its recent disclosure.  There is no basis for admission of that photograph.  Mr. Bonventre's identity or likeness is not in dispute.  He will be sitting at the defense table every day of the trial.  Nor it is in dispute that Mr. Bonventre was arrested. Reminding the jurors of that fact serves no legitimate purpose, but would needlessly taint him in ways difficult to measure, and for the reasons identified in the individual *in limine* submissions of Ms. Bongiorno and Ms. Crupi, which Mr. Bonventre joins fully and incorporates herein.  It is neither relevant nor probative, but is highly prejudicial, to say nothing of the presumption of innocence that it would undermine.

F.      The Government Should Be Required to Provide Necessary Particulars

Mr. Bonventre unsuccessfully sought certain particularization and severance before the government's most recent superseder.  We restate those arguments here in summary because the superseder does not remedy its forebearer's deficiencies, and because the government's inadequate expert disclosures, discussed above, highlights Mr. Bonventre's inability to prepare for his defense without greater specificity about, among other things,

1.      The false records on which the government will rely to prove Counts 9 through 14 of the Indictment, and identification of the particular entries that the government alleges were known by Mr. Bonventre to be false;

2.      Whether the generalized allegations of Paragraph 46 of receiving and transferring "hundreds of thousands of dollars" in cash and checks from BLMIS embrace and are limited to the $273,620.64 in transfers from BLMIS to Mr. Bonventre specified and itemized by date and amount in Paragraphs 149 and 150 of the S2 superseding indictment returned in November 2010.

3.      Identification of the amounts of "wage and other income" that Mr. Bonventre allegedly omitted from his tax returns that rendered the returns false.

This information is essential for Mr. Bonventre to prepare his defense for trial for the following reasons.

First, for the false records underlying Counts 9 through 15, the enormity of this case renders it impractical for Mr. Bonventre to sift through the government's voluminous disclosure of exhibits to learn which of the records are the subject of the government's theory of false records.  Many of these individual records are themselves voluminous and contain scores of constituent entries.  The universe of records from and constituent entries on which the government might rely is enormous, and many of these records either incorporate or are associated with numerous other records that will need to be reviewed once the government discloses the records on which it will rely.  All other defendants join in renewing their motion for a bill of particulars in this regard.

Second, Paragraph 46 of the newest superseding indictment makes generalized allegations of transfers and withdrawals of "hundreds of thousands of dollars" from BLMIS, whereas the second superseding indictment (filed in November 2010) at Paragraphs 149 and 150 specifically referenced $273,620.64 in transfers from 2003 to 2007, with dates and amounts identified.  Mr. Bonventre is entitled to know whether the allegations of Paragraph 46 embrace and are limited to the allegations of Paragraphs 149 and 150 of the November 2010 superseder

18

and, if not, what constitutes the "hundreds of thousands of dollars" referred to in Paragraph 46. It is essential that the government resolve the difference between the indictments so that Mr. Bonventre with the aid of accounting and tax experts can prepare his defense.

Counts 20-23 charge Mr. Bonventre with filing false individual tax returns for 2003, 2004, 2006 and 2007. Among the reasons they are alleged to have been false is that Mr. Bonventre "omitted material amounts of wage and other income," though no count specifies an amount or a source. In contrast, the November 2010 superseder, for all its shortcomings, identified specific dollar amounts for the "omitted material amounts of wage and other income," which corresponded to the amounts and dates of the six transfers alleged in Paragraph 149 of that indictment. Further, as none of those six transfers was alleged to have occurred in 2005, Mr. Bonventre was not charged with filing a false tax return for 2005, a relatively clear indicator of the government's theory of falsity.

The latest superseding indictment, however, forces Mr. Bovnentre to speculate as to the "omitted material amounts of wage and other income." Paragraph 46 alleges aggregate amounts of "off the books" income received between 1992 and 2008 in seven different categories, but does not break out what amounts were alleged to have been received in a given calendar year. Accordingly, Mr. Bonventre is grasping in the dark as to the amounts of wage and other income which he allegedly omitted on his tax returns for 2003, 2004, 2006 and 2007. Aggregate amounts over 17 years fall far short of enabling him to intelligently prepare to defend the tax counts. Mr. Bonventre seeks only to be apprised of the most basic information as to the amount of the allegedly omitted income, and where the government alleges it came from.

