*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 8, 2013

BY ELECTRONIC DELIVERY/HAND

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:   *United States v. Bonventre, et al.*
>       No. 10 Cr. 228 (LTS)

Dear Judge Swain:

The Government respectfully writes in response to defendant Joann Crupi's October 7, 2013 letter motion *in limine* to play a portion of a video recording of Bernard Madoff participating in a group discussion. This video is inadmissible for several reasons – it is hearsay, it is irrelevant, and its admission would violate Rule 403. At a minimum, it is clear that the admission of the video is a sufficiently complicated evidentiary question that the question of its admission should be delayed until the defense case. For all of the reasons described below, the Court should deny the defense application to play the video during its opening statement.

**I.   Background**

The recording in question depicts Bernard Madoff ("Madoff") sitting at a sort of roundtable forum, participating in a moderated discussion with several other participants and a number of onlookers. Among the participants is former Madoff Securities employee Joshua Stampfli, an individual who worked for the Madoff Securities market making operation, along with other financial industry professionals and two professors of economics. During the moderated discussion, Madoff makes a number of statements about the nature of his business and the regulatory environment in which it operates. Most significantly, among the portions that defense counsel has indicated he intends to play for the jury, Madoff states:

- "There are so-called Chinese Walls that are required to be established at every brokerage firm. They're called Information Barriers – a term most people would understand—to sort of wall off a brokerage firm from taking advantage of information that he has as to what clients are basically going to trade or not going to trade. There are separate divisions within the firms and it is very

- carefully enforce and surveilled. It doesn't mean there are not abuses, for sure, but by and large in today's regulatory environment, it's virtually impossible to violate rules."

- "And when you consider the volumes of trading, the trillions of dollars of trading that go on today in Wall Street – I mean, our firm, for example, we trade an excess of $1 trillion dollars a year and that's one firm – and you look at what we would consider to be the infractions, they're relatively small, primarily because of all the regulation. Most firms do try to comply with that."

- "I guess you could also program the computer to violate the regulations, but we haven't gotten there yet. The issue is, by taking the human being out of the equation and getting someone like Josh to go back and run all sorts of algorithms – he can explain that to you because every time he tries to explain it to anyone in the Madoff family, we walk out of the room after fifteen minutes."

- "I'm very close with the regulators so I'm not trying to say what they do is bad. As a matter of fact, my niece just married one."

*See* "The Future of the Stock Market" Recording. The event depicted in the recording purportedly took place on October 20, 2007.

B.   Discussion

    1.   **The Proffered Statements Are Hearsay**

The defendant argues that the "video is not hearsay as it is not offered for the truth of the matter asserted. In fact, since all parties recognize that Mr. Madoff was not telling the truth when he spoke at this conference, his statement cannot be offered and are not offered for the truth of the matters contained herein." (Crupi Let. at 2). *See* Fed. R. Evid. 801. There is a dispute. While it is possible that certain of the things Madoff says during this recording are false, many of the things Madoff says on the video are true, or potentially true. More importantly, the defendants intend to rely on the truth of these assertions in their anticipated defenses. This makes the statements hearsay.

For example, Madoff states, in one of the portions that Crupi seeks to play during the opening statement: "I'm very close with the regulators so I'm not trying to say what they do is bad. As a matter of fact, my niece just married one." In fact, certain witnesses and potential witnesses will testify that Madoff had certain relationships with regulators. It is moreover a matter of public record that Madoff's niece, Shana Madoff, did in fact marry an SEC official. While these facts are irrelevant to the genuine issues in the trial, it cannot be said that their

objective falsity renders the statements nonhearsay. Similarly, Madoff states that "[t]here are so-called Chinese Walls that are required to be established at every brokerage firm. They're called Information Barriers – a term most people would understand—to sort of wall off a brokerage firm from taking advantage of information that he has as to what clients are basically going to trade or not going to trade." This, again, is an objectively true statement. *See generally Hempstead Video, Inc.* v. *Incorporated Village of Valley* Stream, 409 F.3d 127, 137 (2d Cir. 2005) ("Responding to two opinions of this Circuit discussing procedures that may screen and safeguard client confidences (sometimes referred to as "Chinese Walls"), a few district courts have drawn a tentative inference that our Circuit may categorically reject the efficacy of isolation efforts as protection against taint"). Whether these practices were adhered to at Madoff Securities is another matter. But the point is that Crupi cannot rely on the objective falsity of this information to render it nonhearsay.

