

Larry H. Krantz
Marjorie E. Berman

Wendy Gerstmann Powell
*Special Counsel*

Kimberly A. Yuhas

David V. Kirby
Aaron Twersky
*Of Counsel*

Writer's E-mail
lkrantz@krantzberman.com

November 11, 2013

**By ECF**

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street, 8th Floor Mailroom
New York, New York 10007

      Re:    **U.S. v. Bonventre, et al., 10 Cr. 228 (LTS)**

Dear Judge Swain:

      We represent defendant George Perez in the above matter.  We write concerning the government's handling of the testimony of Matthew Cohen.  For the carefully considered reasons set forth in this letter, we believe that the government has withheld significant *Brady/Giglio* impeachment evidence from the defense concerning Mr. Cohen's testimony.  We do not make this allegation lightly, but believe that the circumstances surrounding Mr. Cohen's testimony cannot simply be ignored, as they raise issues that are far too serious.  Accordingly, for the reasons explained below, we write to request that the Court (1) order the government to produce the additional *Brady/Giglio* material requested herein  and (2) after production of that material, allow us to make further application to the Court , if based on that information additional relief seems appropriate.

<b>BACKGROUND</b>

      We review in detail below the relevant facts underlying this application.  We apologize for the length of the Background section, but the issues must be understood in their full context.

**The Initial Disclosure of 3500 Material**

      The initial disclosure of 3500 material as to Matthew Cohen was provided by the government approximately 45 days before trial.  That material included two FBI reports of interviews with Cohen.  The first was a memo of an interview conducted on May 27, 2009. (3535-1)   It concerned the termination of George Perez and Jerome O'Hara from Madoff Securities, and centered on their return of all Madoff Securities' property.  This report did not appear to cover the issues raised in this letter.

Honorable Laura Taylor Swain
Date:  November 11, 2013
Page 2 of 19

The second report, however, was directly on point as to the issues raised herein. (3535-2) Specifically, the government produced an FBI report of an interview with Cohen conducted on April 12, 2011 -- long after the Indictment in this case.  That interview was held at the U.S. Attorney's Office, and was conducted by AUSA's Lisa Baroni and Julian Moore.  Also present were SEC attorney Aaron Arnzen and FBI Special Agents Shannon Fish and Paul Takla.  This was a lengthy interview as to which the typed FBI report is over 6 single spaced pages. Approximately two of those pages (pp. 3-4) were devoted principally to Cohen's recollections of his dealings with George Perez and Jerome O'Hara -- during the time period when Perez and O'Hara still worked at Madoff Securities.  This FBI report contained the following relevant information, obtained from Cohen (emphasis added):

> During the week of December 15, [Alix Partners] AP set up a computer for PEREZ on the 18th floor that allowed him to access the House 17 server. A representative from AP sat with PEREZ at all times when he accessed the House 17 server. One of the first things PEREZ pulled off the machine was the "A Name" file. Upon reviewing the approximately 8,000 names in the file, COHEN first realized there were more managed accounts than were indicated earlier by DIPASCALI.  PEREZ repeatedly told COHEN that he and O'HARA had not designed the systems or written the code for the House 17 server but rather, LIZ WEINTRAUB, who was deceased, did. . . . PEREZ also said he and O'HARA did not understand the code and were just there to keep the system running. PEREZ made similar statements to other AP personnel. Also on one occasion on the 18th floor, PEREZ told COHEN that a few years ago, BERNARD MADOFF asked PEREZ to make changes to the system, but PEREZ told BERNARD MADOFF he would not make the changes because he felt uncomfortable doing so. According to PEREZ, BERNARD MADOFF said if PEREZ was not comfortable with making changes, then PEREZ should not do it. PEREZ did not say what specific changes BERNARD MADOFF wanted him to make.  [Scott Jarrell] may have been present for this conversation with Perez.
>
> ***
>
> Approximately two weeks after he first learned of the "A Name" file, COHEN compared the customer account listing with an employee listing and discovered both PEREZ and O'HARA had their own managed accounts.  Upon further review, COHEN learned that PEREZ and O'HARA opened their accounts with the same amount of cash on the same day.  COHEN also learned the accounts were closed with cash withdrawals on the same day using what appeared to be duplicate withdrawal request letters.

**The Defense Application to Exclude a Small Portion of Cohen's Testimony**

Based on this disclosure, we believed that Cohen's testimony was fairly peripheral to the case. Indeed, it appeared that Cohen was principally being called (as to Perez) to elicit Cohen's recollection of Perez's description of his involvement with the computer systems, so that the government could argue that Perez had somehow minimized his involvement. Because we believed that the proffered testimony was an inadmissible attempt to show "consciousness of guilt," we wrote to the Court, by letter dated October 14, 2013, and sought to exclude this aspect of Cohen's proffered testimony.

