1         (In the robing room)

2         MR. FRISCH: Let me tell you what this is about. I am
3 very careful here to make sure that I asked the question as I
4 did: Did you have a discussion with Mr. Bonventre about an
5 event in the news that happened in the late '80s in Howard
6 Beach, yes or no. All I'm going to ask him. I don't know what
7 the answer is going to be, maybe I don't remember.

8         In fact, they had a conversation. Some African-
9 American men had a car break down in what was then I think
10 still a white neighborhood in Howard Beach. One of the men was
11 killed and others were assaulted. The discussion was from Mr.
12 DiPascali's point of view that the guys got what they deserved
13 because it was a white neighborhood. From that point on, Mr.
14 Bonventre stayed away from Mr. DiPascali, had virtually nothing
15 to do with him until the collapse of the firm.

16         My challenge in asking this question is to stay away
17 from those inflammatory facts for sure, but I have to ask a
18 question that triggers in his mind the event so that I can then
19 ask him the subsequent question. I think the balance in this
20 question --

21        THE COURT: What is the subsequent question? Sorry.

22        MR. FRISCH: That's OK. You're the judge, you get to
23 interrupt. Isn't it a fact that you had a discussion with Mr.
24 Bonventre about an event in the news that happened, and,
25 depending on what he says, isn't it a fact that after the mid

1  to late 1980s he had very little to do with you, in substance.
2  That's it.  Then I'll go on to another event which I don't
3  think there would be an objection to, it is not of this
4  character.
5           THE COURT:  Mr. Zach.
6           MR. ZACH:  Your Honor, I think any inquiry into this
7  conversation as stated by Mr. Frisch is irrelevant and risks
8  403 grounds.  I didn't object to the initial did you get along
9  well.  There have been objections from other counsel about were
10 you friends, all sorts of characterizations in the past.  I let
11 the first one, did you get along well, go.
12          But I think asking that question is irrelevant.  The
13 whole topic is inflammatory.  You can ask some very limited
14 questions about the relationship, but going there risks huge
15 403 problems.
16          MR. FRISCH:  Again, I have no intention of going
17 anywhere near this, and I want to limit him to yes or no
18 answers so he doesn't go into anything.  I have to trigger in
19 his mind what this is about as an impetus for the follow-up
20 question that thereafter Mr. Bonventre understood who he was
21 dealing with and stayed away.  That's it.  Let me finish.
22 That's it.  That's why I was very careful in phrasing this
23 question to him to answer it yes or no if he can.  I assume he
24 is going to answer it yes, no, or I can't answer it yes or no.
25 Then I will move on with the question I just said.

1            THE COURT: For those of us in the room of a certain
2   age who have lived in New York, the question carries with it
3   all of the underlying dynamics of the situation.  If you then
4   follow that up with did my client stop speaking to you then,
5   essentially you are implying a reason.  And if you brought that
6   up news incident, it can only be one reason, which is the
7   suggestion that Mr. DiPascali is a racist.  The probative value
8   of that reason for any conflict between the parties is far
9   outweighed by the potential for unfair prejudice.  I do not see
10  that it can be avoided by even an elliptical question about the
11  news event.
12           Why is it that you can't simply say didn't Mr.
13  Bonventre limit his conversations with you or dealings with you
14  after the mid 1980s, period?
15           MR. FRISCH: I'll settle for --
16           THE COURT: But if you say that works for you, you
17  also need to tell me a little bit more about the relevance of
18  it.  Where are you going with it?
19           MR. FRISCH: The relevance of it is they had nothing
20  to do with each other.  The fact that they would have gone to
21  Fong's and had drinks is something that just wouldn't have
22  happened.  I can't remember the specific testimony, I suppose
23  it was in the 302s, because there are a lot of differences.
24           But the fact that they were somehow talking about the
25  firm and their places in it and what they would do if the fraud

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   was revealed, it just didn't happen.  One of the reasons it
2   didn't happen is Mr. Bonventre didn't trust Mr. DiPascali.
3   They truly had very, very little to do with each other
4   beginning at this time through to the collapse of the firm.
5           As Mr. DiPascali said, there was a time in the '70s
6   they had a social occasion.  There was a time I believe in the
7   early '80s they had a social occasion.  That was it.  At least
8   Mr. Bonventre stayed away from Mr. DiPascali.  I think it is
9   also true that Mr. DiPascali stayed away from Mr. Bonventre,
10  but I'm only responsible for one side of that equation.  He
11  just stayed away from him.  He didn't have anything to do with
12  him.
13          Although I understand how dicey this is and I
14  understand your Honor's ruling, I am trying to think of a way
15  of working around it.  It is the NATURE of it that caused Mr.
16  Bonventre precisely to stay away from this guy and not enter
17  into with him the kind of conversations that Mr. DiPascali says
18  that they had.
19          MR. ZACH:  A couple of things, Judge.  I don't think
20  it is fair for him to question didn't Mr. Bonventre stay away
21  from you, because he wouldn't know that.  Questions of how
22  often did you guys sit and talk, how often did you see each
23  other, how often did you have conversations, those are
24  completely permissible.  But the characterization of what Mr.
25  Bonventre was doing, I don't think Mr. --

