**KRANTZ & BERMAN** LLP

Larry H. Krantz
Marjorie E. Berman

Wendy Gerstmann Powell
*Special Counsel*

Kimberly A. Yuhas

David V. Kirby
Aaron Twersky
*Of Counsel*

Writer's E-mail
lkrantz@krantzberman.com

July 8, 2014

**By ECF**

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   U.S. v. Bonventre, et al., 10 Cr. 228 (LTS)

Dear Judge Swain:

On behalf of George Perez, we write to set forth our objections to the final disclosure of the PSR, dated July 2, 2014. We will be filing our sentencing submission under separate cover later this week.

**Factual Objections Relating to the Offense Conduct**

1. We object to the last sentence of paragraph 50 because the proof at trial failed to establish that Daniel Bonventre supervised George Perez in connection with the "General Ledger and other accounting records." On behalf of Perez, we specifically deny this allegation.

2. We object to the last sentence of paragraph 55 because the proof at trial failed to establish that George Perez had knowledge that "the investment advisory business was entirely a fraud." Indeed, no such evidence was introduced at trial, and on behalf of Perez, we specifically deny this allegation.

3. We object to the fourth sentence of paragraph 59 (beginning with "But Madoff…"), because the proof at trial failed to establish that George Perez had knowledge that the Investment Advisory ("IA") client funds "were not being invested as promised" to clients. Indeed, no such evidence was introduced at trial, and on behalf of Perez, we specifically deny this allegation.

4. We object to paragraph 69 because the proof at trial failed to establish that George Perez had knowledge that alternative sets of books and records were being created

"specifically to deceive the SEC, the taxing authorities, or [KPMG]."  Rather, the proof established that Perez was lied to by Frank DiPascali, his boss, about the purpose of the documents being created for various audits.  DiPascali acknowledged that his purpose in lying to Perez was to have him participate in the fraud unknowingly.  Accordingly, on behalf of Perez, we specifically deny this allegation.

5. We object to paragraph 70 because the proof at trial failed to establish that George Perez had knowledge that alternative sets of books and records were being created for the purpose of deceiving the Securities Exchange Commission ("SEC") as to the "enormous size of the firm's investment advisory business."  Indeed, the proof established that Perez was lied to by Frank DiPascali as to the reason why information about only certain clients was being provided to the SEC.  Specifically, Perez was told that those were the only clients as to which the SEC had requested information.  Moreover, Perez was never shown the requests from the SEC; nor did he ever speak to, or meet with, a representative from the SEC.  Accordingly, on behalf of Perez, we specifically deny this allegation.

6. We object to paragraph 71 because the proof at trial failed to establish that George Perez knew that the records being created were designed to conceal the "size, scope and function of the investment advisory business," or that Perez knew that foreign financial institutions were being used because "it would be harder for the SEC to check with such institutions."  As noted above, the proof established DiPascali lied to Perez about the purpose of the documents being created for the various SEC audits, which lies were for the express purpose of having Perez participate in the fraud unknowingly.  At the very minimum, the above facts were never revealed to, nor known by, Perez.  Accordingly, on behalf of Perez, we specifically deny this allegation.

7. We object to paragraph 72 because the proof at trial failed to establish that George Perez knew that, as to the SEC audits, "Madoff also wanted to create the impression with the SEC that Madoff Securities was not the custodian of investment advisory client assets, because if Madoff Securities was the custodian, the SEC could contact the DTC (which keeps such records) and discover that no such assets really existed."  As noted above, the proof established that DiPascali lied to Perez about the purpose of the documents being created for the various SEC audits, which lies were for the purpose of having Perez participate in the fraud unknowingly.  At the very minimum, the above facts were never revealed to, nor known by, Perez.  Accordingly, on behalf of Perez, we specifically deny this allegation.

8. We object to paragraph 73 because the proof at trial failed to establish that George Perez knowingly participated in the creation of "fake" DTC reports.  Accordingly, on behalf of Perez, we specifically deny this allegation.

