UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                             :

UNITED STATES OF AMERICA          :
                             :

          v.                 :       10 CR 228 (LTS)
                             :

DANIEL BONVENTRE, ANNETTE    :
BONGIORNO, JO ANN CRUPI, a/k/a "Jodi," :
JEROME O'HARA, and GEORGE PEREZ  :
                             :
-------------------------------------------------------------X

**SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF GEORGE PEREZ**

Larry H. Krantz, Esq.
Kimberly A. Yuhas, Esq.
**Krantz & Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
(212) 661-0009

*Attorneys for George Perez*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………...………………….. 1

I.     OVERVIEW OF THIS SUBMISSION ........…………………………….……. 5
II.    THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT ….……... 6
       a.  Growing Up in the Bronx……………………………………………………6
       b.  High School and College …………………………………………… 10
       c.  Family Life ……………………………………………………...…… 12
III.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ………………… 18
       a.  Mr. Perez's Lack of Industry Experience and Madoff Securities'
           Pre-Existing Computer Infrastructure …………………….………………... 19
       b.  Frank DiPascali and Bernard Madoff Lied to George Perez ……………...…… 21
       c.  After 2006, Mr. Perez No Longer Worked on Audit-Related Programs ………. 26
       d.  Perez did Not "Get Rich" From His Work at Madoff Securities ……………… 27
IV.    THE APPLICABLE SENTENCING RANGE UNDER THE SENTENCING
       GUIDELINES …………………………………………………………...…….. 28
       a.  The Advisory Sentencing Guidelines …………………………….………. 28
       b.  The Guidelines Range for Mr. Perez …………………………………..… 30
       c.  The Court Should Reject the Guideline Calculation Contained in the PSR …..... 31
       d.  If the Court Should Adopt the Guidelines Calculation Contained in the
           PSR, Then Mr. Perez is Entitled to a Substantial Variance ………….…....…… 33
V.     THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE
       SERIOUSNESS OF THE CRIME, PROMOTE RESPECT FOR THE LAW,
       PROVIDE JUST PUNISHMENT, AFFORD ADEQUATE DETERRENCE,
       AND PROTECT THE PUBLIC FROM FURTHER CRIMES …………...……... 36
       a.  The Seriousness of the Crime and the Need to Promote Respect for the Law..... 36
       b.  The Need to Provide Just Punishment ……………………………………… 38
       c.  The Need to Afford Adequate Deterrence …………………………………... 40
       d.  The Need to Protect the Public From Future Crimes ……………………...…… 41
VI.    THE KINDS OF SENTENCES AVAILABLE …………………………………… 41
VII.   THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES …… 43
VIII.  IN THE EVENT THAT THIS COURT SHOULD SENTENCE MR. PEREZ
       TO A TERM OF IMPRIONMENT, HE SHOULD BE RELEASED ON
       BAIL PENDING APPEARL ……………………………...…………………….. 44

CONCLUSION ……………………………………………………………………..... 45

## PRELIMINARY STATEMENT

We submit this sentencing memorandum on behalf of George Perez, who is currently scheduled to be sentenced on July 30, 2014.  Our specific objections to the Pre-Sentence Report (PSR) have been submitted under separate cover, by letter dated July 8, 2014.

Mr. Perez stands before the Court having been convicted by a jury of very serious offenses.  This memorandum is submitted from our hearts, for we have represented Mr. Perez since early 2009.  In those five years, we have worked closely with him, have had dinner at his home with his wife and two young children, and have come to know him deeply.   In our eyes, he is a kind, honest and decent man, who epitomizes grace under pressure.  He has earned our utmost respect, fondness and admiration.  For those reasons, we are personally pained by his current tragic predicament.

We begin this memorandum by making some personal observations about the trial.  We do so not to re-litigate the verdict (which is the subject of our post-trial motions), but because we believe these comments bear directly on sentencing.

We began the trial of this matter with a strong belief that the evidence would establish that Mr. Perez was not guilty of the charges, or at a minimum, that there was a reasonable doubt as to his guilt.  Candidly, the events that unfolded at trial only reinforced our belief in this regard, for two principal reasons.  **First**, most of the evidence adduced at trial fully supported our defense that Mr. Perez was not in the "inner circle" at Madoff Securities, but was merely a computer programmer – a "tech-guy" -- who was lied to, manipulated and misled by his superiors -- just as they had lied to and manipulated countless other employees, customers and regulators.  **Second**, we felt that the Government's arguments as to why Mr. Perez's guilt was established were wildly speculative, took unfair liberties with the record, and relied on deeply flawed logic.  In fact, the narrative the Government chose to adopt – namely --  that Mr. Perez

was a greedy and corrupt programmer who was in on the fraud from the beginning of his employment, and participated in it openly and notoriously -- was not only unsupported by any evidence, but was *inconsistent* with the trial testimony of Frank DiPascali.  Indeed, DiPascali acknowledged the need to lie to Mr. Perez -- over and over again through at least 2006 -- in order to induce him to perform the work that was needed, and to keep the fraud from him.  In light of this testimony from the Government's own star witness, and other testimony elicited at trial, we believe that the Government lost its moral compass in arguing the case against Mr. Perez in the wildly overstated and reckless manner that it did.

Sadly, the Government has now adopted the same approach in the sentencing phase of the case.  It has provided the Probation Department with the same overstated version of the facts for inclusion in the PSR.  It has taken the unconscionable position that Mr. Perez reasonably foresaw a $17.5 billion loss as a result of the conduct he jointly undertook, resulting in a recommend sentence under the Guidelines of life imprisonment (trumped only by the statutory maximum of 70 years).  It seeks a staggering forfeiture order of $155 billion, on the absurd theory that Mr. Perez is responsible to forfeit every penny that any client invested with Madoff Securities during the entire tenure of his employment. And as if these potential penalties were not enough, it recently added to the mix a proposed judgment seeking to forfeit Mr. Perez's home -- where he has lived with his wife and two young daughters since 2001 -- on the theory that he used some of his regular salary from Madoff Securities to make monthly mortgage payments.  In short, the Government has yet again lost its moral compass in this matter.  And it has surely strayed from the admonition given by then Attorney General Robert Jackson, recently quoted by Judge Glasser in *United States v. Santiago,* 05 CR 590 (ILG), at 9-10:

> On April 1, 1940, then Attorney General Robert H. Jackson delivered an address titled "The Federal Prosecutor" to the United States Attorneys assembled at their

Second Annual Conference in Washington, D.C. He concluded his inspiring speech as follows:

> The qualities of a good prosecutor are . . . elusive and . . . impossible to define . . . . A sensitiveness to fair play and sportsmanship is perhaps the best protection against the abuse of power, and the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humanity.

While the Government's tactics may have worked before the jury, we are confident that this Court understands that this case actually involves quite a bit of subtlety and nuance as to Mr. Perez. Accordingly, upon considering our sentencing submission in its entirety, as well as the full trial record, we respectfully ask the Court to reject the Government's overstated and cynical narrative, and to see Mr. Perez as he is -- a devoted family man who finds joy in life's simple pleasures, such as his daughters' soccer games, backyard barbeques with friends, and fishing. And as a devoted but abused employee, who trusted Frank DiPascali to a fault, and was manipulated by him, and by Bernard Madoff, in order to carry out *their* criminal ends, *not his*. Surely, while the Government may have persuaded the jury that the lies told to Mr. Perez were somehow "irrelevant," this Court must take the full picture into account in determining Mr. Perez's level of culpability, and in determining what is a fair and appropriate punishment.[1]

---

[1] The Government argued in rebuttal summation that the lies told to Mr. Perez should be disregarded because criminals in TV shows and movies lie to each other all the time. As the prosecutor stated: "My point is, [those shows don't] seem unrealistic because you knew, your common sense told you that was the normal function of a criminal conspiracy. People engage in false statements. They're lying to everyone. Why wouldn't they tell some lies to one another? And that's a normal fact." (Tr. 11711:3-11712:20.) Similarly, the prosecutor told the jury: "[T]hese people knew. They obviously knew. The lies that were told to them at different points are irrelevant." (Trial Tr. 11713:25 – 11714:2.) These improper arguments should carry no weight with the Court.

We also ask the Court consider how, over the past five years, Mr. Perez has suffered immensely under the intense pressure of the Government and the accompanying lens of media scrutiny.   Indeed, since his sudden arrest in November 2009, Mr. Perez has lost almost everything—his ability to find work, his good reputation, and all of his life savings.  In short, the fallout has been devastating.  What remains are Mr. Perez's deep-seated values, the love and support of his family and loyal friends, and his hope for mercy from this Court.

We respectfully submit that a review of all of these factors weighs heavily in favor of a lenient sentence for Mr. Perez.   Indeed, should the Court adopt the overstated loss figure contained in the PSR, then Mr. Perez is entitled to an equally large variance from the draconian Guidelines range.   In this regard, we call the Court's attention to the *amicus* submission filed on behalf of various law professors and experts in criminal law, urging the Court to sentence Mr. Perez and Mr. O'Hara substantially below the recommended Guidelines range, given the unfair impact of "loss calculation" under the Sentencing Guidelines.   *See* Brief of Law Professors and Practitioners as *Amici* in Support of Defendants George Perez and Jerome O'Hara, dated July 11, 2014.

Accordingly, based on the trial record, our objections to the PSR, and the accompanying letters (and video) in support of Mr. Perez, we respectfully urge the Court to impose a sentence of home confinement coupled with community service.   We submit that such a sentence will properly achieve the objectives of federal sentencing, and will provide mercy and justice in this tragic case.  In the alternative, in the event that the Court believes that home detention and community service are insufficient punishment, we respectfully submit that a brief period of incarceration, followed by home confinement, will be fair and just under the circumstances, and will allow Mr. Perez to continue raising his two beautiful daughters.

## I.  OVERVIEW OF THIS SUBMISSION

Under Title 18 U.S.C. Section 3553(a), before imposing sentence, the Court must consider a number of factors, and must then impose a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes sentencing.  *Id.*   Accordingly, this memorandum addresses the Section 3553(a) factors as to Mr. Perez.  We do so in the following order: (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the applicable sentencing range under the Sentencing Guidelines; (4) the need for the sentence imposed to reflect the seriousness of the crime, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes; (5) the kinds of sentences available; and (6) the need to avoid unwarranted sentencing disparities.

