UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                            :
UNITED STATES OF AMERICA,                   :
                                            :
            v.                              :          10 CR 228 (LTS)
                                            :
DANIEL BONVENTRE, ANNETTE                   :
BONGIORNO, JO ANN CRUPI, a/k/a "Jodi,"      :
JEROME O'HARA, and GEORGE PEREZ             :
                                            :
------------------------------------------------------------X

**SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO THE GOVERNMENT'S
PRELIMINARY ORDER OF FORFEITURE AS TO SPECIFIC PROPERTY/MONEY
JUDGMENT ON BEHALF OF GEORGE PEREZ**

Larry H. Krantz, Esq.
Kimberly A. Yuhas, Esq.
**Krantz & Berman LLP**
747 Third Avenue, 32nd Floor
New York, NY 10017-2803
(212) 661-0009

*Attorneys for George Perez*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT……………………………………………...………………….. 1

I.     THE CRITICAL QUESTIONS THIS COURT MUST DECIDE AS TO BOTH
FORFEITURE AND FORESEEABLE LOSS ………..……………………….….. 3
    A.  The Legal Standard …………………………………………………….…..... 3
    B.  The Relevant Inquiry in This Case ……………………………………………... 4

II.    THERE WERE NEVER ANY RANDOMIZED ENTRIES IN STATEMENTS
OR DOCUMENTS SENT TO CLIENTS …..……………….……………....…….. 6

III.   THE GOVERNMENT HAS NOT ESTABLISHED THAT MR. PEREZ
LEARNED OF THE CLIENT FRAUD AT ANY TIME BETWEEN 1991-2003 .... 7
    A.  The Government Has Failed to Establish that the "Very Act" of Writing the
Computer Programs is Sufficient to Establish that Mr. Perez's Knowledge
of the Client Fraud …………………….…………………………….…..…… 8
    B.  The Context In Which Mr. Perez's Actions and Knowledge Must
be Evaluated ……………………………………………………………..….... 9
    C.  The Government Has Not Established that Mr. Perez's Exposure to
STMTPro Proves His Knowledge of the Client Fraud ……….…….…....…… 15
    D.  The Government Has Not Established That Mr. Perez's Access to the House
17 Computer System Establishes His Knowledge of the Client Fraud ………... 17
    E.  The Government Has Not Established that the Lack of Connectivity
for House 17 Establishes Mr. Perez's Knowledge of the Client Fraud ………... 19
    F.  Mr. Perez's Involvement with GEN001 in 1994 Does Not Establish His
Knowledge of the Client Fraud ……………………………………………... 21
    G.  The Government's Claim that Mr. Perez Had Guilty Knowledge of the
Client Fraud from the Early 1990's Cannot be Reconciled with Mr. DiPiscali's
Trial Testimony or His Prior Statements to the Government ………………….. 22

IV.   THE GOVERNMENT HAS NOT ESTABLISHED THAT MR. PEREZ
LEARNED OF THE CLIENT FRAUD IN 2004 …………………….……....…….. 24
    A.  Mr. DiPiscali's Statements During the Swanson Audit Do Not Establish
Knowledge of the Client Fraud …………………………………………….... 24
    B.  The Programs Themselves Do Not Establish Knowledge of the Client Fraud  ... 28
    C.  Mr. Perez's Alleged Conversations With Co-Conspirators Do Not Establish
Knowledge of the Client Fraud as of 2004 …………………...………………. 29

V.    THE REMAINDER OF THE GOVERNMENT'S ARGUMENTS LACK
MERIT ……………………………………………………………………….…..... 31
    A.  Monies Earned as Salary from Madoff Securities …………………………… 31
    B.  Monies Earned as Salary from the SIPA Trustee ………………………….… 32
    C.  There is No Possible Basis for an Obstruction of Justice Enhancement ………. 33
    D.  There is No Possible Basis to Forfeit Mr. Perez's Home ………………..……. 34

VI.   WE RESERVE OUR RIGHT TO SEEK A HEARING ………….………..……. 35

CONCLUSION ………………………………………………………..…………………….. 35

## PRELIMINARY STATEMENT

This supplemental memorandum is submitted on behalf of George Perez in opposition to the Government's Supplemental Memorandum of Law in Connection with Sentencing, dated August 20, 2014 ("Govt. Supp. Mem." or "Supplemental Submission"), and its proposed Preliminary Order of Forfeiture as to Specific Property/Money Judgment regarding George Perez ("Preliminary Order").

For the reasons set forth below, and in our prior submissions, the Government's Preliminary Order as to Mr. Perez – and its theories of foreseeable loss and forfeiture – should be rejected because the Government has failed to sustain its burden of proof.  Indeed, the Government's forfeiture and loss theories – as set forth in its prior and supplemental submissions – relies on multiple layers of facts that are both unproven and, in our view, untrue, including: (1) that Mr. Perez became aware in the early 1990's that the investment advisory ("IA") business was a massive fraud and that clients were being sent false statements as to how their money was being invested; (2) in the alternative, that Mr. Perez became aware of this massive client fraud in 2004, during the "Swanson" SEC audit; (3) that it was reasonably foreseeable to Mr. Perez that the conspiracy he joined would gross over $155 billion in proceeds between 1991 and 2008; and (4) that Mr. Perez was aware that every penny in salary he received since the early 1990's – when he started at Bernard L. Madoff Investment Securities ("Madoff Securities" or the "Firm") – was ill-gotten gains derived from the fraud he had joined.

We respectfully submit that *none* of these facts have been proven by a preponderance of the evidence.  Indeed, the evidence is quite to the contrary, as we have explained in multiple prior submissions.

We have argued all of these points before and therefore incorporate by reference the prior arguments set forth in our post-trial submissions.  Indeed, this is essentially the Government's *fourth* attempt to substantiate its positions as to foreseeable loss and forfeiture, having previously made these same arguments (1) in its first Preliminary Order of Forfeiture as to Specific Property/Money Judgment and the accompanying Declaration of Special Agent Paul F. Roberts in Support of Preliminary Order of Forfeiture as to Specific Property/Money Judgment, both dated July 1, 2014; (2) in its Reply Memorandum on Behalf of the United States of America in Support of Entry of Preliminary Orders of Forfeiture and the accompanying Supplemental Declaration of Special Agent Paul F. Roberts in Further Support of the same, both dated July 21, 2014; and (3) in the Sentencing Submission on Behalf of the United States of America, dated July 18, 2014.  Based on those prior submissions, this Court has already found that the Government failed to sustain its burden of proof as to when Mr. Perez knowingly joined the conspiracy to defraud IA clients by providing them with false information as to how their funds were being invested.  As the Court stated at the recent status conference held on July 29, 2014:

> The government has not presented a sufficient case as to the knowledge, and if anyone wants to be heard as to whether – the knowledge point, meaning the point at which each defendant had sufficient knowledge of the fact that the incorrect information was going out, upon which contributions and investments were being sufficient [*sic*] to enable this Court to calculate the forfeiture obligation per defendant.

(Tr. of July 29, 2014 Court Conf. ("July Conf. Tr.") 48:12-18.)

In our view, the Government's Supplemental Submission as to Mr. Perez *contains no new facts that were not included in its prior submissions on forfeiture and sentencing*. Accordingly, the Court's prior conclusion as to the failure of proof is still wholly applicable. Consequently, we respectfully submit that – as to Mr. Perez – the Government has still failed to sustain its burden of proof on the issues of forfeiture *and* foreseeable loss under the sentencing

guidelines.   Accordingly, the Government's loss calculation and Preliminary Order should be rejected.

## I.   THE CRITICAL QUESTIONS THIS COURT MUST DECIDE AS TO BOTH FORFEITURE AND FORESEEABLE LOSS

### A.  The Legal Standard

As set forth in *United States v. Studley*, 47 F.3d 569 (2d Cir. 1995), in order for the Court to sentence a defendant based in part on criminal activity conducted by co-conspirators, it must make "particularized findings" as to (1) the "scope of the criminal activity agreed upon by the defendant" and (2) whether the co-conspirator conduct in question was "foreseeable to the defendant."   *Id.* at 574-75.   While *Studley* involved the issue of loss calculation under the sentencing guidelines, the same principles are fully applicable to forfeiture.   As the Second Circuit has observed: "[A] court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, *provided the actions generating those proceeds were reasonably foreseeable to the defendant.*"   *United States v. Contorinis*, 692 F.3d 136, 146-47 (2d Cir. 2012) (citations omitted; emphasis added); *accord United States v. Grant*, 2008 WL 4376365, at *2 (S.D.N.Y. Sept. 25, 2008) (noting that "co-conspirators are liable jointly and severally to forfeit the reasonably foreseeable proceeds of their criminal activity").

