*U.S. Department of Justice*

*United States Attorney
Southern District of New York*

*The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007*

November 3, 2014

BY ECF

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street, Suite 1320
New York, New York 10007

    Re:    *United States v. Daniel Bonventre, et al.*
              **No. S10 10 Cr. 228 (LTS)**

Dear Judge Swain:

    We write to respond to several questions posed by the Court at the hearing on October 27, 2014.

**I.    The Chase '703 Account**

    At the hearing, in response to a question from the Court, the Government took the position that a review of the records associated with the JPMorgan Chase '703 account indicate "the source of wires going in [and the] recipient[s] of wires going out; so you can[] see from the face of those documents that money was or wasn't being run through investment vehicles." (10/27/2014 Tr. at 86). In other words, it would have been clear to Daniel Bonventre – or anyone else with intimate familiarity with the '703 account records, such as Annette Bongiorno and JoAnn Crupi – that client redemptions were being funded by other clients' investments. Counsel for Bonventre took the opposite view, (*see id.*), and the Court asked the parties to provide the Court with documentary evidence on this point, (*see id.* at 86-87).

    In the Government's view, the documentary evidence is clear that there were no transfers into or out of the '703 account that could be confused for securities transactions, let alone in the amounts represented to Madoff Securities clients. As the Court is aware, Madoff Securities personnel maintained a number of different kinds of records reflecting the activity in the '703

account.  For example, for October 2004,[1] the firm maintained at least the following four different kinds of records:

1. The so-called daily pad, on which JoAnn Crupi would generally track wires and checks into and out of the '703 account, (*see* Tr. at 931-39).  Attached as Exhibit A, for example, is a copy of the October 29, 2004 daily pad (admitted into evidence as GX 105-c43A, pages 419-420),[2] which depicts a total balance of approximately $770,691,000 – recall that the figures on the daily pad were rounded to the thousand, (*see* Tr. at 935 (testimony of Winnifer Jackson, agreeing that "there will always be three zeroes missing"))).  The document shows incoming and outgoing wires by amount and name of investment advisory account customer or group, *e.g.*, $20 million in from "Kingate – Euro," one of the feeder funds, and $3.9 million to "Picower" scheduled to go out on 11/3.

2. Daily index cards, maintained by Crupi and reviewed by Bonventre, showing account activity and balances, (*see* Tr. at 758-59, 3963, 9949).  Attached as Exhibit B is a copy of the index cards covering October and early November 2004 (admitted into evidence as GX 105-c61, at pages 1-2).  These documents show, for example, the same $20 million in from Kingate ("+20000000.00 KINGATE," on page 2, in the column labelled "TRANS," six handwritten lines down) and the same $3.9 million out to Picower ("-3900000.00 PICOWER," on page 2, in the column labelled "WIRE," 13 handwritten lines down).  Bonventre has initialed the document in multiple places, such as next to the word "BALANCE" on the first page, and in the "COMMENTS" section on the second page.

3. Monthly reconciliations.  Attached as Exhibit C is a copy of the October 2004 monthly reconciliation (admitted into evidence as GX 105-a117), which shows on page 3 an ending balance for the '703 account of $770,691,742.83 – a figure that ties to the penny to the October 29, 2004 balance on the daily index card (at page 2) and

---

[1]   We selected October 2004 because that is a month for which all four types of account records are available.  In particular, the Government was only able to recover actual bank records for the '703 account going back seven years (to approximately 2002), consistent with records retention requirements.  But there is every reason to believe that the records for earlier years are the same, and in fact, the internal Madoff Securities records are largely identical.  For example, attached as Exhibit F, G, and H, respectively, are the daily pad (GX 105-c35, pp. 454), index card (GX 105-c58, p. 137), and monthly reconciliation (GX 105-a121, pp. 278-281), for July 1995.

[2]   October 29, 2004, was a Friday, and so was the last business day of that month.

approximately to the $770,691,000 balance listed on the same day's daily pad.[3] Bonventre's handwriting appears on this document at, for example, page 3, where he has noted a $926.95 adjustment, (*see* Tr. at 3814, 9830).

