NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
BOSTON
HOUSTON
LOS ANGELES
HANOI
HO CHI MINH CITY
ATLANTA

*FIRM and AFFILIATE OFFICES*

ERIC R. BRESLIN
DIRECT DIAL: +1 973 424 2063
PERSONAL FAX: +1 973 556 1552
*E-MAIL:* erbreslin@duanemorris.com

*www.duanemorris.com*

BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE OF DUANE MORRIS*

MEXICO CITY
ALLIANCE WITH
MIRANDA & ESTAVILLO

November 10, 2014

**VIA ECF AND FEDERAL EXPRESS**

Hon. Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

**Re: United States v. Crupi, 10-cr-228 (LTS)**

Dear Judge Swain:

We respectfully submit this letter in response to the government's sur-sur-reply on forfeiture and sentencing, submitted on November 3, 2014. The government ostensibly wrote to provide supplemental information requested by the Court at the October 27, 2014 hearing,[1] but went beyond and took the opportunity to submit what amounts to yet another brief. In that brief, the government overstates, and in some cases plainly misstates, the evidence in a manner that we believe requires clarification.

A. The Obstruction Enhancement and the Crupi Proffer Statements

For the first time, the government submits several alleged statements by Ms. Crupi that, it argues, supports a sentencing enhancement for obstruction pursuant to § 3C1.1 of the Sentencing Guidelines.[2] These statements are either misquotes or taken out of context. Importantly, and

[1] A copy of the October 27, 2014 Hearing Transcript is attached hereto as Exhibit 1 for the Court's convenience.

[2] The theory asserted by the government at the October 27, 2014 hearing and in the November 3, 2014 submission is a new, *post-hoc* explanation – fundamentally different than the theory it originally argued. In its first sentencing submission, the government argued that Ms. Crupi should receive an obstruction enhancement because she asserted that she was not guilty and because, the government argued, she was "'going to 'stick to her story' rather than accept responsibility for her crimes." Gov't Sentencing Submission, Jul. 22, 2014, pp. 70, 72-73 (ECF #1087). It was only at the hearing on October 27, 2014 that the government asserted these new statements as a grounds for the

DUANE MORRIS LLP *A DELAWARE LIMITED LIABILITY PARTNERSHIP* WALTER GREENHALGH, RESIDENT PARTNER

ONE RIVERFRONT PLAZA, 1037 RAYMOND BLVD., SUITE 1800 PHONE: +1 973 424 2000 FAX: +1 973 424 2001
NEWARK, NJ 07102-5429

notably, the government does not answer the Court's primary question of how these supposed lies materially obstructed the government's investigation into Madoff Securities following Mr. Madoff's confession. *See* Oct. 27, 2014 Forfeiture Hearing Tr., 66-67.

First, the government argues: "Crupi told the government that Madoff and DiPascali were involved with various SEC audits, but that she 'was not involved with this process.'" *See* Nov. 3, 2014 Submission, p. 7. (citing Mar. 3, 2009, Crupi 302, p. 17 ("Crupi Proffer")). No such statement exists and Ms. Crupi never made any such statement. The "quote" to which the government refers appears on page 22, not page 17, and is contained in a paragraph about DTCC reports. It reads: "Various documents related to business with the DTCC were gathered for various audits. Crupi was not involved with this process." (Proffer Tr., p. 22). We are aware of no evidence, presented to date or otherwise, that Ms. Crupi ever had anything to do with the DTCC reports. This statement was, in fact, not false.

Second, the government cites page 14 of the Crupi Proffer for the quote: "Crupi knows that Madoff had DiPascali retrieve certain records during these audits, but does not recall the nature of these records other than the fact that they had to do with client accounts." *See* Nov. 3, 2014 Submission, p. 7 (citing Crupi Proffer, p. 14). This statement is actually on page 17 (page 14 does not address the audits at all). Regardless, it is unclear how this statement could have had any impact on the government's investigation at all, nor has the government explained how it did, when it did, or provided any other particulars.

Third, the government argued that Ms. Crupi's statement – that the 2008 audit was the only audit for which she had advance notice – materially impacted the investigation. This statement is also mis-cited. It appears on page 21, not page 17. The statement itself appears in the context of a larger, general discussion of the audits. The government has produced none of the underlying notes for this proffer. However, it is clear from the context, that "advance notice," as recorded in the proffer, was fairly ambiguous.[3] Audits, as the testimony showed, were frequently kicked off by a document request, requiring immediate action by Madoff Securities employees, much like grand jury subpoenas kick off action in large companies. *See, e.g.,* Trial Tr., 5001-03. The audit does not necessarily begin the day the auditors set foot in the door at Madoff Securities. Nor is it clear how this one statement, made a mere three months after Madoff Securities collapsed, materially impacted the massive, sweeping, *five-year* investigation into Madoff Securities.

---

obstruction enhancement. Its November 3, 2014 submission is the first time that it provided citations to explicit statements as recorded in her FBI 302, albeit, incorrectly cited.