G.      Severance is Still Required Under the Government's Most Recent Superseder

A. Severance from the other defendants

The Second Circuit has expressed aversion to joint trials of sufficient enormity and scope to overwhelm a jury and disable it from fairly considering individual charges. *See United States v. Casamento*, 887 F.2d 1141, 1151-53 (2d Cir. 1989). While the Circuit has expressed that aversion in cases charging an inordinate number of defendants, its expressed concern is equally applicable to this case charging an inordinate number of complex transactions over a forty-year period against five people playing different alleged roles. *See id.*

Severance is warranted if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see also United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998). Under Rule 14, the Court has broad discretion to order a severance when a joint trial would unfairly prejudice the moving defendant. Fed. R. Crim. P. 14; *see also United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992) (warning that individual trials should be held to avoid prejudicial spillover). In particular, in a joint trial involving a conspiracy charge, "[t]here generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its merits in the minds of jurors who are ready to believe that birds of a feather are flocked together." *Krulewitch v. United States*, 336 U.S. 440, 454 (1949) (Jackson, J., concurring).

Among the factors courts weigh in determining the need for severance are (1) the number of co-defendants and counts; (2) the indictment's complexity; (3) the anticipated length of trial; (4) disparities in each defendant's level of involvement in the overall scheme;

20

(5) possible conflicts between defense theories; and (6) prejudice resulting from the admission of evidence admissible to certain, but not all defendants. *See United States v. Santiago*, 174 F. Supp. 2d 16, 22 (S.D.N.Y. 2001). No factor is dispositive; rather they are intended to "provide guidance as to whether a jury will be capable of considering the evidence as to each defendant separately, independent of evidence against co-defendants." *Id.*

The magnitude of Mr. Madoff's Ponzi scheme will overwhelm the jury's ability to evaluate the threads of evidence on which the government will rely to prove its case against Mr. Bonventre, causing precisely the prejudicial spillover that warrants a severance. *See United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (observing that severance may be required when sheer volume and magnitude of evidence against one defendant dwarfs proof against co-defendant). The Second Circuit has recognized that "undue 'prejudice'" may result "when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *DiNome*, 954 F.2d at 843 (warning of prejudicial spillover when "evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice"). Further, the normal rationale for joint trials in the name of efficiency is not present here, as prosecutors would *not* be "presenting the same evidence again and again." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987). A constitutionally fair trial should not be sacrificed at the altar of efficiency.

Trying Mr. Bonventre alone would streamline the proof offered by the government, lessen the risk that a jury would be overwhelmed and distracted by evidence that does not relate to him, and would help make a fair trial more of a reality than an empty promise.

*See United States v. McDermott*, 245 F.3d 133, 139-40 (2d Cir. 2003) (reversing conviction in the face of great disparity of evidence among co-defendants, and recognizing that ability to follow limiting instructions "fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible feats of mental dexterity").  Alternatively, the case against Mr. Bonventre should at least be severed from the cases against co-defendants Bongiorno and Crupi to protect him from undue prejudice arising inevitably from evidence of the workings of BLMIS's investment advisory business, most of which did not involve him.

B. Severance of the Tax and ERISA Counts and Underlying Allegations

Counts Twenty through Twenty-three of the most recent iteration of the indictment charge Mr. Bonventre with filing false tax returns for the respective years 2003-2007, with the exception of 2005.  Counts Four and Twenty-Four charge Mr. Bonventre with crimes apparently connected to the filing or audits of Mr. Madoff's taxes.  Counts Five and Nineteen charge Mr. Bonventre with falsifying ERISA-related documents in connection with BLMIS's employee payroll.  All of these counts, together with the underlying allegations in paragraphs 30, 46-47, 60f, 61c, 83-92, 123, 133 of the indictment describe conduct that is unrelated to the various charges of securities fraud and false regulatory filings and should be severed as improperly joined with the other charged offenses.

Under Rule 8, "counts might be 'connected' [for joinder purposes] if one of the offenses 'depends upon or necessarily leads to the commission of the other,' or if proof of one act 'constitutes or depends upon proof of the other.'" *United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007) (quoting *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978)).  In recent years, courts have frequently severed tax counts improperly joined with other fraud charges.  *See, e.g.*,

22

*United States v. Kerik*, 615 F. Supp. 2d 256, 275 (S.D.N.Y. 2009) (severing nearly all tax counts

from those centering around honest services fraud after government "cobbled together in the

Superseding Indictment a laundry list of illegal schemes and false statements made over a span of

eight years"); *United States v. Stein*, No. 05-cr-888, 2008 U.S. Dist. LEXIS 58024, at *7-9

(S.D.N.Y. July 31, 2008) (severing counts charging evasion of personal income tax from those

charging conspiracy to defraud the United States through use of fraudulent tax shelters and

substantive evasion through losses associated with tax shelters). The common thread of these

cases and those referenced below, as here, is the absence of allegations that the conduct forming

the basis of the tax counts was sufficiently and necessarily linked to the separately charged fraud

itself.