Furthermore, Crupi's anticipated defense is dependent upon the very truths that Madoff is asserting in the video. Various submissions of the defendants suggest that they intend to argue that a substantial portion of the reason they believed Madoff was his stature in the business community, to include his relationships with the regulatory community. Indeed, in the instant letter, the defendant states "[w]e intend to try to prove just how believable Mr. Madoff actually could be. Integral to that is our ability to show just how respected he was in the industry, and how terribly plausible he could appear." (Crupi Let. at 2). Crupi cannot introduce a recording of her coconspirator making claims that are part of the basis of her defense – this is an attempt to introduce pure hearsay and it should be rejected by the Court. *Cf United States* v. *Harwood*, 998 F.2d 91, 97 (2d Cir. 1993) (observing that declarant's "'pattern of verbal behavior'" was "irrelevant to any issue in the case and cannot be invoked like a mantra to circumvent a hearsay objection").

      2.      **The Proffered Statements are Irrelevant**

Even if Crupi could demonstrate that these statements are not hearsay, they would be inadmissible because they are irrelevant. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action"). First, the entire purported basis for the video is to demonstrate how well Madoff lied. But as described above, Madoff is making a number of objectively true statements on the recording. Beyond the true statements described above, Madoff states "I guess you could also program the computer to violate the regulations, but we haven't gotten there yet. The issue is, by taking the human being out of the equation and getting someone like Josh to go back and run all sorts of algorithms – he can explain that to you because every time he tries to explain it to anyone in the Madoff family, we walk out of the room after fifteen minutes." Indeed, a number of witnesses will describe Madoff's low understanding of the specifics of how various technologies worked. It is entirely probable that Madoff and his family members did not understand the specifics of how the market marking programs of Stampfil worked. Moreover, there will be no evidence to undermine Madoff's assertion that you cannot program a computer to violate the type of regulations that affected the operation of the market making desk. Indeed, the computer programs at issue in this case were not sufficiently sophisticated to independently "violate the regulations." The programs at issue in this case were mainly designed to create data and documents to assist human beings violating certain

regulations in the investment advisory business. This is a completely separate matter from what Madoff appears to be discussing here.

Even Madoff's trading estimates are potentially true statements that there simply will be no evidence to prove or contradict. He states "[a]nd when you consider the volumes of trading, the trillions of dollars of trading that go on today in Wall Street – I mean, our firm, for example, we trade an excess of $1 trillion dollars a year and that's one firm – and you look at what we would consider to be the infractions, they're relatively small, primarily because of all the regulation. Most firms do try to comply with that." The essential point of this statement is that, given the vast amount of trading that occurs on Wall Street, the financial malfeasance represents a relatively small component of market activity. This is a conclusion that is likely true, but is certainly unknowable. Certainly it cannot be said that Madoff is "lying" with regard to this statement. Even his estimations of the total trading volume of Madoff Securities are potentially true – while the investment advisory business was engaging in no real trading, the market making and proprietary trading businesses engaged in massive amounts of daily trading, the total volume of which is unknown. Most importantly, at no point during the recording does Madoff claim that there is no fraud going on at his company.

That is all to say that, even if one assumes that the question of what Madoff looked like when he was lying is relevant, this video does not depict that. Madoff appears to be largely telling the truth. He is accompanied by one of the Madoff Securities employees who was running an entirely legitimate component of the market making operation. To the extent that Madoff is lying in some portions of this recording, it is unclear how the defense would establish that, even if they intended to call Bernie Madoff himself. Much of what Madoff is saying is objectively true or quite likely true, and this is fatal to the defendant's claim of relevance.