**The Government's New Disclosure**

In opposition, by letter dated October 16, 2013, the government reviewed the "anticipated evidence" to be elicited from Cohen. In the course of reviewing that proffered testimony, *but without indicating that it was disclosing anything new*, the government made the following momentous disclosure:

> In addition, Mr. Cohen will testify that at some point in his work, he learned that O'Hara and Perez's personal investment advisory accounts had been funded with nearly identical journal entries . . . on the same day, and had later been closed on the same day. When Cohen asked Perez about these coincidences, Perez explained that Bernard Madoff had asked the programmers to create certain computer programs that made them uncomfortable, and had paid them approximately $100,000.

*See* Govt's Letter dated October 16, 2013, at p. 2. (emphasis added)

In light of this significant new allegation, I immediately engaged in several conversations with AUSA Matthew Schwartz. On October 16th, the day I received his letter, I questioned Mr. Schwartz as to why this allegation from Mr. Cohen had never before surfaced. Mr. Schwartz responded that he had first heard the allegation from Cohen just one day before he wrote his letter to the Court (dated October 16, 2013).

My next detailed conversation with Mr. Schwartz on this subject was a telephone conversation on Saturday, October 19, 2013. In that conversation, I asked him to describe the expected testimony from Mr. Cohen in detail, so that we could determine if we had a basis for an *in limine* motion. At that time, he described the anticipated testimony from Cohen, which is reflected in my notes, as follows:

> In response to Mr. Cohen's question about the Madoff advisory accounts being opened and closed by Perez and O'Hara at the same time, Mr. Perez allegedly told Mr. Cohen that Madoff asked for changes to a program so statements could be changed. When Perez told Madoff that both he and O'Hara were uncomfortable, Madoff told them they could both have $100,000.

In that same conversation, I pointed out to AUSA Schwartz that Mr. Cohen's belated recollection was completely at odds with his prior interview with the government, held in April

2011.  I also explained various other reasons why Mr. Cohen's new "recollection" was highly suspect.  I asked Mr. Schwartz to go back to Mr. Cohen once again, and to make sure that he (Schwartz) had a good-faith basis to present this testimony to the jury.  He agreed to do that.

On Monday morning, October 21, 2013, I asked Mr. Schwartz if he had reconsidered.  He told me he had spoken with Mr. Cohen again and that he (Schwartz) was comfortable eliciting this testimony from him.

### The Court's Initial Ruling

That same morning (October 21), we discussed the matter with the Court.  *See* Oct 21, 2013 Tr. at pp. 296-297.  Your Honor initially excluded the statement, but the government moved for reconsideration.  In its argument for reconsideration, the government observed that the statement "*is a probative statement, and it is a powerful statement because it is an admission about the charged conduct.  But that is why it is so important."  Id.* at 301-302.  Mr. Schwartz further advised the Court at that time:  *"[T]his is not a late disclosure.  The government made this disclosure promptly.  It happens in every trial that people say things either on the stand or in final debriefings that they haven't said before.  As soon as we heard this from Mr. Cohen, we made a disclosure.  It is, moreover, not the case that there were multiple prior debriefings.  There was one prior debriefing on this issue, and it was several years ago, and that was not the focus of that particular session."  Id.* at 306.

On reconsideration, the Court permitted the statement to be offered in a *Brutonized* form.  *Id.* at 526-27.

### Cohen's Direct Testimony

The following day, Mr. Cohen testified.  As to the statement in issue, his testimony on direct was as follows:

> **Q.** Can you tell the jury what Mr. Perez told you about his account activity?
>
> **A.** Certainly.  So I asked Mr. Perez what led to him opening and then subsequently closing this account.  He told me that Mr. Madoff had asked him to make some changes to one of the AS/400 programs in order to modify statements that had already been printed and sent to a customer.  He told me that he was uncomfortable doing this and that he had told Mr. Madoff that, and Mr. Madoff had said, I'll give you some money, just do it, and he did.
>
> **Q.** Did you take notes of that conversation?
>
> **A.** I did not.
>
> **Q.** Did you tell anyone about that conversation?
>
> **A.** I did.
>
> **Q.** Excuse me?
>
> **A.** I did.

> **Q.** Who did you tell?
>
> **A.** I advised Special Agent Keith Kelly of the FBI, who was leading the investigation for the FBI and was my primary contact with the FBI at that point.  I also advised the trustee's counsel and the folks from FTI, which is another consulting company that was working with us, along side us on this case.  They were responsible for a forensic accounting investigation, whereas, I was responsible for the claims process.  So this would have been in their purview.
>
> **Q.** Did you, yourself, take any further steps to investigate what Mr. Perez had told you?
>
> **A.** No, I did not.
>
> **Q.** Why not?
>
> **A.** Because it was outside of the scope of what I had been hired to do.