1     THE COURT: It does call for some mind-reading. To
2 amend my earlier statement, you can ask questions that are
3 designed to elicit the limited nature of their interactions.
4 Questions that would essentially call for Mr. DiPascali's mind
5 reading as to what was going on with Mr. Bonventre or
6 suggesting an antipathy that is tied to this particular event
7 are not permitted.
8     MR. JACKSON: Your Honor, may we make an application
9 to temporarily seal this portion of the proceedings as the
10 trial is ongoing for the reason that the potential publicity
11 surrounding this particular discussion could adversely impact
12 the government's case?
13     MR. RIOPELLE: No objection.
14     Your Honor, I would like to make a motion to sever. I
15 don't think there is a person in that courtroom who doesn't
16 know what was referred to by Mr. Frisch's question. I had no
17 notice that this question would be asked. I don't ask my
18 counsel for co-defendants to preview their questions to me.
19     I think that this has thrown a skunk in the jury box
20 that we simply can't cure at this point. Reluctantly, because
21 I'm not sure that my client will ever get a better chance with
22 a jury than she has right now, I feel that I should be severed
23 from this defendant and proceed without him.
24     We all know what that question was about. There is
25 not anybody this that courtroom who doesn't know what is

1   referred to.  Now the whole thing is going to die and somebody
2   is going to be a racist.  I don't know who it is, but I fear
3   what the jury is going to make of all this monkey business.
4   I'm frustrated.  I don't know what else to do other than move
5   for a severance.  Sever him out and let him go on a separate
6   trial later, let us continue.
7            MR. ZACH:  We obviously oppose that.  I don't think
8   all that came out.  I am embarrassed to say I'm not from New
9   York, and I guess everyone saw my co-counsel were banging on
10  the table, because I didn't know what this reference was to.  I
11  think the assumption that everybody knows it I think is a
12  little bit overbroad.  I think he just needs to back away from
13  this topic and not touch it anymore.
14           THE COURT:  Let me take this in order.  The
15  application to seal this portion of the transcript, at least
16  until after this trial is concluded, is granted.  The motion
17  for severance is denied.
18           In order to diffuse any potential speculation about
19  these things -- Mr. Frisch, how much more do you have?
20           MR. FRISCH:  Not much.
21           THE COURT:  Whatever else you have --
22           MR. FRISCH:  I didn't mean that answer to be flip.  To
23  give your Honor a more specific answer, I'm almost at the end.
24  I have two other topics that are both brief.  I'm guessing it
25  might be as quickly as 15 or 20 minutes.

1           THE COURT:  Go to your other topics, and then you
2   may -- this is a suggestion as to how you might go to this
3   thing -- come back and say your dealings in the office with Mr.
4   Bonventre were limited to business matters from the '80s on or
5   something like that, weren't they.
6           Assuming that he goes along with that or some neutral
7   variation of that that is not about who is not speaking to whom
8   but is about the nature and quantum of the interactions, then
9   you can confirm that at least for the past 30 years they
10  haven't had any social interactions outside of the office as a
11  matter of course.  Of course, he did testify to the other
12  thing.  And you can leave it at that.  But I think at this
13  point it is appropriate for us to have this space.
14          MR. FRISCH:  What your Honor is ordering me to do is
15  ask any questions along these lines -- and I will go over
16  precisely what the questions are in a second -- at the end, you
17  don't want the temporal connection.
18          THE COURT:  Correct.
19          MR. FRISCH:  The question that I jotted down is, Isn't
20  it true that you and Mr. Bonventre had limited interactions
21  from the late 1980s until 2008 or the beginning of the late
22  1980s, period, and certainly had no social interaction?
23          THE COURT:  I think that works.  How do you feel about
24  saying for at least the past 20 years or for at least 20 years
25  before 2008 or for about 20 years, something along that line

1   that takes the emphasis off the late 1980s as the triggering
2   point?
3            MR. FRISCH:  For about 20 years before 2008.  That
4   would put us into --
5            THE COURT:  Or before Madoff Securities collapsed, so
6   it doesn't suggest.
7            MR. FRISCH:  I think that's fine, yes.
8            THE COURT:  Thank you.
9            (Continued on next page)