9. We object to paragraph 76 because the proof at trial failed to establish that George Perez knew that the trades entered into his advisory account were "made up stock

trades." Indeed, DiPascali testified that Perez was given an IA account as a bonus for his good work in 2004. Perez had no reason to believe that the trades in the account were fake. Accordingly, on behalf of Perez, we specifically deny this allegation.

10. We object to paragraph 83 because the proof at trial failed to establish that George Perez "emptied" his IA account on the same day (April 6, 2006) as O'Hara and Bonventre. Indeed, the proof at trial showed that Perez sought to close his account by letter, dated April 4, 2006, which letter was written in conjunction with O'Hara's letter, dated March 30, 2006. However, there was no evidence introduced at trial suggesting that Perez and O'Hara communicated with Bonventre on the subject, or were in any way aware that Bonventre had closed his account during the same approximate time period. Accordingly, on behalf of Perez, we specifically deny this allegation.

11. We object to paragraph 84 because the proof at trial failed to establish that George Perez "confronted Madoff and DiPascali and stated that they would no longer create and maintain the computer programs Madoff needed to generate false books and records." Rather, the evidence showed that Perez stated he no longer wished to work on the "special programs," as to which he had become uncomfortable. He never stated that he was aware that the books and records were false. The proof also failed to establish that Perez "demanded" a 20% raise, or any raise at all. Accordingly, on behalf of Perez, we specifically deny this allegation.

12. We object to paragraph 85 because the proof at trial failed to establish that George Perez was asked to write any programs for the 2008 audit, or even was told that the audit was occurring. Moreover, as to any computer programs he was asked to write after the spring of 2006, those programs did not involve any randomized data, as he had become uncomfortable working on programs of that nature, and refused to do so. Accordingly, on behalf of Perez, we specifically deny this allegation.

**Counterstatement of the Offense Conduct**

We respectfully submit that much of the Government's narrative of the offense – as set forth in the PSR -- was not proven at trial by a preponderance of the evidence, and that the evidence at trial in fact established an entirely different set of facts wholly inconsistent with the key facts set forth in the PSR. We set forth below our view of what the trial evidence actually established. As explained in our post-trial motions, we believe that this counterstatement of the facts established – at a minimum – a reasonable doubt as to Perez's guilt. But should the Court disagree with us on that question, we respectfully submit that these facts are still relevant on the issue of the appropriate guideline calculation and in mitigation of punishment.

1. Perez was hired by Madoff Securities in 1991 as a computer programmer. (*See* Trial Tr. 5593:11-5594-17.) He had no prior training or experience in the securities industry, nor did he have any securities licenses. (*See* Trial Tr. 7253:8-18.) Moreover, he had no reason to believe that the Firm was engaged in any criminal conduct. To the contrary, it was a highly respected firm on Wall Street, and Bernard

> Madoff was seen as an icon in the industry, as numerous witnesses testified at trial. (*See, e.g.,* Trial Tr. 488:8-12; 1054:2-13; 1077:7-11; 2643:14-2644:16; 5598:6-15.)

2. At the time Perez joined the firm, the basic computer system for the IA business was already in place, having been designed by Elizabeth Weintraub, the former head of the IT department.  (*See* Trial Tr. 5598:19-5599:10; 7010:4-22.)  This was acknowledged by the testimony of Bruce Dubinsky.  (*See* Trial Tr. 1675:8-24.)  That system already had the capacity to generate monthly customer statements, confirms, etc.  (*See* Trial Tr. 1676:13-23.)  Indeed, with this system in place, the process of manually entering trades and processing customer statements was implemented well before Perez joined the firm.  (*See* Trial Tr. 4556:3-25.)  Further, in explaining why the trades were manually entered into the system, DiPascali told Perez that the IA trades were executed in Europe, and in 2004 even provided Perez with a list of European entities, instructing Perez that they were "real firms that . . . [Madoff Securities] traded with in Europe."  (Trial Tr.  5608:21-22; 5670:1-10.)  Perez had no reason to believe that there was anything wrong or improper about this methodology.

3. During the first approximately 12 years of his employment, Perez had no reason to believe or even suspect that any fraudulent activity was taking place around him.  Indeed, there was no evidence introduced at trial as to any relevant conversations with Perez prior to 2004.