We start with the history and characteristics of the defendant because in order to apply all of these factors fairly, the Court must first understand Mr. Perez as a person.  We respectfully submit that who Mr. Perez is, as a human being, stands in stark contrast to the caricature the Government portrayed to the jury.  Indeed, as noted above, the Government's portrayal of Mr. Perez was shallow, one-sided, and ultimately at odds even with the testimony of the Government's own witnesses.  Accordingly, we begin our analysis of the Section 3553 factors by providing the Court with a fuller picture of the true George Perez:  a son who was the first of his family to graduate college; a young man who succeeded in emerging from an impoverished area of the Bronx to land a job at a prestigious Wall Street investment firm; a loyal friend who is genuinely engaged in his community; a supportive husband; and a devoted father who puts his children above all else.  We have provided the Court with dozens of letters in support (as well as a video accompanying the letter from his 11 year old daughter).  These letters reflect Mr. Perez's

true character, which runs far deeper than the cartoon image that the Government presented to the jury.

We then turn to discuss at length the nature and circumstances of the offense. As noted above, our view of what the evidence at trial established (as well as our view of what is the truth) diverges wildly from the Government's recitation of the facts -- as now set forth in the PSR. Accordingly, we are obliged to review that proof in some detail, in order to support our argument as to the nature and circumstances of the offense. By doing so we do not seek to relitigate the trial, but rather, to provide the factual backdrop against which culpability must be measured.

Finally, we address the remaining Section 3553 factors, and explain why those too support a lenient sentence for Mr. Perez.

## II.  THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

### A.  Growing Up in the Bronx

Most of George Perez's life story -- prior to December 2008 -- can be summed up as the classic, hard-working tale of the American dream. George's father, Juan, and his mother, Rosa, each emigrated from Cuba to New York as young children. Their families each settled in the Bronx, in search of better lives and opportunities here in the United States. Socializing with others from Cuba brought the immigrant families a certain sense of community in an otherwise foreign land. And, it was through this community that Juan was introduced to his future wife: Rosa's father decided to introduce Juan to his daughter, hoping for a match. His instincts were right. The two teenagers fell in love, got married, and on February 22, 1966 had their first child, George Perez. Mr. Perez's younger sister, Tina, was born two years later, in 1968. Indeed, Juan and Rosa are modest "immigrants from Cuba who worked hard to instill and preserve strong traditional family values." *Tina Padilla Letter*. They are still married today and continue to love

and support their children -- and each other -- unconditionally.  As a childhood friend describes Mr. Perez's family:

> George comes from a humble beginning.  His parents sacrificed greatly to help their family move forward in society . . . . The sacrifice, drive and humility that was instilled in him by his parents continues to be prevalent in his life today.

*Anthony Loarte Letter.*

Neither Juan nor Rosa graduated from high school.  But, they taught Mr. Perez at an early age the value of hard work.  Mr. Perez watched his father work a series of demanding jobs over the years to provide for his family.  Never too proud, Juan did whatever he could to make ends meet, whether it was working at a car wash, in a factory, at a subway magazine stand, or as a hot dog vendor.  Indeed, the Perez family "toiled and toiled to give [George and his sister] the best life they could."  *George Perez Letter.*

Mr. Perez emulated his father's work ethic, holding "many part time jobs throughout his teenage years to help the family.  He worked in a dental office, a retail store, and a summer camp to name a few."  *Tina Padilla Letter.*  Indeed, Mr. Perez's work ethic started at a very young age.  One of Mr. Perez's fondest memories is working with his father during summer vacations from elementary school.  Waking up with Juan at 3 a.m., Mr. Perez was thrilled to put on an apron and help count change for customers – they "sold newspapers, magazines, and candy," and it was "hard work."  *George Perez Letter.*  In those formative years, Juan taught Mr. Perez about the value of money and the sense of accomplishment earned from a job well-done.  What Mr. Perez remembers most about that time at the newsstand, however, was simply spending quality time with his dad.

The Perez family lived on the fourth floor in a modest apartment in a small, five-story apartment building on 149th Street in the Bronx.  While Juan was at work, Mr. Perez and Tina

were left under the watchful eye of their mother, who worked as a homemaker.  Rosa was disciplined—she watched over the children's homework, made sure the apartment was clean, and put nutritious meals on the table.  Indeed, Mr. Perez's "daily after-school routine included going directly to the kitchen table to start homework before dinner."  *Tina Padilla Letter.*  In addition to Mr. Perez's nuclear family, Mr. Perez had the benefit of growing up surrounded by his extended family.  In the same apartment building, his maternal grandmother lived on the second floor, his aunt on the third, and his paternal grandparents lived above them, on the fifth.  Mr. Perez and Tina were blessed to be raised by a village.

Mr. Perez's parents encouraged and indulged their children's thirst for knowledge.  As Mr. Perez explains:  "Our parents spent their weekends reading, fishing, visiting parks, museums, movie theaters, and beaches.  They showered us with love and attention."  *George Perez Letter.*  It was also during his childhood that Mr. Perez developed his lifelong love for fishing.  Mr. Perez, along with his father and grandfather, would frequent local fishing spots, like Pelham Bay Park or City Island in the Bronx.

Candidly, Mr. Perez grew up quite poor in the Bronx.  The family had little money, no car, and took family vacations to nowhere farther than Coney Island -- it was their "Disney World."  *George Perez Letter.*  Although Juan and Rosa had little money, they started their family in the hopes of a better life for future generations.  The bedrock principles of the Perez household were a good education, strong work ethic, respect for others, religious faith, and love.  Remarkably, although the Perez family lived in a decidedly low socio-economic class, Mr. Perez never grew up feeling deprived.  To Mr. Perez, life then -- and looking back on it now – was, indeed, "beautiful." *George Perez Letter.*

However, life in the Bronx could also be tough at times.  While Mr. Perez's specific block (149th Street) was a peaceful place to live, danger and disorder were always nearby.  As a young boy, Mr. Perez also had the misfortune of personally witnessing muggings, beatings, and stabbings.  It was not uncommon for gunshots to ring out, forcing the residents outside to run and duck behind whatever they could find for safety.  It was during these years that Mr. Perez, who loved and admired his parents and community, nonetheless grew a desire for better.  As one of Mr. Perez's childhood friends remembers:

> George and I come from similar backgrounds and share a lot in common.  We both grew up in the South Bronx during turbulent times in the 1970's and 1980's.  We were both fortunate to come from loving and supportive families, which made all the difference despite modest means.   Unlike most of the kids in our neighborhoods, we avoided the allure of the streets, drugs and influence of friends, and dedicated ourselves to our studies in order to secure a better lifestyle and brighter futures.

*Enrique Garcia Letter.*   Indeed, Mr. Perez was raised in an "impoverished area[] where for many, crime and drugs were a way of life . . . . However, George chose not to become a statistic and decided to pursue a better way of life."  *Jose Matos Letter*.  Furthermore, another friend notes how "George never took for granted the sacrifices made by his parents.  He was committed to finishing school and being able to make a positive contribution to his family."  *Sara Loarte Letter.*

Mr. Perez nurtured not only his own ambitions, but sought to help others in the community seek a better life.  For example, a childhood friend recalls how "[m]any years ago during a very dark time in my life, I was heading down the wrong path.  George was one of a few friends who had the courage to point this out to me.  He helped me turn my life around with good advi[ce] and care." *Victor Soto Letter.*  Another remarkable example is, as a teenager in high school -- and even through his early years of college -- Mr. Perez became a father figure for

some of the youth in his neighborhood.  Mr. Perez would organize fishing trips --  he would pack

sandwiches, get the group organized, and, most importantly to him, would ensure that everyone

paid their subway fare out to Pelham Bay Park (turnstile jumping was common in those days).  A

childhood friend describes these outings:

> I remember George being very different; he was not into the same
> things that most kids in the neighborhood were into.  Although we
> lived in a high crime area, George always found the time to go
> fishing, hiking or other outdoor activities.  He would take some of
> the younger kids in the neighborhood along.  Many of these kids
> grew up in a single family household.  They were unfamiliar with
> the family component and how it can grow to include others.
> George knew the importance of mentoring and being a role model
> for others and attempted to show the other kids in the
> neighborhood.

*Jose Serrano Letter*.   Indeed, Mr. Perez wanted to demonstrate to those young men the

importance of responsibility, show them the beauty of fishing and nature, and open their eyes to

life outside of the Bronx's city streets.

### B.  High School and College

More than anything, for Mr. Perez and his family, education was key.  With the little

money they had, Mr. Perez's parents found a way to make sure that their children went to

Catholic school from elementary through high school.  Moreover, the decision to send Mr. Perez

and Tina to Catholic school reflected the Perez family's religious faith, as Mr. Perez grew up

regularly attending church with his family. .  As Mr. Perez's mother describes in her letter:

> I have been married to George's father for 48 years and have tried
> my best to raise George and his sister, Tina, in a home full of love.
> My children have made me proud to be a mother.  My husband and
> I chose to send our kids to Catholic school because we wanted a
> better life for them.  It wasn't easy to afford Catholic school, but
> my husband worked several jobs while I cared for our home and
> stayed on top of my children's schoolwork and chores.   Our
> children repaid us with excellent grades and even better behavior.
> They were both straight A students and very respectful.  They are
> the kind of kids that would make any mom proud.

*Rosa Graciela Perez Letter.*  In school, while social and friendly, Mr. Perez's primary focus was on his education.  Mr. Perez's mother writes further:

> George was loved by everyone in grammar school.  He was a good student, a sweet boy, and a hard worker.  Sometimes George was teased because he was a little different than the other boys.  He was serious about school, perhaps too serious, and that made him a bit of a nerd in some boys' eyes, an easy target at times.  Occasionally George withdrew and was shy, but he never lost his sense of self.