Indeed, this Court has already determined that it will use the *Studley* inquiry to determine both foreseeable loss and forfeiture.   As this Court stated at the last status conference in this matter, held on July 29, 2014:

> It does seem to me that the Studley approach as to the determination as to what the agreement and scope of the agreement was and what proceeds of the fraud were reasonably foreseeable to the defendant, given the fact and scope of the defendants' joint undertaking or agreement is, is an

> instructive, analytical construct and would be an appropriate approach here.

(July Conf. Tr. 50:14-20.)

Given this approach, with which we agree, this Court must make particularized findings as to the "fact and scope" of the criminal activity agreed upon by Mr. Perez, and as to what proceeds (if any) were reasonably foreseeable to him as a result of that jointly undertaken criminal activity. *The importance of these factual findings cannot be understated.* Indeed, as to Mr. Perez (and each defendant), this constitutes essentially a trial within a trial, with the Court as the ultimate arbiter of what the Government has proven as to the scope of Mr. Perez's criminal conduct. Obviously, the Court's factual findings in this regard will have a profound impact on Mr. Perez's life, since the determination of what is appropriate punishment (both in terms of potential incarceration and forfeiture) will likely be influenced dramatically by these findings. Moreover, these findings will have a significant effect on other litigation pending against Mr. Perez, brought by the Securities and Exchange Commission ("SEC") and the Securities Investor Protection Act ("SIPA") Trustee, which litigations seek to recover billions of dollars in damages, including the recoupment of all salary he was paid from 1991-2008.

**B.  The Relevant Inquiry in This Case**

In particularizing the scope of the criminal conduct engaged in by Mr. Perez, and the proceeds of the fraud (or loss) reasonably foreseeable from that conduct, it is important to clarify the precise nature of the fraud that is relevant for this inquiry, since Madoff Securities was used as a vehicle to engage in many different kinds of fraud. In this regard, we note our agreement with the Government that, for purposes of the forfeiture and loss calculation inquiry, "the essence of the fraud was to induce investors to pay money to Madoff Securities based on false representations about how that money would be invested." Govt. Supp. Mem. at 10-11. In other

4

words, it is knowledge of that pervasive client fraud – as opposed to knowledge of some other wrongdoing that did not work a material deceit on clients – that must be shown in order for a defendant to be held responsible for foreseeable loss or forfeitable proceeds in this case.[1]

Thus, the essential issue for the Court to determine is whether the Government has proven *when* – if ever – Mr. Perez became aware that his computer work was being used to facilitate a massive fraud against the Firm's clients, by providing them with false information – either in monthly statements or otherwise – as to the securities in which their funds were being invested.  This statement of the inquiry is fully consistent with this Court's observation at the recent status conference that the critical issue it must determine as to each defendant is when (or whether) that defendant learned that "incorrect information was going out [to clients]," as a result of which "contributions and investments" were being solicited or received.  (July Conf. Tr. 48:15-19.)   For ease of reference below, we refer to this simply as the "Client fraud," as distinguished from other fraudulent activity occurring at Madoff Securities.

We turn to the specific evidence on this question below. Since the Government has divided its arguments into the time periods 1991-2003 and 2004-2009, we respond in turn. Before addressing these facts, however, we first seek to clarify a potential misconception that the Court may have been under prior to the last status conference.

---

[1]   In this regard, we note our disagreement with the Government's position, set forth in its Supplemental Memorandum of Law, that it need only show that a defendant became aware that "any" of the Firm's "essential books and records" were false, "regardless of whether those records were shown to investors themselves," because such a finding would necessarily mean that it was "reasonably foreseeable that payments to or from the firm were the proceeds of fraud." Govt. Supp. Mem. at 11. We disagree with this position because the fact that false records were being created – or even shown to regulators – would not necessarily mean that the clients of the IA business were being defrauded.  Indeed, one could well have believed that the Firm wanted to hide *some aspect* of its trading activity from regulators, but that the trades were real and the client statements reflecting the positions held were entirely accurate. This is precisely the testimony of Enrica-Cotellessa-Pitz, David Friehling and Craig Kugel, which testimony was fully credited by the Government.

## II.   THERE WERE NEVER ANY RANDOMIZED ENTRIES IN STATEMENTS OR DOCUMENTS SENT TO CLIENTS

Since the key inquiry before the Court is the scope of any agreement on the part of Mr. Perez to disseminate false information to clients as to how their monies were being invested, it is important to clarify upfront that the monthly and other statements sent to clients (such as confirmations) *never* contained any randomized data.   Rather, those client statements and documents were always based on the records of trading activity contained within the Firm's "ordinary" books and records.   Thus, in order for Mr. Perez to have known that these client statements or documents were false, *he would have to have known that the IA business was a fraud, i.e., that the trades depicted in the Firm's ordinary books and records were non-existent.*

It appears that the Court may have been under a misconception in this regard, in light of the Court's statement at the last conference:  "So Mr. DiPascali testified that he knew that there were no trades, that all the statements going out were fake, that the input from the programmers of randomized numbers and all that produced statements that portrayed activity that did not exist."  (July Conf. Tr. 46:24-47:3.)  As we respectfully noted at the conference, however:

> Your Honor, I just want to clarify what I understand to be the facts, and I think there's a misconception that relates to the programmers, as we've been calling them.  The randomization programs that were testified to at trial involve documents being created for auditors, SEC, KPMG.  Those random entries were made, according to Mr. DiPascali, because the firm's underlying records didn't have certain detail in it, trade time, name of counter-party, et cetera.  There is no testimony, of which I'm aware and I do not believe it's accurate, that the clients' statements had any randomized date in them ever.

(July Conf. Tr. 67:23-68:9.)  Significantly, the Government agreed with this characterization of the evidence:

> As a general matter, [the] type of information that was randomized, trade times, counter-parties didn't show up on account statements.  It's just not

the type of information that was included on account statements; so that's
a true statement, as a general matter.

(July Conf. Tr. 71:12-16.)

We point this out because it is a critical aspect of the analysis as to Mr. Perez's knowledge of the Client fraud. Indeed, as we noted above, the only way that Mr. Perez would have learned of the existence of the Client fraud *was if he learned that there was no real trading in the IA business at all, i.e., that the trades depicted in those client statements were fabricated.* As we explain below, we respectfully submit that Mr. Perez never acquired that level of knowledge prior to the demise of Madoff Securities, and at a minimum, there is insufficient proof against him on that question. Accordingly, based in part on this clarification, we respectfully ask that the Court reconsider its conclusion, set forth at the status conference, that:

> The government has sustained its burden of making the prima facie case that each of these defendants knew, at some point before it was all over, that incorrect information was going out to customers, and the Madoff Securities IA operation was premised on a set of representations to customers about what was being done that was, in fact, not being done. And that is the bare necessary predicate for queuing up the issue of forfeiture liability.

(July Conf. Tr. 48:4-11.)

We respectfully submit that the Government has not sustained its burden of proof on even that threshold issue, let alone on the issue of *when* Mr. Perez obtained such knowledge. For this reason and the others set forth below, we respectfully submit that the Government has failed to sustain its burden of proof as to both foreseeable loss and proceeds subject to forfeiture.

## III. THE GOVERNMENT HAS NOT ESTABLISHED THAT MR. PEREZ LEARNED OF THE CLIENT FRAUD AT ANY TIME BETWEEN 1991 AND 2003

As to the time period 1991-2003, the Government does not claim that there is any direct proof of fraudulent intent on the part of Mr. Perez. Indeed, *the Government has not offered evidence of any relevant conversations with him at all during that entire 12 year period.*

7

Moreover, it is undisputed that Mr. Perez worked purely in a technical capacity, and never had any contact with clients or made any decisions as to their accounts.   Nonetheless, the Government claims that his knowledge of the Client fraud during this time period has been proven by virtue of the following:  (1) his mere act of writing programs that "were on their face in service of the fraud and not tied to real trading or real assets," *see* Govt. Supp. Mem. at 35; (2) his exposure to STMTPro in 1991, which program permitted changes to be made to client statements, *see id.* at 36; (3) the fact that he and Mr. O'Hara were allegedly the only programmers permitted to work on House 17 during this time period, *see id.* at 38; (4) the fact that the House 17 system lacked outside connectivity, in contrast to House 05, *see id.*; and (5) the fact that in 1994 he worked on a program called GEN001, which program had the capability to generate trading blotters from the Firm's ordinary books and records, but to insert some randomized trading detail as to those trades.   *See id.* at 39-40.