4. The '703 account statements themselves, which were maintained in Bonventre's office, along with copies of cancelled checks from the account, (*see* Tr. at 4964). Attached as Exhibits D and E are copies of the October and November 2004 account statements for the '703 account (admitted into evidence as GX 206-7). The account statements show the same transaction activity as is reflected in the other Madoff Securities documents. For example, the $20 million transfer in from Kingate on October 29 shows up on the second-to-last page of the October 2004 statement (bates-stamped JPMSAB0001935), and contains the following notation about the transfer: "FEDWIRE CREDIT," "B/O KINGATE EURO FUND LTD." Similarly, the $3.9 million out to Picower on November 3, 2004, shows up on page 9 of the November statement (bates-stamped JPMSAB0001848), with the notation "FEDWIRE DEBIT" "A/C: JEFFRY M. & BARBARA PICOWER FDN." Indeed, virtually every wire transfer is associated specifically with the name of the relevant investment advisory client – including Madoff Securities employees. (*See, e.g.*, Ex. E at 36-37 (JPMSAB0001865-66 (transfers to Irwin Lipkin and Annette Bongiorno)). And in many cases, the '703 account records refers to the investment advisory client not only by name, but specifically by Madoff Securities account number. (*See e.g.*,

---

[3]   Unlike the daily pad and the index cards, the monthly reconciliation did not capture every transaction; rather, it noted principally the outstanding customer checks that had been written against the '703 account but had not yet been cashed. (*See, e.g.,* GX 105-a117 at p. 1 ("Out checks," listing outstanding checks by customer name); *see also* Tr. at 9563 ("the first thing you would do when you try to reconcile an account this size would be to make sure that you understood the outstanding checks that were involved, checks that you had written to people who had not yet cashed them. And you would need to know what that number was in order to balance to the bank. In other words, you know you wrote a check, but if that check wasn't cashed, then in your reconciliation you have to make a provision for that difference, the difference between you and the bank")).

> Ex. D at p. 38 (JPMSAB0001922 ($12 million transfer to investment advisory client Sterling Mets L.P., with reference to account number 1KW247-3)). [4]

Thus, the documentary evidence is clear that (a) funds from the '703 account were not in fact invested in securities; (b) the '703 account records did not show any transactions in securities, but did plainly show money coming in from and going out to investment advisory customers by name; and (c) Bonventre reviewed carefully numerous internal Madoff Securities documents that specifically associated the transactions in the '703 account with individual investment advisory clients. There is simply no credible argument that anyone with Bonventre's level of familiarity with the operations of Madoff Securities could have believed that any of the activity in the '703 account was associated with the purchase or sale of securities.

Indeed, during his trial testimony, Bonventre essentially acknowledged that there was nothing that could be confused with a securities transactions in the '703 account records. Rather, he attempted to explain that fact away:

> Q. And what kind of entries would you see on the account as you went through this reconciliation; what would you actually see?

---

[4] In addition to client transactions, the '703 account statements reflect various cash management transactions, such as overnight sweeps, certificates of deposit, commercial paper, so-called Nassau deposits, and the like, (*see, e.g.,* Tr. at 3604 (testimony of Walter Teletnick: "There were investments . . . money was invested in CDs, commercial papers, and I believe there was another one called – we called it the sweep account")) – none of which could be confused for investments in securities, let alone through a European broker. That is especially true for Bonventre, who was not only the Director of Operations for an SEC-registered broker-dealer, but who personally set up many of the cash management transactions in the '703 account, (*see* Tr. at 3605-06 (Teletnick: "They would sweep it out of the account into a – like a commercial paper also, and then in the morning, they'd give it back to you. That was like an automatic thing which was set up by Dan Bonventre. . . . [H]e had talked to the bank on it because he noticed that there was money that was sitting there that wasn't getting any interest on. So I don't know who he talked to there, but he had told me that they're going to open up a sweep account, and he explained to me how it worked.")), and who was the only meaningful point of contact between Madoff Securities and JPMorgan for decades, (*see* Tr. at 6346-47 (testimony of JPMorgan relationship manager Richard Cassa)).