[3] None of the AUSAs on the November 3, 2014 submission attended Ms. Crupi's proffer. Nor was the FBI agent at the proffer (SA Theodore Cacioppi) one of the FBI agents that testified or regularly appeared in court. Even if we wished to cross examine the agent, the first time the government set forth this new theory was in its November 3, 2014 submission, after the October 27, 2014 hearing on forfeiture had concluded.



Finally, the government argues that statements in a proffer session are more akin to perjury than other lies to law enforcement. Nov. 3, 2014 Submission, p. 8, n.7. It offers no basis for this proposition, except that it warned Ms. Crupi that lying could subject her to prosecution. The guidelines specifically provide for an obstruction enhancement where a witness lies in a sworn statement. That means a statement made under oath. Unsworn statements made to law enforcement officers – and that is precisely what a proffer is – are treated by a different standard. The government has failed to offer any explanation as to how any of Ms. Crupi's statements "significantly obstructed or impeded" the investigation into Mr. Madoff's fraud. We respectfully submit that the obstruction enhancement should not apply.

B. Joint and Several Liability Pursuant to 18 U.S.C. § 982(A)(2)

The government offers a handful of new cases purportedly supporting its position that joint and several liability should apply to forfeiture for a bank fraud offense. None of these cases address the situation where a defendant receives absolutely nothing, either directly or indirectly, from an offense, and exerts no control. Additionally, none of these cases address the textual differences between § 982(A)(2) and the other forfeiture provisions. Crupi Objections to Gov't Supplemental Submission on Sentencing, Sept. 16, 2014, pp. 3-5 (ECF #1138).[4]

We refer the Court to *United States v. Peters*, 732 F.3d 93, 102 (2d Cir. 2013). In *Peters*, the Second Circuit considered whether a forfeiture award of the entire proceeds of a bank fraud offense could be applied to the defendant. *Id.* at 95. The defendant argued that the majority of the proceeds went to the co-defendant corporation and that he should therefore receive a set-off. *Id.* at 98. The Second Circuit did not apply joint and several liability, but found that the defendant had received the proceeds *indirectly*, because he had almost absolute control of the co-defendant corporations. *Id.* at 103-104.[5] The logical extension of *Peters*, requires a showing of some benefit or control to apply the entirety of the loan proceeds to a defendant under forfeiture for bank fraud. We respectfully assert that, under the principles alluded to in *Peters*, and pursuant to the plain language of the statute, Ms. Crupi cannot be held responsible for proceeds of a bank fraud for which she received nothing at all, directly or indirectly.

C. The 703 Account

We respond very briefly to the government's arguments in its November 3, 2014 submission with regard to the 703 account as it relates to references to Ms. Crupi. The argument is the same refrain – that because there were no securities purchased out of the 703 account, then

[4] Far from a "partner" in the Madoff Securities criminality, or even the Kugel bank fraud, Ms. Crupi was little more than a functionary. The government's "partnership" analogy simply does not apply in a circumstance where the co-conspirator is not an equal participant, but merely a facilitator. *See* Gov't Nov. 3, 2014 submission, p. 9.

[5] *Peters* is not precisely on point either, as the discussion focuses more on the definition of proceeds, which is not in dispute in this matter. Nevertheless, while we have located no case law directly on point, and no case law that discusses the specific textual arguments raised here, *Peters* does provide some insight.



Ms. Crupi's involvement with the Daily Pad[6] was sufficient, in and of itself, for her to realize that the IA business was a Ponzi scheme. *See* Nov. 3, 2014 Submission, pp. 1,2,4,7.

We are aware of no entries in the Daily Pad or the Daily Index cards that state "securities purchased," but this idea that the only money that entered and left the 703 Account was customer money has no basis in fact. We randomly selected eight pages from the 2008 Daily Pad. *See* Exhibit 105-c46, pp. 100-108 (attached hereto as Exhibit 2). Each day had entries to, from, and between large banks and other Madoff entities and accounts. To name just a few:

- $51,000 out to MADF FAN (May 7, 2008);
- $51 million out to MADF (May 6, 2008)
- $31,000 in from an unknown source (May 5, 2008)
- $11 million and $11.5 million in from HSBC (May 2, 2008)
- $10 million in from HSBC (May 1, 2008)
- $3.266 million in from interest income (June 30, 2008)
- $10 million out to MADF FAN (June 30, 2008)
- $199,107,000 out to Treasury Bill purchase (June 26, 2008)
- $2 billion in for treasury bill redemption (June 26, 2008)
- $750 million out to a BLM Special account (June 26, 2008).

These were not special occurrences, but daily transfers. The Daily Pad is simply not sufficient, on its own, to impute knowledge of the full Ponzi scheme.

We thank the Court for its courtesy.

Respectfully Submitted,

/s/
Eric R. Breslin

[6] Although it is referenced as a different "type" of record, the Daily Index Cards are, in fact, mere summaries of the Daily Pad. They do not provide substantively more or different information that that which was contained on the Daily Pad. *Compare*, Nov. 3, 2014 Gov't Submission Exhibit A *with id.*, Exhibit B.

DuaneMorris

Hon. Laura Taylor Swain
November 10, 2014
Page 5

cc: All counsel (*via ECF*)