   While Mr. Bonventre may have acquired the revenue charged in the tax counts on

the basis of his employment at BLMIS, the indictment does not allege that the revenue was

directly derived from the conduct charged in the indictment's other counts. *See Shellef*, 507 F.3d

at 99-100 (finding no adequate link between tax and non-tax counts to justify joinder because

unreported income was not derived from the fraud, while tax and non-tax counts were not

"sufficiently unified by some substantial identity of facts or participants") (internal quotations

omitted). Thus, the Court should sever the tax counts to be tried separately. *See id.* ("[T]he fact

that the businesses that produced the 1996 unreported income were also subsequently used to

perpetrate the alleged conspiracy and wire fraud does not justify a conclusion that the offenses

charged are 'based on the same act or transaction, or are connected with or constitute parts of a

common scheme or plan.'"); *Halper*, 590 F.2d at 429 (reversing conviction after income tax

counts improperly joined with Medicaid fraud counts because unreported income – the subject of

tax counts – could have derived from legitimate activities of business that generated income from Medicaid fraud). "Unguided by an allegation of how the unreported income related to the conspiracy, the Court will not hypothesize about how they could be related." *Stein*, 2008 U.S. Dist. LEXIS 58024, at *7 (severing personal income tax counts because indictment did not expressly or impliedly allege that side payments were related to, were part of, furthered, or arose from the tax shelter conspiracy); *see also United States v. Schlegel*, No. 06-cr-550, 2009 U.S. Dist. LEXIS 20912, at *7-8 (E.D.N.Y. Mar. 16, 2009) (noting that, despite government's alternative theories linking tax counts to broader fraud conspiracy, the Court "must look to the Indictment itself to determine the facts relevant to the severance motion" and that severance was warranted because of absence of allegations in indictment that conduct in tax counts furthered goals of the conspiracy, or that unreported income resulted from the charged fraud).

The ERISA- related charges, the conspiracy charged in Count Five and substantive falsification of records in Count Nineteen, relate to an alleged "no show" job that Mr. Bonventre supposedly obtained for his son at BLMIS. The truth or falsity of these allegations has nothing to do with the underlying fraud perpetrated at BLMIS, nor with the falsification of other documents that BLMIS was required to submit to the SEC and/or as a broker-dealer and investment adviser. As with the tax counts, the only common thread is that the government is able to allege some illegal conduct that arose from or during Mr. Bonventre's employment at BLMIS, but that thread is an insufficient basis for the ERISA-related counts to be joined under Rule 8. Counts Five and Nineteen should also be severed.

24

H.    The Court Should Order the Government to Clarify Whether All
      Reports of Defendants' Statements Have Been Produced

While counsels' review of 3500 material is not complete, it appears that the government has produced reports of statements made by one or more of the defendants after Mr. Madoff's arrest to representatives of the Trustee or Receiver, the SEC, forensic accountants or other investigators. It is not clear, however, whether the government has provided *all* such reports and notes, but only those on which the government expects to rely at trial. If it is the government's position that it is only required to produce reports of statements it intends to use, but is not required to produce all reports and notes of statements made to the full compliment of investigators, it must say so immediately so that the defendants can seek appropriate relief.

I.    Mr. Bonventre Joins the Motions of His Co-Defendants to the Extent Applicable to Him

Moreover, all defendants join in the motions of their co-defendants to the extent applicable to them.

                                        Respectfully submitted,

August 30, 2013                         _____/s/_____
                                        Andrew J. Frisch
                                        Jeremy B. Sporn
                                        Amanda L. Bassen
                                        The Law Offices of Andrew J. Frisch
                                        40 Fulton Street, 23rd Floor
                                        New York, New York 10038
                                        (212) 285-8000
                                        (646) 304-0352 (facsimile)
                                        afrisch@andrewfrisch.com

                                        *Counsel for Daniel Bonventre*

25