Regardless, even if the defendant could establish that Madoff is lying, the question of how Madoff looked while he was lying to a group of outsiders is irrelevant. *Cf. United States* v. *Solano*, No. 05 Cr. 563(LTS), 2010 WL 2718973 at *1 (S.D.N.Y. Jul. 8, 2010) (concluding that proffered recording which defendant argued was relevant to his state of mind but which depicted events temporally removed from the charged crime was irrelevant). All of the defendants were insiders at Madoff Securities who interacted with him on a daily basis for a period of decades. There is no proffered evidence to suggest that this is how Madoff behaved when he was "lying" to the defendants. It is axiomatic that a party cannot simply introduce a video, selected at random, to demonstrate how a coconspirator or other third party generally behaved. Under the defendant's logic, an individual accused of a robbery in the summer could introduce a video depicting the victim giving away gifts at Christmas in order to support the individual's claim that the purported stolen goods were given to the defendant, rather than stolen. This would be an absurd result.

To be clear, what Bernard Madoff actually said to the defendants is potentially relevant. *See United States* v. *Song*, 436 F.3d 137, 139 (2d Cir. 2006) (observing that excluded testimony regarding what defendant's manager told her "was not in fact hearsay, inasmuch as the challenged statements were offered not for the truth of the matters asserted, but rather, to demonstrate the motivation behind Song's actions, which were taken in response to the assertedly false statements made to him by the 'manager' and Mrs. Kim"). To the extent that the

Case 1:10-cr-00228-LTS   Document 484   Filed 10/08/13   Page 5 of 6

Page 5

defendant's are eliciting testimony regarding relevant statements actually made by Madoff to the defendants, the Government has no objection. But here, there is no proffer that any of the defendant's were present for the event that is depicted in this recording. The recording is therefore irrelevant.

### 3. The Recording Should Be Excluded Under Rule 403

Even assuming the defendant could establish that the recording is relevant nonhearsy, the Court should exclude it pursuant to Rule 403. Rule 403 of the Federal Rules of Evidence provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Here, the probative value of the recording is low, and it is substantially outweighed by a danger of confusing the issues, and misleading the jury.

First, there is a danger of confusing the issues. The admission of this recording will confusingly suggest to the jury that the statements Madoff makes in this recording are of a type that were made to the defendants. There is no proffered evidence to support this conclusion. Even if such evidence existed, the best evidence of what Bernard Madoff said to the defendants is any actual evidence of what Bernard Madoff said to the defendants. The jury will be led to believe that whether Bernard Madoff seems believable on this recording is a determinative issue in this trial, when in reality Madoff's believability during this isolated event has negligible probative value with regard to his interactions with the defendants. The members of the jury will not be equipped with the information the defendants possessed or with the long history of interactions with Madoff that the defendants had. Thus, the question at trial will never be whether they objectively think Madoff, in a vacuum, looks believable. The question is whether the defendants, given the totality of information that will be introduced during the case, believed that they were acting properly based on Madoff's representations. The jury should not be confused, particularly at the outset of the case, by the defendant's attempts to conflate these issues.

Second, there is a danger of misleading the jury. Particularly if introduced during the opening statements, the jury may reasonably believe that the recording depicts an event that that the defendants attended. Without proper context, it will be impossible for the jury to know the make up of the audience. That context will not exist during the opening statement and it will not be provided by any proffered witness. Crupi argues that the recording is "a testament to a super-normal ability to face people down and lie convincingly," and she states that this "skill . . . is going to be an important part of our defense." But as the Government explains above, it is far from clear that Madoff is lying during the bulk of what is depicted in the recording. Even if the defense can demonstrate that Madoff is telling some untruths, this is a far cry from demonstrating that the video depicts a "super normal" ability to lie. Such a conclusion would necessarily be dependent on other evidence, perhaps including complicated expert testimony, which simply is not yet before the Court. In short, there is a serious danger presented by this recording that the jury will be misled.

### III. Conclusion

For all of the reasons described above, the Court should deny the defendant's application.

Respectfully submitted,

_____/s_____
RANDALL W. JACKSON
MATTHEW L. SCHWARTZ
JOHN T. ZACH
Assistant United States Attorneys
Tel.: (212) 637-1029/1945/2410

cc:	BY E-MAIL
	all defense counsel