Oct 21, 2013 Tr. at 620-21.

### Colloquy After Cohen's Direct

Following this testimony, there was a break in the proceedings and the following colloquy ensued:

> **MR. KRANTZ:**  Your Honor, I just want to say we're in a little bit of a quandary here because, of course, this is a statement, which has -- now, this is now the fifth iteration of his statement because it was different from what was contained in Mr. Schwartz's letter.  Mr. Schwartz's letter referred to a $100,000 statement.  Now, the statement is give him some money. I'm in an awkward predicament to where Mr. Schwartz is a witness to the prior inconsistent statement.  I just need to figure out how I'm going to deal with that statement.  Also, he has said, which is completely new to us and I understand new to the government, that he told this to Special Agent Keith Kelly at the time.  We've never gotten any written report from Mr. Kelly suggesting that.
>
> I don't have any idea if Mr. Kelly confirms that or not.  I would ask the government to provide any discovery on whether -- any 3500 material concerning whether Mr. Kelly ever recorded that.  I believe the answer is that he didn't, but I want to confirm that for the record.
>
> **THE COURT:**  . . . Mr. Schwartz, were you going to respond by way of confirming what you will do?
>
> **MR. SCHWARTZ:**  I was going to respond.  First of all, I disagree that anything that Mr. Cohen said was inconsistent with what he said before.  It was a different articulation, but there's nothing inconsistent with saying, for example, you know, he took money this time and saying he took a specific amount of money last time.

> And if Mr. Krantz wants to ask that question on cross-examination, Mr. Cohen may well come up with the exact dollar figure. And, again, he's free to cross-examine, but I don't perceive any inconsistency.
>
> We have -- with respect to the disclosure of this statement to Mr. Kelly, Agent Kelly, we have made a good faith effort to retrieve all of the appropriate 3500 material. We have reviewed Agent Kelly's files. We've reviewed the 3500 file that the FBI kept on Mr. Cohen. We've produced that material. We've produced everything that we have.
>
> **THE COURT:** So you confirm that you have produced everything that you have?
>
> **MR. SCHWARTZ:** Correct. To be clear, I did not go back and make a targeted inquiry, after I heard this bit of information, but we have made a complete and thorough search for 3500 material and produced every bit of it that we have.
>
> **THE COURT:** And do you intend now to make a targeted inquiry in advance of any testimony by Special Agent Kelly?
>
> **MR. SCHWARTZ:** We were not intending to call Special Agent Kelly; so we have not.
>
> **THE COURT:** I thought you said you produced 3500 material from him?
>
> **MR. SCHWARTZ:** No. We searched the reports that he created in order to produce 3500 material for witnesses that he may have interviewed. So --
>
> **THE COURT:** Thank you for that clarification.
>
> **MR. SCHWARTZ:** Sorry. He's not a witness that we intend to call.
>
> **THE COURT:** Thank you.

*Id* at 622-24.

Needless to say, the 3500 material produced for Agent Kelly included no interviews of Cohen whatsoever, let alone an interview where Cohen reported to Kelly the alleged statement of Perez to which he testified in Court. Moreover, contrary to AUSA Schwartz's statement, Agent Kelly *was* on the government's witness list, and his 3500 material had previously been provided to the defense.

**Cross Examination of Cohen**

On cross-examination, the following relevant testimony was elicited:

**MR. KRANTZ:**

Q. On how many occasions have you spoken to the United States Attorney's Office concerning this case?

**MR. SCHWARTZ:** Objection, your Honor.
(Counsel conferring)

Q. Let me clarify my question.  I'm not referring to meetings about the claims process or anything like that.  But how many times have you met with the U.S. Attorney's Office about this particular criminal case?

A. Two, three, maybe four.  I don't recall the exact number.

Q. And has that been over the course of the last few years?

A. No.

Q. But would you agree you met with them at least as early as 2011?

A. I don't know that I met with them in connection with this case in 2011.  We may have discussed issues.  Are you including the FBI in your definition of the United States Attorney's Office?

Q. Well, do you recall a meeting in 2011 attended by an Assistant U.S. Attorney named Lisa Baroni, an Assistant U.S. Attorney named Julian Moore, multiple FBI agents and an attorney from the SEC?