4. In 2004, DiPascali asked Perez to perform certain programing in connection with an SEC audit (the "Swanson" audit).  This programming involved, among other things, sub-setting accounts and randomizing certain entries on reports, based on data provided to him by DiPascali.  As acknowledged by DiPascali, in order to manipulate Perez into helping with the audit, DiPascali lied to Perez and told him that the sub-setting of data was acceptable because those were the only accounts as to which the SEC had requested data.  (*See* Trial Tr. 5666:8-16.)  DiPascali also lied to Perez and told him that the randomization was acceptable because the items being randomized were not the subject of the audit, and it was acceptable to produce a "representative sample" of that information, because "the auditors were simply trying to verify that Madoff Securities was not cheating its customers by charging them more than the customary markup," which was not happening.  (Trial Tr. 5669:1-23.)  As DiPascali acknowledged, his purpose in lying to Perez was to manipulate him into participating in the massive fraud without knowing it.  (Trial Tr. 5668:2-6.)  Moreover, Perez never met or spoke with an auditor, was never shown the auditor's requests, and was never told what was being explained to the auditors about the records being provided.  (*See* Trial Tr. 5605:15-5606:18.)

5. DiPascali never corrected these lies, and never disclosed to Perez during any of the subsequent audits that Perez was participating in a fraud of any kind.  (*See* Trial Tr. 7013:14-19.)  Nor did DiPascali (or anyone else) ever tell Perez that the trades were not real.  To the contrary, DiPascali always spoke about the trades as real.  (*See* Trial Tr. 7005:2-7007:7.)

6. By early 2006, Perez had become uncomfortable with the work he was being asked to do on the "special programs" used for the audits, which involved randomized data. Accordingly, in an act of conscience, he decided that he would no longer perform that work. (*See* Trial Tr. 5679:4-13.) Consequently, together with O'Hara, he deleted the special programs from the system, in order to disable them. (*See* Trial Tr. 5682:17-25.) The backups were all left intact, so there was no attempt at a cover-up. (*See* Trial Tr. 5288:23-5289:16.)

7. During the same time period, Perez and O'Hara told DiPascali that they were uncomfortable with the special programs, and would not work on them anymore. (*See* Trial Tr. 5679:4-13.) DiPascali downplayed their concerns, saying it was "okay, they didn't have to work on it[.]" (Trial Tr. 5680:7-13.) Moreover, DiPascali *continued* to lie to Perez and O'Hara through 2006. For example, DiPascali admitted that "[u]p until the time that Jerry O'Hara and George Perez confronted Bernard Madoff in late 2006 about the unusual work they had been doing for Madoff's IA business, [he] gave O'Hara and Perez various reasons for why they were doing special projects, including audits of the IA business." (Trial Tr. 5676:10-14.) Further, DiPascali told the Government in an interview that, in the summer of 2006 after some drinks at a Greek restaurant, he explained to Perez and O'Hara that "because Madoff was trading not as agent but as principal making these trades out of his own inventory that was kept at various places overseas, he was able to allocate these trades after the fact, backdate the trades, and do other things with the accounts that a broker acting as agent would not be able to do." (Trial Tr. 10617:23-10618:14.) Similarly, when walking back to the office *after a second SEC audit in 2006*, George and Mr. O'Hara directly asked Mr. DiPascali if the IA business was legitimate. Mr. DiPascali testified that, in response, he "blew them off, as [if to say] what, are you ridiculous?" (Trial Tr. 5277:17-5278:8.) Indeed, Mr. DiPascali admitted that he "didn't want to address that question." *Id.*

8. Also during that time period, Perez closed his IA account, withdrawing the $108,000 bonus he had been given in 2004, approximately $127,000 he had deposited of his own funds, and the "gains" on those deposits, for a total withdrawal of $289,372. *See* GX 101-57; GX 200-25; GX 206-9.