*Id.*  Indeed, Mr. Perez remained focused, studied hard, and excelled academically – and, his discipline paid off.  Mr. Perez was salutatorian of his graduating class at Cardinal Hayes Catholic High School in the Bronx, out of 271 students.  And, in applying for college, Mr. Perez's hard work and academic success was further rewarded, yielding a number of academic scholarships, private scholarships, and grants.

Mr. Perez attended Pace University in downtown Manhattan.  Although he was accepted at more prestigious institutions, Mr. Perez selected Pace because, collectively, he had a near-full scholarship and he wanted to alleviate the burdens of educational debt.  Similarly, Mr. Perez also chose to live at home while going to school full-time, foregoing the "typical" college experience.  Indeed, Mr. Perez was pragmatic in his approach to school -- he controlled his living expenses, minimized debt, and made it a priority to maintain the close ties with his family and friends in the Bronx.  While at Pace, he remained a role model to those at home:  "Seeing George go off to Pace University, made us realize a better future was possible."  *Jose Serrano Letter.*

Mr. Perez's work ethic continued throughout college.  He excelled academically while working part-time jobs to gain experience.  One of his part-time jobs was as a computer programmer at a company called Arcade Building Maintenance ("Arcade").  It was Arcade that offered Mr. Perez his first full-time position upon graduation.  And, in 1989, Mr. Perez indeed accepted the job at Arcade as the first, proud college graduate of his family.  Indeed, his sister

tells how "George has made [their] parents so proud throughout his life . . . . He was the first one in our family to attend college.  And he has been the wisest, smartest, most supportive brother any sister could ever have." *Tina Padilla Letter.*

Just a mere two years later – in 1991 – Mr. Perez received a call from a headhunter, describing an exciting employment opportunity at a cutting-edge, highly successful financial firm:  Madoff Securities.  Mr. Perez was afraid of change, and so he was hesitant to pursue the opportunity.  However, the headhunter encouraged him to apply, saying, "just go on the interview – what do you have to lose?"  So, Mr. Perez followed the headhunter's advice and, after meeting with a number of Madoff Securities employees – including Elizabeth Weintraub and, for the final blessing, Peter Madoff (who enthusiastically touted the firm's pride in "family") – Mr. Perez felt that Madoff Securities was the right place for him, and he took  the job.

### C.   Family Life

Also in 1991, Mr. Perez first met his wife, Jeanette.  They were both out for the evening with friends.  Jeanette caught Mr. Perez's eye, and he asked her to dance.  After the two exchanged numbers, Mr. Perez and Jeanette started a traditional courtship that unfolded slowly. Mr. Perez and Jeanette fell in love.  But they were young – with good jobs and happy lives – so, they chose not to rush into marriage and instead dated seriously for many years.  On November 5, 2000, the couple wed, in the company of their close family and friends.

At first, Mr. Perez and Jeanette lived in a co-op apartment that Mr. Perez had purchased a few years earlier in Fort Lee, New Jersey.  When the couple decided to start a family, they looked to move closer to Jeanette's family.  One of the primary reasons for this move was because Mr. Perez and Jeanette both had full-time jobs, and they wanted to ensure that their

children were raised by those who loved them most.  A familial community was important to the couple; indeed, Mr. Perez sought for his children that same "village" he was raised with as a child.  In 2001, Mr. Perez and Jeanette bought their home in East Brunswick, New Jersey, where the family still resides today, along with their two dynamic and  poised young daughters, ages 11 and 8.

It is certainly no overstatement to describe Mr. Perez as a loving and devoted father. Words do not do justice to the love that Mr. Perez dedicates to his girls — they are his world. Indeed, friends describe Mr. Perez as "one of the greatest fathers I have ever known."  *Victor Soto Letter*.  He has sought to instill many of the same values in his children – a good education, strong work ethic, and respect – that were the cornerstones of his own childhood.  And, as history often repeats itself, the most important thing in Mr. Perez and Jeanette's household is love.  The family leads a modest life.  Besides school and extracurricular activities, Mr. Perez and Jeanette enjoy quality time with their girls, whether it be casual backyard barbeques or family vacations, like camping trips or outings to the Poconos.  Indeed, Mr. Perez recalls that "[a]s a child and as an adult my mother has always praised me by saying that under any circumstance, I was always 'conforme.'  In Spanish, it means content, satisfied.  I believe it fits." *George Perez Letter*.

Mr. Perez is a source of strength for many of his friends and extended family members. Letters from his family describe Mr. Perez as "the first to volunteer" when help is needed, "generous with his time," and "an inspiration . . . and a major influence in [their] life."  *Eric Perez Letter; Steven Rodriguez Letter*.  His aunt explains how when she "lived alone and constantly sought to be connected to my family . . . [George and Jeanette] always had an open door . . . [and] always made it a point to pull our whole family together for holidays and

birthdays, so he has been instrumental in reminding me that I have a family that loves me."

*Barbara Diaz-Soca Letter*.  Poignantly, Mr. Perez's sister tells how:

> George was my solace when I would break down and threaten to
> give up.  He spent countless nights staying up with me for moral
> support while I finished writing papers.  His words still ring in my
> ear:  'This too shall pass.'  So moving was his message that I have
> found myself using this line on my daughter, my friends, and the
> hundreds of students I have taught.

*Tina Padilla Letter*.

One of Mr. Perez's childhood friends describes Mr. Perez as a man who puts "[h]is

family first and his friends a very close second.  George is the type of person that makes you feel

at home even if you just met him."  *Norberto Cotto Letter*.  Another childhood friend observes

that "[t]he commitment, time and devotion George has poured into his family has resulted in

well-rounded young girls and a strong, dedicated wife.  George has always taken a leadership

role in the lives of his girls and has molded them to be smart, confident, compassionate, and well

versed."  *Anthony Loarte Letter*.  Kevin Fong, a former Madoff Securities employee, and witness

at trial, writes:  "All I can say is that when I see their family, I can see the love which is shared

and committed to each other."  *Kevin Fong Letter*.

The overwhelming theme found in the support for George Perez is the love that he has for

his daughters, which his brother-in-law explains:

> His focus is always family, family, family.  As a father, he raises
> my nieces with compassion and integrity and always leads by
> example.  He is heavily involved with their education, sports and
> social events.  He is at every soccer game, gymnastics practice or
> dance event.  He showers his children with love but also makes
> sure they understand discipline.

*Eric Perez Letter*.  Another brother-in-law describes Mr. Perez "as the father of my nieces, he is

amazing.  He is very caring and will drop anything to tend to his girls.  You can really see the

bond they have with each other.  He pushes them to strive for more and you can see it in their school work and on the soccer field." *Steven Rodriguez Letter.*

As many of the letters describe, soccer is an integral part of the Perez family's life. Friends say it is "no surprise if we find George and his daughters, if not the whole family, at the soccer fields/playground," *Zully Escobar Letter*, and describe Mr. Perez as "a regular on the sight on the sidelines, being one of the first parents to arrive and one of the last to leave, because he so much enjoys watching his daughter play." *Charles Sheard Letter.*  Indeed, Mr. Perez is a constant, supportive fixture at practices and games -- not only for his own children, but for other families, as well.  Other soccer parents describe how the Perez's "are always willing to open their home to soccer families at a moment's notice," *Sherice McQueen Letter*, and "host parties for the team as a form of 'teambuilding' . . . for the benefit of the children." *Brian Simpson Letter.*  As one soccer parent recalls:

> Everyone always wanted to go to the team events hosted by George and Jeanette, which often lasted well into the night, and as often as not included spirited volleyball games between the parents in the backyard.  His affability and open affection for all the families on the team, as well as the obvious familial warmth surrounding him, his wife and daughters, always made such events highpoints of the season for all of us.

*Charles Sheard Letter.*  Indeed, friends recognize how "[i]t's very hard in this day and age to find people that are trustworthy enough or caring enough to treat your children like family, but George Perez and his family are those types of people." *Spiros Koukourdelis Letter.*

Soccer is only one l aspect of Mr. Perez's involvement with his children, however. Particularly after the collapse of Madoff Securities in 2008, Mr. Perez has taken on many of the primary household duties.  He meets his daughters when they get home from school, takes them to the park, goes fishing with them at the local lake, shares with them his love of film, and regularly cooks the family meals.  Indeed, his wife describes how Mr. Perez "dedicates his time

to taking care of [the] children, providing three meals and snacks daily with his number one ingredient 'love.'" *Jeanette Perez Letter*. Most importantly, Mr. Perez spends hours every night with his two young daughters overseeing their schoolwork. He ensures that they are engaged in the learning process and holds their work product to the highest of standards. A childhood friend writes:

> As a stay at home dad during the last several years George took on duties of overseeing the household. This included cooking, up keep of the household, grocery shopping, keeping up with the girls' extracurricular activities and their schoolwork. He used his time productively to help [his older daughter], who is 11 years old and [his younger daughter], who is 8 years old, to be in a stable environment despite the public awareness of the case. George became very engaged in [his older daughter's] soccer. He encouraged and motivated her with her academics. His presence at home created more structure and regimen that has been very beneficial to the girls . . . . He has been an exceptional dad to these girls. He has been a constant and engaged parent in their lives and despite the difficult situation their family has encountered these last few years, the girls are very stable emotionally. They pray before mealtime and bedtime. They do very well academically. They are two young girls who love and look up to their dad.

*Sara Loarte Letter*.

Indeed, Mr. Perez spends a great deal of time with his daughters. "George makes lunches, tells nightly bedtime stories, is rigid with the routines he has established for his 2 daughters . . . . He attends every soccer game, every school event, knows exactly what his daughters are learning in school, and offers all the love and supports every child should ever have." *Tina Padilla Letter*. Mr. Perez personally describes the relationship with his children:

> When the kids come home, I cook dinner and help with homework, especially my youngest, who needs help with her writing. Today she no longer just retells or rehashes a story, but can identify and write about the problem and solution and discuss how characters develop. I am so proud of her.

*George Perez Letter*.

16

One of Mr. Perez's top priorities, in the event of a prison sentence, is preparing his daughters with all the tools they need to continue their education in his absence.  Mr. Perez's wife describes the potential danger of his absence from their home:

> Just before the end of one school day [our daughter, a week after the verdict] experienced separation anxiety and asked the teacher to call me to make sure her father would be there after school to pick her up.   We have provided our children with a solid foundation of love and taught them to be faithful, truthful, respectful, and full of courage, and hope.   However, not having their father in their daily life may be too much for them to bear.