These arguments were all made in the Government's prior submissions, and so have already been rejected by the Court as inadequate to sustain its burden of proof as to *when* Mr. Perez acquired guilty knowledge of the Client fraud.   Nonetheless, we address all five points below.

### A. The Government Has Failed to Establish that the "Very Act" of Writing the Computer Programs is Sufficient to Establish Mr. Perez's Knowledge of the Client Fraud

In its Supplemental Submission, the Government asserts that Mr. Perez's knowledge of the Client fraud dates back to 1991 – when he started at Madoff Securities – simply because "[t]he very act of writing the programs, which were on their face in service of the fraud and not tied to real trading or real assets, is enough to establish that the proceeds of the fraud were reasonably foreseeable."   *See* Govt. Supp. Mem. at 35-36.   This argument simply begs the

question, and suggests that the Government would have needed no additional proof at trial other than the programs themselves.  However, the programs were not "on their face in furtherance of the fraud."  Indeed, the programs make no reference to any fraud or to the fact that any entries are false.  Rather, one would have to *know* that the trades being reflected in the programs were non-existent in order to understand that the programs themselves were being used to facilitate the Client fraud.  Thus, while it is easy to employ hindsight knowledge and to claim that Mr. Perez knew of the Client fraud simply because the programs he wrote and worked on were used *by others* to facilitate that fraud, this argument actually proves nothing as to Mr. Perez's state of mind.  Rather, there must be affirmative proof that Mr. Perez *knew* that this was the purpose of the programs on which he was asked to work.  In this case, for the time period 1991-2003, that proof is entirely non-existent.

Aside from begging the question, this argument is deficient because it fails to consider the *context* at Madoff Securities in which Mr. Perez was asked to write the programs.  And in this case, context is everything.

### B.   The Context In Which Mr. Perez's Actions and Knowledge Must be Evaluated

Mr. Perez started at Madoff Securities in 1991, as a young recent college graduate.  He had no prior experience in the securities industry, and was hired in a purely technical capacity.  He was not a trader and had no knowledge of how the Firm executed its trades – which was not his job and was, in any event, a zealously guarded secret (for obvious reasons).  Moreover, it is undisputed that although Madoff Securities was engaged in a massive fraud, it had all of the outward appearances of a legitimate – even venerated – business.  This was the genius of the fraud.  Thus, virtually *all* Madoff Securities employees engaged in conduct that in some way furthered the fraud.  However, the fraud was kept from them, through the deceptions of Bernard

Madoff and Frank DiPascali.  Indeed, other employees at the Firm were tasked with performing functions that – with the benefit of hindsight knowledge – were far more obviously fraudulent than were the programming tasks assigned to Mr. Perez, *but the Government accepts that they had no knowledge of the fraud*.  For example, the following innocent employees were unknowingly engaged in certain fraudulent activity on virtually a daily basis:

- Winifer Jackson, who worked at Madoff Securities for *twenty years*, was primarily tasked with retrieving historical prices from Bloomberg – sometimes dating back as far as 30 days or up to a year – which were then used to write customer account statements in order to "make a profit or a loss on a particular trade based on what the customer was requesting or what instructions that Bernie may have given[.]"  (Trial Tr. 916:21-23.) None of this raised her suspicions.  (Trial Tr. 1036:20-1037:2.)

- Semone Anderson, who was employed at Madoff Securities for *thirteen years*, "would have to look up prices in [] Bloomberg" and "would check account trades for the math to make sure that they were calculated properly before the trades were put through." (Trial Tr. 4265:17-22.)  Ms. Anderson also did corrective "work on the [account] statements," sometimes as far as a year back by getting historical information from Bloomberg.  (Trial Tr. 4269:9-21.)  Yet, Ms. Anderson never suspected that the trading activity was fake – rather, she believed that the trades actually happened.  (Trial Tr. 4408:16-25.)

- Charlene White was a key punch operator, employed with the Firm for *fifteen years*, who routinely entered backdated trade information into the system at the instruction of Mr. DiPascali, yet she did not "suspect that things [she was] doing were in some way participating in a giant fraud."  (Trial Tr. 516:3-5.)

- Alethea Mui – who did not testify at trial, but was employed at Madoff Securities for approximately *thirteen years* – was tasked with entering trades into the system that were "virtually always for dates in the past," however, she "never questioned this practice." 3509-2 at 2.  Ms. Mui also worked with an account called "Decisions" whereby the trades for the account would be generated "going back an entire year into the past." 3509-2 at 5.  She also understood that, for other accounts, historical pricing information would be printed for the "last thirty days' and she would "input trades at the prices as they existed on a certain date in this period."  3509-2 at 2.

- Erin Reardon – who, like Ms. Mui, did not testify at trial but who worked at the Firm for over *nineteen years* – was Mr. DiPascali's assistant and, in this role, was instrumental in assisting Mr. DiPascali in setting up new IA clients.  When opening a new client account, she would check prices on Bloomberg, so that Mr. DiPascali could then "pick the price at which each trade was executed . . . . [which was] virtually always between that day's opening price and the current price."  35118-1 at 4.  Furthermore, Ms. Reardon "and her colleagues were told that Madoff purchased huge blocks of stock

*in Europe* at some kind of discount and that [] when DiPascali said that they were getting into the market, he really meant that [Madoff Securities] was selling to clients out of their own inventory." 35118-1 at 4 (emphasis added).

- Robert Cardile – Mr. DiPascali's brother-in-law, who also did not testify at trial but was employed on the 17th floor – informed the Government in prior interviews that "he had a specific discussion with DiPascali about the trading activity that DiPascali supervised at [Madoff Securities].  DiPascali told him that these trades were executed on European exchanges." 3552-2 at 7.  Nevertheless, in assisting Mr. DiPascali, the "reports that Cardile and others on the 17th floor printed out for DiPascali included only United States data" – yet, Mr. Cardile "never considered why they were consulting U.S. market data for trades that had already occurred on European markets.  He did this because DiPascali told him to do so and Cardile trusted DiPascali." 3552-2 at 7.

- Eleanor Squillari, Mr. Madoff's longtime personal secretary, was approached and asked by Mr. Madoff to "take [her] emails to Shana Madoff and get them deleted[.]"  (Trial Tr. 2719:10-13.)  Indeed, Ms. Squillari followed Mr. Madoff's orders because she simply thought "Bernie was being eccentric.  [And] just thought it was part of his personality.  [Ms. Squillari] didn't think anything of it."  (Trial Tr. 2719:18-19.)  In retrospect, Ms. Squillari acknowledged that Mr. Madoff was "extremely slick" and agreed that she was "manipulated by the boss that [she] had long admired."  (Trial Tr. 2651:4-5; 2653:20-23.)

Not only were innocent employees unknowingly engaged in the Client fraud, but the Government has accepted the fact that even those employees who have pled guilty – other than Mr. DiPascali and David Kugel – were nonetheless unaware that the trades were not real or that Madoff Securities was committing the Client fraud.  This is true of Enrica Cotellessa-Pitz, David Friehling, and Craig Kugel – all of whom testified that they believed the trades in the IA business were real.  (*See* Trial Tr. 3098:19-3099:15; 3100:7-11; 3204:11-3205:1; 3969:4-10; 7459:8-7460:8.)  In fact, Ms. Cotellessa-Pitz may have summed it up best in a letter she submitted to the Government prior to her guilty plea, which poignantly states, in part:

> I know you are aware that I was *not a participant* in the Ponzi scheme – I lost all of my life's savings despite many red flags that have been brought to my attention after-the-fact.  And that, I think, is key to my place in all of this.  When I was asked to do things for Bernie or others, I did them.  I accepted the explanations given to me by Bernie because, not only was he my boss, but he was a revered financial professional who, I believed, was clearly smarter than I . . . .

11

> I, too, was duped in unspeakable ways.  You might think that as an intelligent person I *should* have known, *should* have seen, *should* have questioned – but no, unfortunately – I did not . . . .
>
> I believed and trusted in Bernie like so many other people and industry professionals did.  He manipulated them and he manipulated me.

3502-37 (emphasis original).

This is the context in which Mr. Perez's knowledge of the Client fraud must be evaluated – *not* with the benefit of hindsight as to how the fraud was conducted.  Indeed, there is no claim in this case that the fraud was ever directly revealed to Mr. Perez.  Thus, any alleged knowledge he acquired would have to have been reached by *deducing* the fraud from the tasks he was being asked to perform.  But given the context in which he was working, the concept that the Firm was committing a massive Client fraud – and that the trades were not real – would have seemed unfathomable to him, just as it did to everyone else who was not in the innermost circle.  It is patently unfair to hold Mr. Perez to some higher standard, simply because he has been charged by the Government and has incurred its wrath by electing to go to trial.