Because certain of the funds in the '703 account were held in commercial paper or other cash management devices, the balances on the '703 demand deposit account do not match the balances on the internal Madoff Securities paperwork, which treat all of the cash equivalents as cash. In his monthly reconciliation, Bonventre made an adjustment to the balance for interest income from these various cash management transactions. (S*ee, e.g.,* GX 105-a117, at page 3 (noting "interest income")).

A. The statement that came from the bank had debits and credits, and the check writing facility that the IA business had had the same thing on the opposite side.

Q. Could you see checks and wires coming in and going out?

A. Yes.

Q. Could you tell from where the money was coming in?

A. There were descriptions attached to some of the data that came out of the 17th floor, and there was some descriptions on the statements that the bank sent you, but it was not uniform. I mean, whoever was punching – at least on the bank side, whoever was punching in that data from whatever they were looking at, you know, it wasn't uniform as to what it might say.

Q. And what about information on monies going out, what could you see from the tasks that you were performing?

A. You would see checks going out and you would see wires going out, and they would have some descriptions attached to them, and the same thing on the incoming side. The deposits might just show deposits. It might not say how many checks were involved or how many or who were on those checks, that part would be missing.

Q. Now, could you conclude from working with these bank statements that no real trades in the IA business were being made?

A. No.

Q. When you were working with these bank accounts or the bank statements, rather, did you believe you were seeing the entire picture of Mr. Madoff's business?

A. No.

Q. Did you believe that investments in stocks in Mr. Madoff's investment advisory business necessarily had to come from this account?

A. No.

Q. Explain.

> A. Well, he claimed that he was sending orders to Europe and executing these trades through Barclays Bank in Europe. Now, when you have a clearing arrangement through someone else, you have to put up capital in order to do that. So if your activities, say, has $10 million of activity on a daily basis or somewhere near that number, that bank might ask you to put up $15 million to handle that activity. They're not going to allow you to put orders, place orders with them, have them execute the orders only to find out you can't pay for it. So they ask you to put the money upfront. When you clear through someone else, you have to put up that margin. You have to put up that capital in order to settle those trades. Now, you may have $10 million in activity, but there may be $7 million on one side, $3 million on the other, and the net difference is the $4 million and they have plenty of capital to handle that settlement, and this goes on and on and on. The broker-dealer business had similar arrangements with different companies, and we put up capital to handle that settlement. There was one arrangement we had with a bank in Canada called CIBC, where when we initially opened the account, we put up $4 million. And we never, in the five or six years that we were doing business before the collapse of Madoff, we never had one settlement. They always used the capital that we had, and as a result of the fact that the activity was profitable at the end in December of 2008, that account was worth $11 million, and we never once had to replenish that money and they never sent us any dollars.
>
> Q. So for the trading, the trading was drawn, so to speak, or based on the money in that account that was already there; is that right?
>
> A. It was already there, yes.

(Tr. at 9559-9562).

Thus, the Government believes it is undisputed that Bonventre recognized that there were no transfers to or from brokers representing the purchase or sale of securities. Rather, he attempted to minimize that fact by claiming that brokers maintain cash on hand that they credit or debit as necessary, and that he assumed Barclays was doing the same with the entire investment advisory business.[5] Of course, Bonventre's attempt to analogize the multi-billion

---

[5] In the October and November 2004 account statements attached as Exhibits D and E, for example, there were only three transactions that involved Barclays Bank at all. Each of them was – as is apparent from the face of the '703 account records – a small ($15,000 or $20,000) wire to Chela Limited. (*See* Ex. E at p. 28 (JPMSAB001912), Ex. D at pp. 41, 43 (JPMSAB0001880, 1882)). Chela Limited was an investment advisory client, which held two separate accounts. (*See* GX 5000-10 ("dataA.NAME" (listing Chela Ltd as holding investment advisory accounts 1FR056 and 1FR057)).

dollar '703 account and the billions upon billions of dollars of purported trading activity in the investment advisory business to an account that the broker-dealer business maintained with a small broker for $4 million in Canadian securities is unpersuasive. Even if it were true (as it may well have been) that the firm was able to deposit $4 million into a Canadian brokerage and not send any more money over five years, it is simply not plausible that Bonventre believed that the firm never sent or received a single dollar to or from Barclays for a multi-billion dollar trading account over the several decades that he had oversight over the '703 account.