A. Vaguely.

Q. You don't remember what was discussed, other than vaguely, at that meeting in 2011?

A. I don't.

Q. Do you recall how long that meeting lasted?

A. I don't.

Q. Do you recall the names of anyone present at that meeting?

A. No.

Q. Do you recall if, at that meeting in 2011, you were asked by the United States Attorney's Office, or anyone else present at that meeting, about your conversations with George Perez that took place during the same time frame that you've testified to in front of this jury?

A. I remember having conversations with members of the FBI and the United States Attorney's Office about those issues, but I can't tell you exactly

> when those conversations took place. So it's entirely possible that it was at that meeting.
>
> ***
>
> Q. . . . Do you recall that at that meeting you were asked about the same conversations that you had with Mr. Perez that you've testified before this jury concerning?
>
> A. Since I don't recall the meeting, it would be hard for me to recall particular instances or questions I was asked during the meeting or the conversation that we had during the meeting.
>
> * * *
>
> Q. As best you recall, when was the first time you ever told a representative of the U.S. Attorney's office that, according to you, Mr. Perez told you that when he complained to Mr. Madoff about being uncomfortable, Mr. Madoff paid him some money, as you have indicated to this jury? When is the first time you ever told that to a representative of the U.S. Attorney's office?
>
> A. Are you including the FBI in that categorization of U.S. Attorney's office?
>
> Q. Mr. Cohen, you're an attorney, is that true?
>
> A. I am.
>
> Q. You worked for 15 years at Skadden Arps, one of the largest firms in New York?
>
> A. I did.
>
> Q. Do you know the difference between the FBI and the U.S. Attorney's office?
>
> A. I do.
>
> Q. My question was, when is the first time you ever told the U.S. Attorney's office the statement you testified to here that Mr. Madoff said to Mr. Perez, according to you, that he would pay him some money?
>
> A. I don't recall.
>
> Q. Isn't it a fact that the first time you ever made that statement to a representative of the U.S. Attorney's office was last week?
>
> A. I don't believe so.
>
> Q. How much earlier did you make it?
>
> A. I don't recall.
>
> Q. To whom from the U.S. Attorney's office did you make that statement prior to last week?

> A. I don't recall.
>
> Q. You see the prosecutors here, correct?
>
> A. Yes.
>
> Q. Did you make that statement to any of them prior to last week?
>
> A. I don't recall.
>
> Q. Do you recall Mr. Julian Moore?
>
> A. I do.
>
> Q. Do you recall that you met with him in the past and discussed this case with him?
>
> A. On multiple occasions.
>
> Q. Do you recall if you told him the statement about Mr. Madoff offering money to Mr. Perez?
>
> A. I don't recall whether it was him.
>
> Q. Do you recall if you told Ms. Lisa Baroni that statement, who is another representative of the U.S. Attorney's office, correct?
>
> A. I certainly met with Ms. Baroni on multiple occasions.  I don't recall whether I told her that or when I did if I did.

*Id.* at 628-630; 643-646.

### Re-Direct Examination

On redirect examination, Mr. Schwartz elicited the following relevant testimony:

> Q. [Mr. Krantz] asked you whether -- when you had told representatives of the U.S. Attorney's Office specifically about that statement.  Do you recall that question?
>
> A. I do.
>
> Q. And am I right in remembering that you didn't recall specifically when you mentioned it to the U.S. Attorney's Office?
>
> A. That is correct.
>
> Q. When did you first mention the statement that you testified about to the FBI?
>
> A. The day of the conversation I had with Mr. Perez, or as soon as I could speak to Special Agent Kelly.
>
> Q. You reported it immediately to the FBI?
>
> A. Correct.
>
> Q. Do you have any doubt in your mind that George Perez made that statement to you?

>       A.      None whatsoever.
>
> MR. SCHWARTZ:  Thank you.  No further questions.

*Id*. at 705.

### **The Defense Request that the AUSA Inquire of Agent Kelly**

The following day, October 23, 2013, I expressed to Mr. Schwartz my concern about Mr. Cohen's testimony in general, but also about the specific statement, elicited by Mr. Schwartz, that Cohen had reported Perez's statement directly to Agent Kelly immediately upon hearing it in December 2008 or January 2009.  The reason for my concern was that – as noted above - we had not received any 3500 material (of Mr. Cohen or Mr. Kelly) indicating that such a statement had ever been made by Cohen to Kelly.  Thus, it seemed apparent that no such statement had ever been made by Cohen to Agent Kelly – who at the time was the head of the FBI team investigating Madoff.