9. In September 2006, Perez became concerned about what might happen when Bernard Madoff, recently back from a summer in Europe, found out about Perez's refusal to participate in the "special" programs. Perez – like all of the Madoff Securities employees -- was well aware that Madoff was a very powerful individual, and did not know what consequences might befall him on account of his refusal to work on the "special" programs. Out of fear, he wrote and mailed a letter to himself, stating what had occurred. The obvious purpose of the letter was that it be opened in the event of an emergency. The letter stated: "I have expressed to my boss, Frank DiPascali, my unwillingness to work on projects which I am uncomfortable with. I don't know how far up the ladder my unwillingness has been communicated, but it is only a matter of short time before it hits the top. I fear for my job, my family, my future." *See* GX 105-e7. DiPascali acknowledged at trial that the letter was accurate (Trial Tr. 5683-

10. 84) and that Perez told him about the letter he had written to himself.  (Trial Tr. 5372:3-5)

11. In September 2006, after Madoff returned from Europe, Perez (together with O'Hara) met with him in his office.  As acknowledged by DiPascali, Perez and O'Hara told Madoff they were uncomfortable working on the special programs.  (*See* Trial Tr. 5685:6-16.)  They also said that they were happy to work for Mr. Madoff and loved the other aspects of the firm.  (*See* Trial Tr. 5283:1-8.)  Madoff responded gently and told them they didn't have to work on the special programs anymore, if they were uncomfortable.  (*See* Trial Tr. 5687:2-18.)  Madoff also assured them that their fears were unfounded, reassuring Perez and O'Hara with various stories about his industry experience.  (*See* Trial Tr. 5686:4-22.)  Madoff also reassured them that they would not be fired over this.  (*See* Trial Tr. 5687:12-14.)

12. For the remainder of his time at the firm, Perez did not work on the "special programs" anymore, and there was no evidence introduced at trial that he was even told about the HSBC audit in 2008.  Rather, after Perez and O'Hara refused to work on the "special programs," DiPascali used other people – such as Haresh Hemrajani and Terrence Chen – to get the work he needed done from 2006 forward.  (*See* Trial Tr. 5689:1-5692:14.)  He lied to those people as well about why the special work was needed, in order to keep the fraud from them, just as he had kept the fraud from Perez.  *Id.*  To the extent that Perez did write any additional programs after September 2006, he was never told that those programs were in connection with audits, and was never asked to write any programs that involved randomized data.  (*See* Trial Tr. 5309:4-6; 8182:5-22.)

13. During the period 2006-2008, DiPascali kept an eye on Perez and O'Hara, at Madoff's request, to make sure that they had not uncovered the fraud.  (*See* Trial Tr. 5604:1-4.)  He took them out to dinner and would deliberately order alcohol and suggest they take a car service home so as to "take their temperatures."  DiPascali acknowledged this in an interview with Special Agent Kathryn Scott in August 2009.  (*See* Trial Tr. 10678:15-10679:10.)

14. After the demise of Madoff Securities in December 2008, Perez remained an employee at the Firm.  Very early on, Perez was asked by Matthew Cohen, from AlixPartners, to provide data as to all of the firm's IA clients.  Rather than engage in any attempt to cover-up (as had DiPascali), Perez promptly gave Cohen the "a.name" file.  In fact, that is how the Government learned, in the first instance, of the true scope of the IA business – which had been hidden from it by everyone else.  (*See* Trial Tr. 590:15-25; 672:1-13.)  Perez remained employed at Madoff Securities until March 2009, when he was laid off as the firm was being wound down.

**Objections to the Guideline Calculation**

1. We object to paragraph 112 because the trial evidence failed to establish that the loss figure used therein ($17.5 billion) was a reasonably foreseeable part of any jointly undertaken criminal activity as to which Perez knowingly agreed to participate.  *See*

U.S.S.G. Section 1B1.3(a)(1)(B).  Indeed, there is no evidence that Perez ever met with or spoke with a client, was ever told by anyone what clients were being promised, or that he was ever privy to the fact that *any* clients were being defrauded – let alone that they were being defrauded out of $17.5 billion.  As set forth in *United States v. Studley*, 47 F3d 569, 574-75 (2d Cir 1995):

> [I]n order for a district court to sentence a defendant on the basis of criminal activity conducted by a coconspirator, *a district court must make a particularized finding as to whether the activity was foreseeable to the defendant.  We now find that the Guidelines also require the district court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant. . . .* "[i]n determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." (quoting U.S.S.G. § 1B1.3 Applic. Note 2 (1993); other citations omitted; emphasis added).