*Jeanette Perez Letter*.  But, it is his 11 year old daughter who illustrates the simple things that make Mr. Perez a beautiful father:

> My dad is a great man.  He takes hours preparing dinner, with his special ingredient . . . love.  At the dinner table no one will be able to fill my dad's seat.  My younger sister is not the best eater.  My dad takes time to make sure her steak is cut in just the right size, yet still keeps its juiciness.  He does the same thing with her fruit.  He is always there to tuck us in at night, pray with us and give us a good night kiss.  My dad goes beyond the stars to please my sister and me and make us happy . . . . He is a great listener and his words are so powerful they leave you speechless.  He always tells us, "you have to do what you have to do, so you can do want you want to do," he got it from a movie but he says it so often he has made it his own.   "Respect time" is another saying that is heard throughout our life.  This saying at first did not mean much to me.  But now based on our situation these two words have changed the way I see things.  I now realize how important time is because it is something that you can never get back.

*Older Daughter Letter*.  Certainly, his daughters have come to rely on Mr. Perez as a multi-faceted pillar in their home.  Mr. Perez personally acknowledges that he fears "how my family and I will fare without each other.  I fear my spirit will shrivel and waste away.  I pray they are stronger than me and find the strength to overcome any feelings of despair."  *George Perez Letter*.  Indeed, Mr. Perez's absence from their home, even for a short period of time, will surely have a devastating and lasting impact on his children, as well as Mr. Perez himself.

17

There is much more that we could say about Mr. Perez, but we close this section simply by saying that he is a salt of the earth person, who deserves great credit at sentencing for the life that he has led, and the positive impact he has had on those around him.

### III.   THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government's theory at trial was, essentially, that Mr. Perez and his co-defendants "spent every day of the last 20 years or more, before Madoff was arrested, manufacturing fictitious information, creating millions of fake documents and keeping track of the money that they helped Bernie Madoff to steal." (Trial Tr. 58:7-10.) Further, the Government claimed that Mr. Perez and the others "lied to investors, government regulators, banks, auditors and anyone else who came into contact with Madoff's business." (Trial Tr. 58:11-12.) In its summation, the Government offered "greed" as motive, claiming that it was "a way of living life, of being around their co-conspirators and really, really, really taking advantage of the fraud and all of the monetary aspects that it offered." (Trial Tr. 11020:6-9.)

We respectfully submit, however, that this recitation of the facts is not a fair and accurate presentation of the evidence that was actually presented at trial. Indeed, this narrative was based on sheer innuendo and speculation, and presented the jury with a cartoon image of George Perez, rather than anything approaching reality. Likewise, the PSR largely tracks the Government's theory of the case in the section describing the offense conduct. Accordingly, we discuss below our view of what the evidence at trial actually showed, which evidence demonstrates that Mr. Perez's conduct and his role in the fraud was -- at a minimum -- far more limited and nuanced than the Government was willing to admit at trial. These facts are also outlined – in large part – in our objections to the PSR, but are set forth below in connection with the Section 3553(a) factors.

### A. Mr. Perez's Lack of Industry Experience and Madoff Securities' Pre-Existing Computer Infrastructure

Mr. Perez was hired as a computer programmer at Madoff Securities two years after graduating from college, in 1991.  (*See* Trial Tr. 5593:11-5594:17.)  Mr. Perez had no previous experience in the securities industry, no securities licenses, and no formalized securities training.  (*See* Trial Tr. 7253:8-16; 5594:10-17.)  At the time he was hired, Mr. Perez had no reason to believe that the firm was engaged in criminal conduct, and no evidence was offered at trial to the contrary.  Instead, like everyone else, Mr. Perez believed that Madoff Securities was a highly-successful Wall Street firm, and that its founder, Bernard L. Madoff, was a titan of the industry.  Indeed, the brilliance of Madoff and DiPascali was that they could run a firm that was engaged in a multi-billion dollar fraud, but have it appear to hundreds of employees – as well as to the outside world – that it was a highly reputable firm that always played by the rules, and that its ethics were beyond reproach.  This was proven at trial by the numerous Madoff Securities employees who were not charged in this case – many of whom like George Perez worked there for decades – who testified at trial that they, too, were fooled to believe that Madoff Securities was a legitimate business and Mr. Madoff himself to be a respected, ethical man on Wall Street.  (*See, e.g.,* Trial Tr. 488:8-12; 1054:2-13; 1077:7-11; 2643:14-2644:16; 5598:6-15.)   In this regard, many of the Government's cooperating witnesses, who admitted to participating in various aspects of the fraud, testified that they too were unaware that the whole business was a Ponzi scheme, or that the IA trades were fake.  *Id.*

When Mr. Perez arrived at Madoff Securities, the basic computer system infrastructure for the investment advisory business was already in place, having been developed by Elizabeth Weintraub, the former head of the firm's Information Technology ("IT") department.  (*See* Trial Tr. 5598:19-5599:10; 7010:4-22.)   Indeed, the Government's expert witness Bruce Dubinsky

confirmed at trial that "the majority of the [computer] code for the IA business . . . was developed in the late 1970s through the early to mid 1980s." (Trial Tr. 1675:8-24.) Mr. Dubinsky also confirmed that the computer system – prior to 1991 – already had the capacity to generate, *inter alia*, monthly customer statements, trade confirmations, customer ledgers, and trade blotters. (*See* Trial Tr. 1676:13-23.) DiPascali confirmed these facts in his testimony as well. (*See* Trial Tr. 5598:10-5599:10.)

Significantly, with this system in place, *the process of manually entering trades into the House 17 system and processing customer statements was implemented well before Mr. Perez joined the firm.* (*See* Trial Tr. 4556:3-25.) As DiPascali testified, computer system for the IA business was "always" a "stand-alone system into which trading information was inputted." (Trial Tr. 5599:15-18.) Accordingly, Mr. Perez had absolutely no reason to suspect upon joining Madoff Securities that there was anything wrong or improper about this methodology. It was simply how the business was run.

Moreover, it was under Ms. Weintraub's direction, in 1993, that Madoff Securities migrated its computer system from one back office computer to two separate systems: one for the investment advisory business ("House 17") and another for the market-making and proprietary trading business ("House 05"). While Mr. Perez and Jerome O'Hara assisted in this migration, there were others at Madoff Securities who helped as well. In fact, Haresh Hemrajani, a Government witness who was also hired as a consultant for the FBI post-collapse of the firm, was specifically hired to oversee the computer migration at Madoff Securities in 1993. Yet, despite his knowledge of the House 17 system, the Government accepted that he had no knowledge of the fraud. (Trial Tr. 8541:1-8; 8760:9-11.)

### B.  Frank DiPascali and Bernard Madoff Lied to George Perez

During at least the first decade of Mr. Perez's employment, he had no reason to question whether any fraudulent activity might be taking place around him.  In fact, there was no evidence introduced at trial as to any relevant conversations with Mr. Perez prior to early 2004.  Rather, as Mr. DiPascali confirmed, for approximately the first ten years that Mr. Perez was at the firm, he reported directly to Ms. Weintraub, and it was Mr. Perez's "job[] to act as a computer programmer" and, in that role, he was simply "given assignments by those authorized to give [him] assignments[.]" (Trial Tr. 5599:19-5600:8.)[2]

Indeed, the first relevant conversations introduced at trial regarding George Perez took place starting in 2004.  It was at that time that Madoff Securities started to undergo a series of audits, the first of which was with the Securities and Exchange Commission ("SEC"), known as the "Swanson audit."   Mr. DiPascali asked Mr. Perez to perform certain programming in connection with the Swanson audit, which included programs to subset customer accounts as well as programs to randomize certain trading data based on a list of parameters and information provided by DiPascali.  However, there was substantial evidence at trial that Mr. DiPascali *lied* to Mr. Perez (and his co-defendant, Jerome O'Hara) in connection with this audit in order to garner their unknowing participation in the fraud.  For example, Mr. DiPascali testified, *inter alia*, that:

- It was simply Mr. Perez's job to follow Mr. DiPascali's instructions.  (*See* Trial Tr. 5607:15-20.)

---

[2]     Moreover, while the computer evidence admitted at trial included iterations of a trading blotter program during this time period that had the capacity to randomly generate the names of counterparties from a pre-determined list, there was no evidence introduced at trial as to why this program was created, who asked for it to be created, what it was used for, or what was explained to Mr. Perez about the reason or need for the program.   Moreover, DiPascali confirmed that the basic architecture for the trading blotters – using the term "clearing bank" for the counterparties – was written in the "late 70's."  (Trial Tr. 4973.)

- Although Mr. Madoff did in fact make it clear *to Mr. DiPascali* that he intended to fool the auditors, "Mr. Perez and O'Hara certainly weren't in on that sort of high-level planning meeting about how the business would be portrayed as 20 [IA customers] rather than thousands[.]"  (Trial Tr. 5663:17-5664:4.)

- Mr. DiPascali "lied" and gave Mr. Perez and Mr. O'Hara "cover stories as to why the documents or programs [DiPascali] was asking them to work on or create were needed[.]"  (Trial Tr. 5607:24-5608:17.)

- Mr. DiPascali's "purpose[] for the cover stories was to make them feel comfortable doing the work."  (Trial Tr. 5608:18-20.)  Indeed, it was Mr. DiPascali's intention to "manipulate[e] them in order to have them participate in what [DiPascali] knew to be a massive fraud without them knowing it[.]"  (Trial Tr. 5668:2-6.)

- Mr. DiPascali told Mr. Perez and Mr. O'Hara that "the trades were executed in Europe," with "the intention that they would believe [him.]"  (Trial Tr. 5608:21-22.)  Indeed, when Mr. DiPascali presented Mr. Perez with a list of counterparties, he lied and represented that these "were real firms that . . . [Madoff Securities] traded with in Europe."  (Trial Tr. 5670:9-10.)