Indeed, even the SEC audit personnel – who were trained industry professionals whose job it was to root out wrongdoing – missed the fraud in the face of red flags that are obvious in hindsight, and that they acknowledge having seen during their audits.  In fact, they missed the fraud despite the fact that one whistleblower  (Harry Markopolous) laid out the red flags of the Ponzi scheme for them in excruciating detail – a luxury Mr. Perez surely was not afforded.

We say this not to criticize the SEC, but to explain that they too were blinded by Bernard Madoff's stature in the industry, and because the notion that he could be engaged in a massive fraud seemed unfathomable to them as well.  Thus, they ignored the red flags, just as did the rest of the investment community, because the alternative seemed impossible.

The details of the SEC's failings are laid out in an extensive report by the Inspector General.  *See* Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, dated Aug. 31, 2009, available at http://www.sec.gov/news/studies/2009/oig-509.pdf (the "Report").   That Report – which may be considered by the Court in imposing sentence – concludes, in part, that the SEC examiners were in fact blinded by Mr. Madoff's reputation.  For example, the Report describes how "Madoff made efforts during [one] examination to impress and even intimidate the junior examiners from the SEC.  Madoff emphasized his role in the securities industry during the examination . . . . [and when Madoff] attempt[ed] to dictate to the examiners what to focus on in the examination and what documents they could review . . . . [the examiners] reported back to their Assistant Director about the pushback they received from Madoff, [yet] they received no support and were actively discouraged from forcing the issue." *Id.* at 33-34.   Furthermore, when certain SEC examiners were questioned after the Firm's collapse, they responded: (a) "My personal conclusions [from the examination] were that [Bernard Madoff] was a pioneer in the industry," *id.* at 50; (b) "[I]t was fair to say that because of Bernard Madoff's reputation at that time as a large broker-dealer, there may not have been any thought to look into Madoff's operation any further;" *id.*; and (c) "It's certainly true that [Madoff] didn't fit the profile of a Ponzi schemer, at least as we – in the world that we knew then."  *Id.* at 261.  Indeed, the Report is rife with examples of how Mr. Madoff's reputational stature influenced the SEC examiners – *just as it influenced the employees at Madoff Securities and the investment community as a whole.*

Moreover, because of Mr. Madoff's stature and influence in the industry, the SEC staff failed to identify the fraud despite red flags *far more obvious in hindsight* than those available to Mr. Perez.   For example, the Report acknowledges that "[d]uring Madoff's testimony, he

provided evasive answers to important questions, provided some answers that contradicted his previous representations, and provided some information that could have been used to discover that he was operating a Ponzi scheme.  However, the Enforcement staff did not follow-up with respect to any of the information that was relevant to Madoff's Ponzi scheme."  *Id.* at 310.   In fact, SEC staff members reported that "there were so many contradictions to what Bernie said in testimony or [DiPascali] said to what we were told on our exam.  Yet, there was no evidence of effective follow-up by the Enforcement staff on these contradictions."  *Id.* at 323.

Indeed, the Report acknowledges that SEC staff members were fully aware *at the time* that Mr. Madoff was *lying* to them in the course of its audits.  Nevertheless, even when the "Enforcement staff almost immediately caught Madoff in lies and misrepresentations, [they] failed to follow up on inconsistencies . . . . [and when] Madoff provided evasive or contradictory answers to important questions in testimony, they simply accepted as plausible his explanations." *Id.* at 24.  Certain examiners admitted, at the time, that it was "clear that Madoff 'wasn't truthful and [they] knew he was not giving us full information," and "[they] just remember sitting there in the testimony thinking he's lying during the testimony.  It was just remarkable."  *Id.* at 322. Other examiners described Mr. Madoff's "intent [as one] . . . to deceive."  *Id.* at 208.  Yet, "[w]hen the examiners reported that they had caught Madoff in lies, the Assistant Director minimized their concerns, stating 'it could [just] be a matter of semantics.'"  *Id.* at 35.  Or, that they were not "'overly concerned with' the discrepancies as long as Madoff disclosed 'the bulk' of his trading," even though his disclosures were nonetheless "suspicious."  *Id.* at 194-95.

Another examiner admitted after-the-fact that "[h]indsight is obviously 20/20" and although the examiner "vividly remember[s] . . . . that [Mr. Madoff] had lied [during his testimony] . . . it never dawned on [him] that the whole thing could be a sham."  *See* Report, Ex.

421, *available at* http://www.sec.gov/news/studies/2009/oig-509/exhibit-0421.pdf.   Thus, the examiner accepted that he was "duped" by an "industry superstar" who was an "excellent liar, very convincing." *Id.*

As can be seen from the above, not only were scores of employees taken in by Mr. Madoff and Mr. DiPascali, but even the experts at the SEC were taken in despite obvious inconsistencies and falsehoods in their testimony.  That is how effective Mr. Madoff and Mr. DiPascali were in their deception, and how unthinkable the alternative was at the time.

This is the context in which Mr. Perez's state of knowledge must be evaluated.  Thus, it is simply unfair and unpersuasive for the Government to search for evidence of any aspect of the computer programs that – in hindsight – merely look suspicious, and to argue from those red flags that Mr. Perez *must* have had guilty knowledge.  Indeed, if that were true, then the Government could convict *all* of the employees at Madoff Securities who worked on the IA business, as well as the SEC examiners who conducted the audits, because they all "must" have had knowledge of the fraud given the number of red flags that – in hindsight – were "obvious." Of course, that conclusion would be equally as erroneous and unfair for them as it is for Mr. Perez.

In sum, the mere act of writing the programs is insufficient evidence from which to infer Mr. Perez's guilty knowledge of the Client fraud.  Accordingly, the Government's argument to the contrary should be rejected.

### C. The Government Has Not Established that Mr. Perez's Exposure to STMTPro Proves His Knowledge of the Client Fraud

The Government contends that Mr. Perez's exposure to STMTPro, shortly after his arrival at the Firm in 1991, somehow establishes that he knew from that point onward that the

trades in the IA business were not real, and that clients were being defrauded.  This argument is equally unfair and unpersuasive.

It is undisputed that STMTPro was a program that long preceded Mr. Perez's arrival at Madoff Securities, and was just one of the hundreds of programs he encountered upon his arrival at the Firm in 1991.  (*See* Trial Tr. 1675:8-24; 1676:13-23.)  While the program may have been used by others to further the fraud, there was nothing inherently fraudulent about it at all.  For example, as Ms. Jackson testified at trial, she herself presumably used STMTPro to "fix" customer accounts statements and yet she did not find the work suspicious—instead, she viewed fixing customer statements as an innocuous task, and thought she was doing it simply because "a change needed to be made."  (Trial Tr. 1038-39.)   *Indeed, all that STMTPro did was to allow users – most of them innocent employees – to make changes to customer statements.*  There is nothing fraudulent or even suspect about this functionality, which is routine.  In fact, it is hard to imagine any brokerage house or investment firm (or any other business) whose computer system has *no ability* to make any changes to prior statements or to correct errors of any kind.  The notion is simply preposterous.

Moreover, there is simply no proof that Mr. Perez was aware of the frequency by which the program was used, by whom it was used, or what specific entries those users created.  Likewise, there is no proof that Mr. Perez was privy to the fact that others – for example, David Kugel, as noted by the Government – may have used the program improperly.  Thus, the Government's assertion that the program was *used* to create false records is entirely beside the point, since Mr. Perez was not involved in any of those activities.  Accordingly, the existence of STMTPro does not support an inference of criminal knowledge on the part of Mr. Perez.  Moreover, the notion that Mr. Madoff would have left the fraud so easily exposed to a brand new

and lower-level employee, earning less than $40,000 per year at the time, defies reason and common sense.  Accordingly, the Government's argument in reliance on STMTPro should be rejected.

### D. The Government Has Not Established That Mr. Perez's Access to the House 17 Computer System Establishes His Knowledge of the Client Fraud

The Government next claims that Mr. Perez's guilty knowledge has been established, going back to the early 1990's, because Mr. Perez and Mr. O'Hara were the only programmers allowed to "touch the computer programs associated with the IA business."  Govt. Supp. Mem. at 38.  This argument is both factually incorrect and in any event, unpersuasive.