In short, the evidence is entirely consistent with the Government's argument that the activity in the '703 account demonstrated that no funds were being used to purchase or represented the redemption of securities, and entirely inconsistent with Bonventre's argument. Bonventre's involvement in that account for a period of decades – as well as that of Bongiorno and Crupi, both of whom maintained the firm "checkbook" for years – is compelling proof that they understood that investment advisory customers were being paid with other customers' money: that is, that Madoff Securities was a Ponzi scheme.

## II.     Other Record Cites

Next, there were two other instances during the hearing that the lawyers' recollection of certain evidence differed.

*First*, the Government argued that, in her proffer sessions, Ms. Crupi falsely stated that she had no advance warning about SEC examinations. (10/27/2014 Tr. at 124-25). Her lawyer remembered otherwise. (*See id.* at 136-37). The statement that the Government was referring to came in Crupi's March 3, 2009 proffer session – months prior to DiPascali's August 2009 guilty plea, when the government's investigation was seriously affected by her false statements. At that proffer, Crupi told the government that Madoff and DiPascali were involved with various SEC audits, but that she "was not involved with this process." (3/3/2009 Report at 17; *see also id.* at 14 ("CRUPI knows that MADOFF had DIPASCALI retrieve certain records during these audits, but does not recall the nature of these records other than the fact that they had to do with client accounts.")).[6] Specifically, Crupi told the government that "[t]he audit that DIPASCALI said that MADOFF said was upcoming in late 2008 was the only one for which BLMIS employees such as CRUPI were given advance notice. Certain audits entailed requests by the auditors for

---

[6]     Copies of the reports of Crupi's (and Bongiorno's) proffer statements have previously been provided to the Court. Please let us know if the Court would like additional copies.

the production of documents, but this was the only audit for which BLMIS made any changes to accounts." (*Id.* at 17).[7]

*Second*, the Government argued that "Mr. O'Hara ask[ed], well, is the whole thing a fraud? . . . . [Y]ou only ask the question, is this whole thing a fraud, If you have a pretty good sense that the whole thing is a fraud." (10/27/2014 Tr. at 103). O'Hara's lawyer said there was no such evidence. (*See id.* at 146 (Mr. Mehler: "There's nothing in the evidence where – or in any 3500 material, where either Mr. Perez or Mr. O'Hara says: Is the whole thing a fraud? You will not find that in any document.")). The statement that the Government was referring to is at pages 5277-78 of the trial transcript, when Mr. DiPascali quoted O'Hara as saying, "[s]omething to the effect of, could this whole thing be a fraud?"

### III.   Joint and Several Liability for Forfeiture Under 18 U.S.C. § 982(a)(2)

The Court inquired about cases where defendants were held jointly and severally liable for forfeiture of proceeds that were retained by other individuals in connection with bank fraud offenses. (*See* 10/27/2014 Tr. at 110-11).

In addition to the cases cited in the Government's reply brief, (*see* Gov.'s Supp. Reply at 34), at least two other courts have upheld the forfeiture under 18 U.S.C. § 982(a)(2) of proceeds obtained by conspirators but never received by the defendant. *See United States v. Newman*, 659 F.3d 1235, 1244 (9th Cir. 2011) (vacating district court's reduction of forfeiture under 18 U.S.C. § 982(a)(2) in bank fraud case, noting "It does not matter that he personally profited very little. . . . [B]ecause Tedesco entered into a conspiracy, the 'proceeds' of his crime equal the total amount of the loans obtained by the conspiracy as a whole. To the extent the district court