When I expressed these concerns in general terms to Mr. Schwartz, he told me that he had never discussed the issue with Agent Kelly, who was "retired and living in Arizona."  I requested that Mr. Schwartz contact Mr. Kelly to determine if his recollection differed from Mr. Cohen's, in which case that would be *Brady* material.  I memorialized my request in an email of the same date:

> This will confirm my oral request that the government inquire of Agent Kelly whether he recalls Matthew Cohen telling him, in Dec 2008 or January 2009, that Mr. Perez had made the statement to which Mr. Cohen testified in court (to the effect that Mr. Madoff paid Mr. Perez for working on programs as to which he was uncomfortable).  To the extent that Agent Kelly's recollection differs from Mr. Cohen's on this subject, we believe this would be important Brady-Giglio information.
>
> You have indicated that you will consider this request and get back to me promptly.

I waited several days but received no response from Mr. Schwartz.  When I finally asked him in court (during a break) for his response, he told me that he and the other AUSA's had concluded that they had no obligation to do what I had requested, and that they "were not going to do that."  I memorialized that response in an e-mail dated October 28, 2013:

> This will confirm our conversation in court today in which you advised me, in response to my [] request, that the government was unwilling to contact Agent Kelly on the subject set forth [in my e-mail] below.  You indicated that you believed you had no obligation to do so.  I respectfully disagree.

> In light of your position, can you provide me with contact information for Agent Kelly?

Mr. Schwartz responded by e-mail dated October 30, 2013 as follows:

> Keith Kelly's phone number is [xxx-xxx-xxxx].  We don't have an e-mail or physical address, so far as I know, although he lives in Arizona and we believe he may teach at Arizona State University's school of criminology.
>
> You have not previously expressed your view that we are required to question Mr. Kelly.  While, as I've said, we don't think we have any such duty, we also certainly don't want to be remiss in our obligations. Can you explain the basis for your claim that we're obligated to do so?  If we are overlooking something and in fact have that duty, we will of course do it.

I responded by e-mail dated October 31, 2013, as follows:

> In response to your question below -- as to why I think you have a duty to question Agent Kelly (as I requested in the below e-mail) -- I suggest you take a look at *Kyles v Whitley*, 514 US 419, 437-38, 115 S Ct 1555, 1567-68, 131 L Ed 2d 490 (1995).  There, the Supreme Court held that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."  Here, Agent Kelly, when he was an FBI agent, was  plainly acting on behalf of the U.S. government.  As such, to the extent that he has information contradicting or undermining the testimony of Mr. Cohen concerning Cohen's purported conversation with Agent Kelly, we would plainly be entitled to that information. *Accordingly, given the circumstances here, in my view you have an obligation to ask Mr. Kelly whether he knows of any such exculpatory information.  You cannot just bury your head in the sand and pretend you have no reason to inquire, particularly given Mr. Cohen's last-minute revelation about his purported conversation with Agent Kelly.*
>
> In this regard, I also commend to you the following additional statement from *Kyles*:
>
> This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. See *Agurs*, 427 U.S., at 108, 96 S.Ct., at 2399–2400 ("[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure"). This is as it should be. Such disclosure will serve to justify trust in the prosecutor as "the representative ... of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).   And it will

> tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.
>
> *Kyles v Whitley*, 514 US 419, 439-40, 115 S Ct 1555, 1568, 131 L Ed 2d 490 (1995].
>
> Please consider the above and let me know if you have had a change of heart on this issue. . . .   (emphasis added)

I did not receive any further response from Mr. Schwartz on these issues, either orally or in writing. Moreover, more than a week ago, I called Agent Kelly's number and left a voicemail for him explaining that I had an important question pertaining to the Madoff case, and asking for a return phone call. Not surprisingly, I have not heard back from him.

Thus, we are left in a vacuum of information, which appears to be what the government desires. Given that the government has refused our request for production of highly relevant and important *Brady/Giglio* material, we have no resort but to turn to the Court for assistance in ensuring that the government lives up to its obligations. Accordingly, we make the application below.

## DISCUSSION

### General Principles Governing this Application

There are several bedrock principles of law that govern this application.

**First**, the Supreme Court has recognized in numerous cases the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct .1936, 1948, 144 L. Ed. 2d 286 (1999). As the Supreme Court famously stated in *Berger v. United States*, 295 U.S. 78, 88 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Similarly, the Second Circuit observed in *Shih Wei Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003): "[I]n order to reduce the danger of false convictions, we rely on the prosecutor not to be

simply a party in litigation whose sole object is the conviction of the defendant before him. The prosecutor is an officer of the court whose duty is to present a forceful and truthful case to the jury, not to win at any cost."