Accordingly, based on the limited scope of any criminal conspiracy entered into by Perez, and the lack of foreseeability that any loss would ensue from that conduct, we respectfully submit the correct loss figure under the Guidelines is zero.

Additionally, it was not reasonably foreseeable to Perez that there would be any such actual or intended harm within the meaning of U.S.S.G. Section 2B1.1, by virtue of the conduct in which he engaged.  Indeed, based on Perez's limited involvement, and the misrepresentation made to him by Madoff and DiPascali, no loss at all was foreseeable to him.  As set forth in *United States v Turk*, 626 F3d 743, 748 (2d Cir 2010):

> Sentencing for the offense of conspiracy to commit wire fraud and mail fraud is governed by U.S.S.G. § 2B1.1. By far the most consequential determination a district court must make when sentencing a defendant under this Guideline is the amount of loss caused by the defendant's crime, as this factor can increase the adjusted offense level by as few as zero or as many as 30 points, depending on the loss as measured in dollars. See U.S.S.G. § 2B1.1(b)(1).  . . . Under Application Note 3(A)(i), the "actual loss" for which a defendant is liable is "the reasonably foreseeable pecuniary harm that resulted from the offense."

>Moreover, under *United States v Evergreen Intern.,* 206 Fed Appx 71, 79 (2d Cir 2006), the district court must make "particularized findings" as to the foreseeability of the loss under 2B1.1.  Here, we respectfully submit that -- based on Perez's limited knowledge and involvement in any conspiracy -- there was no "reasonably foreseeable pecuniary harm" that resulted from his participation in the offenses of conviction.  For this reason as well, the loss figure should be zero.

2. We object to paragraph 113 because the number of victims (over 250) was not reasonably foreseeable to Perez.

3. We object to paragraph 114 because Perez's involvement in the fraud did not involve sophisticated means.

4. We object to paragraph 115 because it was not reasonably foreseeable to Perez that the fraud would endanger the financial security of 100 or more victims.

5. We object to paragraph 116 because Perez was never an "associated person" registered with FINRA or the SEC, and the definition of an "associated person" of a broker-dealer or an Investment Advisor specifically excludes any employee whose duties are "solely clerical or ministerial" (as Perez's duties were).  *See* Title 15 U.S.C. Section 78c(a)(18)(applying to Broker-Dealers); Title 15 U.S.C. Section 80b-2(a)(17)(applying to Investment Advisors);and U.S.S.G. Section 2B1.1, Application Note 15(A)(applying these definitions of "associated person").

6. Based on his limited role at Madoff Securities, Perez is entitled to a 2 point reduction as a minor participant.

**Factors that May Warrant a Departure or a Variance**

As to paragraphs 172 and 173, concerning "Factors that May Warrant Departure" or a "Sentence Outside of the Advisory Guideline Range," we submit that a variety of factors in this case warrant a departure or a variance, including the nature and circumstances of the offense (described above), the fact that in carrying out the offense Perez was simply following the instructions of his supervisor, the fact that Perez was lied to about the reasons for the conduct he was asked to undertake, the fact that the proposed guideline calculation grossly overstates the seriousness of the offense, the fact that this is Perez's first offense, the fact that Perez has otherwise led a law abiding life devoted to family and hard work, and the hardship that any period of incarceration will impose on his innocent children and other family members.  We will elaborate on these factors in our sentencing submission.

Finally, we reserve our right to request a sentencing hearing as to any of the facts set forth above, depending on the Government's response to these objections.

Thank you for your consideration of this letter.

To:  Honorable Laura Taylor Swain
July 8, 2014
Page 9 of 9

 

                                                  Respectfully submitted,

                                                  Larry H. Krantz

cc:   Counsel for the Government