- In order to deceive the SEC, Mr. DiPascali lied to Mr. Perez about what the SEC had requested in the Swanson audit, and explained that sub-setting of accounts was proper because "it was standard practice in the industry that when the SEC asks for a group of specific questions about a specific group of clients, you basically give them what they're asking for, and you don't give them anything more."  (Trial Tr. 5666:8-11.)

- In order to deceive the SEC and make Mr. Perez feel comfortable about the randomization of data, Mr. DiPascali acknowledged that he told Mr. Perez "that the auditors were simply trying to verify that Madoff Securities was not cheating its customers by charging them more than the customary markup" and it was "fine to present a representative sample[.]"  (Trial Tr. 5669:1-6.)

- In fact, Mr. DiPascali simply told Mr. Perez, at times, that DiPascali himself "didn't even understand why certain things had to be done with the records, but Bernie needed it done that way and he's a little crazy, but they've got to do what Bernie wants."  (Trial Tr. 5671:25-5672:3.)

Importantly, Mr. Perez was never shown any of the SEC audit requests, never had any direct contact with any of the auditors, never determined what records were going to be created in response to the audit requests, and was never told what was ultimately represented to the SEC in response to their requests.  (*See* Trial Tr. 5605:15-5606:18.)  Rather, Mr. Perez relied on the

representations made by his boss, Mr. DiPascali – representations that ended up being cover stories and lies.  Indeed, Mr. DiPascali admitted that, looking back on those lies, "as a boss and as a friend [Mr. DiPascali] owed [Mr. Perez] better than that[.]"  (Trial Tr. 5668:11-14.)

Notably, Mr. DiPascali admitted on cross-examination that, he *never* "at any point after the Swanson audit up to the demise of Madoff Securities . . . [went] back and [told] Mr. Perez and Mr. O'Hara that [he] had lied to them when [he] gave them these cover stories during the Swanson audit[.]"  (Trial Tr. 7013:14-19.)  Nor did the evidence presented ever demonstrate that Mr. DiPascali (or anyone else) ever told Mr. Perez that the trades were not real.  To the contrary, Mr. DiPascali testified that, regarding the trades, he:  (a) "*never* used a word like 'fake' in [his] conversations at the company," (b) "never . . . told Mr. Perez or Mr. O'Hara that the trades were fake" and (c) agreed that he "wanted as few people as possible to know about the fraud that was being committed at Madoff Securities . . . [b]ecause if people knew, that was a danger to [Mr. DiPascali personally]."  (Trial Tr. 7005:2-7007:7 (emphasis added).)

After the Swanson audit in 2004, Madoff Securities underwent several more audits, which Mr. DiPascali described as a "frenzied period" at the firm.  (Trial Tr. 5675:2.)  As a result, by early 2006, Mr. Perez had become uncomfortable with the audit-related work he was being asked to do – known as the "special programs" – and accordingly, in an act of conscience, he decided that he would no longer do the work.  (*See* Trial Tr. 5679:4-13.)  Consequently, Mr. Perez, together with Mr. O'Hara, decided to delete the special programs from the system, in order to make sure they were not being used improperly by anyone else.  (*See* Trial Tr. 5682:17-25.)  However, the backups to the programs were all left intact -- indeed, there was no attempt at a cover-up.  (*See* Trial Tr. 5288:23-5289:16.)

During the same period, in an act of great courage – although that "courage" was unfairly ridiculed by the Government at trial -- Mr. Perez and Mr. O'Hara also informed DiPascali that they were uncomfortable with the special programs, and would not work on them anymore.  (*See* Trial Tr. 5679:4-13.)  *According to DiPascali, they were the only two employees ever to protest an assignment given to them at Madoff Securities, or to say that they were uncomfortable doing certain work.*  (Trial Tr. 6141:13-23.)  DiPascali downplayed their concerns, saying it was "okay, they didn't have to work on it[.]"  (Trial Tr. 5680:7-13.)   Moreover, DiPascali *continued* to lie to Mr. Perez through 2006.  For example, DiPascali admitted that "[u]p until the time that Jerry O'Hara and George Perez confronted Bernard Madoff in late 2006 about the unusual work they had been doing for Madoff's IA business, [he] gave O'Hara and Perez various reasons for why they were doing special projects, including audits of the IA business."  (Trial Tr. 5676:10-14.)  Further, DiPascali told the Government in an interview that, in the summer of 2006 after some drinks at a Greek restaurant, he explained to Mr. Perez and Mr. O'Hara that "because Madoff was trading not as agent but as principal making these trades out of his own inventory that was kept at various places overseas, he was able to allocate these trades after the fact, backdate the trades, and do other things with the accounts that a broker acting as agent would not be able to do."  (Trial Tr. 10617:23-10618:14.)  Similarly, when walking back to the office *after a second SEC audit in 2006*, Mr. Perez and Mr. O'Hara directly asked DiPascali if the IA business was legitimate.  DiPascali testified that, in response, he "blew them off, as [if to say] what, are you ridiculous?"  (Trial Tr. 5277:17-5278:8.)  Indeed, DiPascali admitted that he "didn't want to address that question."  *Id.*

In September 2006, Mr. Perez became concerned about what might happen when Mr. Madoff, who spent the summer in Europe, found out about his refusal to participate in the

"special programs."  (Trial Tr. 5681:8-11; 5684:3-12.)  Given this fear, Mr. Perez wrote and mailed a letter to himself, stating what had occurred and expressing his fears.  *See* GX 105-e7.  This letter was unfairly ridiculed by the Government in rebuttal summation as both a "complete admission[]" of Mr. Perez's "total understanding of the fact that [he was] engaged in a fraud" (Trial Tr. 11,662:22-5; 11,718:12-14), and "the most boneheaded attempt[] to insulate oneself from criminal liability possibly in history" (Trial Tr. 11,720: 15-19).  Despite this improper argument, the obvious purpose of the letter was that it was to be opened in the event something happened to Mr. Perez.  The letter stated:  "I have expressed to my boss, Frank DiPascali, my unwillingness to work on projects which I am uncomfortable with.  I don't know how far up the ladder my unwillingness has been communicated, but it is only a matter of short time before it hits the top.  I fear for my job, my family, my future."  GX 105-e7.  DiPascali acknowledged at trial that the letter was accurate (Trial Tr. 5683-84) and that Mr. Perez had told him about the letter he had written to himself – thus confirming its purpose as an "open in the event of emergency" letter.  (Trial Tr. 5372:3-5)

Several months before writing the letter, Mr. Perez closed his IA account, withdrawing the $108,000 bonus he had been given in 2004 for "doing a good job"  (Trial Tr. 5252:2-9.), approximately $127,000 he had deposited of his own funds, and the "gains" on those deposits, for a total withdrawal of $289,372.  *See* GX 101-57; GX 200-25; GX 206-9.

Also in September 2006, after Mr. Madoff returned from Europe, a meeting in Mr. Madoff's office was arranged.  In attendance were Mr. Madoff, Mr. DiPascali, Mr. O'Hara, and George Perez.  Indeed, such a meeting was "unusual."  (Trial Tr. 5682:7-10.)  As acknowledged by DiPascali, Mr. Perez and Mr. O'Hara told  Madoff that they were uncomfortable working on the special programs and therefore refused to do any further work with them.  (*See* Trial Tr.

5685:6-16.)  They also told Madoff, however, that they were happy to work for him, and loved other aspects of the firm.  (*See* Trial Tr. 5283:1-8.)  Madoff told them that their fears were unfounded, reassuring Mr. Perez and Mr. O'Hara with various stories about his industry experience.  (*See* Trial Tr. 5686:4-22.)  DiPascali confirmed that Mr. Madoff responded gently, and told Mr. Perez and Mr. O'Hara that they no longer had to work on the special programs, if they were uncomfortable -- indeed, he assured them they would not be fired over this.  (*See* Trial Tr. 5687:2-18.)  Meanwhile, after the meeting, Mr. Madoff instructed Mr. DiPascali to "keep[] an eye on" Mr. Perez and O'Hara, apparently out of concern they would uncover the fraud.  (*See* Trial Tr. 5604:1-4.)

### C.  After 2006, Mr. Perez No Longer Worked on Audit-Related Programs

For the remainder of his time at Madoff Securities, Mr. Perez did not work on the special programs anymore.  Rather, Mr. Perez established ground rules as to which computer projects he would perform.  (*See* Trial Tr. 5288:6-13; 5693:10-13.)  To the extent that DiPascali asked for Mr. Perez's help after the meeting with Mr. Madoff in 2006, he continued to offer cover stories for why he needed the work.  For example, Mr. DiPascali testified that, in "trying to make a false stock record" he explained to Mr. Perez that DiPascali "needed a stock record for only a specific group of accounts[.]"  (Trial Tr. 5309:4-6.)  And, although there was another audit conducted by HSBC in 2008, there was no evidence presented that Mr. Perez participated in any special programming written specifically for that audit, or even was told about the audit.  Rather, DiPascali testified that he enlisted other people to get the work done that he needed after 2006.  For example, Mr. DiPascali enlisted the help of Mr. Hamrajani, and other Madoff Securities employees including Kenny Hutchinson and Terrence Chen.  (Trial Tr. 5689:1-5692:14.)  Similarly, DiPascali testified that he lied to those people as well.  *Id.*

During the period of 2006-2008, DiPascali acknowledged that he kept an eye on Mr. Perez and Mr. O'Hara, at Mr. Madoff's request.  (*See* Trial Tr. 5604:1-4.)  He would take them out to dinner and would deliberately order alcohol and suggest they take a car service home so as to "take their temperatures."  Indeed, Mr. DiPascali admitted this fact during an interview with Special Agent Kathryn Scott in August 2009.  (*See* Trial Tr. 10678:15-10679:10.)

After the demise of Madoff Securities in December 2008, Mr. Perez remained an employee at the firm.  Very early on, Mr. Perez was asked by Matthew Cohen, from AlixPartners, to provide data as to all of the firm's IA clients.  Mr. Perez promptly gave Mr. Cohen the "a.name" file, which is how the Government learned, in the first instance, of the true scope of the IA business.  (*See* Trial Tr. 590:15-25; 672:1-13.)  Mr. Perez remained employed at Madoff Securities until March 2009, when he was laid off as the firm was being wound down.