**First**, from 1991-1992, Mr. Perez and Mr. O'Hara were *the only two* AS400 programmers employed at Madoff Securities (aside from Elizabeth Weintraub, who was their supervisor).  Thus, there is nothing at all surprising about their being in charge of the AS400 computers.   Indeed, Mr. Perez was hired – through an employment agency – precisely because he had experience as an AS400 programmer.  Moreover, the third (and only other) AS400 programmer ever hired at Madoff Securities was Haresh Hemrajani, who was hired in 1993, at the time of the migration of the system onto two new AS400 servers to service both House 17 and House 05.  (*See* Trial Tr. 8539-41.)    Thus, there would have been no other computer personnel qualified to maintain the House 17 system, as all of the other approximately thirty employees in the Firm's IT department – such as Kevin Fong – were Stratus or other system programmers who worked primarily on the market making and proprietary trading side of the business.  (*See* Trial Tr. 7183:19-23.)    Accordingly, there was absolutely nothing suspicious about Mr. Perez and Mr. O'Hara being assigned to oversee the AS400 systems – *since that was their job.*

**Second**, as to Mr. Hemrajani, while he worked principally on House 05, he *did* have access to the House 17 system.  Indeed, he testified that he worked on a House 17 CUSIP file program in 1993 (*see* Trial Tr. 8547), and that at the end of every year he created a "calendar kind of file" on House 17.  (*See* Trial Tr. 8548; 8766.)  Furthermore, in prior interviews, Mr. Hemrajani informed the Government that, in connection with the migration of the House 05 and House 17 servers, "[f]or each new program installed on the House 17 server, [he] trained DiPascali . . . on how to use the programs."  *See* 3510-38 at 2.  Thus, it is simply not true that only Mr. Perez and Mr. O'Hara could "touch" the system.  Indeed, to the extent that Mr. Hemrajani was not given other responsibilities in connection with House 17, this was a decision made by Mr. DiPascali, for reasons unknown to Mr. Perez and Mr. O'Hara.  (Tr. Tr. 5268.)

Moreover, as to the incident wherein Mr. Hemrajani was allegedly questioned by Mr. O'Hara as to why he had logged into the system (cited in the Govt. Supp. Mem. at 38), Mr. Hemrajani testified that this occurred between 1995 and 2000, and that he had logged into the system, without authorization, as a favor to a keypunch operator who wanted to advance her career by learning RPG II programming.  (*See* Trial Tr. 8768:8-22.)  Mr. Hemrajani acknowledged that he had not obtained permission from anyone in the computer department to access the system for this purpose. (*See* Trial Tr. 8769:9-13.)   Thus, this incident fails to prove that Mr. Hemrajani was forbidden from accessing the House 17 system for legitimate business purposes – *which he was not.*

In short, the fact that Mr. Perez and Mr. O'Hara were the principal two programmers who oversaw the House 17 computer system is proof of nothing other than their job responsibilities. It does not in any way establish knowledge of the Client fraud.

**E.  The Government Has Not Established that the Lack of Connectivity for House 17 Establishes Mr. Perez's Knowledge of the Client Fraud**

The Government next recycles its argument that because House 17 lacked connectivity to the outside world, it must have been obvious to Mr. Perez that there was no real trading.  This is yet another grossly unfair and unpersuasive argument.

As noted before, the basic computer system for the IA business was in place for *decades* before Mr. Perez joined Madoff Securities.  It was designed by Liz Weintraub – a fact the Government stubbornly refuses to acknowledge – but is established by the evidence.  (*See* Trial Tr. 5598:19-5599:10.)   The system designed by Ms. Weintraub included programs for the generation of essential documents, such as customer statements, trading blotters, and the IA stock record, among other things.  *See id.*  Remarkably, however, the Government in its most recent submission goes so far as to suggest that Ms. Weintraub did not design a single program on House 17.  *See* Govt. Supp. Mem. at 38.  Indeed, this fact was clearly disproven at trial.

For example, Mr. DiPascali described how Mr. Madoff was able to "dodge" the SEC during its 2004 Swanson audit partly due to the fact that certain programs "had already been running in the background of the computer system designed by Liz Weintraub 20 years earlier[.]"  (Trial Tr. 5008:10-15.)  In this regard, Mr. DiPascali explained how he "found out that Liz Weintraub had already created all of these books and records and they were resident somewhere in [the] system[.]"  (Trial Tr. 5012:1-3.)  Furthermore, Mr. DiPascali confirmed that the computer system was set up in such a way that "[e]very time any client . . . did a transaction, a blotter was created, a blotter in a format that was created by Liz Weintraub[.]"  (Trial Tr. 5030:1-4.)   And, although certain employees, like Mr. Hemrajani, did not actually *see* Ms. Weintraub do any programming on her own, this was simply because, by the time he joined the Firm, Ms. Weintraub was fully settled into her role as supervisor and "as a supervisor she

19

delegated the responsibility to others." (Trial Tr. 8773:22-8774:5.)  Indeed, Mr. Perez was also hired as a computer programmer at a time when Ms. Weintraub was a supervisor, and thus he was also obligated to "tak[e] instruction from Liz Weintraub"—in other words, it was simply his job to be "given assignments by those authorized to give him assignments relating to computer programs[.]" (Trial Tr. 4820:16-19; 5599:23-5600:11; 8774:12-23.)

Not only was the system designed long before Mr. Perez joined the Firm, but as Mr. DiPascali acknowledged, the procedure whereby trades were *manually* entered into the computer system *after the fact* also existed well before Mr. Perez started.  (*See* Trial Tr. 5598:13-5599:10.) Indeed, the employees – including Mr. Perez – were routinely told that the trades for the IA business were executed by Mr. Madoff, in bulk, *overseas*.  (*See* Trial Tr. 5670:9-10; 10617:23-10618:14.)  Moreover, James Capezzuto, a Government witness and former Associate Regional Director at the SEC, acknowledged that a "portfolio accounting system" into which trades can be entered manually – *after the fact* – can indeed exist.  (*See* Trial Tr. 3441:9-3442:23.)  Even Nancy Brady, the Government's connectivity expert, acknowledged that there were no legal requirements as to connectivity, and that trades could be manually entered into a portfolio accounting system.  (*See* Trial Tr. 9016:9-9017:16; 9021:18-22.)

Thus, the House 17 computer system – unlike House 05 – *was not depicted at Madoff Securities as being a live trading system*.  Rather, the "cover story" that was uniformly told to the Madoff Securities employees was that Bernard Madoff did his trading for the IA business overseas, and that the trades were entered into the House 17 system *after the fact*.  Even in hindsight, there is absolutely nothing so strange about that cover story, although now of course the whole world knows it to be false.

Accordingly, the Government simply has not (and cannot) establish that Mr. Perez knew that all of the trading was false based simply on the lack of connectivity – a fact known to many employees, including every keypunch operator who entered data, and to Haresh Hemrajani, who worked on the system.  Even Kevin Fong, a Stratus programmer for House 05, understood that House 17 was not connected to Stratus and this fact did not raise his suspicions.  (*See* Trial Tr. 7267:4-10.)  Indeed, if lack of connectivity made the fraud so obvious, then one would have to conclude that Bernard Madoff simply left the fraud out in the open for anyone who worked on House 17 (or its predecessor) to see.  Again, the notion that the fraud was engineered in a manner that was so apparent and transparent is simply preposterous.  Thus, the Court should reject this argument.

### F. Mr. Perez's Involvement with GEN001 in 1994 Does Not Establish His Knowledge of the Client Fraud

The Government next argues that Mr. Perez's guilty knowledge of the Client fraud is proven by the fact that in 1994 – just three years after he arrived at the Firm – he worked on a program known as GEN001.  That program had the capacity to create trading blotters from the Firm's ordinary books and records, and to insert certain random trading detail into those trading blotters, such as trade times.  This argument has been made before, and is unfair and unconvincing.

As we have noted previously, *there was no testimony introduced at trial as to what Mr. Perez was told about why GEN001 was created, why it included the capacity to insert certain random information as the trading activity otherwise contained in the Firm's books and records, who asked for it to be created, and what he was told (if anything) about what it would be used for.*  Indeed, while the Government now tries to link GEN001 to Mr. DiPascali's testimony that certain trading blotters were always running "in the background" as a "safety valve," Mr.

21

DiPascali never claimed that he spoke to Mr. Perez about these blotters, or that the blotters he was describing were even used.  Moreover, Mr. DiPascali confirmed that the basic architecture for the trading blotters was written in the "late 70's," long before Mr. Perez's arrival at the Firm. (*See* Trial Tr. 4973:5-4974:8.)  And, as discussed above, Mr. DiPascali also confirmed that blotters were generated "in a format that was created by Liz Weintraub[.]"  (Trial Tr. 5030:1-4.) Thus, it is simply unfair to conclude that Mr. Perez, after three years at the Firm as a lower-level tech employee, had to have deduced the existence of the Client fraud based on the existence of GEN001.  Accordingly, the Government's argument in this regard should be rejected.