---

[7] At the hearing, the Court also inquired about the legal basis for imposing an obstruction of justice enhancement based on a defendant's lies during a proffer session. (*See* 10/17/2014 Tr. at 66-67). The Government responded that, in our view, a lie during a proffer statement – which involves warnings that lies are punishable by prosecution, and the presence of counsel – is more akin to perjury than it is to an uncounseled, unwarned false statement to law enforcement. (*See* 10/17/2014 Tr. at 122-23). Although we are not aware of any decision that has analyzed the precise issue the Court identified, numerous courts have imposed obstruction of justice points based on lies during proffer statements. *See, e.g.*, *United States v. Contreras-Buritica*, 427 F. App'x 178, 180 (3d Cir. 2011) (unpublished); *United States v. Waldner*, 564 F. Supp. 2d 911, 938 (N.D. Iowa 2011); *see also United States v. Shou Wen Liu*, No. S1 12 Cr. 707 (LAK) (S.D.N.Y.) (defendant originally charged with narcotics conspiracy and violating 18 U.S.C. § 1001 for lying during proffer session, allowed to plead guilty to narcotics conspiracy with obstruction-of-justice enhancement).

Incidentally, the statements that the Government cited in connection with Bongiorno's lies during her proffer session, (*see* 10/27/2014 Tr. at 125-26), are contained in the report of her January 20, 2009 proffer – again, long before DiPascali pleaded guilty. (*See* 1/20/2009 Report at 13 (stating that trades were back-dated, which Bongiorno though was acceptable "as long as the trade was in the month that they were about to create the account statement for. . . . MADOFF said that he could sell stock to the clients within the range of any given day during the past month."); *see also id.* at 4, 16 (generally denying knowledge of Avellino & Bienes)).

held that the 'proceeds' from Tedesco's crime were anything else, the district court applied the wrong legal test."); *United States v. Joel*, No. 11 Cr. 89-T-23TGW, 2012 WL 2499424, at *4 (M.D. Fla. June 5, 2012) (imposing forfeiture under 18 U.S.C. § 982(a)(2) for fraudulently-obtained loan, rejecting defendant's contention that "he is not liable for forfeiture for the entire amount of the loan because he only received $20,000 of the proceeds," concluding that the defendant "as a convicted co-conspirator, is liable in forfeiture for the full amount of the illegal proceeds received by the conspiracy"), *report and recommendation adopted*, 2012 WL 2451822 (M.D. Fla. June 27, 2012). As the Court explained in *Joel*, "'the proceeds of a conspiracy are a debt owed by each of the conspirators . . . . It would be absurd to treat them more leniently than the law treats a lawful partnership, all of whose members are severally as well as jointly liable for the partnership's debts.'" 2012 WL 2499424, at *4 (quoting *United States* v. *Spano*, 421 F.3d 599, 603 (7th Cir. 2005)). In neither of these cases was there any indication that the defendant objecting to forfeiture had a claim to more of the proceeds of the conspiracy than that defendant actually received.[8]

## IV. Revised Proposed Forfeiture Orders

Finally, the Government has enclosed revised proposed forfeiture orders for each of the defendants. Consistent with the Court's comments at the hearing, the revised orders (a) eliminate the provision permitting the United States to take possession of any occupied residence upon entry of the order, (*see* 10/27/2014 Tr. at 106-08), and (b) eliminate duplicative language regarding the forfeiture of the defendants' right, title and interest as to certain assets, (*see id.* at 64, 104).

Thank you for your consideration.

Respectfully,

 /s/  Matthew L. Schwartz
MATTHEW L. SCHWARTZ
JOHN T. ZACH
RANDALL W. JACKSON
PAUL M. MONTELEONI
Assistant United States Attorneys
Tel.: (212) 637-1945

cc:    BY ECF

    All defense counsel

---

[8] The briefing on the forfeiture motion in the *Joel* case did not include any assertions that the objecting defendant, Vernon, had an agreement with the conspirators to obtain more of a benefit than the $20,000. *See United States v. Joel*, No. 11 Cr. 89-T-23TGW (M.D. Fla.) (ECF Nos. 195, 202). The docket for Tedesco's appeal in *Newman* is sealed. But neither opinion mentioned, much less relied on, any assertion that the objecting defendant had a claim to additional proceeds from the conspirators.