**Second**, in light of this special obligation of the prosecutor, "it is well established that a prosecutor's knowing use of false testimony violates the due process clause of the Fourteenth Amendment. Due process requires not only that the prosecutor avoid soliciting false testimony, but that he not conceal it, and that he not allow it to go uncorrected when it has occurred. These standards apply whether the subject of the falsehood goes to the merits of the case or only to the credibility of the witness: 'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.'" *Perkins v. LeFevre*, 642 F.2d 37, 40 (2d Cir. 1981) (citations omitted). Moreover, this violation occurs whether the prosecutor actually knew of the false testimony, or where he or she "should have known" of its falsity. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976).]

**Third**, "when a defendant has requested that the prosecutor produce specific information that is material to the case against him, due process requires that such production be made. Although *Brady* dealt with material that was exculpatory in nature, its principle extends to evidence relating to a material witness's credibility." *Perkins*, 642 F.2d at 40 (citations omitted).

**Fourth**, in order to comply with its obligations under *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in [the] case, including the police." *Kyles,* 514 U.S. at 437, 115 S.Ct. 1555. *Accord, United States v. Fell*, 2:01-CR-12, 2013 WL 1953320 (D. Vt. May 10, 2013) ("A prosecutor has a duty to disclose exculpatory or impeachment evidence known to others acting on the government's behalf, whether or not the prosecutor is aware of the evidence."). Moreover, the individual prosecutor has a duty to learn of any relevant information known to other members of the prosecutor's office. *Shih Wei Su*, 335 F.3d at 119 ("The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."). Additionally, the prosecutor may not "consciously avoid" recognizing the obvious when it comes to false testimony, and may not "sit on its hands" to avoid learning the truth. *United States v. Wallach*, 935 F2d 445, 457 (2d Cir. 1991).

Summarizing these principles: (1) the prosecutor has a special obligation not to win at all cost, but to ensure that justice is done; (2) the prosecutor may not elicit testimony that he or she knows or should know is false, and must correct any such testimony if it is elicited; (3) a prosecutor must disclose to the defense any information that is material to the defense, including impeachment material; and (4) the prosecutor has a duty to learn of any favorable evidence possessed by those acting on behalf of the government, including law enforcement officers and other members of the prosecutor's office, and may not "consciously avoid" learning of exculpatory information.

**Applying These Principles Here**

While the government's entire handling of Cohen's testimony regarding Perez causes us grave concern, there are three key aspects of that testimony -- each with an accompanying request for relief -- that must be analyzed under the principles set forth above.

**FIRST,** there is Cohen's substantive testimony under oath as follows:

> I asked Mr. Perez what led to him opening and then subsequently closing this account. He told me that Mr. Madoff had asked him to make some changes to one of the AS/400 programs in order to modify statements that had already been printed and sent to a customer. He told me that he was uncomfortable doing this and that he had told Mr. Madoff that, and Mr. Madoff had said, I'll give you some money, just do it, and he did.

For a multitude of reasons, the accuracy of Cohen's testimony in this regard is highly questionable. Among the reasons to question the credibility of the testimony are the following, all of which are well-known to the government:

(a) As acknowledged by Mr. Schwartz, Cohen disclosed this recollection to the U.S. Attorney's Office just days before trial -- five years after the fact -- despite multiple prior meetings with Assistant U.S. Attorneys.

(b) Mr. Cohen was interviewed by no less than five members of the government (two AUSA's, one SEC attorney, and two FBI agents) on April 12, 2011, *which interview was not only post-indictment, but was highly detailed and covered the precise topic at issue here.* At that time, he provided a completely different and inconsistent version of Perez's statement, which version is entirely consistent with the defense in this case:

> PEREZ told COHEN that a few years ago, BERNARD MADOFF asked PEREZ to make changes to the system, but PEREZ told BERNARD MADOFF he would not make the changes because he felt uncomfortable doing so. According to PEREZ, BERNARD MADOFF said if PEREZ was not comfortable with making changes, then PEREZ should not do it. PEREZ did not say what specific changes BERNARD MADOFF wanted him to make.

Moreover, according to the Agent's notes from that meeting, Cohen stated that he noticed the opening and closing of Perez and O'Hara's advisory accounts, *but did not indicate that he ever questioned Perez on that subject.*

(c) Neither Cohen nor anyone else has any notes of the alleged statement, despite its obvious importance.

    (d)  The alleged statement by Perez makes no sense, since it is undisputed that the meeting with Bernard Madoff occurred in September 2006, while the $100,000 deposit into the advisory account was made in 2004, and the money was withdrawn (without any alleged involvement by Madoff) in March of 2006. Thus, it would have been absurd for Perez to have provided the alleged explanation to Cohen in response to a question about the opening and closing of his IA account.