### D.  Mr. Perez did Not "Get Rich" From His Work at Madoff Securities

Contrary to the Government's false and inflammatory allegations at trial, Mr. Perez did not gain riches as a result of the offenses of conviction.  He did not make millions of dollars per year, his IA account did not accumulate millions of dollars, and he does not own luxury items.  As the Government's own exhibit reflects, by 2007 (when the salary was at its peak), Mr. Perez's salary (including bonus) was calculated at approximately $300,000.  His average salary during his 18 year tenure at Madoff Securities was about $150,000 per year – hardly unusual for a computer programmer in the securities industry.  Indeed, Kevin Fong -- a former computer programmer for Madoff Securities and one of the Government's own witnesses -- testified that, in 2008, his base salary was $300,000 with the expectation of an additional $100,000 bonus, which he considered within industry norms.  (Trial Tr. 7265:12-24.)  Other programmers at

Madoff Securities – with the exception of Haresh Hemrajani -- earned from $150,000 to approximately $400,000 in 2007.[3]

Under these circumstances, we respectfully submit that Mr. Perez's salary is hardly evidence of "greed," as argued by the Government.  Indeed, Kevin Fong – in a letter to the Court submitted on Mr. Perez's behalf – describes Mr. Perez as modest and content:

> I was always forward preparing and planning while [George] was overall satisfied with what he had.  While I was looking for business opportunities and career advancement, he was one which was content and happy with what he possessed.  From the time I first knew him, fishing was his primary love and joy . . . . Wholeheartedly, he was content with life.  As long as he had a decent job, a place to live, food to eat, money to provide for his family and ability to fish, he believed he had a beautiful life.

*Kevin Fong Letter*.  Moreover, while the Government argued that Mr. Perez extorted raises and bonuses from Mr. Madoff, there was no evidence elicited at trial to support the Government's fictional argument in this regard.

In view of the foregoing, we respectfully submit that the nature and circumstances of the offense reflect -- at worst – a very limited level of culpability on the part of Mr. Perez.  For this reason as well, he is entitled to substantial leniency.

## IV. THE APPLICABLE SENTENCING RANGE UNDER THE SENTENCING GUIDELINES

### A. The Advisory Sentencing Guidelines

As is now well-known, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that mandatory application of the Sentencing Guidelines violated a defendant's Sixth Amendment rights.  *See Kimbrough v. United States*, 522 U.S. 85, 100-01 (2007); *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008).  The Supreme Court thus replaced the rigid

---

[3]    This list includes programmers Robert Falcone, Ken Huthchinson, Robert Schwartz, and Joseph Suazo, and programmer supervisor Debbie Koster.

application of the mandatory Guidelines with a more flexible framework—one which renders the Guidelines *advisory* only, and requires the Court to consider each of the factors under 18 U.S.C. § 3553(a) in fashioning an appropriate, individualized sentence.  *See Booker*, 543 U.S. at 259-60; *see also Kimbrough*, 522 U.S. at 101.   Indeed, today, a Court must treat the advisory Guidelines calculation only as a "starting point," and instead "must then consider all the § 3553(a) factors and [] undertake an individualized assessment based on the facts presented."  *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009); *see also United States v. Preaceley*, 628 F.3d 72, 84 (2d Cir. 2010); *Cavera*, 550 F.3d at 189 (The District Court "must [] conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense.").

In sentencing a defendant, it is the duty of the Court to determine a sentence that is "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  *Booker*, 522 U.S. at 101.   "District Judges are . . . generally free to impose sentences outside the recommended range."  *Cavera*, 550 F.3d at 189.   And, while the sentencing court must explain any variance from the Guidelines it chooses to impose, the Court need not cite exceptional circumstances to justify a non-Guidelines sentence.  *See Gall v. United States*, 552 U.S. 30, 47 (2007); *Jones*, 531 F.3d at 171; *United States v. Pugh*, 515 F.3d 1179, 1190-92 (11th Cir. 2008). In fact, a sentencing court may vary from the Guidelines due to a disagreement with the advisory calculation or other policy considerations.   *See Kimbrough*, 552 U.S. at 101-02; *accord, United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008).   Moreover, the Court's justification need not be proportionate to the extent of the variance.  *See id.*  In evaluating the reasonableness of a sentence, the Second Circuit has confirmed that a sentence's reasonableness is not determined by the extent of its variance from the advisory Guidelines range but, rather, by "the district court's

individualized application of the statutory sentencing factors." *United States v. Dorvee*, 604 F.3d 84, 95 (2d Cir. 2010).

Notably, Courts have repeatedly recognized that application of the Guidelines in securities fraud cases can result in advisory ranges that are unreasonably high, and have thus imposed below-Guidelines sentences. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (noting that securities fraud "calculations under the guidelines have run so amok that they are patently absurd on their face"); *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (observing that securities fraud calculations result in the "piling-on of points"); *United States v. Mueffelman*, 400 F. Supp. 2d 368, 377-78 (D. Mass. 2005) (imposing a below-Guidelines sentence where the "issues concerning the blameworthiness of a defendant found guilty of fraud are more complex than simply measuring the amount of loss").

### B.  The Guidelines Range for Mr. Perez

As set forth in our objections to the PSR, we strongly object to the Government's Guidelines calculation in this case, which is incorporated into the final PSR dated July 2, 2014. Specifically, the Government claims that the aggregate loss amount suffered by Madoff Securities investors was approximately $17.5 billion, and further contends that this entire loss amount was both foreseeable to Mr. Perez and was the result of conduct jointly undertaken by him.  As a result, according to the Government, Mr. Perez's base offense level is subject to a staggering increase of 30 levels. *Id.*   The Government then seeks other increases as well: (i) an enhancement of 6 because the offense involved more than 250 victims; (ii) an enhancement of 2 because the offense involved sophisticated means; (iii) an enhancement of 2 because the offense substantially endangered the financial security of 100 or more victims; and (iv) an enhancement of 2 because the offense conduct involved a violation of the securities laws, and Mr. Perez was

30

allegedly "associated with" a Broker-Dealer or and Investment Advisor at the time of the offense.[4]  Applying these enhancements, the Government calculates Mr. Perez's total offense level under the advisory Sentencing Guidelines at level 43.  Even with a criminal history score of zero, the resulting applicable advisory Guidelines range that the Government recommends for George Perez is nothing short of draconian:  life in prison.  This calculation is trumped only by the statutory maximum of 70 years.

We have two principal responses to this proposed Guidelines calculation.  **First,** as set forth in our objections to the PSR, we respectfully submit that this Guidelines calculation is simply wrong, because the Government has not proven that the staggering losses alleged were reasonably foreseeable to Mr. Perez as a result of any conduct jointly undertaken by him.  **Second,** to the extent that this Guidelines calculation is adopted by the Court, the resulting offense level grossly overstates the seriousness of Mr. Perez's offense conduct, and thereby warrants an equally significant variance from the advisory Guideline range.  We address these two responses below.

### C.  The Court Should Reject the Guideline Calculation Contained in the PSR

We respectfully submit that the trial evidence failed to establish that the staggering loss figure used in the PSR ($17.5 billion) was a reasonably foreseeable part of any jointly undertaken criminal activity as to which Mr. Perez knowingly agreed to participate.  *See* U.S.S.G. Section 1B1.3(a)(1)(B).  Indeed, there was no evidence introduced that Mr. Perez ever met with or spoke with a client, was ever told by anyone what clients were being promised, or that he was privy to the fact that *any* clients were being defrauded – let alone that they were

---

[4]    These additional enhancements are addressed in our objections to the PSR, dated July 8, 2014, at page 8.

being defrauded out of $17.5 billion.  As set forth in *United States v. Studley*, 47 F3d 569, 574-75 (2d Cir 1995):

> [I]n order for a district court to sentence a defendant on the basis of criminal activity conducted by a coconspirator, *a district court must make a particularized finding as to whether the activity was foreseeable to the defendant. We now find that the Guidelines also require the district court to make a particularized finding of the scope of the criminal activity agreed upon by the defendant.* . . . "[i]n determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."

(quoting U.S.S.G. § 1B1.3 Applic. Note 2 (1993)) (other citations omitted) (emphasis added).

In this case, based on the limited scope of any criminal conspiracy joined in by Mr. Perez, it was not foreseeable to him that *any* loss would ensue from that conduct, let alone a loss of $17.5 billion.   Accordingly, we respectfully submit the correct loss figure under the Guidelines is zero.  Further, since the other Guidelines increases contained in the PSR also rely on factors that could not have been foreseen by Mr. Perez, we respectfully submit that the proper offense level is 7, resulting in a sentencing range of 0-6 months.   Moreover, even if a "sophisticated means" enhancement is applied, the resulting offense level is 9, corresponding to a sentencing range of 4-10 months.

Additionally, we respectfully submit that – based on the trial evidence – the Government has failed to prove that it was reasonably foreseeable to Mr. Perez that there would be *any* actual or intended harm within the meaning of U.S.S.G. Section 2B1.1, by virtue of the conduct in which he engaged.  Indeed, based on Perez's limited involvement, and the misrepresentations made to him by Madoff and DiPascali, no loss at all was foreseeable to him.  As set forth in *United States v Turk*, 626 F3d 743, 748 (2d Cir 2010):

> Sentencing for the offense of conspiracy to commit wire fraud and mail fraud is governed by U.S.S.G. § 2B1.1. By far the most consequential determination a district court must make when sentencing a defendant under this Guideline is the amount of loss caused by the defendant's crime, as this factor can increase the adjusted offense level by as few as zero or as many as 30 points, depending on the loss as measured in dollars. See U.S.S.G. § 2B1.1(b)(1). . . . Under Application Note 3(A)(i), the "actual loss" for which a defendant is liable is "the reasonably foreseeable pecuniary harm that resulted from the offense."

Moreover, under *United States v. Evergreen Intern.,* 206 Fed Appx 71, 79 (2d Cir 2006), the district court must make "particularized findings" as to the foreseeability of the loss under 2B1.1.