### G. The Government's Claim that Mr. Perez Had Guilty Knowledge of the Client Fraud from the Early 1990's Cannot be Reconciled with Mr. DiPascali's Trial Testimony or His Prior Statements to the Government

As we have argued before, the Government's claim that Mr. Perez had knowledge of the Client fraud since the early 1990's is entirely undermined by Mr. DiPascali's trial testimony (and by his pre-trial statements to the Government) as to the lies he told Mr. Perez and Mr. O'Hara in order manipulate them into performing the programming tasks needed for the Swanson audit in 2004.  These lies demonstrate that Mr. DiPascali – who was clearly in the best position to know – believed at the time that Mr. Perez and Mr. O'Hara *had no knowledge that the trades were not real or that clients were being defrauded.*

We have previously set forth Mr. DiPascali's cross-examination testimony on this point at pages 8-11 of our Memorandum in Support of George Perez's Motions for a New Trial and for a Judgment of Acquittal, dated April 15, 2014.  We have also set forth Mr. DiPascali's direct testimony and prior debriefing on this subject at pages 7-11 of our Reply Sentencing Memorandum on Behalf of George Perez, dated July 25, 2014.   For ease of reference, we attach those pages of our prior briefs to this memorandum as Exhibits A and B, respectively, and incorporate those excerpts by reference here.

We respectfully submit that a fair reading of those excerpts establishes beyond any doubt that it was Mr. DiPascali's understanding – as of 2004 – that Mr. Perez and Mr. O'Hara were *unknowing* participants in the Client fraud.  There is no other explanation for Mr. DiPascali's detailed lies to them, or for the questions that Mr. Perez and Mr. O'Hara asked of him at that time.  For example, when he explained to them that additional trading detail needed to be added to the trading blotters for the Swanson audit, according to Mr. DiPascali:  "Naturally, O'HARA and PEREZ inquired where that specific data was housed and how it could be obtained so they could 'fill out' the House 17 trade blotters."  3501-46 at 3.  Other questions they asked, as set forth in Exhibit B, further demonstrate their belief at the time that the trading *was most certainly real*, just as Mr. DiPascali had always claimed it to be.  In fact, as the Court is aware, Mr. DiPascali explicitly acknowledged at trial that his intention in lying to both Mr. Perez and Mr. O'Hara was "*to have them participate in what [DiPascali] knew to be a massive fraud without them knowing it.*"  (Trial Tr. 5668:2-6.)  While the Government studiously ignores this testimony in its post-trial submissions, the simple fact is that this testimony *cannot be squared with the Government's theory that Mr. Perez and Mr. O'Hara were knowing participants in the Client fraud since the early 1990's.*

In light of this trial testimony and Mr. DiPascali's prior statements, the Government's stubborn insistence that Mr. Perez was a knowing conspirator in the Client fraud from 1991-2003 – despite compelling evidence to the contrary from its own star witness – is simply unconscionable.  Put another way, Mr. DiPascali's contemporaneous knowledge on this subject is far more revealing of the truth than is the Government's *after-the-fact* and cynical speculation based on its review of computer code from 1991 and 1994.    Indeed, as one of the two masterminds of the fraud, Mr. DiPascali surely was in the best position to know who his co-

conspirators were, *and who they were not.* Likewise, Bernard Madoff's own lies to Mr. Perez and Mr. O'Hara at the meeting in September 2006 show that *he, as well,* did not believe them to be co-conspirators or to know about the Client fraud at that time. (*See* Trial Tr. 5685-87; 6140-41.) Surely, evidence of Mr. Madoff's mind-set on the subject is more reliable than is the Government's rank speculation, unsupported by any evidence.

For all of these reasons, we respectfully submit that the Government has failed to sustain its burden of proof as to Mr. Perez's alleged knowledge of the fraud between 1991 and 2003. Indeed, the evidence is overwhelmingly to the contrary.

## IV.   THE GOVERNMENT HAS NOT ESTABLISHED THAT MR. PEREZ LEARNED OF THE CLIENT FRAUD IN 2004

Given the lack of substance to the Government's argument as to Mr. Perez's alleged knowledge of the Client fraud during the time period 1991-2003, it is no wonder that the Government reverts to a fallback position *that cuts 12 years off of the criminal conduct alleged.* Specifically, the Government claims, in the alternative, that Mr. Perez became aware of the Client fraud at least by 2004, during the Swanson SEC audit.

In support of this argument, the Government relies on (1) the statements made to Mr. Perez and Mr. O'Hara by Mr. DiPascali during the Swanson audit; (2) the programs that were written for this audit; and (3) certain conversations that occurred with alleged co-conspirators, as described by Mr. DiPascali. These arguments are all baseless.

### A.   Mr. DiPascali's Statements During the Swanson Audit Do Not Establish Knowledge of the Client Fraud

In support of its argument that Mr. DiPascali's statements alone establish Mr. Perez's knowledge of the Client fraud, the Government resorts to mischaracterizing Mr. DiPascali's testimony and his pre-trial debriefings. When the actual statements by Mr. DiPascali are examined – as opposed to the Government's rewriting of those statements to suit its own

24

purposes – it is clear that those statements do not establish Mr. Perez's knowledge of the Client

fraud.

In support of its argument in this regard, the Government summarizes Mr. DiPascali's

lies to Mr. Perez and Mr. O'Hara as follows:

> But even assuming that they had no awareness of the fraud prior to 2004,
> O'Hara and Perez's agreement to "fudge" – *i.e.*, fabricate – trading records
> for the SEC demonstrate that they are liable for forfeiture from that point
> on.  Even crediting their argument (which lacks any factual basis) that
> they fully believed DiPascali's lies, DiPascali (a) told them that the
> records should be falsified through the insertion of entirely fake trading
> data, and (b) told them that the purpose of the SEC's audit was to make
> sure that the firm was not cheating its customers. (Tr. at 5033-37, 5669).
> It follows that by falsifying documents the SEC relied upon to ensure that
> Madoff Securities wasn't cheating its customers, O'Hara and Perez could
> reasonably foresee that Madoff Securities *was* cheating its customers.

Govt. Supp. Mem. at 44-45.  A close analysis of this paragraph demonstrates the weakness of the

Government's position, and its own willingness to "fudge" the record.

**First,** it is simply not the case that Mr. DiPascali ever told them told them that "the

records should be falsified through the insertion of entirely fake trading data."  Indeed, this is a

grossly unfair characterization of Mr. DiPascali's testimony and prior statements on this point.

As memorialized in one of those debriefings, annexed as a part of Exhibit B, what DiPascali

actually admitted saying to them was the following:

> When it came to creating the information that the trade blotters would
> contain, [DiPascali] faced an even larger hurdle in convincing O'HARA
> and PEREZ to help.  Yet, [DiPascali] simply explained that the House 17
> records of the IA business were internal records and their present form,
> though suitable for their purposes, was not going to satisfy outside
> auditors.  MADOFF was going to need to provide them with more
> specifics about the trading activity. Naturally, O'HARA and PEREZ
> inquired where that specific data was housed and how it could be obtained
> so they could "fill out" the House 17 trade blotters.  While reminding
> O'HARA and PEREZ that the trading for the IA business occurred
> "overseas", [DiPascali] suggested that for the purposes of these expected
> audits, it would be inefficient to attempt to obtain the specific trading
> details from these overseas entities. [DiPascali] reminded O'HARA and

> PEREZ the nature of the split strike strategy, in which large blocks of securities were purchased in a piecemeal fashion for Clients, necessarily resulted in a complicated and voluminous record of trading that would unnecessarily complicate matters when all the auditors were really trying to do was verify MADOFF was not cheating customers by charging them more than the customary mark up.  O'HARA and PEREZ agreed with [DiPascali] MADOFF was certainly not doing that.
>
> * * *
>
> They would simply provide a representative picture of each trade in their blotters. As long as the data reinforced the overall picture that MADOFF was not cheating his customers on the trades, i.e. each small trade averaged a certain price in line with the quoted prices at the time, generating an average mark up in line with the industry standard (about $.04 per share), that was all that was important.

Thus, he simply did not use words like "fake" or "false."  Indeed, Mr. DiPascali testified at trial that he never used the word "fake" in his entire career at Madoff Securities (*see* Trial Tr. 7061:15-17), although the Government sprinkles that term in every sentence it can, in order to suggest (falsely) that the fraud was openly discussed at Madoff Securities.