    (e)  The alleged statement also makes no sense because there would be no rational reason for Perez to be "confessing" to Cohen at all, let alone in December 2008 or January 2009, when Perez was still working at Madoff Securities and the office was teeming with FBI agents and SEC attorneys. Indeed, as the government conceded in footnote 1 of its letter dated October 16, 2013 (when it was arguing the admissibility of Perez's alleged "minimization" of his role when speaking to Cohen about the computer system): "AlixPartners and the FBI were working closely during the first few months of the investigation. The incentives to lie to Mr. Cohen were therefore virtually identical as the incentives for lying to law enforcement personnel." Thus, the government is left to argue out of one side of its mouth that Perez minimized his role when speaking to Cohen (because he had a motive to lie to law enforcement), and to argue out of the other side its mouth that Perez simultaneously confessed to Cohen about being paid off by Madoff to work on programs as to which he was uncomfortable. The illogic of this position is self-evident.

    (f)  Cohen's trial version of Perez's statement is also at odds with the statement Perez gave to two attorneys working for the Receiver at the time, according to the government's own 3500 material. Specifically, according to the 3500 material for Daniel Zinman and Mary Park, both attorneys with Richards, Kibbe and Orbe, they interviewed Perez while he was still working at Madoff Securities, and he made the following statement, in response to their question as to whether he had ever observed any indications of misconduct at the firm:

> A couple of years ago, when the SEC came to BMIS, Mr. DiPascali and Bernard Madoff were "drilling" Mr. Perez for data reports. Mr. Perez produced whatever data they wanted. He believed the SEC's requests were in connection with an audit, but he was not sure. He was being bombarded with too many requests, and he felt uncomfortable about the situation. Mr. DiPascali told him he had nothing to be uncomfortable about. Mr. Perez wanted to know what was going on, and Mr. DiPascali told him nothing was going on. He told Mr. DiPascali that he didn't want to produce all reports. After he raised his objections with Bernard Madoff, Mr. Perez never got another report request. (3588-2 and 35101-3).

In light of all of the above red flags, the government's conclusion that it could in good-faith present Cohen's testimony on this point to the jury at trial is deeply flawed. Moreover, under the principles of law set forth above, it is clear that the government may not simply accept this testimony at face value, and close its eyes to the possibility that the testimony is false.

Rather, it must – at a minimum - inquire of the various government representatives who were present at the debriefing on April 12, 2011, as to whether their recollections of that meeting are inconsistent with Cohen's trial testimony. The government must do this because *it is charged with knowledge of all those working on its behalf.*  Thus, to the extent that Lisa Baroni (USAO), Julian Moore (USAO), Aaron Arnzen (SEC), Shannon Fish (FBI), or Paul Takla (FBI), recall Cohen giving a contrary version of his discussion with Perez, or even recall that he failed to give the "trial version" despite being asked questions on the same subject, *that information would clearly constitute Brady/Giglio information and must be inquired into and disclosed.*  Yet, as far as we know, the government has not made even that basic inquiry, preferring instead to bury its head in the sand so that Cohen's testimony is not undermined.  We respectfully submit that by doing so the AUSA's have failed to live up to their obligation to locate and disclose exculpatory and impeachment material. Moreover, they may not rely on disclosure of the one FBI report noting the prior inconsistent statement alone, because that one report may not contain the full scope of the exculpatory and impeachment material, and in any event, does not set forth the current recollection of any of those present.

**Relief Requested:**  Accordingly, we ask that the Court order the government to contact all five government representatives who were present at the April 12, 2011 debriefing, in order to determine if any of them possess impeachment material as to Mr. Cohen's trial testimony.   To the extent that their recollections of the prior interview vary in any material way from Cohen's trial testimony, we ask that the Court order such information be disclosed as *Brady/Giglio* material.

**SECOND,** there is the issue of Cohen's testimony, elicited by AUSA Schwartz on both direct and re-direct  examination, that Cohen informed Special Agent Kelly of Perez's alleged statement *immediately* after he heard it.  Indeed, the following testimony took place on re-direct examination:

> **Q.**     When did you first mention the statement that you testified about to the FBI?
>
> **A.**     The day of the conversation I had with Mr. Perez, or as soon as I could speak to Special Agent Kelly.
>
> **Q.**     You reported it immediately to the FBI?
>
> **A.**     Correct.
>
> **Q.**     Do you have any doubt in your mind that George Perez made that statement to you?
>
> **A.**     None whatsoever.