Here, we respectfully submit that -- based on Mr. Perez's limited knowledge and involvement in the conspiracy -- there was no "reasonably foreseeable pecuniary harm" that resulted from his participation in the offenses of conviction.  For this reason as well, the loss figure should be zero, and the Guidelines calculation should be as set forth above.

### D. If the Court Should Adopt the Guidelines Calculation Contained in the PSR, Then Mr. Perez is Entitled to a Substantial Variance

The Guidelines calculation proposed by the Government, and adopted in the PSR, results in an unfair and unjust recommended sentence of 70 years in prison.  This plainly overstates the seriousness of the offense.  Indeed, it is significantly higher than the Guidelines calculation for kidnapping and murder.  Accordingly, even the Probation Department has recognized that a *substantial* variance is appropriate, and has recommended a sentence of 8 years imprisonment.  We respectfully submit that even this recommended variance is plainly insufficient, under the unique circumstances of this case.

The reason for this absurd result under the Guidelines is that the Guidelines themselves place far too much emphasis on loss, as a proxy for culpability.  Indeed, in connection with sentencing, we have submitted to the Court on behalf of various *Amici* who include distinguished

law professors and practitioners, a brief in support of Mr. Perez and Mr. O'Hara. In that brief, these *Amici* explain why, in their view:

> [T]his case highlights a serious problem facing federal sentencing judges today - namely, that the federal sentencing guidelines as currently written place too much emphasis on economic "loss" and too little emphasis on other factors that traditionally have been important factors in determining a fair and just sentence that takes full account of the factors set forth in 18 U.S.C. § 3553(a).

Brief of Law Professors and Practitioners as *Amici* in Support of Defendants George Perez and Jerome O'Hara, dated July 11. 2014, at p. 1. Moreover, these *Amici* advocate an alternative approach to sentencing under the Guidelines, which approach was suggested to the Sentencing Commission by a Task Force assembled by the ABA Criminal Justice Section. The *Amici* describe this alternative approach as follows:

> The Task Force focused on the structural framework of the Guidelines and opined as follows:

>> This structural framework is not ideal because it can be unduly rigid and lead to the arbitrary assignment of values and the overemphasis of considerations that are more easily quantified to the detriment of equally relevant considerations that are less easily quantified. There is also a risk under the current structural framework that a guideline will appear to carry more empirical or scientific basis than is present.

> The ABA Task Force focused its proposed alternative Guideline on more dynamic substantive considerations and on measures of "culpability" that are more consistent with the §3553(a) factors:

>> The Guideline has 5 levels of culpability that range from lowest to highest. The appropriate culpability level for any given case will depend on an array of factors. These include, but are not limited to: the defendant's motive (including the general nature of the offense); the correlation between the amount of loss and the amount of the defendant's gain; the degree to which the offense and the defendant's contribution to it was sophisticated or organized; the duration of the offense; extenuating

34

> circumstances in connection with the offense; whether the defendant initiated the offense or merely joined in criminal conduct initiated by others, and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The list is not exclusive. Other factors may also bear on the culpability level.

*Id.* at pp. 8-9.

These proposed considerations are well within the current spirit of Section 3553(a), and we urge the Court to consider them here, should it adopt the loss figure set forth in the PSR, or any loss figure resulting in an unduly harsh recommend sentence.  Specifically, in determining the degree of variance that is appropriate, we urge the Court to take into account the following mitigating facts: (1)  Mr. Perez was not motivated by greed in commission of the offenses of conviction; rather, he was simply carrying out his job responsibilities, as instructed by his superiors; (2)  there is no correlation between the $17.5 billion alleged loss and Mr. Perez's gain from the offenses of conviction; indeed, other than his ordinary salary -- which was not extravagant -- and a 2004 bonus of $108,000 for "good work," which was deposited into an IA account -- Mr. Perez did not profit in any additional way from his employment at Madoff Securities; (3) Mr. Perez was repeatedly lied to about the reason for the programs he was being asked to write, in order to manipulate him into participating in the fraud unknowingly;  (4)  no criminal conduct was initiated by Mr. Perez; and (5)  when he became uncomfortable with the "special programs," following the audits from 2004-06, he took affirmative steps to delete those programs and refused to continue working on them – a refusal never engaged in by any other Madoff Securities employees other than Mr. Perez and Mr. O'Hara.

In sum, when all of the relevant facts are considered, it is clear that the loss calculation contained in the PSR is simply wrong.   Alternatively, should the Court adopt the PSR

calculation, then Mr. Perez is plainly entitled to a substantial variance from the recommended sentence under advisory Guidelines.

### V. THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE CRIME, PROMOTE RESPECT FOR THE LAW, PROVIDE JUST PUNISHMENT, AFFORD ADEQUATE DETERRENCE, AND PROTECT THE PUBLIC FROM FURTHER CRIMES

#### A. The Seriousness of the Crime and the Need to Promote Respect for the Law

We fully acknowledge that the fraud orchestrated and engaged in by Bernard Madoff and Frank DiPascali was breathtaking in its scope and seriousness. And had it been proven that Mr. Perez was a knowing and willing participant in that fraud for 18 years – writing programs that he knew were designed to steal billions of dollars from clients and to prevent detection of the massive fraud by auditors – we would agree that he would deserve a harsh sentence given the seriousness of the crime. *But the proof and the truth establish nothing of the sort.* To the contrary, as explained above, Mr. Perez was a functionary at Madoff Securities – he was a tech guy who was not privy to any of the inner workings of the Firm. Indeed, as confirmed by DiPascali, Mr. Perez and Mr. O'Hara were lied to and manipulated *for the very purpose of keeping the fraud from them.* As he testified:

> Q. Isn't it correct, Mr. DiPascali, that you lied to them about what the SEC had requested in the Swanson audit?
>
> A. Yes.
>
> Q. You did that so that they would be comfortable doing the work, true?
>
> A. My intention was to make them be comfortable.
>
> ***
>
> Q. In misleading them in that way, do you agree with me you were manipulating them?
>
> A. Yes.

Q.  For your own purposes, correct?

A.  For Bernie's purposes, yes.

Q.  For your purposes in implementing Bernie's plans, true?

A.  True.

Q.  You were their boss, true, one of their three bosses?

A.  That is correct.

Q.  It was their job to follow your orders, true, your directions?

A.  It was.

Q.  You were their friend, true?

A.  Very.

*Q.  Isn't it a fact, Mr. DiPascali, that you were manipulating them in order to have them participate in what you knew to be a massive fraud without them knowing it? Wasn't that your intent?  Yes or no.*

*A.  Yes.*

Q.  Didn't you think that as a boss and a friend you owed them better than that?

A.  During that short time frame when I had to make that decision, that did not cross my mind.

Q.  As you sit here today and look back on that episode that we are discussing now, do you agree that as a boss and as a friend you owed them better than that?

A.  Yes, certainly.

(Tr. 5666:17-5670:17)(emphasis added)

Under these circumstances, there is simply no comparison between the massive fraud engaged in by Madoff and DiPascali, and the very limited role played by Mr. Perez in that fraud – a role as to which he was kept in the dark.  Thus, we respectfully submit that a sentence of home confinement with community service, or in the alternative, a short term of imprisonment followed by home confinement, adequately reflects the seriousness of the offense and promotes respect for the law

.

37

### B.  The Need to Provide Just Punishment

We respectfully submit that the sentence we propose provides just punishment.  In this regard we note that this is Mr. Perez's first offense, and that his life has otherwise been characterized by hard work and devotion to family and community.  Moreover, not only are the circumstances of the offense compelling, but Mr. Perez has already endured enormous suffering as a result of his prosecution in this case.  Indeed, Mr. Perez has already been severely punished.

Initially, with the demise of Madoff Securities in 2008, Mr. Perez lost his job, and the world as he knew it was turned completely upside-down.  As he stayed at the company to help wind down the business, he thought that the loss of his job was the worst to come – indeed, as a committed employee, he told friends that he would stay at Madoff Securities for "[a]s long as they need me or tell me to go home." *Lissa Leslie Letter*.

Mr. Perez was ultimately laid off by Madoff Securities in March 2009.  Subsequently, he was unable to find other employment, due to the stigma of the Madoff name.  But as it turned out, that was the least of his problems.

For in November 2009, Mr. Perez was arrested.  Mr. Perez's arrest was conducted in his home, at the crack of dawn, with his two young daughters in the house.  That arrest began a five year odyssey that continues to this day.  During that time, Mr. Perez has not only had to face the stress and uncertainty of his future, but he has had to deal with being vilified in the press.

Mr. Perez and his wife, Jeannette, have suffered tremendously under the stress and uncertainty of the past five years.  A childhood friend observes how "[t]hroughout this debacle, George has already suffered extensively thinking of what he has put his family through." *Jose Matos*.  Yet, they have also been committed to handling this troubling situation with trust in the system and spiritual faith – primarily in an exhibition of solidarity and strength for their two

young children.  Many have commented on the strength of Mr. Perez during this difficult time.

One friend writes:

> I have been impressed with how well George has handled his long
> legal ordeal.  He has behaved with a grace that I am not sure I
> could if I were in similar circumstances.  He has retained his close
> bond with friends and family while maintaining the sense of humor
> that makes him fun to be around . . . . I have been impressed with
> the character he has shown even after the verdict was announced.

*Robert J. Letter*.    Indeed, his long-time friend Anthony Loarte describes how Mr. Perez

"continues to play an intricate role in the household and has not allowed the pain and stress of his

circumstance [to] affect his responsibility to his family.  He has kept his family focus intact even

when most would fold, which I see as a tribute to his strength and spiritual beliefs."  *Anthony*

*Loarte Letter*.

Another childhood friend writes: "George's journey for the last four and a half years has

been a difficult one for anyone to endure . . . . [i]n my opinion, most people who would

experience such a situation would find it difficult to function and would battle symptoms of

depression.  Mr. Perez has chosen to be a productive and positive factor in this process.  His

approach to the matter only speaks to the strength of his character."  *Sara Loarte Letter*.