In reality, as shown by the trial evidence, the fraud was a zealously guarded secret, and Mr. DiPascali himself acknowledged that it "was of paramount importance to minimize the number of people who knew about the fraud[.]"  (Trial Tr. 5547:11-13.)  Thus, rather than use any terminology that might have tipped Mr. Perez or Mr. O'Hara off as to the Client fraud, Mr. DiPascali engaged in a diabolical effort to persuade them that the information in the blotters that really mattered to the auditors *was entirely true,* and that the detail being randomized was *immaterial* to the audit and could be shown as a mere "representative picture of the trades." (Trial Tr. 5669:13-18.)  Moreover, since Mr. Perez and Mr. O'Hara were not present for *any* conversations with *any* auditors, they had no idea how this information was being depicted to the auditors by Mr. DiPascali.  In short, the evidence simply does not support the Government's claim that – even if believed – Mr. DiPascali's lies had to have put Mr. Perez and Mr. O'Hara on

notice of the Client fraud being hidden from the auditors.  To the contrary, *Mr. DiPascali took great pains to hide this very fact from them.*

**Second**, the Government resorts to a non-sequitur when it claims that Mr. DiPascali's statement – to the effect that all the auditors cared about was whether Madoff Securities was cheating its customers by overcharging them on commissions – should somehow have led Mr. Perez and Mr. O'Hara to deduce "that Madoff Securities was cheating its customers."  In fact, the key point of the lies Mr. DiPascali told was to persuade Mr. Perez and Mr. O'Hara that Madoff Securities *was not cheating its customers, as he expressly told them.*  As Mr. DiPascali told the Government: "O'Hara and Perez agreed with [DiPascali that] Madoff was certainly not doing that [i.e., cheating its customers]." 3501-46 at 3.  Thus, the Government's argument in this regard defies all logic.  It should be rejected.

**Third,** the Government's reliance on the word "fudged" is overplayed.  While it is true that Mr. DiPascali did use that term at trial in describing his conversation with Mr. Perez and Mr. O'Hara concerning the Swanson audit, *it appears nowhere in his far more detailed pre-trial debriefing on this very conversation*. *See* Ex. B.  Moreover, Mr. DiPascali confirmed at trial that he tried to make them as "comfortable" as possible with the work they were being asked to perform.  (*See* Trial Tr. 5668-69.)  Thus, it is highly unlikely that he actually used a term such as that at the time.  Moreover, given the number of lies that Mr. DiPascali told to employees throughout his 40 year career at Madoff Securities, it is absurd to suggest that he could reliably remember the exact word he used in lying to Mr. Perez and Mr. O'Hara in that conversation.

**Fourth**, the Court should reject out of hand the Government's argument that there is "no factual basis" for Mr. Perez and Mr. O'Hara's contention that they believed Mr. DiPascali's lies.  To the contrary, the record is clear that (1) Mr. DiPascali was their boss; (2) Mr. DiPascali was

one of the most gifted liars in history; (3) Mr. DiPascali's intention was that they believe his lies; and (4) Mr. DiPascali successfully fooled other long-time Madoff Securities employees, as well as some of the smartest regulators and sophisticated investors in the world for more than 40 years.   This is a more-than-sufficient basis upon which to conclude that Mr. Perez and Mr. O'Hara believed Mr. DiPascali's lies.  Indeed, short of an x-ray of their minds at the time, it is as compelling a form of proof as is possible.  Moreover, it is the Government's burden to prove that they *did not* believe Mr. DiPascali's lies, not the other way around.

For all of these reasons, the instructions given to them by Mr. DiPascali during the Swanson audit *do not in any way* establish their knowledge of the Client fraud, as claimed by the Government.

### B.  The Programs Themselves Do Not Establish Knowledge of the Client Fraud

The Government next argues that the programs written for the Swanson audit, in and of themselves, establish knowledge of the Client fraud.  This argument should be rejected.

**First**, the Government's description of these programs as "generating fake books and records solely for the purpose of responding to the SEC audit," Govt. Supp. Mem. at 45, may be true in hindsight, but does not in any way constitute proof of knowledge *at the time.*

**Second**, the fact that the programs make reference to an "audit," cited by the Government in its brief, *see id.,* is proof of nothing other than the undisputed fact that Mr. Perez and Mr. O'Hara were told by Mr. DiPascali that there was an audit being conducted by the SEC.  Indeed, their reference to the audit shows only that they did not think there was any reason to hide this fact in the computer comments they wrote.

**Third**, the fact that the programs depicted the trades as being in "RVP/DVP" format was simply done at the direction of Mr. DiPascali (as were all of the features of the programming).

28

Mr. Perez was a computer programmer, *and not a trader or an investment manager*.   Thus, there is no evidence that he had any clue what RVP/DVP even meant, let alone that it was being used to further a massive fraud.

**Fourth**, the existence of a "London Transaction Report," also cited by the Government, *see id.,* is not proof from which knowledge of the Client fraud may be inferred, *because Mr. Perez and Mr. O'Hara were expressly told (like most other Madoff Securities employees), that the trades were actually being executed overseas.*   Thus, there would have been nothing suspicious about creating a report as to this trading, which Mr. DiPascali assured them was actually taking place.

For all of these reasons, the existence of the programs themselves does not establish Mr. Perez's knowledge of the Client fraud.

### C. Mr. Perez's Alleged Conversations With Co-Conspirators Do Not Establish Knowledge of the Client Fraud as of 2004

The Government also argues that Mr. Perez's knowledge of the Client fraud as of 2004 is established through his alleged conversations with co-conspirators. *See* Govt. Supp. Mem. at 46-47.  This argument is unavailing for a very simple reason: all of the conversations relied on by the Government, *see id.*, took place in 2005, *long after the Swanson audit was over.*  Thus, they cannot possibly support a finding of knowledge of the Client fraud *in 2004.*   Rather, these alleged conversations occurred during the second SEC audit in March 2005 or during the KPMG audit later in 2005.  (*See* Trial Tr. 5132.)

All of these alleged conversations rely entirely on the uncorroborated word of Mr. DiPascali.  Given Mr. DiPascali's status as a convicted perjurer and lifetime con artist, it would be grossly unfair to base a critical judgment as to Mr. Perez's life on Mr. DiPascali's credibility alone, for reasons we have explained before.   Moreover, the notion that Mr. Perez and Mr.

O'Hara were supposedly knowing participants in the Client fraud prior to 2006 is undermined by Mr. DiPascali's statements about conversations with them *in 2006, after the final SEC audit.* For example, Mr. DiPascali admitted that "[u]p until the time that Jerry O'Hara and George Perez confronted Bernard Madoff in late 2006 about the unusual work they had been doing for Madoff's IA business, [he] gave O'Hara and Perez various reasons for why they were doing special projects, including audits of the IA business."  (Trial Tr. 5676:10-14.)   Further, Mr. DiPascali told the Government in an interview that, in the summer of 2006 after some drinks at a Greek restaurant, "they asked [him] directly if the IA business was legitimate."  3501-41 at 1-2. According to Mr. DiPascali, he "laughed off the suggestion."  (Trial Tr. 10617:23-10618:14.) Indeed, Mr. DiPascali testified that, in response to the same question, he "blew them off, as [if to say] what, are you ridiculous?"  (Trial Tr. 5277:17-5278:8.)

In light of these conversations, the Government has simply failed to prove that at any time prior to 2006, Mr. Perez became aware that he was participating in the Client fraud.  And of course, after 2006, he refused to participate in any projects involving randomization whatsoever, as we have previously explained at length.

Moreover, while the Government notes that the counterparties used for the KPMG audit in 2005 were different from the SEC audit in 2004, it must be borne in mind that the concept of a "counterparty" – from Mr. Perez and Mr. O'Hara's perspective – was simply a field of data to be populated, as they were just the computer programmers writing the code.  They were not forensic examiners engaging in a trade-by-trade comparison from the prior year's audit.  Moreover, they were never told why one set of data was populated with "domestic" counterparties, and another was populated with "foreign" counterparties, let alone that this was being done as part of a fraud. Indeed, to the extent that the audit tasks became suspicious—this is *exactly* why Mr. Perez and

Mr. O'Hara became uncomfortable and revolted later in 2006, after all of the audits were done, and refused to work on the "special programs" anymore, as we have set forth in prior submissions.

For all of these reasons, the Government has not met its burden of proof as to foreseeable loss and forfeiture.  Accordingly, its Preliminary Order should be rejected in its entirety, as should its theory of foreseeable loss under the sentencing guidelines.

## V.      THE REMAINDER OF THE GOVERNMENT'S ARGUMENTS LACK MERIT

As to the remainder of the Government's arguments against Mr. Perez, we rely principally on our prior submission as to forfeiture.  However, we do note the following additional points, in response to the Government's Supplemental Submission.