Yet again, under the circumstances here, it is hard to understand the government's good-faith basis for eliciting this highly questionable testimony from Cohen, without – at a minimum – checking its accuracy with Agent Kelly.  However, the government concedes that it has made no such inquiry, despite the lack of any notes from Cohen or Kelly reflecting that such a conversation ever took place. Indeed, the government contends that despite all of the red flags suggesting the inaccuracy of this testimony  -- such as the lack of a report from Kelly, the fact

that no follow-up inquiry was ever made with Perez, and the fact that no adverse employment action was ever taken against Perez on account of the alleged statement -- it has no obligation to contact Agent Kelly and inquire as to whether Cohen's testimony is true.  We respectfully disagree, and believe that such an inquiry is necessary *because Agent Kelly's knowledge is imputed to the government, since he was acting on the government's behalf at the time of the alleged communication.*  And of course, the only way that Kelly's knowledge can be ascertained by the government *is by asking him.*

**Relief Requested:**  Accordingly, since the government insists on hiding its head in the sand, we ask the Court to order the government to contact Agent Kelly – who was the head of the FBI's Madoff squad and is on the government's witness list -- and ask him if he recalls Cohen telling him of this alleged statement by Perez.  If Kelly has no recollection of such a statement by Cohen, or recalls affirmatively that he was not told that by Cohen, this information must be disclosed to the defense under *Brady/Giglio*.  Moreover, if Kelly has any recollection of his conversation with Cohen that undermines Cohen's trial testimony, that must be disclosed as well.

**THIRD**, there is the issue of Cohen's testimony, elicited on cross-examination, that he told representatives of the U.S. Attorney's Office of Perez's alleged statement *prior* to the week before his testimony:

> Q. Isn't it a fact that the first time you ever made that statement to a representative of the U.S. Attorney's office was last week?
>
> A. I don't believe so.
>
> Q. How much earlier did you make it?
>
> A. I don't recall.
>
> Q. To whom from the U.S. Attorney's office did you make that statement prior to last week?
>
> A.  I don't recall.
>
> Q. You see the prosecutors here, correct?
>
> A. Yes.
>
> Q. Did you make that statement to any of them prior to last week?
>
> A. I don't recall.

As the government has acknowledged, the first time that AUSA Schwartz learned of Cohen's recollection (to which he testified at trial) was on October 15, 2013, approximately one week before Cohen's trial testimony.  Presumably, this was the first time that anyone in the U.S. Attorney's Office had heard of it as well, since it would surely have been passed on to AUSA Schwartz by the prior AUSA's (if they had been informed).  Thus, this testimony by Cohen – to the effect that he had told the U.S. Attorney's Office the relevant information *earlier* than a week before his trial testimony – appears to have been false*, and the government appears to have been*

*aware of that fact.* Nonetheless, instead of correcting Cohen's testimony on re-direct, the government sought to bolster it:

> Q. [Mr. Krantz] asked you whether -- when you had told representatives of the U.S. Attorney's Office specifically about that statement. Do you recall that question?
>
> A. I do.
>
> Q. And am I right in remembering that you didn't recall specifically when you mentioned it to the U.S. Attorney's Office?
>
> A. That is correct.

By asking this question, AUSA Schwartz suggested to the jury that Cohen was being truthful in denying that he first disclosed the statement to the U.S. Attorney's Office only one week before his testimony, and was bolstering the suggestion that the disclosure had in fact occurred earlier than that. Indeed, the government suggested that the only problem was that Cohen could not remember the exact date of that earlier disclosure – not that it had never occurred. By doing so, we respectfully submit that the government appears to have deviated from its obligation to correct testimony that it knew to be false.

**Relief Requested:** Accordingly, in order properly to correct Cohen's testimony, we ask that the Court order the government to inform the defense of the first time that Cohen disclosed to any representative of the U.S. Attorney's Office his contention that Perez admitted to him that he (Perez) was paid by Madoff to work on projects as to which he was uncomfortable. We also ask the Court to order the government to disclose the substance of Cohen's recollection of the statement on that first occasion, and who was present. Moreover, to the extent that any later disclosures from Cohen varied from that initial description of the conversation (or varied from his trial testimony), that information should be disclosed as well (including the date of such disclosure and those present). All of this information constitutes critical *Brady/Giglio* material as to Cohen's testimony.

\*\*\*

In sum, we respectfully submit that there are grave issues as to the government's handling of Cohen's trial testimony. At a minimum, the government has failed to honor its obligations as representatives of the U.S. government to locate and disclose all exculpatory and impeachment evidence within its possession. Accordingly, we have no resort but to turn to the Court for appropriate relief, and to protect us from the government's seeming indifference on this issue.

We thank the Court for its consideration of this letter.

                                                  Respectfully submitted,

Honorable Laura Taylor Swain
Date:  November 11, 2013
Page 19 of 19

                                                                 /s/
                                            Larry H. Krantz

cc:     Matthew Schwartz, AUSA (by ECF)