As a result of this case, Mr. Perez has essentially lost all that he has worked to achieve –

he has lost his job and future careers prospects; he has lost virtually all of his life savings; his

reputation has been destroyed; and the prospects for his future are uncertain.  Moreover, despite

whatever sentence this Court chooses to impose, the nightmare is far from over for Mr. Perez:

he still faces ongoing litigation from the SEC as well as the Trustee.  In short, his life will

forever be haunted by the debacle of his employment at Madoff Securities.

But, it is the prospect of a lengthy prison sentence that will cause not only an immense

amount of suffering for Mr. Perez, but will be almost insurmountable for his family – especially

his daughters, "whom are at such an age where a father's guidance and support play such a critical role in their future." *David Mandleur*.   Indeed, his 11 year old daughter writes of her pain:

> Recently, times have been hard because of our situation . . . . I thought this was all going to pass and be a forgotten topic . . . and then he was found guilty which was a completely different story. From that moment on I haven't known what my future would hold.

*Older Daughter Letter*

Thus, Mr. Perez now stands before this Court as a man who has already endured tremendous hardship under a tsunami of legal and personal difficulties since the collapse of Madoff Securities.  Still, in the wake of this enormous tragedy, Mr. Perez has been committed to handling these trying circumstances with grace, always in an effort to protect his family.  Despite his brave exterior, Mr. Perez has already suffered extensively over the past five years, and we respectfully suggest that he has suffered enough.  Any term of imprisonment forcing Mr. Perez to separate from his family will be devastating.  Accordingly, we respectfully submit that a sentence of home confinement with community service is a fair and just punishment.

### C.  The Need to Afford Adequate Deterrence

A lengthy prison sentence for Mr. Perez is also not necessary in order to promote either general or specific deterrence.  Indeed, given the unusual and *sui generis* circumstances here – the concept of general deterrence has no practical application.  Moreover, courts have recognized the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (noting that "[M]ost business executives fear even a modest prison term to a degree that more hardened types might not. Thus, a relatively modest prison term should be 'sufficient but not

more than necessary' for this purpose."). Particularly in a case that is highly publicized, such as Mr. Perez's, even just the "stigma of a felony conviction will operate to deter this type of criminal behavior by others in positions similar to defendants]." *United States v. Hoffman*, 2006 WL 3390736, at *6 (D. Neb. Nov. 22, 2006) (noting that a highly publicized prosecution "sends a compelling message of deterrence").

### D. The Need to Protect the Public From Future Crimes

Given the circumstances of this case, and all that has befallen Mr. Perez already, it is self-evident that there is virtually no risk of him committing future crimes. Indeed, Mr. Perez has a strong support system, as evidenced by the numerous letters submitted by his family and friends. Moreover, as discussed above, Mr. Perez has demonstrated a strong work ethic since childhood, and surely possesses the capability and motivation to maintain a stable future and contribute positively to society. Indeed, Mr. Perez explains in his own letter to the Court his specific plans with his community, and his desire to be a positive contributor to society: "The idea of becoming a number weakens me. There is so much humanity left in me. Please don't constrict this part of me, allow me to be there for my family and serve my community in a meaningful way. I will make you proud of what I can do." *See* George Perez Letter at 3. Notably, the PSR also notes that "the likelihood of recidivism is low" and the "instant offense [] represents the defendant's first conviction." *See* PSR at 43. Accordingly, an analysis of these factors demonstrates that Mr. Perez has virtually no risk of recidivism.

### VI. THE KINDS OF SENTENCES AVAILABLE

The Court's obligation is to impose a sentence that is no greater than necessary to reflect the nature and seriousness of the offense, the characteristics of the defendant, provides a just punishment, and satisfies the other factors set forth in Section 3553(a). In some instances – as we respectfully submit here – sentences of home confinement coupled with community service

meet these goals without the need for incarceration.  Indeed, probation is a punitive measure that "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant."  *United States v. Brady*, 2004 WL 86414, at *8-9 (E.D.N.Y. Jan 20, 2004) (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.).  Moreover, probation is available by statute (Title 18 U.S.C. 3561(c)(1)), as noted in paragraph 162 of the PSR, because the offenses of conviction are not Class A or B felonies.  *See* Title 18 U.S.C. Section 3559.  And while the Sentencing Guidelines technically preclude probation for sentencing ranges in Zone C or D (U.S.S.G. Section 5B1.1), this prohibition is merely advisory in the post-*Booker* era.    Alternatively, since the day of Mr. Perez's arrest qualifies as a day in custody, Mr. Perez is eligible for a sentence of time served plus a period of supervised release, with a special condition of home confinement.  Indeed, that home confinement is a permissible condition of supervised release was recently confirmed by the Second Circuit in *United States v Tourloukis*, 558 Fed. Appx 112, 116 (2d Cir 2014)(affirming sentence of fifty months in prison plus six months of home confinement while on supervised release).

　　We respectfully ask that the Court consider alternatives to imprisonment for Mr. Perez.  Indeed, Mr. Perez has identified the ways he would like to contribute to his community:

> I would spend my time helping some of the local programs secure and implement technology to better maintain their records, making contact and medical information more reliable and accessible in case of emergencies. My daughter and I have discussed and look forward to become soccer 'buddies' with T.O.P. Soccer, a program for young athletes with disabilities.  Elijah's Promise 'uses food as a tool to alleviate hunger, empower lives, and invite justice to the most vulnerable members of our Central Jersey Community.'  My

> friends and I have donated food to soup kitchens before, I would endeavor to offer more of myself to their cause if given the chance. The idea of becoming a number weakens me. There is so much humanity left in me. Please don't constrict this part of me, allow me to be there for my family and serve my community in a meaningful way. I will make you proud of what I can do.

*George Perez Letter.* However, if the Court believes that home confinement with community service is insufficient, we respectfully submit that a brief period of incarceration, followed by home confinement, will be sufficient, but not greater than necessary, to provide fair and just punishment.

### VII.  THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

Imposition of a non-Guidelines and non-custodial sentence on Mr. Perez will not result in unwarranted sentencing disparities. We acknowledge that the size and scope of this case is extreme, and it is these unique circumstances that make it near-impossible to compare similarly situated defendants to Mr. Perez. Nonetheless, comparing Mr. Perez's level of culpability to that of Mr. Peter Madoff – who was sentenced to 10 years in connection with this fraud – supports a far more lenient sentence for Mr. Perez. In contrast to Mr. Perez, Peter Madoff was the Chief Compliance Officer at Madoff Securities, who – as a sophisticated, trained attorney – admitted to, *inter alia*, tax fraud, knowingly falsifying books and records of an investment advisor, and knowingly engaging in false filings with the SEC.

Furthermore, it is appropriate to compare the sentences of other Ponzi scheme participants – those with much greater culpability – in order to impose a proportionate sentence for Mr. Perez. For example, Travis L. Wright, the *manager* of a $145 million Ponzi scheme, who was said to have spent more than $15 million on his own lifestyle, was sentenced in 2012 to 10 years in prison. *See United States v. Wright*, 2:10-cr-01141 (D. Utah). In Boston, Steven Palladino, the leader behind a $10 million Ponzi scheme, was also sentenced to ten years in

prison for his architecture of the fraud.  *See United States v. Palladino*, No. 14-10100-DPW (D. Mass.).  Finally, Jeffrey Skilling – the mastermind behind Enron, one of the largest corporate frauds of all time – was re-sentenced to fourteen years with the consent of the Justice Department.  *See United States v. Skilling*, 4:04-cr-00025 (D. Tex.)  Moreover, in a recent sentencing in a $30 million health care fraud case, the defendants – all of whom were senior level executives and had gone to trial -- were given sentences of three, two and one year, respectively, despite sentencing Guidelines over 20 years, based on the Court's overall evaluation of the 3553 factors.  *United States v, Farha, et al.,* 11-cr-115-T-30MAP.

Accordingly, after assessing the sentences of defendants in other fraud cases who held far greater levels of responsibility, and reaped far more in proceeds, it follows that a sentence of home confinement with community service would not cause any unwarranted sentencing disparities.

### VIII.   IN THE EVENT THAT THIS COURT SHOULD SENTENCE MR. PEREZ TO A TERM OF IMPRISONMENT, HE SHOULD BE RELEASED ON BAIL PENDING APPEAL

The standard for bail pending appeal was summarized in *United States v Archer*, 813 F Supp. 2d 339, 343 (EDNY 2010):

> The Second Circuit has stated that this Court . . . must determine the following factors: (1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if released; (2) that the appeal is not for purpose of delay; (3) that the appeal raises a substantial question of law or fact; and (4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed. *United States v. Randell,* 761 F.2d 122, 125 (2d Cir.1985). The defendant bears the burden of establishing that he is entitled to release pending appeal. *See* Fed.R.Crim.P. 46(c); *Randell,* 761 F.2d at 125.

In this case, we submit that there is no issue as to risk of flight or danger to the community.  Moreover, any appeal filed would not be for purposes of delay.  Finally,

there are substantial questions of law including (1) the sufficiency of the evidence of intent, and (2) the profoundly prejudicial effect of the Government's arguments to the jury, particularly in rebuttal summation.  These issues have been fully briefed in our post-trial motions and -- if decided in Mr. Perez's favor – plainly would result in a reversal of his convictions.   Accordingly, we respectfully submit that bail pending appeal is appropriate in this case.

### CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a sentence of probation with conditions of home confinement coupled with community service for George Perez.  In the alternative, if the Court deems it necessary, we respectfully request that only a brief period of incarceration be imposed, with a special condition of home confinement during supervised release.  Either sentence would permit Mr. Perez to continue to play a crucial role in the life of his young family, support his community, and contribute positively to society.

Finally, we join in the arguments of all co-defendants, to the extent applicable to Mr. Perez.

Dated: New York, New York
         July 11, 2014

                                                    Respectfully submitted,

                                                    /s/
                                                    _____
                                                    Larry H. Krantz, Esq.
                                                    Kimberly A. Yuhas, Esq.
                                                    **Krantz and Berman LLP**
                                                    747 Third Avenue, 32nd Floor
                                                    New York, NY 10017
                                                    (212) 661-2414
                                                    *Attorneys for Defendant George Perez*

45