### A.  Monies Earned as Salary from Madoff Securities

The Government persists in its contention that every penny in salary that Mr. Perez earned from 1991-2008 is subject to forfeiture as the proceeds of the fraud.  *See* Govt. Supp. Mem. at 52-56.  In support of this theory, the Government explains how funds from the IA business were used to "prop up" the market making and proprietary trading side of the business, making every penny that the Firm paid in salary to anyone the "proceeds" of the fraud.

The flaw in this analysis is that these funds are only subject to forfeiture *if it was known or reasonably foreseeable to Mr. Perez that his entire salary was the proceeds of the fraud he had joined.  See* Section (I)(A), *supra.*   This has not been proven by any stretch of the imagination, for all of the reasons we have stated before.  Indeed, the Government has not proven that Mr. Perez knew or reasonably foresaw that *any* portion of his salary as being the proceeds of fraudulent activity in which he was engaged.  Moreover, to the extent that monies from the IA business were used to prop up the other side of Madoff Securities, this would have been totally unknown to Mr. Perez at the time, since he was not privy to the Firm's accounting

records or practices.  Thus, there would have been no conceivable way for him to have known or have foreseen that the monies he earned as salary for working on the market making and proprietary trading side of the business were the proceeds of fraud.

### B.  Monies Earned as Salary from the SIPA Trustee

The Government also persists in its bizarre contention that monies earned as salary from the SIPA Trustee after the demise of the Firm are subject to forfeiture.  This argument is incorrect in the first instance because these funds were plainly received *after* the conspiracy charged in the indictment ended (December 2008), and because these salaries were not paid with funds from Madoff Securities.  Thus, they simply cannot constitute "proceeds" of the fraud charged in the Indictment.  Put another way, Mr. Perez was not charged or convicted of defrauding the SIPA Trustee.

Moreover, the Government's contention that Mr. Perez "continued [his] participation in the conspiracy after the appointment of the trustee," based on one alleged conversation with Mr. Hemrajani, is entirely off-base.  *See* Govt. Supp. Mem. pp. 58-59.  Putting aside the fact that the conspiracy charged had already ended, the conversation relied on by the Government is entirely innocuous.  According to Mr. Hemrajani's testimony, Mr. Perez simply told Mr. Hemrajani that that he (Mr. Perez) "thought he was the more appropriate person to provide documents" to the Trustee because he was more familiar with House 17.  (Trial Tr. 8792:24-8794:4.)  Mr. Hemrajani disagreed, and Mr. Perez "said nothing in response," (Trial Tr. 8793:13), but Mr. Hemrajani interpreted his "facial expression" as "being unhappy."  (Trial Tr. 8793:13-25.)

For the Government to suggest that this conduct amounts to attempted obstruction of the investigation, or to continued conspiratorial conduct, is simply ridiculous.  This allegation is particularly galling given that it was Mr. Perez who, in the first instance, revealed the scope of

the fraud to representatives from AlixPartners.  Specifically, Matthew Cohen, a Managing Director of AlixPartners, confirmed at trial that, when Mr. DiPascali was asked to identify the number of customers in the IA business, Mr. DiPascali tried to cover up the fraud by handing the SEC a list of "20-some accounts"—indeed, he lied and said it was only "24 plus some friends and family."  (Trial Tr. 671-672.)  On the other hand, it was Mr. Perez who showed Mr. Cohen for the first time in December 2008 the file containing *all* of the Firm's clients (the A.Name file), which is how investigators learned that there were thousands of IA customers.  (*See* Trial Tr. at 672.)  Thus, this argument should be rejected.[2]

### C.  There is No Possible Basis for an Obstruction of Justice Enhancement

As to this point, we join in the arguments made by defense counsel on behalf of JoAnn Crupi regarding the Government's failure to provide adequate legal justification to increase the offense level for obstruction of justice pursuant to U.S.S.G. § 3C1.1. *See* Defendant Joann Crupi's Objections to the Government's Supplemental Submission on Forfeiture and Sentencing, dated September 12, 2014, Section V.  Specifically, the Government has failed to show that the supposedly obstructive conduct was purposefully calculated and likely to thwart the investigation or prosecution of the *same* offenses of conviction at issue here. *See* U.S.S.G. § 3C1.1.  For example, as to the offenses relating to the obstruction of the SEC specifically, this was not at all what the SEC was investigating during its audits.  Moreover, as to the SEC audits themselves, the Government has not in any way established what the SEC was actually investigating in these

---

[2]    Additionally, the Government's attempt to resurrect the issue of documents that Mr. Perez printed out while working for the SIPA Trustee, which evidence was precluded by the Court on our motion *in limine*, is simply absurd.  *See* Govt. Supp. Mem. at 59, fn. 18.  As explained in our letter to the Court in support of our *in limine* motion, dated September 30, 2013, Mr. Perez *did* have access to the House 17 system, and printed these programs to use to show prospective future employers. *See United States v. Bonventre et al.*, 10-CR-228 (LTS), Docket # 464.  Thus, this is just more of the Government's grasping at straws.

audits.  For example, as to the Swanson audit, the Report specifies that the audit's purpose was *only* "to determine whether Madoff [wa]s *front-running* impending Madoff Securities block transactions through his Madoff-managed fund accounts." *See* Report at 92 (emphasis added).  Certainly, an investigation into front-running is not the same as a Ponzi scheme investigation, and thus *cannot* be the same as the investigation of the offenses of conviction.  Notably, the Report itself concludes that one of the reasons the Ponzi scheme was not uncovered during the 2004 audit was because "the Associate Director stated he focused on front-running because 'that was the area of expertise for my crew.'" *See* Report at 30.  Indeed, even the SEC acknowledges that front-running is unlike a Ponzi scheme, as it requires – even from an examination standpoint – different areas of expertise.  As to the other SEC audits, the Government has not established what their purposes were.  Accordingly, the Government's request for an obstruction enhancement should be denied.

### D.  There is No Possible Basis to Forfeit Mr. Perez's Home

The Government persists in its attempt to forfeit Mr. Perez's home, where his wife and children live, on the theory that he used his Madoff Securities salary to make mortgage payments.  This argument should be rejected for the reasons set forth in our Memorandum in Opposition to the Government's Preliminary Order of Forfeiture, dated July 17, 2014, at pages 12-14.   These reasons include the fact that Mr. Perez could not have known or reasonably foreseen that his entire salary from 2002-2009 was the proceeds of the fraud.   Moreover, the total equity payments made during that time period were only $36,572.37, and there is no conceivable basis to forfeit the home in order to recoup monies paid towards interest, taxes and homeowner's insurance.  Thus, this is simply more overreaching on the part of the Government.

## VI.    WE RESERVE OUR RIGHT TO SEEK A HEARING

Based on the evidence the Government has submitted, we believe that no hearing is necessary as the Government has failed to make out a prima facie case regarding foreseeable loss and forfeiture.  However, in the event that the Court finds that a prima facie case has been established, we reserve our right to seek a hearing in that regard. [3]

## CONCLUSION

The Government has now had over five years to investigate Mr. Perez.  It has turned over every rock, down to the smallest pebble.  It has interviewed hundreds of witnesses, many dozens of times.  Yet, after all of this effort, the proof of its sweeping narrative against Mr. Perez – vilifying him as a corrupt computer programmer since the early 1990's – is simply non-existent.  Indeed, in its zeal to demonize Mr. Perez, it has taken innocuous events and argued them as proof of guilt and, far worse, has taken significant exculpatory evidence and argued that as proof of guilt as well.  In our view, this approach by the Government has been lacking in balance and fairness, and has seemed at times to be a search for a conviction and punishment, rather than a search for the truth.

And so, our last resort is with the Court.  We have every confidence that Your Honor has reviewed the evidence meticulously, and that the Court has every intention to ensure that justice is done in this case, as it has stated.  Indeed, justice is all that we can respectfully, and rightfully, request for Mr. Perez and his family.  Accordingly, for all of the foregoing reasons we have stated in this memorandum and in our prior submissions – as well as the arguments made by Mr. Perez's co-defendants, in which we join to the extent applicable – we object to the Government's Preliminary Order and submit that the Government's application should be denied in its entirety.

---

[3]    We also note for the record that this submission is without prejudice to any and all claims that Jeanette Perez or any other individual may assert in connection with any ancillary proceeding the Court may hold pursuant to Fed. R. Crim. Pro. 32.2(c).

Dated: New York, New York
      September 12, 2014

                          Respectfully submitted,

                                   /s/

                          Larry H. Krantz, Esq.
                          Kimberly A. Yuhas, Esq.
                          **Krantz and Berman LLP**
                          747 Third Avenue, 32nd Floor
                          New York, NY 10017
                          (212) 661-2414
                          *Attorneys for Defendant George Perez*